# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

DENNIS G. DEPPE
Plaintiff,
v.

CASE NO.: 6:24-cv-2098-CEM-NWH

For Jury Trial

JOHN C. VETTER, (Individually)
LINDA E. COCO, (Individually)
JEFFREY S. WEISS, (Individually)
SANDRA M. SOVINSKI, (Individually)
SVETLANA S. SHTROM, (Individually)
YOUNDY C. COOK, (Individually)
ELIZABETH A. KLONOFF, (Individually)
KAREN C. KLINE, (Individually)
ROBERT A. SWEETAPPLE, (Individually)
ALEN H. HSU, (Individually)
JOHN M. BUSTAMANTE, (Individually)
JOHN M. TABODA, (Individually)
JOE F. SOUTHRON, (Individually)
ROBIN FORET, (Individually)
LATIKA K. EIFERT, (Individually)
DEBORAH V. VAN VECHTEN, (Individually)
JEFFREY M. SHAINLINE, (Individually)
MICHAEL D. GERHOLD, (Individually)
MILTON M. FENG, (Individually)
PAUL R. PINSUKANJANA, (Individually)
MARK W. BERANEK, (Individually)
CHARLES B. KUZNIA, (Individually)
HANNIBAL M. WARE, (Individually)
RON D. DESANTIS, (Individually)
MELINDA M. MIGUEL, (Individually)
ASHLEY M. MOODY, (Individually)
PAETRA T. BROWNLEE, (Individually)

ANGELA M. GALLAGHER, (Individually)
BAHAA E. SALEH, (Individually)
SABINE M. O'NEAL, (Individually)
ROBERT J. TAFT, (Individually)
TINA M. MAIER, (Individually)
MARK S. SOLOMON, (Individually)
KEVIN A. KEELING, (Individually)
MATT H. KIM, (Individually)
NOREN PAN, (Individually)
FRED A. KISH, (Individually)
MARTIN J. REPETTO, (Individually)
JOHN DALLESASSEE, (Individually)
RASHID M. BASHIR, (Individually)
SUSAN A. MARTINIS, (Individually)
NICHOLAS J. STORK, (Individually)
BRENDA L. STORK, (Individually)
LARRY J. STORK, (Individually)
WILLIAM J. HARROD, (Individually)
Defendants.

_______________________________/

**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

COMPLAINT AND DEMAND FOR JURY TRIAL .......... 1

JURISDICTION AND VENUE .......... 1

NATURE OF THE CASE .......... 2

PARTIES .......... 5

FACTUAL ALLEGATIONS .......... 14

A. University of Illinois, The University of Texas at Austin, and Military Target Deppe's Oxide and Oxide-Free VCSEL Inventions .......... 15

B. Military and Universities Track Deppe and sdPhotonics' Research on the Oxide-Free VCSEL Invention .......... 17

C. Deppe Builds the Patent Portfolio with sdPhotonics and UCF to Cover the Oxide-Free VCSEL Invention .......... 26

D. Sovinski Breaches the 2014 IP Agreement, Violates UCF-2.029, and Commits Perjury in USPTO Patent Applicatons on Deppe's on Oxide-Free VCSEL Inventions .......... 42

E. Weiss, Sweetapple, and Brownlee Operate the Illegal Proceeding of the Florida Whistleblower Case No. 2019-CA-015042-O .......... 51

F. Keeling and Solomon Let UCF Attorneys Commit Additional Perjury in USPTO, as military and University of Illinois Administrators Misappropriate sdPhotonics' Cryo-VCSEL Prototypes .......... 89

G. Miguel, Taft, and Maier Violate the Florida Whistleblower's Act and Deppe is Stalked by the Military from the U.S .......... 100

U.S. SUPREME COURT AND 11th CIRCUIT COURT RULINGS ON EQUITABLE TOLLLING .......... 106

FIRST CAUSE OF ACTION: 42 U.S.C. § 1985 .......... 109

SECOND CAUSE OF ACTION: 42 U.S.C. § 1983; 1st AMENDMENT .......... 116

THIRD CAUSE OF ACTION: 42 U.S.C. § 1983; 1st AMENDMENT .......... 125

FOURTH CAUSE OF ACTION: 42 U.S.C. § 1983; 14th AMENDMENT .......... 285

FIFTH CAUSE OF ACTION: 42 U.S.C. § 1983; 5th AMENDMENT .......... 285

SIXTH CAUSE OF ACTION: CIVIL CONSPIRACY TO COMMIT THEFT .......... 405

SEVENTH CAUSE OF ACTION: NEGLIGENCE .......... 537

EIGHTH CAUSE OF ACTION: ABUSE OF PROCESS .......... 557

NINTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .......... 624

TENTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP ........ 651

ELEVENTH CAUSE OF ACTION: TORTIOUS INTERFERENCE WITH AN EMPLOYMENT RELATIONSHIP ........ 713

TWELFTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY ........ 773

THIRTEENTH CAUSE OF ACTION: BREACH OF CONTRACT ........ 791

PRAYER FOR RELIEF ........ 794

## THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Dr. Dennis G. Deppe files this Second Amended Complaint (Complaint) against the named Defendants for violations of civil rights pursuant to 42 U.S.C. §1985 and the 1st, 5th, and 14th U.S. Constitutional Amendments pursuant to 42 U.S.C. §1983, and for civil remedies pursuant to state law, for which a Florida state court proceeding was used illegally by the military, attorneys, and judges working with the military, to carry out fraud, contract breaches, extortion, stalking, cyber-stalking, assaults, batteries, and confinement, trying to cover up perjury in the U.S. Patent and Trademark Office (USPTO), and additional crimes as part of organized government crime, to acquire and take control of the Plaintiff's company, its business operations, and its inventions.

In support of the Third Amended Complaint, Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1. Jurisdiction is proper to this court pursuant to 28 U.S.C. §1331 (federal question) and 28 U.S.C §1343 (civil rights), according to the facts of the matter that deal with questions of U.S. federal law for civil rights violations pursuant to 42 U.S.C. §1983 under the 1st, 5th, and 14th U.S. Constitutional Amendments and for civil rights violations pursuant to Title 42 U.S.C. §1985, that relate to Florida lawsuits and actions in the alleged conspiracy involving the military working with employees of the University of Illinois, The University of Texas, and the University of Central Florida (UCF). The federal district court has supplemental jurisdiction through 28 U.S.C. §1367 over state law claims that

involve civil remedies for the conspiracies to commit perjury with the U.S. Patent and Trademark Office (USPTO) and violations of state laws against stalking, assaults, batteries, and extortion.

2. Venue is appropriate in this Court pursuant to 28 U.S.C. §1391 as actions mainly took place in the middle district of Florida, Plaintiff and most of the Defendants have or have had residences in the middle district of Florida and Florida, and, to the Plaintiff's best knowledge and belief, most Defendants were in conspiracy with employees of UCF and Florida state actors in malfeasance that centers on the Florida Whistleblower Case and Florida's Whistleblower procedures, who are or were citizens in the middle district of Florida or Florida.

**NATURE OF THE CASE**

3. This Complaint is filed due to government stalking, cyber-stalking, assaults, and batteries, with improper use of the Florida Whistleblower system, with retaliation including alleged stalking, cyber-stalking, assaults, batteries, and confinement that became part of extortion attempts in the Florida Whistleblower Case No. 2019-CA-015042-O, and in additional civil rights violations in the U.S. District Court of the Florida Middle District (FLMD) in Case No. 6:20-cv-1588-WWB.

4. The Plaintiff has a track record of making important inventions in semiconductor lasers, and Deppe's earlier invention known as an oxide VCSEL[1]

[1] D.G. Deppe, "Selectively oxidized vertical-cavity surface-emitting lasers," in *Vertical-Cavity Surface-Emitting Lasers and Their Applications*, edited by J. Cheng and N. Dutta, (Gordon and Breach, 1999).

was previously been targeted by the military and professors at the University of Illinois and The University of Texas at Austin in plagiarism schemes with military program monitors from the Defense Advanced Research Projects Agency (DARPA). When these schemes largely failed, the university professors and military targeted Deppe's next invention, the oxide-free VCSEL, in a long-term intellectual property theft scheme.

5. Deppe's oxide VCSEL invention created what are now world's smallest commercial laser devices available and revolutionized much of the global laser industry. The tiny lasers are mass produced as semiconductor chips, and are now used in the high-speed optical switches in data centers, low power sensors in cellphones and headsets by Apple, Facebook, and other consumer electronics companies, and are used heavily by the military. In 2023 the oxide VCSEL had a global market size of $1.7B.[2]

6. This Complaint seeks redress for damages to Deppe and his property caused by the Defendants' actions when the military used the proceedings of the Florida Whistleblower Case No. 2019-CA-01042-O, and the Florida Whistleblower's Act trying to complete the intellectual property theft scheme to injure and damage Deppe and his property, and sabotage Deppe's company and injure and damage the Plaintiff, to cover up the UCF crimes of perjury in the USPTO patent records.

[2] https://www.snsinsider.com/reports/vcsel-market-2603.

7. This military and universities set up an expansive intellectual property theft scheme that grew to include state and federal judges in Florida and Illinois, the SBA IG, Hannibal Ware, the Florida governor's office of Ron DeSantis, and university administrators and professors who joined the military organized crime that came through the federal and state government agencies.

8. The military was able to use Florida's 9th Judicial Circuit Court and the U.S. District Court of the Middle District of Florida (FLMD) to set up illegal proceedings that were then used by attorneys and judges working with the military for criminal stalking, cyber-stalking harassment, extortion, assaults, batteries, and confinement trying to extort a fraudulent settlement agreement.

9. In or about October, 2022, when the military and UCF learned the Plaintiff intended to make his own corrections to perjury that attorneys working with UCF and the military had committed in the USPTO as part of their take-over of the Plaintiff's company, the Plaintiff became heavily stalked, assaulted, and battered with advanced RF transmitters and food and water poisoning by police and federal law enforcement.

10. When the Plaintiff tried to use the Florida Whistleblower's Act to report the stalking, assaults, and batteries to the Florida IG, Melinda Miguel, and that retaliation was coming from the military and attorneys working with UCF's audit office of Robert Taft and Tina Maier, the Plaintiff became stalked so heavily with the military RF technologies and food and water poisoning that by the end of December, 2022, he was forced from the U.S. into Europe seeking physical safety.

11. This Complaint seeks compensation for injuries and damages caused to the Plaintiff and the Plaintiff's property and loss of his company, and punitive damages restricted to the claims presented in the causes of actions, and preserves without prejudice any and all additional claims to those presented that may arise or be brought from actions both disclosed and undisclosed in this matter.

## THE PARTIES

12. Name of Plaintiff: Dennis Deppe, is a citizen of the state of Florida who has a residence at 5749 Aloma Woods Blvd., Oviedo, FL 32765. During the times relevant to this Complaint, Plaintiff was employed with the high technology start-up sdPhotonics LLC he owned, and part time with the UCF.

13. First named Defendant: John C. Vetter, is a retired intellectual property attorney who previously was with Foley & Lardner LLP. To the Plaintiff's best knowledge and belief, Mr. Vetter resides at 10350 W. Bay Harbor Dr., Apt. 10h, Bay Harbor Islands, FL 33154.

14. Second named Defendant: Linda E. Coco, is an attorney and was a law professor employed by Barry University, Orlando, FL, and more recently a law professor with the University of the Pacific McGeorge School of Law. To Plaintiff's best knowledge and belief, Linda Coco resides at 2573 Ambrosia Way, Fairfield, CA 94533.

15. Third named Defendant: Jeffrey S. Weiss, is an attorney with the law firm Garganese, Weiss, D'Agresta & Salzman, P.A. To the Plaintiff's best knowledge and belief, Mr. Weiss resides at 3143 Bentonshire Pl., Longwood, FL 32779.

16. Fourth named Defendant: Sandra M. Sovinski, is an attorney and employed as Deputy General Counsel by UCF. To the Plaintiff's best knowledge and belief, Ms. Sovinski has a residence at 4180 Saxon Dr., New Smyrna Beach, FL 32169.

17. Fifth named Defendant: Svetlana S. Shtrom, is the Director of Technology Transfer at UCF. Ms. Shtrom is a citizen of the state of Florida. To the Plaintiff's best knowledge and belief, has residence at 516 Osprey Lakes Cir., Chuluota, FL 32766.

18. Sixth named Defendant: Youndy C. Cook, is Vice President and General Counsel of UCF. To the Plaintiff's best knowledge and belief, Ms. Cook resides at 4632 Shorecrest Dr., Orlando, FL 32817.

19. Seventh named Defendant: Elizabeth A. Klonoff, is Vice President for Research and Dean of the College of Graduate Studies of UCF. To the Plaintiff's best knowledge and belief, Ms. Klonoff resides at 615 Cherokee Cir., Orlando, FL 32801.

20. Eighth named Defendant: Karen C. Kline, is an intellectual property attorney with Duane Morris LLP. To the Plaintiff's best knowledge and belief, Ms. Kline resides at 1019 W. Palmetto Park Rd., Boca Raton, FL 33486.

21. Ninth named Defendant: Robert A. Sweetapple, is an attorney with Sweetapple, Broeker & Varkas, P.L. To the Plaintiff's best knowledge and belief, Mr. Sweetapple resides at 792 Staghorn Ct., Boca Raton, FL 33432.

22. Tenth named Defendant: Alen H. Hsu, is an attorney with Weiss, Serota, Helfman, Cole + Bierman. To the Plaintiff's best knowledge and belief, Mr. Hsu has a residence at 7375 NW 112th Ter., Parkland, FL 33076.

23. **Dismissed without prejudice due to inability to serve**: Floyd E. Anderson, is an attorney working in intellectual property. To the Plaintiff's best knowledge and belief, Mr. Anderson has a residence at 35111 Hillhouse Ln., Windsor, CO 80550.

24. Eleventh named Defendant: John M. Bustamante, is an attorney working in intellectual property with the law firm of Woolsey Morcom. To the Plaintiff's best knowledge and belief, Mr. Bustamante has a residence at 106 Castillo Ave., San Antonio, TX 78210.

25. **Dismissed without prejudice due to inability to serve**: Ary M. Chang, is an intellectual property attorney who was previously employed by Foley and Lardner. To the Plaintiff's best knowledge and belief, Ms. Chang has a residence at 1015 S. Montezuma Way, West Covina, CA 91791.

26. Twelfth named Defendant: John M. Taboada, is an intellectual property attorney with Taboada Law Firm, PLLC. To the Plaintiff's best knowledge and belief, Mr. Taboada has a residence at 12419 Winding Br., San Antonio, TX 78230.

27. Thirteenth named Defendant: Joe F. Southron, is an attorney with the Four Rivers law firm. To the Plaintiff's best knowledge and belief, Mr. Southron has a residence at 3415 W. Dorchester St., Tampa, FL 33611.

28. Fourteenth named Defendant: Robin Foret, is an attorney now employed with Gordon and Rees. To the Plaintiff's best knowledge and belief, Ms. Foret has a residence at 28278 Emerald Bend, Spring, TX 77386.

29. Fifteenth named Defendant: Latika K. Eifert, is a graduate of the UCF who is a program monitor for the Army Research Laboratory. To the Plaintiff's best knowledge and belief, Ms. Eifert resides at 791 High Grove Park Ct., Oviedo, FL 32765.

30. Sixteenth named Defendant: Deborah V. Van Vechten, is a program monitor with the Office of Naval Research. To the Plaintiff's best knowledge and belief, Ms. Van Vechten has a residence at 973 Spencer Rd., McLean, VA 22102.

31. Seventeenth named Defendant: Jeffrey M. Shainline, was at the time of events alleged in the complaint a physicist and staff scientist at the National Institute of Standards and Technology. To the Plaintiff's best knowledge and belief, Mr. Shainline has a residence at 135 S. 42nd St., Boulder, CO 80305.

32. Eighteenth named Defendant: Michael D. Gerhold, is a program monitor with the Army Research Office. To the Plaintiff's best knowledge and belief, Mr. Gerhold has a residence at 4826 Black Mountain Path, Raleigh, NC 27612.

33. Nineteenth named Defendant: Milton M. Feng, is a professor emeritus at the University of Illinois. To the Plaintiff's best knowledge and belief, Mr. Feng has a residence at 1906 Byrnebruk Dr., Champaign, IL 61822.

34. Twentieth named Defendant: Paul R. Pinsukanjana, is a physicist and researcher employed with Intelligent Epitaxial Technology, Inc. To the Plaintiff's best knowledge and belief, Mr. Pinsukanjana has a residence at 4125 Lovers Ln., Apt. A, Dallas, TX 75225.

35. **Dismissed without prejudice due to inability to serve**: Yunpeng Song, is an engineer employed with Liturex, Inc. To the Plaintiff's best knowledge and belief, Mr. Song has a residence at 35 Beechwood Park, Poughkeepsie, NY 12601.

36. Twenty-first named Defendant: Mark W. Beranek, is a consultant and has worked as a military program monitor with the Naval Air Warfare Center Aircraft Division. To the Plaintiff's best knowledge and belief, Mr. Beranek has a residence at 1337 Goldenrod Way, Oconomowoc, WI 53066.

37. Twenty-second named Defendant: Charles B. Kuznia, is an engineer and president of Ultra Communications, Inc. To the Plaintiff's best knowledge and believe, Mr. Kuznia has a residence at 1626 Willowhaven Rd., Encinitas, CA 92024.

38. Twenty-third named Defendant: Hannibal M. Ware, is or has been the Inspector General of the U.S. Small Business Administration. To the Plaintiff's best knowledge and belief, Mr. Ware resides 44363 Foxthom Ter., Ashburn, VA 20147.

39. Twenty-fourth named Defendant: Ronald D. DeSantis, became the Florida governor in January, 2019. To the Plaintiff's best knowledge and belief, Mr. DeSantis has a residence at 700 N. Adams St., Tallahassee, FL 32303.

40. Twenty-fifth named Defendant: Melinda M. Miguel, became the Florida governor's Chief Inspector General on January 8, 2019. To the Plaintiff's best knowledge and belief, Ms. Miguel resides at 3729 Swallowtail Trace, Tallahassee, FL 32309.

41. Twenty-sixth named Defendant: Ashley B. Moody, was appointed Florida Attorney General in January, 2019. To the Plaintiff's best knowledge and belief, Ms. Moody resides at 334 Inner Harbour Cir., Tampa, FL 33602.

42. Twenty-seventh named Defendant: Paetra T. Brownlee, was appointed as judge on Florida's Ninth Judicial Circuit Court on May 28, 2020. Ms. Brownlee is now employed on Florida's 6th District Court of Appeal. To the Plaintiff's best knowledge and belief, Ms. Brownlee has a residence at **redacted**.

43. Twenty-eighth named Defendant: Angela M. Gallagher, is an engineer and graduate of UCF employed by Siemens, Inc. To the Plaintiff's best knowledge and belief, Ms. Gallagher resides at 14145 Anastasia Ln., Orlando, FL 32828.

44. Twenty-ninth named Defendant: Bahaa E. Saleh, was UCF Dean and is now a professor with the College of Optics and Photonics of UCF. To the Plaintiff's best knowledge and belief, Mr. Saleh has a residence at 9737 Blandford Rd., Orlando, FL 32827.

45. Thirtieth named Defendant: Sabine M. O'Neal, was president of sdPhotonics and a research scientist employed by UCF, now employed by IMEC USA. To the Plaintiff's best knowledge and belief, Ms. O'Neal has a residence at 3880 Orange Lake Dr., Orlando, FL 32817.

46. Thirty-first named Defendant: Robert J. Taft, is Chief Audit Executive with UCF. To the Plaintiff's best knowledge and belief, Mr. Taft has a residence at 857 Sherbourne Cir., Lake Mary, FL 32746.

47. Thirty-second named Defendant: Tina M. Maier, is Associate Director of University Audit at UCF. To the Plaintiff's best knowledge and belief, Ms. Maier has a residence at 2276 King Henrys Court, Winter Park, FL 32792.

48. Thirty-third named Defendant: Mark S. Solomon, is an intellectual property attorney. To the Plaintiff's best knowledge and belief, Mr. Solomon has a residence at 1910 Fletcher St., Houston, TX 77009.

49. Thirty-fourth named Defendant: Kevin A. Keeling, is an intellectual property attorney. To the Plaintiff's best knowledge and belief, Mr. Keeling has a residence at 1808 High Falls Ln., Pearland, TX 77581.

50. Defendant: Wendy W. Berger, is a judge with the U.S. District Court of the Middle District of Florida. **Dismissed with prejudice from the lawsuit by Order of Court**.

51. Defendant: Embry J. Kidd, was a magistrate judge with the U.S. District Court of the Middle District of Florida, and is now an Appellate Court Judge on the 11th Circuit. **Dismissed with prejudice from the lawsuit by Order of Court**.

52. Defendant: Julie S. Sneed, is a judge on the U.S. District Court of the Middle District of Florida. **Dismissed with prejudice from the lawsuit by Order of Court**.

53. Defendant: Elizabeth M. Warren, is Clerk of the Court of the U.S. District Court of the Middle District of Florida. **Dismissed with prejudice from the lawsuit by Order of Court**.

54. Thirty-fifth named Defendant: Matt H. Kim, is President of QuantTera located in Phoenix, AZ. To the Plaintiff's best knowledge and belief, Mr. Kim has a residence at 9005 E. Kalil Dr., Scottsdale, AZ 85260.

55. Thirty-sixth named Defendant: Noren Pan is the Chief Executive Officer of MicroLink, Inc., located in Chicago, IL. To the Plaintiff's best knowledge and belief, Mr. Pan has a residence at 805 Westwood Ln., Wilmette, IL 60091.

56. Thirty-seventh named Defendant: Fred A. Kish, is a Professor at North Carolina State University, Raleigh, NC. To the Plaintiff's best knowledge and belief, Mr. Kish has a residence at 12409 Birchfalls Dr., Raleigh, NC 27614.

57. Thirty-eighth named Defendant: Martin J. Repetto is Medical Director at the Pavilion Behavioral Health System in Champaign, IL. To the Plaintiff's best knowledge and belief, Mr. Repetto has a residence at 1211 English Oak Dr., Champaign, IL 61822.

58. Thirty-ninth named Defendant: John Dallesasseee is a Professor at the University of Illinois at Champaign-Urbana, IL. To the Plaintiff's best knowledge and belief, Mr. Dallesassee has a residence at 4303 Curtis Meadow Dr., Champaign, IL 61822.

59. Fortieth named Defendant: Rashid M. Bashir is the Dean of the College of Engineering at the University of Illinois at Champaign-Urbana, IL. To

the Plaintiff's best knowledge and belief, Mr. Bashir has a residence 1401 Waterford Pl., Champaign, IL 61821.

60. Forty-first named Defendant: Susan A. Martinis is Senior Vice Chancellor for Research & Innovation at the University of Illinois at Champaign-Urbana, IL. To the Plaintiff's best knowledge and belief, Ms. Martinis has a residence at 1811 Old Maple Ln., Savoy, IL 61874.

61. Forty-second named Defendant: Nicholas J. Stork is a business owner in Sparta, IL. To the Plaintiff's best knowledge and belief, Mr. N. Stork has a residence at 1325 E. Broadway St., Sparta, IL 62286.

62. Forty-third named Defendant: Brenda L. Stork, is a home maker who resides in Sparta, IL. To the Plaintiff's best knowledge and belief, Ms. B. Stork has a residence at 1375 E. Broadway St., Sparta, IL 62286.

63. Forty-fourth named Defendant: Larry J. Stork, is a high school teacher at Sparta High School, Sparta, IL. To the Plaintiff's best knowledge and belief, Mr. L. Stork has a residence at 1375 E. Broadway St., Sparta, IL 62286.

64. Forty-fifth named Defendant: William J. Harrod, was a program monitor at Intelligence Advanced Research Program Agency. To the Plaintiff's best knowledge and belief, Mr. Harrod has a residence at 8675 Hunters Way, Saint Paul, MN 55124.

65. The Defendants have personal and individual liability because they took their unlawful actions knowingly and intentionally, and their unlawful actions are direct and proximate causes of Plaintiff's damages, and/or took their actions

or omissions of action with wanton and willful disregard of human rights, safety, and property, in bad faith, or with malicious purpose.

## FACTUAL ALLEGATIONS

### A. University of Illinois, The University of Texas at Austin, and Military Target Deppe's Oxide and Oxide-Free VCSEL Inventions.

66. Deppe is an inventor, researcher, and entrepreneur with more than thirty years-experience in research, publishing and presenting scientific results, patenting inventions, and technology start-ups. He has worked for large and small technology companies, multiple universities, his own technology start-ups, and as a consultant for industry and law firms.

67. Deppe's scientific specialty is semiconductor lasers. Deppe's inventions and scientific breakthroughs in semiconductor lasers have revolutionized much of semiconductor laser science and technology. One of Deppe's inventions is the oxide VCSEL now produced globally.

68. The oxide VCSEL is used in data centers to optically switch the internet, in cellphones and headsets by Apple, Meta, and others for eye-tracking and facial recognition, in laser mice for gaming, and by the military for high-speed optical data communication and specialized optical sensors.[2]

69. Deppe invented the oxide VCSEL in 1993 after he had left Bell Labs a few years earlier and joined the faculty of The University of Texas at Austin.[1] While at Bell Labs, Deppe and other Bell Labs researchers studied the VCSEL inventions

from the Japanese researcher Kenichi Iga.[3] One of the Bell Labs' research groups made a dramatic breakthrough to improve on Iga's results, reducing the VCSEL size and increasing the laser's efficiency.[4] The research by Iga and breakthroughs at Bell Labs created the first commercial VCSEL products of the tiny lasers.[4]

70. Deppe's oxide VCSEL invention was "the better mousetrap," but one with extremely complicated laser physics. The oxide VCSEL enables much smaller size, higher efficiency, and higher speed than the VCSELs Iga or Bell Labs researchers were able to achieve. The unique physics of Deppe's oxide VCSEL invention made it so much better than other VCSELs, that the oxide VCSEL is now the only VCSEL produced commercially.[1,2]

71. The military had already heavily corrupted university research by the time Deppe invented the oxide VCSEL. Within two years of the invention, Deppe was approached separately by professors from the University of Illinois, Nick Holonyak, and The University of Texas at Austin, Joe Campbell, with plagiarism schemes they had devised with program monitors from DARPA.

72. Holonyak was an expert in the semiconductor materials used in semiconductor lasers who took advantage of the corruption in the university research. Holonyak built a large network of his former doctoral students he advised at the University of Illinois, that he used to manipulate and control research awards for himself and others.

---

[3] https://www.cent.titech.ac.jp/4ed16457d1459b7308937630d8e0affb41df0d15.pdf
[4] https://www.photonics.com/Articles/Backstory_VCSEL_Breakthrough_1989/a64636

73. Campbell was one of Holonyak's former doctoral students who had also left Bell Labs to become a professor at The University of Texas at Austin. Campbell was desperate for the assistance from Holonyak and anyone else who could help him win research awards after he began working as a professor at The University of Texas, and said so in conversations with Deppe.

74. Holonyak's plagiarism scheme was for Deppe to name Holonyak as the inventor of the oxide VCSEL, and Holonyak would use his network to guarantee Deppe also received awards for the invention. If Deppe refused, Holonyak would use his network to insure Deppe did not receive credit for the invention.

75. Deppe refused the scheme, and Holonyak attempted his plagiarism scheme with Campbell and the DARPA program monitors. However, it quickly became clear from publications that Holonyak did not understand the advanced laser science used in the oxide VCSEL. Campbell and the DARPA program monitors in contrast were weak scientists compared to Holonyak who had little scientific backgrounds in the area of semiconductor lasers.

76. Once it became clear Holonyak would be unable to publish meaningful work on the oxide VCSEL to back up his claims, he abandoned the plagiarism scheme for himself.

77. Campbell instead made threats for years to Deppe, which in fact were threats Campbell was relaying from the military about the inventions, while Campbell and Deppe were both employed at The University of Texas, and

attempted the plagiarism with his other colleagues at The University of Texas who also had worked previously with Holonyak at the University of Illinois.

**B. Military and Universities Track Deppe and sdPhotonics' Research on the Oxide-Free VCSEL Invention.**

78. Deppe left The University of Texas because of the on-going retaliation over the flawed plagiarism schemes. He moved to Orlando, FL in 2005 to start a company to develop his next invention, which became sdPhotonics and the oxide-free VCSEL targeted in the intellectual property theft scheme by the University of Illinois, The University of Texas, UCF, and the military.

79. When Deppe moved from Texas to Orlando, FL to start sdPhotonics, he also accepted a faculty position with UCF.

80. The UCF administrators and professors joined the military, University of Illinois, and The University of Texas in their intellectual property theft scheme involving Deppe's oxide-free VCSEL research and sdPhotonics.

81. Prior to accepting the position Deppe met with UCF administrators including their VP of Research Thomas O'Neal who offered Deppe space to lease in the UCF Photonics Incubator with the facilities needed to house and operate the crystal growth equipment the company used to synthesize the advanced materials used for the VCSEL research and prototypes.

82. After meeting with Thomas O'Neal and obtaining information on UCF policies and patent regulations, Deppe agreed to place his company, which became sdPhotonics, in research facility space it leased in the UCF Photonics Incubator.

83. Deppe then transferred intellectual property on quantum dot lasers and oxide-free VCSELs he owned from another company, Nanosource, Inc., into sdPhotonics to continue the research and development of the new laser technologies in the UCF Photonics Incubator.

84. In 2010, Deppe began building the patent portfolio that would cover the discoveries sdPhotonics was making on its oxide-free VCSEL inventions.

85. Deppe worked directly with Shtrom's UCF Technology Licensing Office to assure UCF patent rules and regulations were satisfied. sdPhotonics and UCF took joint ownership in the patents, with sdPhotonics paying for research and development costs, and sdPhotonics and UCF splitting the costs of the patenting.

86. Michael Gerhold of the Army Research Office (ARO), worked closely with the University of Illinois, and Gerhold began tracking Deppe's development of the oxide-free VCSEL invention in 2011.

87. sdPhotonics was awarded research contracts through an SBA program known as Small Business Innovative Research (SBIR) that Gerhold then monitored through ARO.

88. Gerhold wrote the article shown in **Exhibit 2** for a military publication that was published in 2019 that explains how he tracked Deppe's research and the research of his company, sdPhotonics, to learn details about the oxide-free VCSEL invention.

89. Following the breakthroughs from Deppe's oxide VCSEL invention, DARPA program monitors tried to develop their own laser invention that could be

smaller and better than the oxide VCSEL. However, semiconductor lasers are highly developed and use advanced laser physics for which the DARPA program monitors and the university professors lacked the understanding. The DARPA projects relied on flawed science and failed, and instead flooded the scientific literature with false claims from professors trying to get additional funding.

90. In the same time period, Deppe's company sdPhotonics began making presentations at scientific conferences and publishing scientific papers reporting record results from the oxide-free VCSELs that were even smaller and more efficient than his oxide VCSEL invention, with the oxide-free VCSELs promising another revolutionary advance due to semiconductor lasers that could be made much smaller in size than Deppe's early oxide VCSEL invention.

91. The military and universities became so desperate to learn about sdPhotonics' advances with the oxide-free VCSEL invention that by that time they used women to have sex with Deppe to learn about his research, his plans for the oxide-free VCSEL invention, and his company's business plans.

92. Campbell brought one of the women, Diana Huffaker, to Deppe while Huffaker was a graduate student at The University of Texas. Campbell told Deppe that Huffaker had contacted him about a research assistant position for her doctoral studies, and that he had recommended that Huffaker work with Deppe.

93. Huffaker eventually participated with Campbell and others at The University of Texas in schemes to damage Deppe's employment position after the initial plagiarism schemes from Campbell and others had also largely failed.

94. Sabine O'Neal was a second woman who became involved in the military and university scheme after she had met Deppe elsewhere, and had begun working with him in research and development at The University of Texas at Austin.

95. Sabine O'Neal moved from The University of Texas at Austin to Orlando, FL with Deppe, and worked with sdPhotonics as its president after Deppe founded the company.

96. In the time frame of or about 2013, sdPhotonics' lost an SBIR contract that had been awarded because O'Neal had not properly maintained the company's financial records for overhead accounting.

97. O'Neal was later discovered to have partly sabotaged the sdPhotonics' business operations with the military and UCF, and had engaged in fraud with the company's financial accounts that UCF and the military auditors in central Florida used much later in in the intellectual property theft scheme involving the oxide-free VCSEL invention.

98. In trying to understand why sdPhotonics had lost the contract because of its overhead accounting, O'Neal was asked to provide the financial records of the company overhead and other expenditures.

99. O'Neal claimed she had not been keeping the financial records for the overhead expenditures, because she did not know how to properly calculate the overhead expenditures.

100. O'Neal refused at that time to provide any useful accounting records on the company's overhead expenditures.

101. It was then also discovered in reviewing the sdPhotonics' financial records that O'Neal was placing large payments from the company accounts into a retirement account she held with sdPhotonics.

102. O'Neal was informed to cease the large payments she was making into the retirement account she held with sdPhotonics.

103. In or about November, 2014, O'Neal abruptly announced that she was resigning from sdPhotonics, and had accepted a full-time employment position with UCF.

104. O'Neal was a Ph.D. physicist, and had obtained specialized expertise and knowledge on sdPhotonics' crystal growth equipment from her work with Deppe and sdPhotonics.

105. O'Neal continued to consult with the sdPhotonics on maintaining and repairs of the company's crystal growth equipment.

106. O'Neal informed Deppe that Bahaa Saleh from UCF, who oversaw the facilities of the UCF Photonics Incubator, requested periodic meetings with her to understand her consulting with sdPhotonics.

107. In the time period from about 2016 until about August, 2018, O'Neal held periodic meetings with Saleh, after which she informed Deppe while laughing that Saleh knew so little about anything technical involving her work that they only talked about kayaking when she and Saleh met.

108. O'Neal stated that the meetings were only for Saleh to fulfil UCF's administrative requirements for O'Neal to consult.

109. Deppe later realized O'Neal was providing Saleh information about sdPhotonics, and Deppe's plans to commercial the oxide-free VCSEL invention.

110. During this time period O'Neal also began participating in meetings with Elizabeth Klonoff.

111. O'Neal also laughed at those meetings, and informed Deppe that Klonoff repeatedly claimed while he was working for sdPhotonics that UCF "paid Deppe's health insurance" while he was working full time with sdPhotonics.

112. It would later turn out that The University of Texas at Austin was involved in a separate fraud scheme with the military in the time period from 2016 through 2018, and had committed identity theft in Deppe's IRS tax records as part of their separate scheme.

113. In or about June, 2022, the Plaintiff discovered with military auditors in central Texas in reviews of the audit records that O'Neal had refused to provide, O'Neal had engaged in fraud to generate a false audit report with the military auditor in central Florida prior to her resignation from sdPhotonics in December, 2014.

114. After O'Neal has resigned from sdPhotonics in December, 2014, the military and universities next used Gallagher and Coco after O'Neal to learn about Deppe and his company.

115. Deppe met Angela Gallagher, whom Deppe later learned from sources other than Gallagher was the wife of the former UCF dean Neal Gallagher.

116. Sabine O'Neal and Angela Gallagher know or knew each other.

117. Linda Coco, worked as a law professor in Orlando, FL, and struck up a relationship with Deppe and that led to her consulting with sdPhotonics.

118. Linda Coco and Angela Gallagher know or knew each other.

119. Robin Foret, an attorney in Texas involved in the intellectual property theft scheme with The University of Texas, knows or knows of, or knew or knew of, Diana Huffaker, and that she had worked in Deppe's laboratory at The University of Texas at Austin.

120. Linda Coco began providing consulting services to sdPhotonics involving invoicing for government contracts in or about 2015.

121. Linda Coco also provided consulting services for sdPhotonics in hiring and other aspects involving human resources, and set up retirement and financial accounts after the Plaintiff changed banks for the sdPhotonics' accounts.

122. By late 2016 Coco began making strange threats against sdPhotonics, claiming she had been improperly issued a 1099 for her work.

123. When sdPhotonics tried to satisfy her complaints, she then claimed a new and different issue in how she was given the 1099, and claimed she was reporting the company to the IRS.

124. Coco then made a false report to UCF claiming that sdPhotonics had not issued a W-2 to one of the company's different employees while in the UCF Photonics Incubator, and after the employee had taken a position elsewhere.

125. In fact, the company had issued the employee the W-2.

126. The UCF administrator Christina Serra requested a meeting with Deppe and attempted to pursue the false complaint by Coco on the basis that sdPhotonics was part of the UCF Photonics Incubator.

127. Deppe met with Serra, and Serra claimed that she had been contacted by the sdPhotonics' employee identified by Coco who had complained to her that he had not been issued a W-2 from sdPhotonics, and began to explain to Deppe how serious the issue was.

128. sdPhotonics however had issued the W-2, and Serra was forced to admit she had lied about being contacted by the former sdPhotonics' employee.

129. When Serra learned that sdPhotonics had issued the employee the W-2, she changed her story and admitted that she had not met with or received any complaint from the former sdPhotonics' employee.

130. Serra then advised Deppe to stay away from Coco because she was making false reports to UCF about sdPhotonics.

131. In 2016, while Deppe was traveling, Coco went into Deppe's house while he was out of town, and obtained information from his personal files and records.

132. Coco and Gallagher then informed Deppe that they had taken the information from the records, and began making unusual threats.

133. In 2017 Coco and Gallagher made threats to Deppe that they would be able to stalk and cyber-stalk him "for the rest of his life," and destroy any personal relationships he may develop with other women.

134. Coco claimed at the time that she would be able to track Deppe on any online dating account through which he may meet women, and that they would contact any such women to damage any possible relationship.

135. Gallagher claimed she also would be able to cyber-stalk Deppe on any online dating account through which he may meet women, and that they would contact any such women to taint the possible relationship.

136. However, Coco never explained why she made the threats.

137. Gallagher made the same threats, and also could not explain why she made the threats.

### C. <u>Deppe Builds the Patent Portfolio with sdPhotonics and UCF to Cover the Oxide-Free VCSEL Invention.</u>

138. From 2015 into August, 2018, Deppe worked full-time with sdPhotonics where he wrote patents covering the oxide-free VCSEL invention.

139. During this time Deppe worked directly with Shtrom who oversaw UCF's Technology Licensing Office and the UCF patent prosecution attorney, Neil Jetter, on drafting and filing the patents.

140. During this time Deppe also worked directly with John Miner in Shtrom's UCF Technology Licensing Office on drafting and filing the patents, and Neil Jetter was employed by Shtrom's UCF office, and to discuss licensing strategies that sdPhotonics and UCF could use in commercialization.

141. Shtrom, Miner, and Jetter were fully involved in drafting and approving the patent applications for filing, with the patent costs split between sdPhotonics and UCF, which were then filed by Neil Jetter.

142. Shtrom signed documents as part of the patent filing procedures and prosecution for both sdPhotonics and UCF ownership in the patents.

143. Shtrom's UCF Technology Licensing office invoiced Deppe and sdPhotonics for costs of the patents pursuant to the 2014 IP Agreement, for which the terms are pursuant to UCF Regulations UCF-2.029 that cover employee rights in inventions for which UCF may also have ownership.

144. **Exhibits 3**, **4**, and **5** are email and invoice records that show that sdPhotonics and UCF worked closely together in the patent prosecution for the patents at issue that cover the oxide-free VCSEL inventions.

145. **Exhibit 3** shows an email dated July 11, 2017, that Miner sent UCF's patent attorney with instructions on ownership and filing.

146. **Exhibit 4** shows the invoicing to Deppe and sdPhotonics that was set up by Shtrom's UCF Technology Licensing Office. **Exhibit 4** shows invoices dated October 27, 2016.

147. **Exhibit 4** shows cleared checks from one of the payments by sdPhotonics for the patents. The payments are dated November 3, 2016.

148. **Exhibit 5** shows some of the patent records signed by Deppe, Shtrom, and Shtrom's supervisor, Thomas O'Neal, for filing the jointly owned patent applications and their prosecution through the USPTO and international patent offices.

149. The patent documents shown in **Exhibit 5** signed by Deppe and O'Neal are dated July 11, 2017.

150. The patent documents shown in **Exhibit 5** signed by Deppe and Shtrom are dated February 13, 2018.

151. Bahaa Saleh oversaw the UCF Photonics Incubator facilities while sdPhotonics leased the facilities through the UCF High Technology Incubator.

152. Saleh and Deppe met several times from 2015 into 2018 in the same time period Deppe was working full time for sdPhotonics, and drafting and filing patent applications with Shtrom, Miner, and Jetter.

153. Both Deppe and Sale requested the meetings at different times in this time period, with Deppe requesting to meet with Saleh to discuss the UCF Photonics Incubator facility problems, and the failure to maintain the facility and its equipment, and Saleh requested meetings with Deppe with Saleh's concerns over Deppe's research.

154. Saleh knew that UCF professors had made false scientific claims that they were using in attempts to obtain research funding, and that some of Deppe's research corrected those claims.

155. Saleh requested Deppe stop making the presentations to correct the scientific errors, because Saleh thought the corrections would hurt UCF's chances to receive the funding his professors were seeking based on the false scientific claims that had come from DARPA projects at other universities.

156. Deppe and Saleh discussed the false claims in some detail, and Deppe informed Saleh that professors were making the false claims trying to get funding, and some had even lied about what was in their papers.

157. This was very common in university research especially if it involved research funding and Saleh and Deppe discussed the false claims in some detail.

158. Saleh then informed Deppe of the "university perspective" on the false claims, and that "dishonesty is a good thing if it benefits the university."

159. Saleh's statements reflected a general approach expected of university professors. However, Deppe's position with UCF was tenured and Deppe largely ignored Saleh on that topic, explaining to Saleh that he and Deppe had different values in the science.

160. Saleh tried to correct Deppe about his and Saleh's different values in science, with Saleh claiming it wasn't Saleh putting out false information about the research, it was the professors who worked under Saleh to obtain the military contracts, and Saleh would not do that with his own research.

161. During this time period, O'Neal informed Deppe that Saleh had asked her to have monthly meetings with her to discuss O'Neal's consulting with sdPhotonics.

162. O'Neal was also meeting with Klonoff periodically about her consulting with sdPhotonics, and providing information about sdPhotonics' technologies and research plans to Klonoff.

163. O'Neal began coming to Deppe and informed him that Klonoff had research connections with various entities that wanted to fund his research, and had asked O'Neal to obtain proposals from Deppe to develop new types of lasers.

164. O'Neal then asked Deppe how he would address specific problems using semiconductor lasers, and to write short proposals for the research.

165. Deppe would later learn that in the same time of 2017 to 2018, The University of Texas and military had set up identity theft and tax fraud on his IRS tax records for the 2017 tax year, as part of the plan involving intellectual property theft by the military and three universities.

166. These proposals O'Neal requested from Deppe for sdPhotonics were never funded and rarely mentioned after, and it later became clear they were being used by Klonoff and Saleh to "sell" access to Deppe's research to foreign research entities without Deppe's knowledge, who were working with the military.

167. By the Summer, 2018 Deppe had decided to move sdPhotonics from the UCF Photonics Incubator because of the facility problems in the UCF Photonics Incubator Saleh oversaw.

168. The UCF Photonics Incubator facility and its equipment that Saleh oversaw were in disrepair and unsafe.

169. Saleh had not hired appropriate staff to maintain the UCF Photonics Incubator facilities when Deppe and Saleh met to discuss the problems. While Saleh agreed that the facility was not properly maintained, Saleh claimed the university had no funds to hire the needed staff.

170. The move for sdPhotonics from the UCF Photonics Incubator was estimated to take about eighteen (18) months because of the company's extensive crystal growth equipment it used to produce its lasers.

171. In August, 2018, sdPhotonics signed a new one-year lease with the UCF Incubator director that would enable the move.

172. O'Neal was still consulting with sdPhotonics on maintenance and operation of the company's crystal growth equipment, and still meeting with Saleh.

173. Upon information and belief, O'Neal informed Saleh that Deppe intended to begin plans to move sdPhotonics from the UCF Photonics Incubator.

174. Upon information and belief, O'Neal also informed Klonoff of the planned move by sdPhotonics.

175. Deppe returned to the faculty of UCF in August, 2018, upon which Saleh took almost immediate action against sdPhotonics.

176. Instead of allowing the time for sdPhotonics to move from its leased space as Deppe had planned, Saleh demanded the company move immediately.

177. At the time, sdPhotonics held research contracts with annual revenue of ~ $1M, and the immediate move would force the company to terminate or suspend its contracts and its ten or so employees.

178. Saleh then took additional actions against Deppe, reducing his salary and position.

179. By October, 2018 Saleh was making repeated demands that Deppe immediately move sdPhotonics from the UCF incubator, knowing such a move would damage the company's business operations.

180. However, there was some disagreement with the director of the UCF Incubator, who oversaw the leasing of the UCF Photonics Incubator for which Saleh oversaw the facilities. sdPhotonics had paid rent to UCF Incubator for many years, and the director knew the company held significant contracts from incubator reports he received of the company.

181. In October, 2018, the director of the UCF Incubator informed Deppe that Saleh was retaliating against sdPhotonics to force the company into an immediate move, and the director had been able to arrange instead for sdPhotonics to be allowed eighteen months to make the move.

182. Deppe agreed to the eighteen-month time frame and began making arrangements to move sdPhotonics to different facilities in which it could perform its crystal growth.

183. In November, 2018, with the confirmation that Saleh was engaged in retaliation and concerned for sdPhotonics, Deppe contacted the Florida governor's

IG and informed the IG that he and his company were being retaliated by UCF and provided information about the retaliation. The Florida IG then began whistleblower procedures.

184. The attorney Karen Kline was representing and advising Deppe and sdPhotonics prior to September, 2018 on contract and patent matters.

185. In October, 2018, Deppe asked Kline to review the UCF Regulations UCF-2.029 in the 2014 IP Agreement, and contact UCF to determine if they wished to release or license their UCF ownership in certain patents, including the jointly owned patents and application on the oxide-free VCSEL inventions at issue.

186. Karen Kline then contacted Sandra Sovinski by letter pursuant to the UCF Regulations UCF-2.029 about the patents and sdPhotonics' planned move from the UCF Photonics Incubator.

187. **Exhibit 6** shows the December 11, 2018 email Sovinski sent Shtrom after Karen Kline contacted Sovinski about the patents, and Karen Klines letter is the letter shown attached to Sovinski's email in **Exhibit 6**.

188. When Sovinski informs Shtrom that when she received Kline's letter about sdPhotonics leaving the UCF Photonics Incubator and the oxide-free VCSEL patents, she immediately sent the letter to Elizabeth Klonoff and Youndy Cook.

189. Sovinski admits to Shtrom in her December 11, 2018 email shown in **Exhibit 6** that she already knows that sdPhotonics had split patent costs and paid research and development costs for the inventions, had joint ownership of the patents, but Sovinski sounds hopeful that sdPhotonics may be late on patent

payments, clearly looking for reason to take some type of action against sdPhotonics (red underlines added):

> Hi Svetlana,
>
> I just got this letter, and I've forwarded it to Liz and Youndy. I took a quick look at the IP list attached, and in ARGIS, but need your help.
>
> From a quick look at the patents, they look to be most, if not all, government funded.
> Also, for at least one of them, Deppe is the only inventor, but it still shows co-ownership with his company, and I don't see any agreement as to why. I see the courting license, and I recall (and saw) that the company has been splitting the patent costs, but it looks like maybe they are late now?

190. Sovinski admitted in her email to Shtrom after receiving the letter from Kline that she knew that sdPhotonics has been making patent payments and splitting patent costs with UCF, and was also paying for the development costs on government contracts.

191. Sovinski admitted in her email to Shtrom that Sovinski already knew at the time in December, 2018, that sdPhotonics has joint ownership of the patents at issue covering the oxide-free VCSEL inventions.

192. Sovinski states in her email shown in **Exhibit 6** that she has already sent the information from Karen Kline to Elizabeth Klonoff (Liz) and Youndy Cook (Youndy), who oversee the UCF research and Sovinski.

193. The records make clear that Sovinski knew well ahead of filing the false declarations into the USPTO, and as early as December, 2018, that she would breach the 2014 IP Agreement and UCF Regulations UCF-2.029 by filing any declarations into the USPTO asserting further ownership.

194. Approximately eight months after Sovinski had received the letter from Karen Kline, in or about August, 2019, Sovinski began filing false declarations into the USPTO committing perjury, and breaching the 2014 IP Agreement, and violating UCF Regulations UCF-2.029(4)(d) that prohibited the retroactive filings.

195. In early January, 2019, the initial report from the external law firm Bryan, Cave, Lieghton, and Paisner was released following an external investigation by the IG under Rick Scott that investigated misspending of UCF administrators.[5,6] The findings explained why UCF had not been able to maintain its research facilities. The UCF administrators had misspent more than $80M of state funding, with a significant amount being spent to build themselves expanded offices in a new administration building.

196. The report contained evidence the whistleblower reporting procedures under the Florida Whistleblower's Act was actively being used for retaliation by Robert Taft and Tina Maier in the UCF audit office as a means to prevent whistleblower reporting of the malfeasance and misfeasance by the UCF administrators.[7]

197. The excerpts concerning UCF's misuse of the Florida Whistleblower's Act are below:[6]

---

[5] https://knightnews.com/wp-content/uploads/2019/01/BCLP-Report-of-Investigation.pdf
[6] https://mynews13.com/fl/orlando/news/2019/03/12/ucf-misused-funds-report-demands-university-oversight-reform
[7] See Florida's Whistleblower Act, Fl. St. § 112.3817, http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0100-0199/0112/Sections/0112.3187.html

Pg. 14:

for proper funding of capital projects, monitoring and reporting. We also found that the University, or at least its F&A department, failed to foster a culture that encouraged challenging senior members of the administration and whistleblower activity. Based on these control deficiencies, and in consultation with PwC, we have proposed certain enhancements to the University's internal controls for the BOT and University leadership to consider, which are set forth in Part IV of the Report.

Pg. 51:

oversight, auditing, monitoring and reporting. We also found that the University, or at least its F&A division, failed to foster a culture that encouraged challenging senior members of the administration and whistleblower activity.

Pg. 52:

**Culture.** F&A employees who were aware of the use of E&G funds to build TCH as well as the relevant restrictions on the use of such funds failed to bring that information to the attention of the BOG, the office of the University's general counsel or its internal auditors, the compliance, ethics and risk office or anyone else. At least one senior employee cited a concern that she would have risked her job security if she had done so. While the University did receive some anonymous tips regarding the use of E&G for the TCH project, these tips came *after* the AG's preliminary audit findings were announced. This is indicative of a culture during the period in question that did not sufficiently encourage whistleblower activity as a means to ensure compliance with applicable laws and regulations.

and Pg. 53:

- The University should consider the need for improved training and communications regarding its whistleblower program designed to increase awareness of the program and encourage employees to report known or suspected violations of law, regulation or University policy.

198. Despite the findings and misspending of ~$80M of Florida taxpayer funding, Ron DeSantis became governor just as the report was released, and took no corrective action to address the misuse of the Florida Whistleblower's Act by UCF state actors in the BCLP report.[6]

199. Instead of taking corrective action in response to the report of violations of the Florida Whistleblower's Act by UCF state actors, on January 8, 2019, DeSantis appointed the new Chief IG, Melinda Miguel, to oversee the Florida whistleblower procedures.[8]

200. At the same time at the beginning of January, 2019 that the Florida governor changed to DeSantis, and the IG changed to Miguel, Miguel began sending information and records that Deppe had provided to Rick Scott's IG, back to Taft and Maier at UCF.

201. Karen Kline informed Deppe that she had developed a conflict of interest with the state of Florida, but that she knew other attorneys who would represent him against UCF.

202. A short time later in January, 2019, Sovinski began sending Deppe eviction letters demanding Deppe immediately move sdPhotonics from the space it leased with the UCF Photonics Incubator.

203. After Sovinski began sending her letters to Deppe demanding the immediate move by sdPhotonics from the UCF Photonics Incubator, Karen Kline informed Deppe because of her a new conflict of interest with UCF, she had found Alen Hsu who would be able to represent sdPhotonics to fight the lease eviction against UCF based on the retaliatory action.

204. **Exhibit 7** shows an email from Maier to Robert Taft and Rebekah Weeks identifying a UCF faculty member who had been told that information she

[8] https://www.flgov.com/wp-content/uploads/2024/10/2023-2024.pdf

provided to the prior Florida governor's IG under Rick Scott and prior to Miguel was told by the prior IG that information she provided on the matter not be returned to UCF because of the UCF administrators' track record known behavior to use retaliation against UCF employees who report malfeasance by UCF administrators.

205. Instead, Melinda Miguel also sent the information the UCF professor had provided to the prior IG about UCF directly back to Taft and Maier at UCF.

206. Maier's email in **Exhibit 7** shows that by January, 2019, Miguel was already violating the Florida Whistleblower's Act with UCF's state actors Taft and Maier, improperly sending information about retaliation from Taft and Maier's UCF office, back to Taft and Maier.

207. Note that Maier first contacts Rebekah Weeks in the email chain in **Exhibit 7**, claiming the faculty member was not happy that DeSantis' IG Miguel sent the information she had provided to the prior IG was sent back to Taft and Maier, when apparently the prior IG under Rick Scott had assured the faculty member she would not.

208. Maier then placed statements in her email about receiving information from the IG Melinda Miguel she sent Weeks at 5:32 P.M. January 28, 2019, that Maier changed 10 minutes later at 5:42 P.M. to say the information instead came from Weeks.

209. Sovinski admitted in her letters in January, 2019 and February, 2019, that she knew forcing sdPhotonics to move from its space immediately as she demanded would damage the company's business operations and its contracts.

210. Sovinski claimed in her letters that she was taking her actions despite this because Deppe reported the UCF retaliation by Saleh, Taft, and Maier under the Florida Whistleblower's Act to the prior Florida governor's IG under Rick Scott.

211. After Miguel had sent the information back to Taft and Maier at UCF, Maier and Deppe met multiple times on the UCF campus to discuss the retaliation by UCF and whistleblower reporting under the Florida Whistleblower's Act.

212. In one of her letters, Maier had claimed to Deppe that the Florida Whistleblower Statute required any malfeasance or misfeasance to be "gross malfeasance" or "gross misfeasance," and that what was reported did not rise to the level of "gross malfeasance" or "gross misfeasance."

213. In a later phone call Maier admitted she had no understanding of what the phrases "gross malfeasance" or "gross misfeasance" actually mean.

214. Maier then claimed instead that someone had told her to use that explanation in her official finding under the Florida Whistleblower's Act, but did not disclose who had told her to do so.

215. Maier insisted in the phone call that Robert Taft had no knowledge that Maier had claimed that the Florida Whistleblower Act required "gross malfeasance" or "gross misfeasance."

216. In a meeting on the UCF campus that followed the phone call with Maier, Maier refused to receive further information or evidence, or discuss evidence she possessed of the retaliation by UCF administrators.

217. Instead, Maier became angry because Deppe reported Taft and Maier to the prior IG under Rick Scott in or about November, 2018, and that she and Taft were violating the Florida Whistleblower's Act.

218. In Maier's anger she informed Deppe in their last meeting on the UCF campus in or about March, 2020 that her job with the UCF audit office was to find "dirt" on Deppe to protect the UCF administrators like Saleh, exactly what the BCLP report had also found.

219. Maier repeated the statement in a different form, and informed Deppe in their last meeting on the UCF campus that she was not in her position to go after UCF administrators, she was in her position to go after Deppe.

220. In the same time period sdPhotonics was working with the epitaxial foundry Intelligent Epitaxial Technology, Inc. (IET). IET had the semiconductor production equipment needed for the specialized crystal growth needed to manufacture sdPhotonics' oxide-free VCSEL prototypes.

221. By July 2019, sdPhotonics had moved out of the UCF Photonics Incubator in Orlando, FL and into new facilities located in Richardson, TX, and IET provided needed facility space in its Richardson, TX facility under a sublease to sdPhotonics to house the sdPhotonics crystal growth, device fabrication, and testing tools.

222. The military program monitors already knew in detail Deppe's plans in moving, because Deppe had informed the military program monitors on the contracts that he would move the company to Richardson, TX as required on the contracts.

223. Deppe had hired John Taboada to oversee the patents on Deppe's laser inventions when Kline had refused to provide further representation due to her conflict of interest with the state of Florida, and instead continued to claim she wanted to consult with sdPhotonics to assist in responding to the retaliation.

224. Deppe worked closely with Paul Pinsukanjana at IET in Richardson, TX, who also worked as a defense contractor with the military, and Pinsukanjana was able to learn a great deal of details about the recipes IET needed to produce the oxide-free VCSEL materials.

225. Pinsukanjana had come from the University of California at Santa Barbara (UCSB) that had also hired former Bell Labs researchers, one of whom was John Bowers.

226. Bowers had proposed highly flawed research as part of the Obama/Biden Aims Center funding project trying to solve a long-standing integration problem that DARPA had attempted to solve.

227. The integration problem DARPA was trying to solve requires extremely tiny lasers due to materials mismatch that can be integrated already prefabricated with special bonding materials to operate with high efficiency.

228. Bowers proposed the opposite involving epitaxial growth of two mismatched materials together, with claims that quantum dots would make defects in the material unimportant, and had obtained large contracts for UCSB from the Obama/Biden Aims Center.

229. It quickly became clear to many experts in semiconductor lasers that Bowers did not understand what he had proposed and that quantum dots would not solve the integration problems using growth of mismatched materials in this case.

230. Pinsukanjana was also focused on the project and wanted details from Deppe about parts that Bowers had not understood about the laser integration problem.

231. Pinsukanjana repeatedly asked Deppe for details of why Bower's ideas were flawed. Deppe explained the integration problem to Pinsukanjana and where Bower's was confused.

232. Despite the letters and attempts to evict sdPhotonics from the UCF Photonics Incubator, sdPhotonics remained in the UCF Photonics Incubator until the end of its lease in July, 2019. When the company moved, the military and universities began their intellectual property theft scheme that used state actors at UCF to commit the perjury in the USPTO patent records on sdPhotonics' patents.

233. In about July, 2019, the military abruptly cancelled one of sdPhotonics' contracts that was being monitored by Latika Eifert that sdPhotonics was using to develop the oxide-free VCSELs.

234. A second contract from the Army was also terminated in July, 2019, as Deppe moved sdPhotonics from the UCF Photonics Incubator.

235. Shortly after this, sdPhotonics was issued the new military contracts that were reported to the DOD OIG in **Exhibit 1** that became part of the intellectual property theft scheme by the military program monitors.

**D. Sovinski Breaches the 2014 IP Agreement, Violates UCF Regulations UCF-2.029, and Commits Perjury in the USPTO on Patent Applications that Cover the Plaintiff's Oxide-free VCSEL Inventions.**

236. In or about August, 2019, Sandra Sovinski filed her own declarations into the USPTO records that breached the 2014 IP Agreement, and the UCF Regulations UCF-2.029 to which the terms of the 2014 IP Agreement are pursuant, and provided dispositive proof of the perjury Sovinski committed in filing the declarations.

237. These were following in or about the same time period with declarations that Svetlana Shtrom filed into the USPTO.

238. The first of these declarations by Sovinski is shown in **Exhibit 8**.

239. As required by the USPTO, Sovinski filed the declarations signed under the penalty of perjury.

240. Sovinski falsified the terms of the 2014 IP Agreement in her declaration, and in doing so made contradictory statements about those terms to the actual terms in the 2014 IP Agreement that she attached to the declaration she filed into the USPTO under the penalty of perjury.

241. Sovinski claims in her declaration that the 2014 IP Agreement Deppe signed gave UCF unrestricted rights to Deppe's inventions, as shown in the statement below from **Exhibits 8**:

> **On August 13, 2014,** in recognition of his employment obligations, **Dennis Deppe executed an assignment of any and all rights to UCF** for all inventions conceived or invented during his employment. This assignment document is presented for recordation herewith. In accordance with Florida Statute 1001.72,

242. However, the assignment document Sovinski attached is simply the 2014 IP Agreement (last page of **Exhibit 8**) and contradicts Sovinski's assertion of unrestricted rights in her declaration, that states all terms of the agreement are pursuant to UCF-2.029 as shown below:

> 1. I have received and reviewed University Regulation UCF-2.029, entitled "Patents, Trademarks, and Trade Secrets." All terms in this Agreement are defined pursuant to UCF-2.029.

243. The 2014 IP Agreement Sovinski attached to her USPTO declaration is shown separately in **Exhibit 9**, with the same contractual terms shown in the second page that each term of the 2014 IP Agreement is explicitly pursuant to UCF-2.029.

244. Sovinski's contradictory claim in the declaration she filed with the 2014 IP Agreement is furthermore nonsensical. Deppe's UCF employment rights to his inventions are given in UCF Regulations UCF-2.029.

245. Sovinski's declaration claims Deppe gave up his employment rights to his inventions in UCF-2.029 to give UCF unrestricted rights to his inventions, in exchange for his employment rights in UCF-2.029.

246. Fl. St. §837.011(1) defines the patent prosecution with the USPTO an official proceeding.

247. Fl. St. §837.021, perjury by contradictory statements in an official proceeding is shown below:

**837.021 Perjury by contradictory statements.—**

(1) Except as provided in subsection (2), whoever, in one or more official proceedings, willfully makes two or more material statements under oath which contradict each other, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(2) Whoever, in one or more official proceedings that relate to the prosecution of a capital felony, willfully makes two or more material statements under oath which contradict each other, commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

248. The declaration Sovinski filed into the USPTO with the 2014 IP Agreement attached proves dispositively that Sovinski committed perjury in the USPTO in violation of Fl. St. §837.021, when she filed the declarations with the above state that falsified the terms of the 2014 IP Agreement she attached.

249. Furthermore, the terms given in the 2014 IP Agreement as being pursuant to UCF-2.029 are the true terms of the agreement, and proves intentionally.

250. Fl. St. §837.02(1), perjury in an official proceeding, is shown below:

**837.02 Perjury in official proceedings.—**

(1) Except as provided in subsection (2), whoever makes a false statement, which he or she does not believe to be true, under oath in an official proceeding in regard to any material matter, commits a felony of the third degree,

251. The declaration filed by Sovinski in which she falsified the terms of the 2014 IP Agreement she attached also proves dispositively that Sovinski committed perjury in the USPTO in violation of Fl. St. §837.02(1).

252. UCF Regulations UCF-2.029 to which the 2014 IP Agreement is pursuant are shown in **Exhibit 10**.

253. UCF Regulations UCF-2.029 determine when and under what conditions UCF can take or retain ownership in inventions.

254. UCF Regulations UCF-2.029(4)(d) show that UCF has to follow strict regulations when it claims to own inventions of its employees.

255. One of the requirements from UCF-2.029 concerning payment of patent costs and UCF's ability to assert ownership in inventions of employees is shown below in UCF-2.029(4)(d) and shown highlighted in **Exhibit 9** and states (red underlines added):

> (d) In the event the University asserts its rights in the Invention, all costs and expense of patenting, developing, and marketing the Invention and related activities, including those which may lead to active licensing of the Invention, shall be paid by the University.

256. Sovinski acknowledged to Shtrom in December, 2018 (**Exhibit 6**) that she knew from UCF records that sdPhotonics **had paid** for the patent costs and that Deppe after UCF and Deppe signed the 2014 IP Agreement requiring them to follow UCF-2.029, and in fact Shtrom's UCF office was invoicing Deppe directly for sdPhotonics' shares of patent costs.

257. The email Sovinski sent to Shtrom in **Exhibit 6** shows that Sovinski knew the statements in her retroactive declarations were false when she prepared the declaration dated May 21, 2019 shown in **Exhibit 10**.

258. The email that Sovinski sent to Shtrom shown in **Exhibit 6** dated December 11, 2018, after receiving the letter from Karen Kline with the list of jointly owned patents, confirms that Sovinski, Cook, Klonoff, and Shtrom knew that sdPhotonics had paid for patent costs and joint ownership of the oxide-free VCSEL inventions, and that the agreements were set up by Shtrom herself.

259. Furthermore, Sovinski's email in **Exhibit 6** and additional information show that Defendants Youndy Cook and Elizabeth Klonoff knew that Sovinski and Shtrom intended to file the false statements in the USPTO ownership document shown in **Exhibit 8**, and were part of and had agreed with the plan.

260. Sovinski would eventually admit during the Florida Whistleblower Case No. No. 2019-CA-015042-O proceedings that she also made additional false statements in her declarations after learning they were proven false by prior patent records.

261. The statements from **Exhibit 8** that are false concerning the filing of the patents are shown below, and proven false by prior USPTO patent records:

Previously Recorded Document is erroneous. Dennis Deppe filed provisional applications nos. 62/467,514 and 62/361,531, *pro se*, contrary to UCF regulations and policies, and **improperly designated his own company, sdPhotonics, LLC, as a co-applicant**. UCF's prosecution counsel carried on the improper co-applicant designation during the non-provisional phase. UCF's prosecution counsel also did not record any assignment documents for the application, also contrary to UCF policies. (Note: UCF intends to file a

262. Sovinski would admit approximately four (4) months into the proceedings of Florida Whistleblower Case No. No. 2019-CA-015042-O that these statements are false:

*"and improperly designated his own company, sdPhotonics, LLC, as a co-applicant. UCF's prosecution counsel carried on the improper co-applicant designation during the non-provisional phase."*

263. and:

*"UCF's prosecution counsel also did not record any assignment documents for the applications, also contrary to UCF policies."*

264. Ownership assignments filed by Neil Jetter at the instruction of Shtrom's office show the ownership of the patent applications were explicitly filed as jointly assigned to sdPhotonics and UCF when filed, as identified in the Application Data Sheets of the USPTO patent records shown in **Exhibit 11**.

265. The ownership assignments shown in **Exhibit 11** jointly assign ownership to sdPhotonics and the UCF Research Foundation at the time of patent filing, with the assignment of the patent ownership from **Exhibit 11** shown below:

| | | | |
|---|---|---|---|
| If the Applicant is an Organization check here. ☒ | | | |
| Organization Name | sdPhotonics, LLC | | |
| **Mailing Address Information For Applicant:** | | | |
| **Address 1** | 450 South Lake Jessup Avenue | | |
| Address 2 | | | |
| **City** | Oviedo | **State/Province** | FL |
| **Country** | US | Postal Code | 32765 |
| Phone Number | | Fax Number | |
| Email Address | | | |
| Additional Applicant Data may be generated within this form by selecting the Add button. Add | | | |

266. **Exhibit 12** shows the cover page of one of the patents that Sovinksi filed retroactive declarations into the USPTO after the patent had issued, and clearly shows that the ownership was jointly assigned on the cover page of the issued patent.

(12) **United States Patent**
**Deppe**

(10) **Patent No.: US 10,033,156 B2**
(45) **Date of Patent: Jul. 24, 2018**

(54) **LOW RESISTANCE VERTICAL CAVITY LIGHT SOURCE WITH PNPN BLOCKING**

(71) Applicants: **University of Central Florida Research Foundation, Inc.**, Orlando, FL (US); **sdPhotonics, LLC**, Oviedo, FL (US)

(72) Inventor: **Dennis G. Deppe**, Oviedo, FL (US)

(73) Assignees: **University of Central Florida Research Foundation, Inc.**, Orlando, FL (US); **sdPhotonics, LLC**, Oviedo, FL (US)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,226,053 A | 7/1993 | Cho et al. |
| 5,594,751 A | 1/1997 | Scott |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0317007 A1 | 5/1989 |
| JP | 2005051124 | 2/2005 |
| WO | 9750109 | 12/1997 |

OTHER PUBLICATIONS

267. **Exhibit 13** shows Sovinski's USPTO declaration with the alleged false or the misrepresentative statements Sovinski made in her declarations. The false statements outnumber the true statements.

268. Title 18 U.S.C. § 1001 is the federal criminal code against making false statements. 18 U.S.C. § 1001(a) states:

(a) Except as otherwise provided in this section, whoever, in any matter within jurisdiction of the executive, judicial, or legislative branch of the Government of the United States, knowingly and willfully –

(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;

(2) makes any materially false, fictitious, or fraudulent statement or representation; or

(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years...

269. Title 18 U.S.C. § 1621 is the federal code against perjury generally. Title 18 U.S.C. § 1621 (b)(2) states:

in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true; is guilty of perjury

and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

270. Title 28 U.S.C. § 1746(2) – Unsworn declarations under the penalty of perjury, states:

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the unsworn declaration, certification, or statement, in writing of such person which is subscribed by him, as true under the penalty of perjury, and dated, in substantially the following form:

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
(Signature)".

271. Title 18 U.S.C. § 1623 – False declarations before grand jury or court, states in 18 U.S.C. § 1623(a):

(a) Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false declaration, or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.

272. The false ownership document shown in **Exhibit 8**, signed under the penalty of perjury and filed into the USPTO patent records, provides dispositive proof that Sovinski violated the Florida state perjury Fl. St. § 837.02(1).

273. Fl. St. § 837 – Perjury, in Florida state law § 837.011 defines:

(1) "Official proceeding" means a proceeding heard, or which may be heard or is required to be heard, before any legislative, judicial, administrative, or other governmental agency or official authorized to take evidence under oath, including any referee, general or special magistrate, administrative law judge, hearing officer, examiner, commissioner, notary, or other person taking testimony or a deposition in connection with any such proceeding.

(2) "Oath" includes affirmation or any other form of attestation required or authorized by law by which a person acknowledges that he or she is bound in conscience or law to testify truthfully in an official proceeding or other official matter.

(3) "Material matter" means any subject, regardless of its admissibility under the rules of evidence, which could affect the course or outcome of the proceeding. Whether a matter is material in a given factual situation is a question of law.

274. Fl. St. § 837.02(1) – Perjury in official proceedings. – states:

(1) Except as provided in subsection (2), whoever makes a false statement, which he or she does not believe to be true, under oath in an official proceeding in regard to any material matter, commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

275. Sovinski violated both Fl. St. §837.02(1) that prohibits perjury in the official proceeding of the USPTO, and Fl. St. §837.021(1) against contradictory statements.

276. Fl. St. §837.021(1) states (subsection (2) refers to capital felony):

(1) Except as provided in subsection (2), whoever, in oner or more official proceedings, willfully makes two or more material statements under oath which contradict each other, commits a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

277. John Taboada reviewed the UCF Regulations UCF-2.029, the 2014 IP Agreement, and the retroactive ownership documents Sovinski filed into USPTO patent records, and informed Deppe that Sovinski had committed fraud on the

ownership documents. After filing the first corrective assignments into USPTO patent records, Taboada refused to file additional corrections and informed Deppe he would have to sue UCF to correct the USPTO patent records.

278. In October 2019, Cook was provided information showing the ownership documents Sovinski had filed into the USPTO patent contain false assertions involving the patent ownership by sdPhotonics.

279. In or about November, 2019, Cook admitted that she knew that the ownership document that Sovinski filed into the USPTO patent records shown in **Exhibit 8** contains false statements.

280. Cook refused to correct, or have corrected, the USPTO document shown in **Exhibit 8** after admitting that the document that had been filed by Sovinski under the penalty of perjury into the USPTO patent records and contained false statements.

281. Sovinski also refused to correct the document shown in **Exhibit 8** after admitting that she knew the document she had filed into USPTO patent records contained false statements.

282. Alen Hsu informed Deppe that Hsu lacked the experience intellectual property to take further action on correcting the patents that Taboada also refused to correct, and Karen Kline and Hsu found Robert Sweetapple who wanted to litigate the case.

**E. <u>Weiss, Sweetapple, and Brownlee Operate the Illegal Proceeding of the Florida Whistleblower Case No. 2019-CA-015042-O.</u>**

283. Kline advised Deppe that she and Hsu wanted to continue to consult on the lawsuit, and that Hsu would assist Deppe with discovery requests. Kline invoice sdPhotonics and claimed she was taking part in the settlement discussions with UCF, but would not and did not inform Deppe what the settlement discussions were about, because of her conflict of interest with UCF.

284. Robert Sweetapple filed the Florida Whistleblower Case No. 2019-CA-015042-O on December 12, 2019 against UCF for whistleblower retaliation in violation of Fl. St. §112.3187.

285. The 9th Judicial Circuit Court of Florida then participated with the Florida governor's office and UCF and set the proceeding of Florida Whistleblower Case No. 2019-CA-015042-O to operate without a judge.

286. The docket from the Florida Whistleblower proceeding is attached in **Exhibit 14.**

287. During this time, Jeffrey Weiss pretended to be an officer of the illegal whistleblower proceeding representing UCF, while Robert Sweetapple pretended to be the officer of the illegal proceeding representing Deppe.

288. Immediately after complaint was filed and the lawsuit had started, Sweetapple announced he had learned UCF wanted to settle the case and refused to perform litigation.

289. Youndy Cook, Sandra Sovinski, and Alen Hsu then began working on draft settlement agreements, with Hsu sending some of these drafts for Deppe to review.

290. While Sweetapple was refusing to litigate, Jeffrey Weiss and UCF were sending Sweetapple discovery requests for Deppe's responses.

291. Deppe prepared and answered discovery requests with some assistance from Hsu, while Sweetapple refused to perform any meaningful legal work on litigation.

292. During this same time period Hsu worked to prepare a settlement agreement with Cook and Sovinski, claiming to Deppe that Cook and Sovinski's wished to relinquish all UCF rights in the patents because of the proof of perjury against Sovinski.

293. Kline continued to consult with Hsu and Sweetapple, and invoiced sdPhotonics during the whistleblower proceeding for the consulting.

294. However, Kline would not report back to Deppe about any of the discussions she had with UCF.

295. Deppe was also operating sdPhotonics in the same time period, which held the new military contracts that had been issued that were being used in different fraud schemes and described in the DOD OIG report in **Exhibit 1**.

296. In January, 2020, Deppe was contacted by Gerhold of the ARO, not long after the Florida Whistleblower lawsuit was filed.

297. Gerhold informed Deppe that there was an opportunity to accelerate sdPhotonics's development on the oxide-free VCSEL inventions and asked Deppe to attend meetings in Washington, D.C. that had been set up by lobbyists working with some of the military defense contractors.

298. The meetings were set up with Charlie Kuznia and Richard Weiss of the defense contractor, Ultra Communications, Inc., who worked closely with Gerhold.

299. Kuznia's company had developed a military product that used oxide VCSELs.

300. sdPhotonics, Ultra Communications, and Gerhold knew that the products being produced by Kuznia's company may be dramatically improved in speed and reliability by replacing the oxide VCSELs Kuznia was using with sdPhotonics' oxide-free VCSELs that could achieve much better reliability.

301. Kuzina contacted Deppe multiple times in the Summer 2019, and informed Deppe that Mark Beranek from NAVAIR wanted to issue sdPhotonics a contract to develop the oxide-free VCSELs for a separate project that again used the product from Kuznia that used oxide VCSELs.

302. sdPhotonics accepted the NAVAIR contract from Beranek.

303. By March, 2020, meetings were set up in Washington, D.C. shown in **Exhibit 15**. The meetings were held with offices of Kamala Harris and the four Texas elected officials, John Cornyn, Colin Allred, Will Hurd, and John Carter.

304. Pinsukanjana also attended the March, 2020 D.C. meetings, with Deppe, Kuznia, and Richard Weiss.

305. Following the meetings, in April, 2020, and four months into the Florida Whistleblower Case No. 2019-CA-015042-O, Sovinski began filing

ownership documents into the USPTO patent records on the oxide-free VCSEL patents that she had changed from her previous filings.

306. One of Sovinski's new documents is shown in **Exhibit 16**.

307. Sovinski changed her original documents dated May 21, 2019 four months into the proceedings of the Florida Whistleblower Case No. 2019-CA-015042-O, by placing strikethroughs in only two of the false statements, initialing the strikethroughs with "SMS" and dates of April 7, 2020.

308. Sovinski changed the two statements with the strikethroughs because these statements explicitly contradicted prior USPTO records.

309. Sovinski placed strike-throughs in the statements shown, initialed the strikethroughs "SMS," and dated the strikethroughs 4/7/2020.

> Previously Recorded Document is erroneous. Dennis Deppe filed Provisional application no. 62/459,078, *pro se*, contrary to UCF regulations and policies~~, and improperly designated his own company, sdPhotonics, LLC, as a co-applicant~~. ~~UCF's prosecution counsel carried on the improper co-applicant designation during the non-provisional phase.~~ SMS 4/7/2020 UCF's prosecution counsel also did not record any assignment documents for the application, also contrary to UCF policies.

310. The changes Sovinski made in her USPTO patent records shown in **Exhibit 16** provide clear and convincing evidence that the original false ownership document Sovinski filed shown in **Exhibit 8** violate federal and state perjury laws.

311. The changed ownership document filed by Sovinski dated April 7, 2020 shown in **Exhibit 16** presents the second dispositive proof Sovinski committed perjury in the USPTO, despite that she tried to recant in the USPWTO proceeding during the Florida Whistleblower proceeding.

312. Title 18 U.S.C. § 1623 – False declarations before grand jury or court, governs recantation of documents filed under the penalty of perjury. 18 U.S.C. § 1623(d) states:

(d) Where, in the same continuous court or grand jury proceeding in which a declaration is made, the person making the declaration admits such declaration to be false, such admission shall bar prosecution under this section if, at the time the admission is made, the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed.

313. Fl. St. §837.07 gives the Florida state law concerning recantation as a defense to perjury, and is shown below:

Recantation shall be a defense to any prosecution for perjury or false statement only if the person making the false statement admits such statement to be false in the same continuous proceeding or matter, and:

(1) The false statement has not substantially affected the proceeding; or
(2) Such admission is made before it has become manifest that such false statement has been or will be exposed.

314. The changed documents (**Exhibit 16**) by Sovinski provide dispositive proof that Sovinski committed perjury in April, 2020, in violation of 18 U.S.C. § 1001 and 18 U.S.C §§ 1621, 1623, in the earlier declarations she signed and dated May 19, 2019 shown in **Exhibit 8**.

315. In or about May, 2020, after Sovinski had filed her changed ownership documents into the USPTO patent records, Hsu presented Deppe with a settlement agreement he had prepared with Sovinski and Cook involving the Florida Whistleblower Case No. 2019-CA-015042-O.

316. Deppe had already worked with the program monitor Lateka Eifert who had issued the military contract to develop the oxide-free VCSEL inventions, and the military had already secured its government rights in the inventions under Eifert's contract.

317. Eifert had already confirmed with Deppe that the military and government had it necessary documentation on the patents in order, and Deppe had filed the assignments for the Army into the USPTO.

318. However, when Deppe reviewed the settlement agreement that Cook, Sovinski, and Hsu had drafted, he found that it required military approval from an unspecified Army office after Deppe signed the agreement, and made no changes to the false declarations Sovinski filed into the USPTO.

319. In May, 2020, after Deppe refused the settlement agreement, Weiss, Hsu, and Sweetapple attempted to force Deppe into a meeting against his will involving the settlement agreement that Deppe had already refused.

320. Weiss claimed to have knowledge the Army was working directly with UCF, and the Army wanted the technology and for Deppe to sign the agreement.

321. Instead, Deppe prepared responses for discovery requests for Sweetapple to provide to UCF using records Deppe possessed and additional records obtained from public records requests.

322. Deppe then used public records requests and obtained emails and records that showed Svetlana Shtrom had contacted a separate Army office than Eifert's and provided false information about Sabine O'Neal.

323. Shtrom claimed UCF had been entitled to a subcontract on Eifert's contract to sdPhotonics because O'Neal had been a UCF employee, when in fact it was Eifert who was responsible for overseeing any subcontracts from the contract Eifert, and it was Eifert had secured the government rights on the contracts.

324. After obtaining the information from the public records request and USPTO patent records, in or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her Shtrom's emails to the other Army office and claims about Sabine O'Neal and the contract Eifert had monitored, and the need for some type of Army approval related to UCF's supposed involvement in Eifert's contract.

325. Eifert informed the Deppe when she saw the emails and records that Shtrom had sent the different Army office that she would discuss it with her supervisors and get back to him.

326. About a week later, in mid-June, 2020, Eifert informed the Deppe that her supervisors had reviewed the emails and information Shtrom sent to the separate Army office and determined, separately from Deppe, that Shtrom and UCF had engaged in fraud on Eifert's contract to sdPhotonics.

327. Eifert then informed Deppe her supervisors wanted Deppe to report the information to the SBA IG, Hannibal Ware, and gave Deppe instructions on how to file the SBA complaint with Ware's office.

328. Deppe filed the SBA IG complaint with evidence of fraud and perjury in the USPTO patent records, and emails from Shtrom contacting the separate

Army office with false information about O'Neal, on June 22, 2020 as Eifert had instructed.

329. The receipt from the SBA IG's office for the complaint is shown in **Exhibit 17**.

330. After the Plaintiff filed the complaint to the SBA IG, still in June, 2020, Deppe provided Sweetapple's law firm the information and records needed for Deppe's responses to UCF's discovery requests.

331. After receiving the information and records that had been assembled with needed documents to serve Deppe's responses to Weiss for UCF's discovery requests, Berkeley Sweetapple of Sweetapple's law firm informed Deppe that Weiss had stayed the proceedings on the day the discovery responses were due, and had refused to accept service of Deppe's responses to UCF's discovery requests.

332. Berkeley Sweetapple was unable to explain to Deppe how Weiss had stayed proceedings, without a motion to do so, and why Weiss would stay proceedings when it was Deppe responding to UCF's discovery requests.

333. Sweetapple's law firm never presented Deppe any motions from Weiss that he had filed to stay discovery.

334. Feng was a consultant for sdPhotonics who was also a professor at the University of Illinois, who had obtained a highly specialized sdPhotonics' prototype laser known as a Cryo-VCSEL that Deppe had invented.

335. sdPhotonics was developing the Cryo-VCSEL for a 4 K optical link for an IARPA Supercables project issued to sdPhotonics began in or about June, 2019, and was monitored by William Harrod of IARPA.

336. sdPhotonics subcontracted to the University of Illinois to have Milton Feng fabricate and test prototypes of sdPhotonics' new Cryo-VCSEL invention, to perform high-speed testing on the Cryo-VCSEL prototype in his University of Illinois laboratory for the IARPA project described.

337. Not long after the complaint with Ware's SBA IG office, Deppe was contacted by the University of Illinois professor, Milton Feng, claiming he had been contacted by an FBI agent asking about Deppe.

338. Feng informed Deppe that an FGI agent had contacted Feng and told him that Deppe was under investigation by the FBI.

339. Feng later named the FBI agent who had contacted him as Christopher Bockelmann, an FBI agent who at the time was listed as working in the Springfield, IL office which Feng had also identified.

340. Feng informed Deppe that Feng had not "told the FBI investigator anything," but could provide no information on why he was contacted by an FBI investigator or what the FBI wanted.

341. Upon information and belief, Ware used his SBA IG office's authority to place Deppe under government surveillance by the FBI, after Deppe filed the complaint with the SBA IG on June 22, 2020 that was given the receipt shown in **Exhibit 17**.

342. In or about July, 2020, Deppe contacted the attorney John Vetter with whom Deppe had previously worked in Deppe's consulting.

343. Deppe explained to Vetter that attorneys with UCF had targeted sdPhotonics in intellectual property theft, and committed perjury in the USPTO patent records on the oxide-free VCSEL inventions.

344. By that time in July 2020, Ware's SBA IG office had worked with the FBI and local law enforcement in Florida to place Deppe under electronic surveillance, including tracking his internet use and emails.

345. Deppe sent Vetter records of the false ownership documents that the attorneys working with UCF had filed into the USPTO patent records. Upon reviewing the USPTO records Vetter informed Deppe that the false ownership documents looked "serious."

346. Vetter recommended Deppe contact Ary Chang and Floyd Anderson, with whom Deppe had also worked previously in consulting on patent litigation.

347. Vetter informed Deppe that Chang had been fired from the law firm Foley and Lardner, with whom Vetter, Deppe, and Anderson had also worked on cases in which Deppe had consulted.

348. Deppe contacted Chang, who agreed to work on the matter.

349. Deppe explained to Chang that Hsu and Sweetapple tried to throw the Florida Whistleblower Case No. 2019-CA-015042-O with Weiss and UCF.

350. In or about July, 2020, Deppe also hired Bustamante to help litigate the matter of the perjury in the USPTO on the oxide-free VCSEL patents.

351. Bustamante reviewed the records, the 2014 IP Agreement, and UCF-2.029, and recommended filing a federal complaint because of what occurred in the Florida Whistleblower proceeding.

352. Bustamante then prepared the federal complaint to be filed with the District Court of Florida's Middle District.

353. However, prior to filing the complaint, Bustamante informed Deppe that he had learned the name of the judge who would be assigned to the federal lawsuit, and that she was the newly appointed "Trump judge" named Wendy Berger.

354. After Bustamante filed the complaint which became Case No. 6:20-cv-01588-WWB-DCI, Wendy Berger was assigned as the judge to the case.

355. On August 19, 2020, Weiss filed a surprising motion in the Florida Whistleblower Case No. 2019-CA-015042-O to compel discovery.

356. The discovery responses at issue in Weiss' motion were the same responses Deppe had prepared and were ready to serve when Sweetapple's law firm informed Deppe that Weiss had refused service in June, 2020.

357. After Weiss filed the motion to compel on August 19, 2020, Deppe repeated requested, insisted, and then demanded Sweetapple to serve the discovery Deppe had prepared that Sweetapple he held at his law firm, and that were ready to serve to Weiss.

358. Sweetapple instead refused to serve Deppe's discovery responses to Weiss.

359. Deppe then explicitly fired Sweetapple from further work on the case according to the contract Deppe and Sweetapple had signed for Sweetapple's legal services when Sweetapple had claimed he would litigate the case aggressively.

360. The contract between Sweetapple and Deppe included the clause 8 shown below:

> **8.** CLIENT has the right to terminate this agreement at any point in these proceedings of this matter. Upon notice of termination of agreement attorneys will cease work on the matter and provide billing for work performed only up to termination.

361. However, Sweetapple refused to accept the termination, and refused to cease work on the matter.

362. Sweetapple instead tried to set the hearing with Weiss for the motion to compel.

363. Hsu contacted Deppe in the same time period and warned Deppe that he should not to try to stop Sweetapple and Weiss.

364. Deppe then filed his own motions and letters with the court in August, 2020, to explain the actions by Weiss, Sweetapple, and Hsu, and that he had terminated Sweetapple but that Sweetapple had refused to be terminated.

365. In was only then that Paetra Brownlee, the only judge of record in the Whistleblower lawsuit, appeared as the judge assigned to the Florida Whistleblower Case No. 2019-CA-015042-O (**Exhibit 14**).

366. However, Brownlee had not been appointed as a state judge prior to ab out May 28, 2020 by Ron DeSantis.

367. After Deppe filed motions and letters with the court, Sweetapple agreed to file a motion to be terminated from the case.

368. However, Sweetapple still did not stop working on the case, and instead tried to set a hearing, under the guise that he needed the hearing for his withdrawal.

369. Weiss used the false certification shown below attempting to make Sweetapple part of the hearing, claiming he had spoken to Deppe about it. Weiss's false certification is shown below:

> I HEREBY CERTIFY that a lawyer in my firm with full authority to resolve this matter had a substantive conversation in person or by telephone with opposing counsel and Plaintiff in a good faith effort to resolve this motion before the motion was noticed for hearing but the parties were unable to reach an agreement.

370. In fact, Weiss had not spoken at all to Deppe.

371. Weiss had instead sent Deppe and email that Deppe should not contact him or his law firm at all about the motion, and that he would only work with Sweetapple to set the hearing.

372. Furthermore, Weiss had no explanation for why Deppe would need to consult with Weiss to terminate Sweetapple.

373. In September, 2020, Deppe sent a confidential letter to Judge Brownlee, cc'ing Weiss and Sweetapple, informing Brownlee that the Florida Whistleblower proceeding was in fact being used for retaliation, and that Weiss and Sweetapple had tried to force Deppe into a settlement meeting against his will.

374. Instead of maintaining the letter as confidential, Judge Brownlee had the confidential letter about the lawsuit being used for additional retaliation placed on the court's public docket.

375. About the same time Deppe learned that Bustamante had prepared and filed an improper complaint against UCF in the federal Case No. 6:20-cv-01588-WWB-DCI, for which UCF had sovereign immunity.

376. In September, 2020, after learning Bustamante had prepared an improper federal complaint, Deppe had the Case No. 6:20-cv-01588-WWB-DCI dismissed without prejudice.

377. In that time period Bustamante informed Deppe that he had learned in discussions with Weiss, Sovinski, and Cook that UCF wished to settle the Florida Whistleblower Case.

378. The proposed settlement agreement would be for UCF to relinquish all rights to the patents covering the oxide-free VCSEL inventions, and additional payments of some financial damages.

379. Bustamante then repeatedly contacted Deppe in unscheduled phone calls claiming he needed information about the oxide-free VCSEL development, and whether sdPhotonics had used UCF facilities, for the settlement agreement.

380. Bustamante could not explain in the calls why he needed the specific information about how the oxide-free VCSELs were developed, and whether sdPhotonics had used UCF facilities.

381. Bustamante expressed dissatisfaction with the information that sdPhotonics had leased space from the UCF Photonics Incubator and had performed the work on SIBR contracts.

382. In one call Deppe asked Bustamante why he needed this type of information. Bustamante responded to Deppe that if sdPhotonics had offered him an equity position, he would have worked with sdPhotonics.

383. Near the end of October, 2020, Bustamante and Chang presented Deppe the settlement agreement they had prepared with Weiss, Cook, and Sovinski.

384. Upon reviewing the settlement agreement, Deppe found the agreement again fraudulently required a non-specified military office to approve the agreement after Deppe signed the agreement.

385. Deppe again refused the agreement that used the same fraud involving the Army and UCF as the prior agreement both Deppe and Eifert, and reportedly her supervisors, determined was fraudulent and had reported to Ware's SBA IG office.

386. Deppe then discussed the agreement that Bustamante and Chang had prepared with John Vetter in a phone conversation.

387. In the phone conversation Deppe informed Vetter that the agreement appeared fraudulent, and that all sdPhotonics needed were the corrected ownership documents to be filed into the USPTO patent records.

388. In response, Vetter demanded that Deppe sign the settlement agreement, and became angry in the phone call.

389. Vetter repeated the demands that Deppe sign the agreement multiple times, and finally added threats to his demands.

390. When Deppe continued to refuse, Vetter angrily informed Deppe that if Deppe did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

391. Following Vetter's threats, Weiss informed Deppe that Weiss would not be providing discovery requests for which UCF was already at the end of a thirty-day extension.

392. USPTO patent records would later show that just a few weeks before Vetter had made his threats, additional ownership documents had been filed into USPTO patent records dated October 15, 2020 and October 29, 2020 from USPTO patent records, one of which is shown in **Exhibit 18**.

393. Vetter's threats in November, 2020 were followed by the stalking, assaults, batteries and confinement that occurred during the Florida Whistleblower proceeding in Q4 2020, all trying to extort the fraudulent agreement for UCF and the military that could be used to cover up the dispositive proof of perjury by Sovinski in the USPTO patent records on the oxide-free VCSEL invention.

394. Deppe had scheduled a visit to Feng's laboratory at the University of Illinois in November, 2020 to review test results and discuss the next steps for the

research on the sdPhotonics' cryogenic oxide VCSEL prototypes that Feng was testing in his laboratory in his consulting for sdPhotonics.

395. After leaving Florida, Pinsukanjana began contacting Deppe in repeated phone calls while Deppe was driving.

396. Pinsukanjana's contacts were to learn where Deppe intended to spend the night as he travelled to Illinois.

397. Deppe was unsure because of the long drive, and Pinsukanjana contacted Deppe repeatedly after Deppe had left Florida until Pinsukanjana learned from Deppe would stop and stay overnight in Carbondale, IL.

398. The stalking began in Carbondale, IL.

399. Carbondale, IL is a rural town, and while coming into and driving in Carbondale Deppe was followed by other cars on otherwise empty roads and streets. Deppe then became stalked in stores and on the streets in Carbondale when he left his car.

400. The stalking employed maskless stalkers who used the physical endangerments brought on by the covid epidemic during one of its peaks in November, 2020 and December, 2020m, in repeated confrontations.

401. The stalkers would enter Deppe's personal space for which the stalkers would be contagious, and angrily demand Deppe remove his mask or take off his gloves, because covid was "not real."

402. Deppe was repeatedly confronted on streets, in stores, in hotels, and elsewhere by the maskless stalkers, pretending to be angry over Deppe's wearing

of a protective mask with demands that Deppe remove his own mask because covid was not real.

403. In the case of one stalker who confronted Deppe multiple times, Deppe also confronted the stalker. The stalker admitted he had been approached on the street and given $100 by people he didn't know to take part in the stalking and assault Deppe using the threat of covid infection, consistent with what Deppe observed with the other stalkers.

404. It became apparent that much of stalking by the military and universities were staged for the purpose of harassment and intimidation, and at the same time designed to pose real physical endangerments due to the threats of covid infection.

405. As the stalking was taking place in Carbondale, IL, Deppe also began having his financial accounts changed, with evidence of identity theft.

406. Deppe became unable to access several of his and sdPhotonics' bank accounts and credit card accounts.

407. Deppe began receiving phone calls while being stalked in Carbondale, IL from military program monitors, attorneys, and employees of defense contractors. The calls were staged around Vetter's phone call that had made the threats involving the settlement agreement.

408. Matt Kim is a former University of Illinois graduate student, colleague of Nick Holonyak and Milton Feng, and owner of the company QuanTera that does military contracting with specialty in semiconductor devices.

409. Matt Kim also consulted for the Plaintiff's company on different occasions.

410. Kim contacted the Plaintiff in repeated phone calls while the Plaintiff was stalked, assaulted, and battered in Carbondale, and repeatedly asked the Plaintiff in the calls whether the Plaintiff had ever had sex with a sixteen (16) year old girl.

411. The Plaintiff informed Kim that he was being stalked by the military, and asked why was Kim was calling to ask the Plaintiff with such questions.

412. Matt Kim could provide no legitimate reason for his phone calls or why he was repeatedly calling to ask the Plaintiff whether he had ever had sex with a sixteen (16) year old girl.

413. Noren Pan is a former University of Illinois graduate student and colleague of Nick Holonyak and Milton Feng, and owner of the company Microlink, Inc., that does military contracting in semiconductors.

414. Pan and the Plaintiff's company, sdPhotonics, had performed some work before in anticipation of submitting joint research proposals for projects.

415. The Plaintiff contacted Pan in November, 2020, while he was being stalked, assaulted, and battered in Carbondale, IL, and informed Pan about what was happening and requested his help.

416. Pan responded by text message and informed the Plaintiff that Pan had set up a meeting in a vacant house in Chicago, and wanted the Plaintiff to meet him in the vacant house.

417. Pan could provide no legitimate reason for why he was asking the Plaintiff to meet him in a vacant house during the stalking, assaults, and batteries that took place in Carbondale, IL, in Q4 2020 during the Florida Whistleblower proceeding.

418. Plaintiff was contacted by Defendant Kish, another one of the former graduate students of Nick Holonyak, while the Plaintiff was being stalked in Carbondale, IL, in November, 2020 during the Florida Whistleblower proceedings.

419. The Plaintiff and Kish exchanged emails in which the Plaintiff informed Kish he was being stalked as part of a military take-over of his company, and that the stalking was occurring as part of the Florida Whistleblower lawsuit.

420. Kish then informed the Plaintiff that Kish was very good friends with one of the DARPA program monitors linked to the organized crime from the military, Gordon Keeler.

421. Kish acknowledged that he knew the effort was to take over the Plaintiff's company and use the laser inventions to obtain further government funding.

422. Kish then tried to distance himself from any involvement, and insisted in November, 2020 while the Plaintiff was being stalked and cyber-stalked, that his own university, North Carolina State University, was not part of the what was occurring, and would not receive any of the funding related to the Plaintiff's oxide-free VCSELs.

423. Van Vechten called Deppe multiple times during the stalking in Carbondale, IL.

424. In one call Van Vechten informed Deppe that she expected the sdPhotonics technology to greatly improve her retirement. Van Vechten explained how her military salary was adequate, but not what she expected to receive as a result of Deppe's oxide and oxide-free VCSEL inventions.

425. Van Vechten called Deppe repeatedly to discuss whether he would give up the rights to the sdPhotonics' VCSEL inventions, and offered Deppe other contracts for sdPhotonics if Deppe agreed.

426. This was followed by a call from John Taboada, who explained to Deppe that he knew that the FBI was working with the military and UCF, and that the FBI and UCF were planning to frame Deppe for the false ownership documents that the attorneys working with UCF had filed into the USPTO patent records.

427. Mark Beranek who had worked with Kuznia in a contract with sdPhotonics through NAVAIR that had begun in September, 2020, also called Deppe.

428. Beranek offered Deppe alternative contracts to sdPhotonics if the company would relinquish ownership in the oxide-free VCSELs and related VCSEL technology in the NAVAIR contract.

429. Mark Beranek's phone call in late November, 2020 during the stalking was followed by a call from Charlie Kuznia.

430. Kuznia informed Deppe that he had learned sdPhotonics was relinquishing ownership of its laser inventions and Kuznia requested to take over the IARPA project involving the cryogenic oxide VCSEL, Feng, Van Vechten, and the University of Illinois.

431. Kuznia further claimed his own company, Ultra Communications, Inc., was desperate for funds, and that he understood sdPhotonics would not need the contract.

432. After being stalked by car and by foot, assaulted, harassed, constantly awoken in the hotel, and repeatedly exposed to risks of covid, the Plaintiff was surrounded by unknown and threatening individuals in a parking lot, where he became extremely concerned for his safety.

433. Exhausted, the Plaintiff walked into a grocery store where the workers behind the counter allowed the Plaintiff to use a store phone. The Plaintiff then called Milton Feng and explained he was being stalked and threatened by the military and law enforcement, and asked for Feng's help.

434. Feng responded to Deppe's repeated requests for help that he had been instructed not to assist Deppe or sdPhotonics and could not help.

435. The Plaintiff then called his nephew, Nicholas (Nick) Stork, and informed him the Plaintiff had car problems in Carbondale, IL, and asked if Nick Stork could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

436. Van Vechten then called the Plaintiff almost immediately after he had contacted Nick Stork and informed the Plaintiff that he was being stalked, had information about the stalkers, and that it was coming from part of the military that was working with Donald Trump.

437. Van Vechten went on to say the government and UCF were defending themselves because of the Plaintiff had filed the Florida whistleblower lawsuit, and that Trump hated whistleblowers.

438. Van Vechten then used a trick, informing the Plaintiff that Trump had lots of supporters in So. Illinois and he should stay out of the hotels, and that he needed to get to a blue part of the state.

439. Van Vechten then explained that she knew a place behind locked doors away from the stalkers for a few days close to the Univ. of Illinois campus, in the blue part of the state, and that the military had connections there but would take her several hours to arrange the stay and would call back.

440. Once Nick Stork arrived with his wife, Mindy Stork, the Plaintiff explained to them that he was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

441. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

442. Several hours later while Nick Stork and Mindy Stork had made arrangements and were driving the Plaintiff to the Univ. of Illinois campus in Champaign-Urbana, Van Vechten called again and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, where the Plaintiff could stay for a few days, and gave the Plaintiff the name of the facility, which was Pavilion, and directions.

443. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork, after which the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

444. When the Plaintiff awoke the next morning, he learned that Van Vechten had confined the Plaintiff in a psychiatric ward under the Martin Repetto in the facility she sent the Plaintiff, the Pavilion.

445. The Plaintiff was confined against his will and without cause in the Pavilion psychiatric ward for six (6) days.

446. For those next six days the Plaintiff was harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and received food poisoning.

447. During part of time the Plaintiff was placed in a communal sleeping center where numerous different supposed "patients" were checked into the room,

all refusing to wear masks despite covid, and supposedly just admitted with no covid testing.

448. The Plaintiff was told by certain staff that he would be forced to attend supposed "group" sessions for their patient in order to be released at the end of the six days.

449. The sessions were clearly staged meetings of approximately a dozen or so people pretending to be patients with supposed mental ailments.

450. The Plaintiff was asked to meet with Martin Repetto repeatedly during the Plaintiff's confinement in the Pavilion.

451. Each time Repetto requested to meet with Deppe, Repetto demanded information in the meeting about the oxide-free VCSEL, and claimed the Plaintiff was withholding information.

452. However, the Plaintiff had never mentioned lasers or VCSELs to Repetto or anyone else in the Pavilion, and Repetto's meetings were also clearly staged.

453. Supposed "psychiatric patients" were moved continuously into and out of the communal sleeping area where the Plaintiff slept, none of whom wore masks. Each claimed they were not tested before they were admitted, despite the peak of covid in November, 2020.

454. The Plaintiff tried multiple times to call out of the Pavilion by phone to reach Nick Stork, and his calls out of the Pavilion would not go through.

455. On the fourth day of the Plaintiff's confinement one of the staff brought the Plaintiff a supposed diagnosis from Repetto the Plaintiff was asked to sign stating the Plaintiff had bipolar mental disease.

456. The Plaintiff refused to sign.

457. On the fourth morning one of the supposed "mental patients" admitted he was out of work and had been approached by someone who agreed to pay him to take part in the intimidation scheme in the Pavilion with the military against the Plaintiff.

458. Later that day after the supposed patient admitted to the Plaintiff what was happening was staged, the Plaintiff was moved to a private room on the same floor.

459. On that night the Plaintiff received food poisoning and vomited throughout the night, and did not sleep.

460. The next morning several of the supposed "patients" met in the hallway, after which one of the staff members brought each of the supposed "patients" ballpoint pens. The supposed "patients" then followed the Plaintiff around the hallway with their ballpoint pens pointed towards the patient in what was obviously staged for intimidation.

461. When that failed the supposed "patients" began checking themselves out of the Pavilion by going to the reception desk on the floor and informing the staff they were ready to leave. The staff signed paperwork for more than half of the dozen or so supposed "patients" who then left the facility.

462. On the final morning Defendant Repetto came to the Plaintiff's room and informed the Plaintiff that he wanted to keep the Plaintiff longer in the facility, and the Plaintiff demanded to be let out.

463. Defendant Repetto informed the Plaintiff that they had called his nephew, Nick Stork, who would meet him outside the Pavilion facility.

464. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister, Brenda Stork, and brother-in-law Larry Stork.

465. Nick, Brenda, Larry and Mindy claimed to the Plaintiff that Nick had tried to contact to the Plaintiff while he was in the Pavilion and the staff were rude and refused to put Nick's calls through to the Plaintiff.

466. The Plaintiff grew suspicious of the claims by Brenda and Larry Stork after they arrived in Southern Illinois, and Brenda and Larry Stork repeatedly insisted they wanted to help hide the Plaintiff from UCF, while by then Brenda, Larry, and Nick Stork new the confinement in the Pavilion had been set up by the military and Deborah Van Vechten.

467. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contained records of phone calls between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

468. Once Brenda Stork, Larry Stork, and Deborah Baird, learned in August, 2021 that the Plaintiff had obtained the medical records showing that Nick

Stork had been having phone calls with the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

469. By October, 2021, Brenda Stork, Larry Stork, and Deborah Baird used threats and intimidation based on what they had done with the military and that they would take some additional actions with UCF and military against the Plaintiff.

470. They then demanded the Plaintiff sign over property to them that the Plaintiff held in Southern Illinois, claiming they would take more action with the military if the Plaintiff did not meet their demands.

471. When the Plaintiff was released from the Pavilion in November, 2020, Pinsukanjana and Yunpeng Song also continued the harassment and intimidation, and informed the Plaintiff that IET intended to provide sdPhotonics' oxide-free VCSEL materials to the Chinese company with whom Song was working.

472. However, Pinsukanjana knew that sdPhotonics' oxide-free VCSEL materials were covered by SBIR agreements and the International Traffic in Arms Regulations (ITAR), and could not be provided to foreign entities without approval of the U.S. State Department, or ITAR could be violated.

473. Deppe repeatedly objected to Song and Pinsukanjana in December, 2020, and informed them that sdPhotonics had given no such approval and that any transfer of sdPhotonics' oxide-free VCSEL materials would likely violate ITAR, as well as existing agreements between each of the parties.

474. In response, Song and Pinsukanjana continued their plans, ignoring Deppe about ITAR.

475. Throughout the remainder of November, 2020 and December, 2020 after Deppe was released from the Pavilion he cyber-stalked while the physical stalking continued, and experienced more evidence of identity theft in financial and business accounts. Deppe discovered addresses had been changed in his personal bank accounts and those of sdPhotonics.

476. sdPhotonics furthermore had key parts of its business government website with the System for Award Management (SAM) deleted and Deppe's name removed from the sdPhotonics' website.

477. The company had to reinstate the site in December, 2020 through the military helpdesk known as the SAM helpline. Deppe recorded the interactions with the help desk staff as the site was reinstated. The helpline staff were unable to determine how the parts of sdPhotonics' government business account had been deleted and Deppe's name removed.

478. Deppe reported the identity theft and stalking in a letter to Brownlee in December, 2020, reporting the retaliation for filing the whistleblower complaint in the case she oversaw. He also provided the letter to Weiss to insure there was no *ex-parte* communication with the court.

479. Instead of keeping the information confidential following whistleblower procedures, Brownlee placed the letter on the court's docket.

480. When Deppe returned to Florida in December, 2020 from the travel in which he was stalked, harassed, assaulted, battered, and confined, he arrived at his home in Oviedo, FL to find the house had been broken into, and all the external door locks of the house had been broken.

481. The broken locks on the house were linked to a real estate company whose owner was a close friend of Angela Gallagher.

482. Because of the break-ins Deppe stayed in hotels in Orlando, FL while he had the door locks repaired, and experienced more "staged" stalkers who followed him in and outside the hotels.

483. By the end of December, 2020, Deppe had contacted the Florida Attorney General, Ashley Moody, reporting that he was being stalked and threatened during the Florida Whistleblower Case No. 2019-CA-015042-O proceeding.

484. Ashley Moody responded to Deppe that her office was not the correct office to report criminal actions by attorneys because the attorneys were part of a court case, and claimed she would not have jurisdiction or authority to take any action. Moody's office then directed Deppe to the other agencies in Florida.

485. In January, 2021, the Plaintiff and Noren Pan discussed the military attempted take-over of sdPhotonics.

486. Noren Pan admitted in the January, 2021 phone call that he knew the Plaintiff's company had been targeted by the military, universities, and defense contractors in intellectual property theft.

487. Deppe had also contacted the attorney Robin Foret in December, 2020, and requested her advice and assistance in having the Florida Whistleblower Case No. 2019-CA-015042-O dismissed because of the stalking and extortion that had occurred.

488. Deppe asked Foret to review the work of Joe Southron who Deppe had contacted to dismiss the Florida Whistleblower lawsuit, and Foret agreed to provide her assistance on the lawsuit reviewing court filings and related documents.

489. Deppe hired Joe Southron to dismiss the Florida Case No. 2019-CA-015042-O without prejudice so that Deppe could bring the claims at a later date after the retaliation had ended.

490. Southron attempted to obtain a power of attorney agreement as part of his representation for reasons he could not explain.

491. Foret advised Deppe Southron did not need a power of attorney.

492. Deppe asked Southron why he needed the power of attorney, and Southron then dropped the request for the power of attorney after he was unable to justify to Deppe why he would need it.

493. Southron then argued to Deppe against dismissing the Florida Whistleblower Case No. 2019-CA-015042-O, despite that Southron had been informed that Deppe had been stalked by the military and prior attorneys in the lawsuit.

494. Instead, Southron insisted on obtaining all evidence involving the perjury in the USPTO patent records.

495. Southron then informed Deppe that he was certain his firm could win the lawsuit with an amended complaint.

496. In January, 2021, Gerhold contacted and informed Deppe that he had learned from Van Vechten that sdPhotonics was relinquishing its rights to its intellectual property on its VCSEL inventions.

497. After Deppe informed Gerhold the information wasn't true, Gerhold promised new contracts for sdPhotonics and requested information on the company's business plans to conduct reliability testing of the oxide-free VCSELs for the new contracts.

498. However, because of the stalking, physical endangerments, extortion attempts, and government involvement, Deppe began working to end the sdPhotonics' contracts with the military in January, 2021.

499. Foret has filed an affidavit as part of a "Motion to Dismiss" in which she claims she "was not involved in any of the activities" listed in this Complaint and was unfamiliar with the Florida Whistleblower Case No. 2019-CA-015042-O.[9]

500. Statements Foret made in her affidavit contradict the list of email correspondence between Deppe and Foret shown below, as well as their content, during the time from December 19, 2020 through May 15, 2021.

[9] See Foret's affidavit attached to Foret's Motion to Dismiss filed with this Court in Doc. [46].

501. The emails were exchanged between Deppe and Foret during the time from December 19, 2020 through May 15, 2021 with Foret assisting Deppe to insure Southron properly dismissed the lawsuit.

R Robin Foret texaslaborlaw@yahoo.com

| | | |
|---|---|---|
| me, Robin 6 | Inbox Dismissal - texaslaborlaw@yahoo.com> wrote: Dennis, My attorney job is now ... 2021.05.13 Dep... | 5/15/21 |
| me | Complaint Complaint.pdf | 5/7/21 |
| me | Motion to Dismiss - Attached 2021.05.06 Dep... | 5/7/21 |
| me | Order of Dismissal - Order 2021.05.06 Dep... | 5/7/21 |
| me, Robin 2 | Inbox Motion to dismiss - Dennis, Yes, that looks much better now, why couldn't he d... 2021.05.06 Dep... | 5/7/21 |

| | | |
|---|---|---|
| me | Here - Here is what I sent. Joe, Let me look at the dismissal over the weekend and ch... | 4/16/21 |
| me | See text - Dr. Deppe, After careful consideration I am withdrawing from representatio... | 4/16/21 |
| me, Robin 2 | Inbox Thanks - Glad to help. Robin > On Apr 11, 2021, at 7:59 AM, Dennis Deppe wrot... | 4/11/21 |
| Robin Foret | Inbox Attached: The New Science of Adult Attachment and How It Can Help YouFind ... | 1/20/21 |
| Robin Foret | Inbox Secure Attachment and Other Attachment Styles - https://www.verywellmind.c... | 1/20/21 |
| me | Can you look at this? - This is a retainer agreement with a firm to review documents. Engagement Te... | 1/11/21 |
| Robin, me 2 | Inbox Re: whistleblower statute - Two Cases - texaslaborlaw@yahoo.com> wrote: De... King v Board of ... Competelli v Cit... | 1/11/21 |
| me, Robin 3 | Inbox whistleblower statute - texaslaborlaw@yahoo.com> wrote: D... FloridaStatutes... | 1/8/21 |
| me | documents to review - I'd like you to look at three documents that a... docum... 12.21.20_Oppos... Affidavit_12_21... | 12/27/20 |
| Robin, me 4 | Inbox Another possible law firm - texaslaborlaw@yahoo.com> wrot... WebPage.pdf | 12/22/20 |
| me, Robin 2 | Inbox example lawfirm - I will check out the Website and see if I ca... | 12/19/20 |
| Robin, me 2 | Inbox Re: documents - UCFRF - texaslaborlaw@yahoo.com> wrote:... | 12/19/20 |

502. Statements Foret made in her affidavit[10] contradict the list of email correspondence between Deppe and Foret shown above, as well as their content during the time from December 19, 2020 through May 15, 2021.

503. Foret's affidavit makes the claim below:[10]

> 9. I explained that I could not give opinions on his legal documents because I did not handle patent issues. Moreover, my purpose was to date, not to.

504. However, Foret sent Deppe the email on December 19, 2020 that she would review the legal documents she had received and get back to Deppe. Foret's email directly contradicts Foret's claim in her affidavit:[10]

Gmail — Dennis Deppe <dennisdeppe01@gmail.com>

**documents**

**Robin Foret** <texaslaborlaw@yahoo.com> — Sat, Dec 19, 2020 at 8:25 AM
To: Dennis Deppe <dennisdeppe01@gmail.com>

Dennis;

Thank you for the documents; I will review them later this morning. Can you give me until after lunch to talk - about 1:00 or 1:30pm? Is that convenient for you?

Sincerely,

Robin Foret

> On Dec 19, 2020, at 6:48 AM, Dennis Deppe <dennisdeppe01@gmail.com> wrote:
>
>
> Good morning Robin,
>
> Attached are some key documents. Talk to you later this morning.
>
> Dennis
> <Background_PatentAssignments.pdf>

505. In late February, 2021, during the Florida Whistleblower Case No. 2019-CA-015042-O, Deppe travelled to Dallas, TX where sdPhotonics was located to discuss the intellectual property theft and stalking with Robin Foret directly and get her input as to what could be legally done about the government involvement.

506. Foret and Deppe discussed the stalking that had occurred during the lawsuit and other criminal actions by government entities involved with the military and universities.

507. Foret and Deppe discussed how sdPhotonics had been founded, the role of Sabine O'Neal in founding the company, and O'Neal's departure from the company.

508. When Foret and Deppe discussed the stalking and other criminal actions that had occurred, Foret was most interested in Deppe's past relationship with Diana Huffaker from The University of Texas at Austin.

509. Deppe and Foret had never discussed Huffaker before Foret had brought up Huffaker's name, only sdPhotonics and O'Neal. Foret told Deppe she had found Huffaker's name from the internet.

510. Foret and Deppe discussed the government corruption involving the patents at length on multiple occasions in the time frame of February and March, 2021.

511. Foret explained that she did not have the legal experience in the criminal actions, but acknowledged she knew about the scheme by the universities and military.

512. Foret informed Deppe that the intellectual property theft scheme was at political levels above the SBA IG's office, and advised Deppe that contacting other IGs such as with the DOJ would do little good, stating "it was already above that level."

513. Foret then specifically stated that only Joe Biden could stop the intellectual property theft scheme and stalking. Foret then recommended Deppe write to Biden directly.

514. Foret went on to provide Deppe information about Huffaker showing that Joe Campbell at The University of Texas at Austin had used Diana Huffaker as one of the female honeypots to learn about his research and scientific plans.

515. Foret then attempted to obtain additional information from Deppe on other women he had dated before he returned to Florida.

516. In the same time period Foret let it slip that she knew of Deppe's nephew, Nick Stork, but did not explain how she knew of Nick Stork.

517. In or about January, 2021, Foret had made referrals to Kevin Keeling and Mark Solomon as two attorneys from Texas working in intellectual property who could help resolve the false ownership documents filed into the USPTO patent records.

518. Foret called Deppe while Deppe was in Florida to make the referral to Keeling and Solomon, explaining to Deppe that it was important that Solomon was a patent attorney who had a doctorate in a technical field.

519. Solomon would eventually use his doctorate in a technical field as part of his refusals to correct false ownership documents filed into the USPTO patent records after he obtained a power of attorney from Deppe for the patents.

520. In March, 2021, Southron provided Deppe the complaint Southron had amended.

521. Southron's amended complaint brought the Florida Whistleblower's Act against a large number of individuals.

522. Deppe researched Southron's amended complaint and found that Florida courts had already ruled that the Florida Whistleblower Act, Fl. St. § 112, cannot be brought against individuals.[10]

523. When Deppe refused to allow Southron to file the amended complaint, Southron tried to terminate his representation because of Deppe's refusal.

524. When Deppe insisted Southron dismiss the Florida Whistleblower Case No. 2019-CA-015042-O, Southron prepared several improper motions to dismiss the case that were refused.

525. Deppe continued to work with Foret in this time period to have the improper motions from Southron reviewed and corrected.

526. Southron finally agreed to file the correct motion to dismiss the Florida Whistleblower Case No. 2019-CA-015042-O.

527. Foret's claims in her affidavit that she had no involvement in any matter related to the Florida Whistleblower Case No. 2019-CA-015042-O are further contradicted by the email she sent Deppe on May 15, 2021 shown below, showing she had considered her work to be legal services, and that she knew that Deppe was living back in Florida during that time:

[10] See Fl. St. § 112 and De Armas v. Ross, 680 So. 2d 1130 (1996).

Gmail Dennis Deppe <dennisdeppe01@gmail.com>

**Dismissal**

**Robin Foret** <texaslaborlaw@yahoo.com> Sat, May 15, 2021 at 9:29 AM
To: Dennis Deppe <dennisdeppe01@gmail.com>

Dennis,

My attorney job is now over. When you get to Dallas, maybe we can still have dinner.

Hope you are doing well.

Robin

**F. Keeling and Solomon Let UCF Commit Additional Perjury in the USPTO, as the Military and University of Illinois Administrators Misappropriate sdPhotonics' Cryo-VCSEL Prototypes.**

528. Foret's referral to Keeling and Solomon would turn out to do the opposite of protecting Deppe or sdPhotonics' patents. Keeling and Solomon used the power of attorney they received to file and correct patents, instead to allow additional false ownership documents to be filed with the USPTO after the Florida Whistleblower Case No. 2019-CA-015042-O was dismissed.

529. Keeling initially reviewed the ownership documents that had been filed into the USPTO patent records and determined with Solomon that the ownership documents filed into the USPTO patent records at issue contained perjury and misrepresented UCF patent regulations UCF-2.029.

530. Keeling and Solomon determined that sdPhotonics had ownership rights in the patents, and possibly exclusive ownership because of the perjury by UCF employees and their violation of UCF Regulations UCF-2.029 (**Exhibits 8, 9, 10**).

531. Keeling determined in his review of the patent records, UCF Regulations UCF-2.029, and the declarations Sovinski filed into the USPTO patent records violated UCF Regulations UCF-2.029 (**Exhibits 8, 10**), and determined that Sovinski engaged in perjury and breached the 2014 IP Agreement.

532. Solomon reviewed the retroactive documents that had been filed into the USPTO patent records with Keeling, and also determined that the declarations Sovinski filed into the USPTO patent records at issue contained false statements.

533. Solomon also determined in his review of the patent records and UCF Regulations UCF-2.029 with Keeling that the ownership documents at issue filed into the USPTO patent records violated UCF Regulations UCF-2.029 (**Exhibits 8, 9, 10**).

534. Solomon requested Deppe issue him a power of attorney, so he could correct the false ownership documents that had been filed into the USPTO patent records and file additional patents for Deppe and sdPhotonics.

535. After Solomon obtained his power of attorney, he refused to make corrections to the false ownership documents that had been filed into the USPTO patent records.

536. Solomon and Keeling refused to correct the false ownership documents, and allowed attorneys working with UCF to file the same false USPTO declarations they determined was perjury and breached the 2014 IP Agreement, onto newly filed patent applications Solomon filed for the Plaintiff and sdPhotonics.

537. Instead of correcting the false ownership documents filed into the USPTO patent records and protecting the patent applications filed by Deppe or sdPhotonics, Solomon repeatedly claimed that he (Solomon) had a doctorate in a technical field, and knew what he was doing letting other attorneys working with UCF file on the newly filed patent applications from Deppe or sdPhotonics.

538. Over the next year Solomon used the power of attorney he was issued to allow other attorneys to file additional false ownership documents into the USPTO patent records on the oxide-free VCSEL inventions.

539. Solomon took no action to correct or prevent the false ownership documents from being filed.

540. Over the next year, Keeling also refused to take action while other attorneys working with UCF and the military filed additional false ownership documents into the USPTO patent records on the oxide-free VCSEL inventions.

541. Keeling finally claimed to Deppe while Solomon was refusing to take action that he and Solomon already knew that every court would be influenced by the involvement of the military and government entities, and trying to make the corrections was pointless.

542. Solomon made the same claim, in the same phone conversations with Keeling and Deppe.

543. Deppe later discovered that false ownership documents were being filed into the USPTO patent records on additional sdPhotonics' patents even as the Florida Whistleblower Case No. 2019-CA-015042-O was being dismissed.

544. One of the USPTO documents filed during the Florida Whistleblower case as it was being dismissed is dated April 2, 2021 and shown in **Exhibit 19**.

545. The military included researchers from the National Institute of Standards and Technology (NIST) in the military and universities intellectual property theft scheme involving perjury in the USPTO and sdPhotonics Cryo-VCSEL prototypes.

546. The next government funding from the Biden Whitehouse Administration was already being discussed, which was initially called the "Build Back Better" government funding program.

547. In or about June 2021, Deppe was contacted by the NIST employee Jeffrey Shainline. NIST had been working closely with Deppe and Feng at Illinois, but Shainline was not involved in the project.

548. Shainline instead requested discussions with Deppe to try to understand why Bower's proposed solutions that had been heavily funded by the Obama/Biden Aims Photonics Center had failed to produce any useful results.

549. Shainline wanted to propose on the next government funding package from the Biden/Harris Whitehouse administration which was the "Build Back Better" program, that became "Chips + Science."

550. Shainline explained to Deppe that NIST expected to play a central role in Biden's proposed "Build Back Better" and wanted to include sdPhotonics in their proposed project.

551. Shainline was confused about why the projects from the Obama/Biden Aims Photonics from 2015 that had been proposed by Bowers at UCSB had failed to solve a chip integration problem that they had targeted.

552. Shainline then asked Deppe why what Bowers had proposed on the Obama/Biden Aims Photonics Center had failed to solve integration problem.

553. After receiving general technical information needed for the integration scheme and why what Bowers had proposed would not work, Shainline used a bait and switch and sent the email shown in **Exhibit 20**.

554. Shainline's email shown in **Exhibit 20** had nothing to do with the proposed funding package from Biden, and instead describes measurements that were proposed by Feng at Illinois.

555. Feng had learned sdPhotonics would develop an advanced I-V model to study the low temperature physics and showed up at one of the meetings with the wrong understanding of the laser device physics needed for the I-V model.

556. Shainline then described in his email the same incorrect understanding that came from Feng, which are not the measurements needed to develop an I-V model for sdPhotonics' cryogenic oxide VCSELs.

557. Shainline uses a taunt at the end "We may even be able to give you money, if you're interested in that sort of thing."

558. The taunt was because of Deppe's reputation for placing the science above the funding.

559. sdPhotonics had developed the oxide-free VCSEL invention with a relatively small amount of research funding of ~$7M over many years with a small group focused on the laser device.

560. Shainline received no information that would be useful to perform the research needed to solve the integration problem, but did receive extremely useful information that told them how to write a proposal and what issues were key.

561. In June, 2021 following the interaction with Shainline describing the incorrect measurements and incorrect physics that had been proposed by Feng, Gerhold and Feng attempted plagiarism involving sdPhotonics cryogenic oxide VCSEL that Feng had in his University of Illinois laboratory.

562. Gerhold sent Deppe an article to review about contracts Gerhold had awarded with the ARO to Deppe and Feng.

563. Embedded in Gerhold's publication were paragraphs crediting Feng with the cryogenic oxide VCSEL invention from sdPhotonics that Feng was testing in his University of Illinois lab.

564. After Deppe identified the claims to Gerhold as incorrect and withheld his own approval from sdPhotonics work being included in the article, Gerhold agreed to change the article.

565. Feng, who wanted more cryogenic oxide VCSEL prototypes from sdPhotonics, claimed Gerhold had made the mistake.

566. Feng claimed he knew that Deppe had invented the cryogenic oxide VCSEL after several years of researching the new laser device.

567. However, by the end of the IARPA Supercables project beginning in or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois, and Harrod was agreeing with Feng.

568. By the beginning of or about August, 2021, Defendant Harrod began demanding in phone meetings that the Plaintiff allow IARPA to use the sdPhotonics' Cryo-VCSELs in other projects. However, Harrod could provide no legitimate reason for why sdPhotonics should relinquish ownership or property rights in its prototypes to go with his demands.

569. Instead, Harrod demanded control of the prototypes, claiming he had been issued the directive from his IARPA Director, Catherine Marsh, who had told him to obtain the prototypes for other projects, and that Harrod himself knew nothing about the issue.

570. The Plaintiff refused to provide Harrod any permission and demanded the return of the sdPhotonics' Cryo-VCSEL prototypes.

571. By September, 2021, sdPhotonics was able to end the IARPA Supercables project with the University of Illinois and Feng's group.

572. After the IARPA Supercables project had ended and Feng refused to return the Cryo-VCSEL prototypes, Harrod issued Feng additional contracts to use the sdPhotonics' Cryo-VCSEL prototypes on Harrod's other IARPA projects, with Feng publishing articles on the Cryo-VCSELs and claims the lasers were developed at the University of Illinois in his laboratory.

573. **Exhibit 21** shows that in September, 2021, as William Harrod was demanding improper control of sdPhotonics Cryo-VCSEL prototypes, and sought to use the trade-secrets in the prototypes that gave it record speed, Sovinski and Shtrom at UCF filed additional declarations into the USPTO on sdPhotonics oxide-free VCSELs.

574. Svetlana Shtrom filed the additional assignment declarations on sdPhotonics' oxide-free VCSEL patents into the USPTO patent records shown in **Exhibit 21** that continued the breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029(4)(d), in continued damage to sdPhotonics' business operations.

575. In or about November, 2021, after the IARPA Supercables program had ended, Feng and IARPA were again asked to return the sdPhotonics' proprietary Cryo-VCSEL prototypes.

576. When Feng again refused, the Plaintiff contacted by email Rashad Bashir, the Dean of Engineering at the University of Illinois, and Susan Martinis, who is responsible for research and commercialization at the University of Illinois, and explained to Bashir and Martinis what Milton Feng had done on the IARPA Supercables project to disrupt sdPhotonics' research, and asked for the sdPhotonics' Cryo-VCSEL prototypes be returned as had been agreed as part of the IARPA project.

577. Instead of Bashir or Martinis returning the Cryo-VCSEL prototypes, the Plaintiff received an email from Susan Martinis office that included Milton

Feng, John Dallesassee, and Fred Kish, and that claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

578. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

579. Bashir, Martinis, and Milton Feng then produced Illinois press releases and scientific articles with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

580. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from Harrod to the University of Illinois based on the sdPhotonics' Cryo-VCSEL, and claimed they had been developed in Feng's laboratory at the University of Illinois.

581. By March, 2022, Deppe had discovered tax fraud and identity theft in his IRS records on his 2017 tax year by attorneys working with The University of Texas at Austin and a tax accountant in Orlando, FL.

582. The tax fraud and identity theft, verified by an IRS investigation described in **Exhibit 22**, had been committed by administrators at The University of Texas at Austin who had filed a W-2 onto Deppe's 2017 tax year.

583. The University of Texas had crafted its own scheme with the military to trying to take over the sdPhotonics oxide-free VCSEL inventions, and had used a false claim to the IRS that Deppe had been employed by The University of Texas in 2017 as a means to claim ownership of the oxide-free VCSEL patents.

584. Later, Deppe discovered that additional ownership documents from Shtrom shown in **Exhibit 23** had been filed on patents and patent applications from sdPhotonics in February, 2022.

585. In or about March, 2022, Deppe again filed a second complaint with the SBA IG Hannibal Ware describing details of the stalking, assaults, batteries, and confinement that had occurred in Q4 2020 during the Florida Whistleblower Case No. 2019-CA-015042-O proceeding, and additional information on the perjury by UCF's Sovinski in the USPTO working with the military.

586. In the same time period of about March, 2022, while working with military auditors in central Texas and reviewing past sdPhotonics' financial records, Deppe began discovering that Linda Coco had placed errors in the sdPhotonics' retirement accounts of several employees when she had set up the accounts in 2015, that had caused the errors to enter in the company's IRS tax filings that had been made by the sdPhotonics' accountant.

587. sdPhotonics had to make corrections to the tax filings and back payments to past employees' retirement accounts.

588. In or about June, 2022, again working with military auditors in central Texas, Deppe discovered the fraud that Sabine O'Neal had created in the sdPhotonics' business records prior to 2014, and that had damaged its accounts and tax filings.

589. The accounting fraud by O'Neal was further linked to the identity theft committed on Deppe's 2017 tax records with employees of The University of Texas at Austin (**Exhibit 22**).

590. The accounting fraud by Sabine O'Neal was discovered and confirmed by both Deppe and DOD auditors in reviewing accounting records from when O'Neal was sdPhotonics' president prior to 2014.

591. As O'Neal had claimed, she had not filed overhead expenditure reports required by DOD while she had been overseeing sdPhotonics' accounting and tax filing prior to November, 2014.

592. The DOD auditors also confirmed that O'Neal had passed the audit in or about 2013 on the contract with the DOD auditor in Orlando, FL, despite that O'Neal in fact had not submitting overhead expenditures.

593. The records confirmed that O'Neal and the DOD auditor had committed fraud prior to 2014.

594. O'Neal had passed the audit while possessing no financial records for overhead costs for sdPhotonics, and had claimed the audit of the direct and overhead costs had been nearly perfect at the time.

595. The Plaintiff also confirmed from review of the financial records, that in or just after 2015, Linda Coco had in fact set up errors in retirement accounts that impacted sdPhotonics' IRS tax filings.

596. Some checks were directed to the incorrect accounts, and some checks were not directed to any accounts and not deposited or apparently cashed. The

Plaintiff was forced to work with the retirement firm, TIAA-CREF, and former employees of the company prior to its ending business operations, to correct the accounts.

597. In the meantime, the DOD auditors also confirmed sdPhotonics patent payments and verified the invoices from Shtrom's UCF office, and the patent payments from sdPhotonics for the costs of patenting, including the checks shown in **Exhibit 4**.

598. Deppe terminated Keeling and Solomon in August, 2022, after they repeatedly used Solomon's power of attorney to allow attorneys working with the military and UCF to file the false ownership documents and ownership documents that violated UCF Regulations UCF-2.029 into the USPTO patent records.

599. Their statements about corruption in the courts from Keeling and Solomon left little doubt that they had signed their agreements, and Solomon had obtained the power of attorney, intending to damage sdPhotonics' by using the power of attorney to allow other attorneys working with the military and UCF to file additional false ownership documents onto the oxide-free VCSEL patents.

### G. Miguel, Taft, and Maier Violate the Florida Whistleblower's Act and Deppe is Stalked by the Military from the U.S.

600. In October, 2022, Deppe again followed USPTO rules and regulations and contacted Cook at UCF with the military, provided Cook the invoicing and

payment records, and asked Cook for any input prior to Deppe filing his own corrections to the false USPTO declarations that Sovinski had filed.[11]

601. Deppe provided Cook the email from Sovinski shown in **Exhibit 6** showing that Sovinski knew that sdPhotonics had paid for patent costs prior to filing the false ownership documents into the USPTO patent records.

602. After Deppe contacted Cook in October, 2022, he became heavily stalked using high power directed energy RF transmitters used by the military and police, and food and water poisoning linked to local law enforcements in Florida.

603. As opposed to the stalking that had occurred in Q4 2020 that was largely staged, the stalking that used the RF directed energy transmitters was dangerous and caused Deppe repeated injuries.

604. The military and police-style RF directed energy transmitters used for these purposes are relatively high power, and cause known disruptions to the human nervous system, ears, eyes, and other organs when shot with the high-power RF transmitters (see **Exhibits 1**). The military refers to the RF pulses shot from these types of transmitters as "RF bullets."

605. While Deppe was being stalked and shot with the RF transmitters he was contacted by Frank Tucker, who worked closely with Lateka Eifert. Tucker is an expert on military uses of RF transmitters in simulation and training.

---

[11] https://www.uspto.gov/trademarks/trademark-updates-and-announcements/steps-when-confronted-assignment-against-your-property#:~:text=%C2%A73.54%3B%20TMEP%20%C2%A7503.01(c).&text=Finally%2C%20if%20the%20ownership%20information,of%20title%20in%20the%20property.

606. Deppe had not spoken to Frank Tucker since well before the Florida Whistleblower case in 2019, and refused to speak to Tucker at the time because of information and belief that Tucker was involved, if not behind the use of the RF transmitters by UCF and the military.

607. As Deppe was being stalked, this time in Q4 2022 with the RF transmitters and other tactics, he again contacted Melinda Miguel in the Florida governor's IG office pursuant to the Florida Whistleblower's Act and informed Miguel of the stalking, assaults, and batteries, and that it was linked to the perjury in the USPTO and the attempted take-over of sdPhotonics by the military and UCF.

608. Miguel's response is shown in **Exhibit 24**. Miguel claims her office lacks jurisdiction over patent fraud and perjury involving the UCF employees. The inset from **Exhibit 24** is shown below:

The Office of the Chief Inspector General received your additional information on December 23, 2022, in which you expressed concerns about tax and patent fraud, the military, possible criminal activity, and the referral of your information to the University Audit office at the University of Central Florida (UCF).

Please be advised that this office does not have jurisdiction over federal government issues, such as tax fraud and the military. You may wish to report your concerns to the appropriate Federal Office of Inspector General (i.e., The Treasury Inspector General for Tax Administration). You may find their contact information online at https://www.ignet.gov/content/inspectors-general-directory.

609. The duties of the Florida Chief Inspector General are given on the Florida government website https://www.floridaoig.com/default.htm and shown below:

The Chief Inspector General has a broad range of responsibilities outlined in sections 14.32 and 20.055, Florida Statutes (F.S.). These responsibilities include carrying out activities designed to deter, detect, prevent, and eradicate fraud, waste, abuse, mismanagement, and misconduct in government. Initiating, supervising, and coordinating investigations; coordinating complaint handling activities with agencies; coordinating activities of Florida's Whistle-blower's Act and maintaining Florida's Whistle-blower's Hotline.

610. The Chief Inspector General's letter shown in **Exhibit 24** contradicts Florida laws, and specifically Fl. St. § 817.535, that make fraud unlawful.

611. The statements in Miguel's letter shown in **Exhibit 24** furthermore contradict her stated duties as Chief Inspector General to eradicate fraud in government agencies, and the Florida statute Fl. St. § 817.535 covering fraud. (see https://www.flsenate.gov/Laws/Statutes/2018/0817.535).

612. Miguel acknowledges in **Exhibit 24** that she has been informed by Deppe that Taft's UCF audit office was using the Florida Whistleblower Procedures to cover up perjury by UCF employees in the USPTO patent records (**Exhibit 24**).

613. However, Miguel then violated the Florida Whistleblower's Act, and sent information from Deppe pursuant to the Florida Whistleblower's Act concerning Robert Taft and his involvement in use of the Florida Whistleblower's Act to cover up perjury in the USPTO and additional whistleblower retaliation involving extortion, stalking, assaults, and batteries, back to Taft.

614. Miguel asked Deppe to contact Taft directly if he had concerns with Taft's office at UCF. Miguel's letter shown in **Exhibit 24** states:

> *"in which you express concerns about... the referral of your information to the University Audit Office of the University of Central Florida (UCF)."*

615. As a result of Miguel's intentional violation of the Florida Whistleblower's Act, Deppe became stalked so heavily and repeatedly with assaults and batteries using the military and police technologies and tactics that he was forced to leave the U.S. for his physical safety (**Exhibit 1**).

616. After Taft had received the information and records from Miguel, Tina Maier contacted Deppe from Taft's UCF office in January, 2023, while Deppe was in Europe trying to escape the military stalking by federal law enforcement.

617. Maier's email is shown in **Exhibit 25** dated January 20, 2023.

618. Maier's email in **Exhibit 25** falsely states that the evidence of perjury in the USPTO patent records by the attorneys working with UCF included in Maier's email does not rise to the level of malfeasance or misfeasance:

> intellectual property theft from sdPhotonics LLC. Additionally, you alleged that threats, physical stalking, cyber stalking, and physical endangerment were used to sign fraudulent intellectual property agreements. Lastly, you expressed concerns of UCF filing multiple false ownership documents with the United States Patent and Trademark Office involving sdPhotonics' patents and patent applications, and that Robert Taft, UCF Chief Audit Executive and our office has covered-up those alleged false USPTO filings.

619. In fact, Tina Maier falsely claims Deppe signed the agreement, when the information and records show Deppe refused the settlement agreements that even Eifert's military office determined were based on fraud by UCF and the military.

620. Maier's response in **Exhibit 25** sent January 20, 2023 concerning malfeasance by UCF employees is shown below:

> Specifically, the statute sets a high standard for the impact of the allegations. The language in the statute is intended for us to evaluate the complaint for a violation of any federal, state, or local law, rule or regulation which a) presents a substantial and specific danger to the public's health, safety, or welfare or b) rises to an act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, or gross neglect of duty.

621. As Maier's notice states (**Exhibit 25**), Maier reviewed evidence that is included in this Complaint of the false ownership documents filed by employees of UCF into the USPTO patent records.

622. Maier specifically had in her possession the 2014 IP Agreement signed August 13, 2014 stating that all terms are pursuant to UCF-2.029, **Exhibit 9**, and

the declaration Sovinski filed into USPTO patent records also shown in **Exhibit 8** that falsifies the terms of the 2014 IP Agreement and its pursuance to UCF Regulations UCF-2.029.

623. Maier's training as an investigator with the UCF audit office requires her to treat perjury by UCF employees as malfeasance.

624. Maier reviewed the evidence that sdPhotonics had paid patent costs for the patents at issue.

625. Maier's employment as an investigator with the UCF audit office requires her to treat intentional violation of UCF Regulations UCF-2.029 by a UCF employee as malfeasance, or at the least as misfeasance.

626. Maier knew when she was writing her email that the statements in her email were false, and that the UCF employees who had filed the false USPTO documents at issue had engaged in malfeasance that was coupled to at least misfeasance.

627. Deppe returned to the U.S. in or about early March, 2023, after he had filed the report to the DOD OIG shown in **Exhibit 1**, and the stalking appeared to have stopped in Europe.

628. Deppe did not return to Florida for several weeks after returning to the U.S., since the stalking had been most intense in Florida.

629. Dates that the alleged false ownership documents into the USPTO patent records as part of the alleged patent fraud and perjury that were part of the intellectual property theft scheme include:

a. **Summer, 2019 extending into August 2019**, with one of the USPTO documents shown in **Exhibit 8**.

b. **April 7, 2020**, with one of the documents shown in **Exhibit 16**, during the proceedings of the Florida Whistleblower Case No. 2019-CA-015042-O.

c. **September, 2020 to October, 2020** during the Florida Whistleblower Case No. 2019-CA-015042-O. One of the USPTO documents October 29, 2020 is shown in **Exhibit 18**.

d. **April, 2021**, as the Florida Whistleblower Case No. 2019-CA-015042-O was being dismissed. One of the USPTO documents dated April 2, 2021 is shown in **Exhibit 19**.

e. **September, 2021**, as Feng refused to return sdPhotonics' cryogenic oxide VCSEL. One of the USPTO documents is shown in **Exhibit 21** and dated September 21, 2021.

f. **February, 2022**.

g. **February, 2023**, after Deppe had been stalked from the U.S. using the directed energy military and police-style RF transmitters, and food and water poisoning.

## U.S. SUPREME COURT AND 11th CIRCUIT COURT RULINGS ON EQUITABLE TOLLING

630. The U.S. Supreme Court has established that equitable tolling is required with a showing (1) that the petitioner has been pursuing his rights diligently, and (2) that extraordinary circumstances stood in his way and prevented

timely filing. Extraordinary circumstances include egregious behavior or wrongdoing by the other party that attempts to prevent the petitioner from pursuing their rights. See *Fleming v. Evans*, 481 F.3d 1249, 1255-56 (10th Cir. 2007); *June v. United States*, (9th Cir. 2013).

631. The 11th Circuit Court has found equitable tolling is required specifically when parties are prevented from properly accessing the courts and due to the stalking, assaults, and batteries that have been used during the court proceedings: "Equitable tolling is an extraordinary remedy to be applied sparingly, when a plaintiff's untimely filing is due to extraordinary circumstances that are beyond his control and unavoidable even with diligence." *Sherrod v. Bd. of St. Lucie Cnty.*, 635 F. App'x 667, 673 (11th Cir. 2015).

632. Furthermore, the 11th Circuit found in *Chappell v. Rich*, 340 F.3d 1279 (11th Circ., 2003) that "access to the courts must be more than merely formal; it must also be adequate, effective, and meaningful."

633. The military has been able to use organized government crime to damage four different lawsuits with multiple state and federal judges. This Third Amended Complaint focuses on actions that mainly involve the military's use with UCF and the Florida governor's office in its use of the Florida Whistleblower's Act in its own organized crime and federal civil rights violations alleged in this complaint.

634. In addition, there is fraud upon the court in each of the three federal lawsuits involving federal judges of the U.S. District Court of the Middle District of

Florida who repeatedly violated the court's Local Rule 1.05(a) to become involved in the military bribery scheme and at least attorneys working with UCF.

635. The Florida Whistleblower lawsuit was filed on December 12, 2019, and Deppe was forced to dismiss the lawsuit after the military corrupted every attorney and the judge in the case. The lawsuit was dismissed May 21, 2021, or 556 days later.

636. Deppe was pursuing his rights through the end of the Whistleblower lawsuit, and had already hired Keeling and Solomon during the Whistleblower lawsuit to correct the patent records in the USPTO. Both attorneys refused to do so, and finally admitted they knew the court systems had been corrupted and could not take action on the perjury or other actions by the attorneys working with UCF filing additional false declarations that Sovinski had prepared and signed.

637. Deppe continued to pursue his rights after terminating Keeling and Solomon from the matter and contacted Youndy Cook in October, 2022 with the verified proof she already knew UCF possessed that sdPhotonics had joint ownership in the patents

638. From Europe Deppe continued to pursue his rights and filed the complaint with the DOD OIG shown in **Exhibit 1** dated February 17, 2023, explaining what the military program monitors and university professor had done in their intellectual property theft scheme with the contracts and perjury in the USPTO patent records. Deppe returned in or about the third week of March, 2023, and continued to pursue his rights to the military to correct the patents and seek

compensation for his injuries and damages due to the organized government crime by the military.

639. The facts in this Complaint show that: (1) Deppe has been pursuing his rights diligently in this matter, and (2) that stalking episodes were used by the attorneys working with the employees of at least UCF, the military, the SBA IG, the Florida IG and Florida court systems, and that the 9th Judicial Circuit Court and FLMD court systems themselves used the proceeding of the Florida Whistleblower lawsuit and the retaliation in violation of the Florida Whistleblower's Act to prevent meaningful access to the courts, and created extraordinary circumstances that stood in Deppe's way and prevented timely filing, despite Deppe's continued and persistent diligence.

640. Deppe is entitled to equitable tolling for the time period from the filing of the Florida Whistleblower lawsuit, December 12, 2019, through March, 2023, which is three years and three months. In the alternative, Deppe is entitled to at least the 556 days during the Florida Whistleblower lawsuit and 180 days after Deppe's contact to Cook at UCF in October, 2022, or 736 days.

641. In fact, Deppe began pursuing his rights in November, 2018, when he contacted the Florida governor's IG under Rick Scott, and reported retaliation from Taft and Maier in the UCF audit office in violation of the Florida Whistleblower's Act, and justifies even further tolling than requested for the present causes of actions of this complaint.

**FIRST CAUSE OF ACTION**

## 42 U.S.C. §1985. Conspiracy to obstruct justice in FLMD Case No. 6:20-cv-1588. Defendant: Bustamante.

642. 42 U.S.C. §1985(2) makes it a civil rights violation in relevant part "If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court in the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully..."

643. 42 U.S.C. §1985(2) makes it a separate civil rights violation "If two or more persons in any State or Territory conspire... to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment..."

644. 42 U.S.C. §1985(3) states "in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

645. "To prove a conspiracy between the state and private parties under § 1983, the plaintiff must show an agreement or meeting of the minds to violate constitutional rights. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each must at least share the common objective of

the conspiracy." *United Steelworkers of Am. V. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989).

646. The U.S. Supreme Court determined in *Haddle v. Garrison* 525 U.S. 121 (1998), that a claim under 42 U.S.C. § 1985(2) was established under nearly any attempt to intimidate or prevent witnesses from testifying or parties from participating in court cases. In *Haddle v. Garrison* the action taken found in violation of 42 U.S.C. §1985 was the termination of an otherwise at will employee to deter the employee from testifying in a court matter.

647. The U.S. Supreme Court held in *Haddle v. Garrison* that 42 U.S.C. § 1985(2), (3) was established to protect the judicial process against actions by which it may otherwise be improperly impacted.

648. The elements needed to prove a conspiracy are: (1) an agreement between two or more parties; (2) to do an unlawful act or to a lawful act by an unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009); *Walters v. Blankenship*, 931 So.2d 1367, 140 (Fla. 5th DCA 2006).

**Count 1: Defendant Bustamante.**

649. The Plaintiff realleges and incorporates paragraphs 316-317, 322-329, 350-354, 375-385, 630-641, 642, 644-648, and Exhibits 8-10 of this Complaint as though fully set forth herein.

650. Defendant Bustamante was hired to represent the Plaintiff in matters involving the false declarations that had been filed by Sandra Sovinski into the USPTO in or about August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

651. The Plaintiff and Bustamante discussed when he was Bustamante was hired that other attorneys had tried to damage the Plaintiff's position in the Florida Whistleblower proceeding.

652. Bustamante reviewed the 2014 IP Agreement, UCF Regulations UCF-2.029, and the declarations that Sovinski had filed into the USPTO, and advised the Plaintiff that the Plaintiff and sdPhotonics should sue UCF in federal court instead of the Florida state court, and that Bustamante would prepare the complaint to be brought in the U.S. District Court of the Middle District of Florida (FLMD court).

653. After the Bustamante prepared the complaint, but prior to filing the complaint, Bustamante contacted and informed the Plaintiff that Bustamante had learned the name of the federal judge who would be assigned to the case, and that the judge was a "Trump" judge named Wendy Berger.

654. In or about August, 2020, Bustamante filed the federal complaint into the FLMD court, and Wendy Berger was assigned as the judge to the case, which was FLMD Case No. 6:20-cv-1558.

655. It was later determined from subsequent lawsuits in the FLMD court system that Wendy Berger and the clerk of the FLMD court, Elizabeth Warren, and other FLMD judges, were in fact repeatedly violating FLMD Local Rule 1.05(a).[12]

656. The Plaintiff then learned that Bustamante had also brought the federal complaint improperly against UCF, and that UCF had sovereign immunity against suit in federal court.

657. After the Plaintiff was forced to dismiss the improper federal complaint Bustamante had prepared and filed, Bustamante began drafting a settlement agreement with Jeffrey Weiss, Ary Chang, Youndy Cook, and Sandra Sovinski.

658. When the Plaintiff asked Bustamante why he needed certain information from the Plaintiff, Bustamante became annoyed and informed the Plaintiff that sdPhotonics should have offered Bustamante an equity position, and Bustamante would have worked for sdPhotonics.

659. Bustamante violated 42 U.S.C. §1985(2), (3), when he tried to intimidate the Plaintiff with information that the FLMD court system would also be corrupt, and at the same time admitted he was in a conspiracy, by informing the Plaintiff that Bustamante had learned Wendy Berger would be assigned as judge to the case even before he filed the complaint.

[12] FLMD court records show dispositive proof the FLMD chief judges have used a pattern of Local Rule 1.05(a) violations to enable the court's judges be selectively assigned to certain cases, including this federal lawsuit, and were provided to the Chief Judge Marcia Howard [Doc. 101].

660. In fact, Berger was assigned to the federal case, and Bustamante articulated his agreement in the conspiracy with the FLMD judges to intimidate the Plaintiff by Bustamante articulating that he was also part of the conspiracy to violate the Plaintiff's rights to a fair proceeding. The FLMD judges were in fact violating Local Rule 1.05(a), exactly as Bustamante explained he had learned from others.

661. Bustamante then repeated the pattern of intimidation, informing the Plaintiff in or about early October, 2020, that Bustamante had been offered an equity position from others to further damage the Plaintiff in the Florida Whistleblower proceeding, and that Bustamante would do nothing in response to the stalking, assaults, and batteries that had occurred when the military and attorneys working with UCF engaged in extortion.

662. Bustamante's actions prevented the Plaintiff from pursuing litigation in federal court to resolve the false declarations that had been filed by Sandra Sovinski, and Bustamante could have easily brought claims against Sovinski in her individual capacity, and did further damage to the Plaintiff and his company, and exposed the Plaintiff to further damages in the Florida Whistleblower proceedings using the settlement agreement Bustamante helped draft.

663. Defendant Bustamante engaged in the unlawful acts intentionally and maliciously, and Plaintiff is entitled to compensatory damages and punitive damages.

**Count 2: Defendant Bustamante.**

664. The Plaintiff realleges and incorporates paragraphs 316-317, 322-329, 350-354, 375-385, 630-641, 643-648, and Exhibits 8-10 of this Complaint as though fully set forth herein.

665. Defendant Bustamante was hired during the Florida Whistleblower in or about late July, 2020 during the Florida Whistleblower proceeding, to resolve the false declarations that Sovinski from UCF had filed into the USPTO in or about August, 2019, and again in April, 2020, and address the breaches of the 2014 IP Agreement and UCF Regulations UCF-2.029.

666. Bustamante articulated that he had agreed to participate in a corrupt conspiracy, and Bustamante informed the Plaintiff that Bustamante had learned from others that Wendy Berger would be assigned as judge to the case, even before he filed the complaint, when in fact any district judge should have been randomly assigned to the case pursuant to the FLMD Local Rule 1.05(a).[12]

667. In fact, Berger was assigned to the federal case, which was FLMD Case No. 6:20-cv-1588, and Bustamante articulated his agreement in the conspiracy with the FLMD judges to intimidate the Plaintiff by Bustamante articulating that he was also part of the conspiracy to violate the Plaintiff's rights to a fair proceeding. The FLMD judges were in fact violating Local Rule 1.05(a), exactly as Bustamante explained.

668. Defendant Bustamante then tried to damage the Plaintiff further, and filed an improper federal complaint against UCF in lawsuit.

669. Bustamante's actions prevented the Plaintiff from pursuing litigation in federal court to resolve the false declarations that had been filed by Sandra Sovinski, and Bustamante could have easily brought claims against Sovinski in her individual capacity, and did further damage to the Plaintiff and his company, and instead exposed the Plaintiff to further damages in the Florida Whistleblower proceeding using the settlement agreement Bustamante helped draft and the extortion, stalking, assaults, and batteries in Q4 2020.

670. Defendant Bustamante violated 42 U.S.C. §1985(2), (3), when he engaged in the conspiracy to use the FLMD court system to damage the Plaintiff's legal position, and prepared and filed the improper federal complaint against UCF in retaliation for the Plaintiff filing the lawsuit.

671. Defendant Bustamante engaged in the unlawful acts intentionally and maliciously, and Plaintiff is entitled to compensatory damages and punitive damages.

## SECOND CAUSE OF ACTION

**42 U.S.C. §1983, 1st U.S. Constitutional Amendment. Retaliation against the Plaintiff for reporting through the Florida Whistleblower's Act. Defendants: Miguel, Taft, Maier.**

672. The 1st Amendments to the U.S. Constitution pursuant to 42 U.S.C. § 1983 protects the Plaintiff's right to petition the government, including through Florida's Whistleblower procedures, and to be free from governmental action to retaliate or otherwise deter the Plaintiff from reporting complaints through the Florida Whistleblower system.

673. To establish a 42 U.S.C. § 1983 claim, the Plaintiff must show: (1) the Plaintiff was engaged in constitutionally protected activity; (2) the Defendants' actions or inactions against Plaintiff were retaliatory; (3) the Plaintiff's activity was a substantial or motivating factor in the Defendants' conduct; (4) that the Defendants retaliation were designed to deter a similarly situated reasonable person from engaging in similar activity; and (5) Defendants' actions were taken under color of law.

674. The Florida Whistleblower Act is contained in Fl. St. §112.3187(4)(b) defines actions prohibited as

"An agency or independent contractor shall not take any adverse action that affects the rights or interests of a person in retaliation for a person's disclosure of information under this section."

675. Fl. St. §112.3187(5)(b) defines the nature of information disclosed that is protected in relevant part as

"Any act or suspected act of gross mismanagement, malfeasance, misfeasance... or gross neglect of duty committed by an employee or agent of an agency..."

676. Fl. St. §112.3187(3)(d) defines "Gross mismanagement" in relevant part as

"a continuous pattern of managerial abuses, wrongful or arbitrary and capricious actions, or fraudulent or criminal conduct which may have a substantial adverse economic impact."

**<u>Count 1: Defendant Miguel.</u>**

677. Plaintiff realleges and incorporates paragraphs 236-276, 603-628, 672-676 and Exhibits 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

678. Defendant Miguel admits she was contacted by the Plaintiff in or about October, 2022 with information that UCF and the UCF audit office of Robert Taft and Tina Maier, and their involvement with the military in stalking, assaults, and batteries, and the breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029, and perjury in the USPTO by Sovinski.

679. The Florida Whistleblower's Act, Fl. St. §112.3187(5)(b) specifically defines the nature of information disclosed for which the agency may not take adverse actions.

680. The nature of information disclosed for which an agency shall not take any adverse action are given below in relevant part from §112.3187(5)(b) states:

> "Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds... or gross neglect of duty committed by an employee or agent of agency..."

681. However, Defendant Miguel placed false information in her letter to the Plaintiff, and claimed she had no jurisdiction to investigate crimes being committed by UCF employees, or the retaliation by Robert Taft and Tina Maier using their UCF audit office that in fact was violating the Florida Whistleblower's Act.

682. Perjury in the USPTO, breaches of the 2014 IP Agreement, violations of UCF Regulations UCF-2.029 by UCF employees, and stalking assaults and

batteries by Taft and Maier, do in fact constitute gross mismanagement, malfeasance and misfeasance by employees of UCF.

683. Defendant Miguel then retaliated against the Plaintiff for sending the protected information to her IG office, and sent the protected information to the Taft and Maier, who the IG knew from the Plaintiff and the BCLP reporting were engaged in retaliation to cover up crimes for UCF administrators.

684. Defendant Miguel violated Fl. St. §112.3187(4)(b), when she took the adverse action of falsely claiming that the information sent to her was not protected information, and then sending it to Taft and Maier at UCF violating Fl. St. §112.3187(4)(b).

685. As a result of Miguel's actions and Taft's failure and/or refusal to cease the retaliation that was reported to Miguel, the Plaintiff became stalked so heavily using military tactics and RF transmitters, that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

686. Defendant Miguel violated the Plaintiff's U.S. Constitutional rights protected by the 1st Amendment when the Plaintiff engaged in protected activity by reporting retaliation under the Florida Whistleblower's Act by Robert Taft and Tina Maier to Defendant Migue in or about October, 2022 as the Plaintiff was being stalked, assaulted and battered involving the perjury in the USPTO by attorneys working with UCF, and she retaliated against the Plaintiff by sending the information to Taft and Maier who she had been informed was engaged in the retaliation.

687. Defendant Miguel's took her retaliatory actions in violation of Fl. St. §112.3187(4)(b), to deter the Plaintiff from further reporting the evidence of crimes and retaliation by UCF employees, and acted under the color of law.

688. The Plaintiff is entitled to compensatory damages and punitive damages for the injuries Defendant Miguel's actions caused to the Plaintiff, and her actions were intentional and malicious, acknowledging the Plaintiff was undergoing dangerous stalking, assaults, and batteries related to the actions by the military and UCF.

**Count 2: Defendant Maier.**

689. Plaintiff realleges and incorporates paragraphs 236-276, 603-628, 672-676 and Exhibits 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

690. Defendant Maier admitted that Melinda Miguel sent information the Plaintiff provided to Miguels office in or about October, 2022, that included information and records showing that UCF and the UCF audit office of Robert Taft and Tina Maier were involved with the military in stalking, assaults, and batteries, and the breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029, and perjury in the USPTO by UCF employees Sovinski and Shtrom.

691. The Florida Whistleblower's Act, Fl. St. §112.3187(5)(b) specifically defines the nature of information disclosed for which the agency may not take adverse actions defined in Fl. St. §112.3187(4)(b).

692. The nature of information disclosed for which an agency shall not take any adverse action are given below in relevant part from §112.3187(5)(b):

> "Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds... or gross neglect of duty committed by an employee or agent of agency..."

693. However, Maier placed false information in her letter to the Plaintiff, and claimed the stalking, assaults, and batteries, and breaches of the 2014 IP Agreement, violations of UCF Regulations UCF-2.029, and perjury in the USPTO, do not constitute malfeasance or misfeasance, and therefore does not constitute protected information.

694. Perjury in the USPTO, breaches of the 2014 IP Agreement, violations of UCF Regulations UCF-2.029 by UCF employees, and stalking assaults and batteries, do in fact constitute gross mismanagement, malfeasance and misfeasance by employees of UCF, and is protected information pursuant to Fl. St. §112.3187(5)(b).

695. Defendant Maier retaliated using false claims that the information disclosed was not protected information, and violated Fl. St. §112.3187(4)(b) in that retaliation against the Plaintiff, because the Plaintiff sent protected information to Florida's IG office, and to deter the Plaintiff from sending further information and records of the crimes being committed by UCF employees engaged in perjury with the military in the USPTO.

696. Defendant Miguel violated Fl. St. §112.3187(4)(b), when she took the adverse action of falsely claiming that the information sent to her was not

protected information, and then sending it to Taft and Maier at UCF violating Fl. St. §112.3187(4)(b).

697. As a result of Miguel's actions and Taft's failure and/or refusal to cease the retaliation that was reported to Miguel, the Plaintiff became stalked so heavily using military tactics and RF transmitters, that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

698. Defendant Maier violated the Plaintiff's U.S. Constitutional rights protected by the 1st Amendment when the Plaintiff engaged in protected activity by reporting protected information to Miguel's office under the Florida Whistleblower's Act about Robert Taft and Tina Maier to Defendant Migue in or about October, 2022, as the Plaintiff was being stalked, assaulted and battered involving the perjury in the USPTO by attorneys working with UCF, and Defendant Maier retaliated by false claims that the information the Plaintiff sent Miguel was not protected pursuant to Fl. St. §112.3187(5)(b).

699. Maier acted under the color of law, and took her adverse actions to deter the Plaintiff from further reporting, and to continue the stalking, assaults, and batteries, and the perjury in the USPTO by UCF employees.

700. The Plaintiff is entitled to compensatory damages and punitive damages for the injuries Defendant Maier's actions that caused to the Plaintiff, and her actions were intentional and malicious, acknowledging the Plaintiff was undergoing dangerous stalking, assaults, and batteries related to the actions by the military and UCF.

**Count 3: Defendant Taft.**

701. Plaintiff realleges and incorporates paragraphs 236-276, 603-628, 672-676 and Exhibits 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

702. Defendant Taft was cc'd on Melinda Miguel's letter and received the information and records from Miguel that showed that the UCF employees Sandra Sovinski and Svetlana Shtrom had engaged in the crimes of perjury in the USPTO and breached UCF Regulations UCF-2.029 in doing so.

703. The letter from Miguel that cc'd Robert Taft further detailed allegations that Defendant Taft and Tina Maier had engaged in retaliatory actions in response to prior reporting of the evidence of perjury and violations of UCF regulations by UCF employees, in violation of the Florida Whistleblower's Act.

704. The Florida Whistleblower's Act, Fl. St. §112.3187(5)(b) specifically defines the nature of information disclosed for which the agency may not take adverse actions against a person for the person's disclosure of protected information.

705. The nature of information disclosed for which an agency shall not take any adverse action are given below in relevant part from §112.3187(5)(b):

> "Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds... or gross neglect of duty committed by an employee or agent of agency..."

706. However, Defendant Taft had his investigator, Tina Maier, place false information in her letter to the Plaintiff, and claimed the stalking, assaults, and

batteries, and breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029 do not constitute malfeasance or misfeasance, and therefore does not constitute protected information.

707. Perjury in the USPTO, breaches of the 2014 IP Agreement, violations of UCF Regulations UCF-2.029 by UCF employees, and stalking assaults and batteries, do in fact constitute gross mismanagement, malfeasance and misfeasance by employees of UCF, and is protected information pursuant to Fl. St. §112.3187(5)(b).

708. Defendant Taft violated Fl. St. §112.3187(4)(b), when he took the adverse action of having his investigator, Tina Maier, falsely claim that the information sent to Melinda Miguel was not protected information, to continue the retaliation against the Plaintiff.

709. Defendant Taft retaliated when he had his investigator, Tina Maier, generate a finding that falsely claimed that the information disclosed was not protected information, to deter the Plaintiff from further reporting, and violated Fl. St. §112.3187(4)(b).

710. As a result of Taft's actions and Taft's failure and/or refusal to cease the retaliation that was reported to Miguel, the Plaintiff became stalked so heavily using military tactics and RF transmitters, that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

711. Defendant Taft violated the Plaintiff's U.S. Constitutional rights protected by the 1st Amendment, when Taft received the protected information that

the Plaintiff reported to Miguel's office that was protected by the Florida Whistleblower's Act Fl. St. §112.3187(5)(b), and retaliated against the Plaintiff by having his investigator, Tina Maier, create a false finding that claimed the information provided was not protected by Fl. St. §112.3187(5)(b).

712. Robert Taft retaliated against the Plaintiff with the false letter from his investigator, Tina Maier, to deter the Plaintiff from further reporting the evidence of crimes and retaliation by UCF employees, and Maier acted under the color of law.

713. The Plaintiff is entitled to compensatory damages and punitive damages for the injuries Defendant Taft's actions that caused to the Plaintiff, and her actions were intentional and malicious, acknowledging the Plaintiff was undergoing dangerous stalking, assaults, and batteries related to the actions by the military and UCF.

## THIRD CAUSE OF ACTION

**42 U.S.C. §1983, 1st U.S. Constitutional Amendment, Retaliation against Plaintiff for seeking redress in Florida state court pursuant to the Florida Whistleblower's Act. Defendants: Weiss, Sweetapple, Sovinski, Shtrom, Hsu, Kline, Brownlee, Bustamante, Vetter, Taboada, Pinsukanjana, Kuznia, Baranek, Kim, Pan, Kish, Feng, Van Vechten, N. Stork, Repetto, B. Stork, L. Stork, Southron.**

714. To establish a 42 U.S.C. § 1983 claim that the Defendants deprived Plaintiff of his Constitutionally protected 1st Amendment rights, the Plaintiff must show: (1) the Plaintiff was engaged in constitutionally protected activity; (2) the Defendants' actions or inactions against Plaintiff were retaliatory; (3) the Plaintiff's

activity was a substantial or motivating factor in the Defendants' conduct; (4) that the Defendants retaliation were designed to deter a similarly situated reasonable person from engaging in similar activity; and (5) the Defendants' actions were taken under color of law.

715. The U.S. Supreme Court has found that "Private persons, jointly engaged with state officials in a challenged action, are acting 'under color' of law for purposes of § 1983 actions." Dennis v. Sparks, 449 U.S. 24, 27-28 (1980).

716. The elements needed to prove a conspiracy in Florida are: (1) an agreement between two or more parties; (2) to do an unlawful act or to a lawful act by an unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009); *Walters v. Blankenship*, 931 So.2d 1367, 140 (Fla. 5th DCA 2006).

717. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**<u>Count 1: Defendant Sovinski.</u>**

718. Plaintiff realleges and incorporates paragraphs 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 714, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

719. The Florida Whistleblower lawsuit was filed on or about December 12, 2019.

720. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

721. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

722. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

723. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsly representing the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached.

724. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

725. In addition to committing perjury, Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed

retroactive ownership declarations into the USPSTO beginning in or about August, 2019.

726. During this time, Sovinski worked with Youndy Cook and Alen Hsu to draft a settlement agreement, of which Hsu sent the Plaintiff's drafts, that falsely claimed Army approval was required for UCF to make any changes or corrections to the false declarations that Sovinski had filed into the USPTO.

727. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

728. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

729. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on the agreement prepared by Cook, Sovinksi, and Hsu that claimed UCF required Army approval for UCF to correct the USPTO declarations.

730. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower

proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

731. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

732. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

733. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi was then sent to the Plaintiff, and again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

734. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

735. The Plaintiff had a federal constitutional right to seek redress through the court system for damages caused by Sovinski's actions in August, 2019 in which she engaged in perjury against the Plaintiff and his company by filing false declarations into the USPTO onto the Plaintiff's property, his company, without retaliation.

736. Defendant Sovinski retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when she used the proceedings of the

Whistleblower lawsuit to engage in additional perjury in the USPTO in April, 2020 during the proceedings, and tried to change evidence and perjury at issue in the proceeding, and drafted the fraudulent settlement agreement with Cook and Hsu that required Army approval from an office unrelated to sdPhotonics' contracts, that even Eifert's office determined was fraud, drafted a second agreement in or about October, 2020 with Bustamante and Cook, as she was directing more false declarations to be filed into the USPTO, to deter the Plaintiff from pursuing further actions in the Florida Whistleblower lawsuit.

737. The Plaintiff was damaged by Defendant Sovinski's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceedings.

738. Defendant Sovinski's actions were in fact both unlawful and criminal, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 2: Defendant Shtrom.**

739. The Plaintiff realleges and incorporates paragraphs 85, 138-150, 187-194, 236-276, 324-326, 573-574, 584, 630-641, 714 and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

740. The Florida Whistleblower lawsuit was filed on or about December 12, 2019.

741. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts

of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

742. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

743. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact, the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

744. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsely representing the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached.

745. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

746. Shtrom followed Sovinski USPTO filings with Shtrom's own retroactive declarations, and when she filed the declarations Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when she filed retroactive ownership.

747. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

748. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

749. Defendant Shtrom again filed her own USPTO declarations soon after, again breaching the 2014 IP Agreement and UCF-2.029 during the Florida Whistleblower proceeding.

750. In or about May, 2020, the Plaintiff used public records from public records requests and obtained emails and records that showed Svetlana Shtrom had contacted a separate Army office than Eifert's and provided false information about Sabine O'Neal.

751. Shtrom claimed UCF had been entitled to a subcontract on Eifert's contract to sdPhotonics because O'Neal had been a UCF employee, when in fact it was Eifert who was responsible for overseeing any subcontracts from the contract Eifert, Eifert had secured the government rights.

752. The false claims by Shtrom to the Army office had been used in a settlement agreement that had been drafted by Cook, Sovinski, and Hsu, and

required unexplained Army approval from an unspecified office after Deppe signed the agreement, and made no corrections to the perjury by Sovinski in the USPTO.

753. After obtaining the information from the public records request and USPTO patent records, in or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her Shtrom's emails to the other Army office and claims about Sabine O'Neal and the contract Eifert had monitored, and the need for some type of Army approval related to UCF's supposed involvement in Eifert's contract.

754. Eifert informed the Deppe when she saw the emails and records that Shtrom had sent the different Army office that she would discuss it with her supervisors and get back to him.

755. About a week later, in mid-June, 2020, Eifert informed the Deppe that her supervisors had reviewed the emails and information Shtrom sent to the separate Army office and determined, separately from Deppe, that Shtrom and UCF had engaged in fraud on Eifert's contract to sdPhotonics.

756. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

757. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

758. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

759. Defendant Shtrom again breached the 2014 IP Agreement and UCF-2.029, when she followed Sovinski's USPTO declarations with her own retroactive declarations in or about October, 2020.

760. Defendant Shtrom retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when she used the proceedings of the Whistleblower lawsuit to engage in additional breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029(4)(d), by filing retroactive declarations into the USPTO in attempts to correct prior declarations filed by Sovinski, presenting false information to an Army office about Sabine O'Neal with no connection to sdPhotonics or its contracts, and the false information she had sent to the Army office was then used to try to force the Plaintiff into signing the fraudulent settlement agreement, to deter the Plaintiff from pursuing further actions in the Florida Whistleblower lawsuit.

761. The Plaintiff was damaged by Defendant Shtrom's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceedings.

762. Defendant Shtrom's actions were in fact both unlawful, malicious, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 3: Defendant Weiss.**

763. Plaintiff realleges and incorporates paragraphs 187-194, 236-276, 284-287, 290-291, 305-315, 319-329, 355-357, 362, 365-372, 391, 630-641, 714, and Exhibits 8-14 of this Complaint as though fully set forth herein.

764. The Florida Whistleblower lawsuit against UCF in part for false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

765. The false declarations that were filed by Sovinski into the USPTO violate both federal criminal codes and Florida state laws against perjury.

766. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

767. During the time the proceeding operated without a judge, Defendant Weiss pretended to be an officer of the illegal Whistleblower proceeding, and filed documents for his client, UCF, into the Florida Whistleblower proceedings, while he operated the proceeding without a judge.

768. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

769. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

770. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

771. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

772. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO, violating Fl. St. §§837.021(1), 837.07(1), (2).

773. While Defendant Weiss pretended to be an officer of a legitimate state court proceeding, he tried to prevent evidence from coming into the proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

774. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

775. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower

proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

776. At the end of June, 2020, Defendant Weiss announced he had stayed the proceedings and refused a discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

777. In or about August, 2020, Defendant Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, that in fact Defendant Weiss had refused, and again tried to keep evidence of Sovinski's perjury in the USPTO from coming into the proceeding.

778. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

779. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

780. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

781. The Plaintiff had a federal constitutional right to seek redress through the court system for damages caused by Sovinski's actions in August, 2019 in which

she engaged in perjury against the Plaintiff and his company by filing false declarations into the USPTO onto the Plaintiff's property, his company.

782. Defendant Weiss retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he pretended to be an officer of the court in the illegal Florida Whistleblower proceeding that operated without a judge, tried to force the Plaintiff into a settlement agreement with UCF and the military that even Lateka Eifert's office determined was based on fraud by UCF employees with Shtrom, used a trick to prevent service of the Plaintiff's discovery response and filed a false motion to compel to keep evidence of perjury by Sovinski in the USPTO from entering the proceeding, to deter the Plaintiff from pursuing the Florida Whistleblower lawsuit.

783. The Plaintiff was damaged by Defendant Weiss' actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

784. Defendant Weiss actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 4: Defendant Sweetapple.**

785. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 714, and Exhibits 3-14 of this Complaint as though fully set forth herein

786. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

787. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

788. During the time the proceeding operated without a judge, Defendant Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

789. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

790. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

791. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

792. While Defendant Sweetapple pretended to be an officer of the illegal state court proceeding, he tried to prevent evidence from coming into the proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

793. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

794. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

795. In or about May, 2020, Defendant Sweetapple tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF to assign.

796. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army

had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

797. Defendant Sweetapple learned the Plaintiff filed the SBA IG complaint, in or about June, 2020.

798. In or about the end of June, 2020, Defendant Sweetapple announced to the Plaintiff that Weiss had stayed the proceedings, and that because of the stay Defendant Sweetapple would not serve Weiss the discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

799. In or about August, 2020, Jeffrey Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, when in fact Sweetapple had falsely claimed that Weiss had stayed the proceedings.

800. The docket showed Weiss had no way to stay the proceeding, and claimed he had done so without filing a motion.

801. When the Plaintiff instructed Defendant Sweetapple serve Weiss the discovery response, Defendant Sweetapple refused and tried to set the hearing with the Weiss for the motion to compel.

802. When the Plaintiff fired Defendant Sweetapple, Defendant Sweetapple refused to cease work on the matter, despite that the contract between the Plaintiff and Sweetapple required Sweetapple to cease work upon being filed.

803. Defendant Sweetapple took his actions under color of law, pretending to be an officer of the illegal state court proceeding that operated without a judge.

804. Defendant Sweetapple retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he pretended to be an officer of the court in the illegal Florida Whistleblower proceeding that operated without a judge, tried to force the Plaintiff into a settlement agreement with UCF and the military that even Lateka Eifert's office determined was based on fraud by UCF employees with Shtrom, used a trick and claimed Weiss had stayed proceedings to prevent service of the Plaintiff's discovery response and tried to set a hearing for a false motion to compel filed by Weiss to keep evidence of perjury by Sovinski in the USPTO from entering the proceeding, to deter the Plaintiff from pursuing the Florida Whistleblower lawsuit.

805. The Plaintiff was damaged by Defendant Sweetapples' actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

806. Defendant Sweetapple actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 5: Defendant Hsu.**

807. Plaintiff realleges and incorporates paragraphs 282-293, 315-329, 362-365, 630-641, 714-716, and Exhibits 9-10, 16 of this Complaint as though fully set forth herein.

808. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

809. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

810. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

811. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

812. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

813. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

814. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

815. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

816. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

817. Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that included terms the Plaintiff informed Defendant Hsu he would not accept.

818. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

819. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

820. Defendant Hsu learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents to prove certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

821. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

822. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

823. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF that Defendant Hsu had written into the agreement with Cook and Sovinski.

824. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed

about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

825. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

826. Defendant Hsu contacted and warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

827. Defendant Hsu retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated and engaged with state actors Cook and Sovinski to prepare a settlement agreement with UCF and the military that even Lateka Eifert's office determined was based on fraud by UCF employees with Shtrom, forced the Plaintiff into a settlement meeting about the agreement after the Plaintiff had refused the agreement and rejected the meeting, and warned the Plaintiff not to try to stop Sweetapple and Weiss from using trick to prevent service of the Plaintiff's discovery response and filed a false motion to compel to keep evidence of perjury by Sovinski in the USPTO from entering the proceeding, to deter the Plaintiff from pursuing the Florida Whistleblower lawsuit.

828. The Plaintiff was damaged by Defendant Hsu's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 6. Defendant Kline.**

829. The Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 714-716, and Exhibits 3-14, 16 of this Complaint of this Complaint as though fully set forth.

830. The Plaintiff hired Defendant Karen Kline in or about 2016 to provide legal advice on patents filed by the Plaintiff and his company, sdPhotonics.

831. In or about November, 2018, the Plaintiff informed Defendant Kline he planned to resign his employment from UCF and move sdPhotonics from the UCF incubator, and asked Defendant Kline to review the patents that had been filed jointly with UCF and two additional patents.

832. In December, 2018, Defendant Kline contacted Sandra Sovinski at Sovinski's UCF office with the patent list.

833. In or about the beginning of January, 2019, after sending her letter, Defendant Kline informed the Plaintiff she had been contacted by Sandra Sovinski and had a new conflict of interest due to UCF, but that she wished to consult to find other attorneys to represent the Plaintiff and his company, sdPhotonics.

834. Defendant Kline subsequently informed the Plaintiff that she had found Alen Hsu from a different firm to represent the Plaintiff.

835. Defendant Kline continued to refuse to take action when, in August, 2019, Sandra Sovinski filed false declarations into the USPSTO, violating the same 2014 IP Agreement and UCF-2.029 patent regulations Kline had contacted Sovinski about in December, 2018.

836. Instead, after Defendant Kline confirmed that Sovinski had violated Florida perjury laws the Plaintiff was informed that he should file the Florida Whistleblower complaint.

837. Defendant Kline then referred Robert Sweetapple and Alen Hsu to be hired by the Plaintiff to pursue the Florida Whistleblower lawsuit.

838. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

839. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

840. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

841. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

842. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

843. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

844. Defendant Kline then had phone meetings with Robert Sweetapple, Alen Hsu, Cook, Sovinski, and Weiss during the illegal Whistleblower proceedings, but refused and/or failed to disclose the contents to the Plaintiff as she billed him for the phone meetings, while Robert Sweetapple operated the illegal proceeding of the Florida Whistleblower's lawsuit that Kline had insisted should be filed was operated without a judge.

845. Alen Hsu and Robert Sweetapple learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents that proved certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

846. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free

VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

847. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

848. Defendant Kline continued to refuse to take action in response to the clear evidence that Sandra Sovinski was engaged in a pattern of criminal activity of perjury in the USPTO.

849. Defendant Kline conspired and engaged with state actors Cook, Sovinski, Weis, and Sweetapple, when she made the agreement not to take action in response to perjury in the USPTO at issue in the illegal Florida Whistleblower proceeding, and then took part in planning meetings with Sovinski, Cook, Sweetapple, Weiss and Hsu, while refusing to provide the Plaintiff work product or any information about the planning meetings, that used the illegal Florida Whistleblower proceedings to commit additional perjury and tried to cover-up evidence of that perjury in the USPTO.

850. Defendant Kline retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when she agreed, conspired, confederated, and engaged with Cook, Sovinski, Weiss, and Sweetapple, to allow Sovinski to engage in further

perjury in April, 2020 in the USPTO during the proceeding while refusing to take action, participated in the trick with Weiss and Sweetapple to operate the illegal Florida Whistleblower proceedings without a judge, and conspired with Cook and Sovinski on a settlement agreement with UCF and the military that even Lateka Eifert's office determined was based on fraud by UCF employees with Shtrom, to deter the Plaintiff from pursuing the Florida Whistleblower lawsuit.

851. The Plaintiff was damaged by Defendant Kline's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 7: Defendant Paetra Brownlee.**

852. Plaintiff realleges and incorporates paragraphs 283-287, 365-366, 373-374, 478-479, 630-641, 714, and Exhibits 8-10, 16, 14 of this Complaint as though fully set forth herein.

853. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

854. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

855. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP

Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

856. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

857. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

858. Defendant Brownlee was not appointed as a Florida state judge until or about May 28, 2020.

859. The docket of the Florida Whistleblower proceeding shows Paetra Brownlee knowingly took over an illegal state court proceeding that had been operated by only the two attorneys Jeffrey Weiss and Rober Sweetapple.

860. Brownlee made her first appearance into the case in or about August, 2020, after the Plaintiff fired Robert Sweetapple for his refusal to serve the Plaintiff's discovery responses to opposing counsel, Jeffrey Weiss, and a false motion to compel filed by Weiss.

861. Once the Plaintiff learned Brownlee had been assigned as judge to the case, the Plaintiff sent Brownlee a confidential letter to her judicial chambers that

was cc'd to Weiss and Sweetapple that the Florida Whistleblower proceeding had been used by Weiss and Sweetapple in an attempt to force a settlement the Plaintiff had refused, and had violated the Fl. St. §112.3187(4)(b) (Florida's Whistleblower Act).

862. Brownlee then placed the confidential letter on the docket of the proceeding.

863. Brownlee gave no legitimate reason for her action of placing the letter onto the court's docket.

864. By early November, 2020, attorneys involved in the Florida Whistleblower proceedings began a systematic pattern of threats, intimidation, stalking, assaults, batteries, and confinement, trying to force the Plaintiff to sign a settlement agreement the Plaintiff had refused.

865. Defendant Brownlee retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, in violation of the 1st Amendment of the U.S. Constitution, when she took over the illegal Florida Whistleblower proceeding that operated without a judge without jurisdiction, violated the Florida Whistleblower's Act, Fl. St. §112.3187(4)(b) by placing letters of the whistleblower retaliation onto the docket, and oversaw the proceeding as attorneys working with UCF and the military tried to extort an agreement using stalking, assaults, batteries, and confinement in Q4 2020 during the proceeding, to deter the Plaintiff from continuing in the state lawsuit.

866. The Plaintiff was damaged by Defendant Brownlee's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

867. The Plaintiff is entitled to punitive damages for Defendant Brownlee's crimes and unlawful actions in the Florida Whistleblower proceeding.

**Count 8: Defendant John Bustamante.**

868. Plaintiff realleges and incorporates paragraphs 316-317, 322-329, 350-354, 375-385, 630-641, 714-716, and Exhibits 8-10 of this Complaint as though fully set forth herein.

869. Defendant Bustamante was hired by the Plaintiff to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom.

870. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

871. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

872. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

873. Furthermore, Defendant Bustamante determined that in April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records violate Fl. St. §§837.021(1), 837.07(1), (2).

874. Defendant Bustamante advised the Plaintiff that a complaint should be filed in federal court because of what had occurred in the illegal Florida Whistleblower proceeding.

875. Bustamante then obtained information from the Plaintiff on the 2014 IP Agreement and UCF-2.029, and prepared the federal complaint to be filed in the FLMD court.

876. Bustamante then contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

877. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered him an equity position, Bustamante would have worked for sdPhotonics.

878. Bustamante prepared the agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski. When the Plaintiff reviewed the agreement, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

879. Instead, it had the same requirement of Army approval from an unspecified office that Lateka Eifert had already confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions.

880. Eifert had requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office, over what Defendant Bustamante had again placed in the settlement agreement he had drafted with Cook, Sovinski, and Weiss.

881. At the beginning of November, 2020, the Plaintiff was extorted by John Vetter to sign the agreement Bustamante had prepared with Cook, Weiss, and Sovinski, or "find out what happens to a whistleblower in Florida."

882. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

883. Bustamante responded at that time that there was nothing he was able to do about it, when Bustamante could have taken many different legal actions, including reporting the crimes by the other attorneys, and he had an ethical duty to do.

884. Defendant Bustamante agreed, conspired and engaged with the military state actors Cook, Sovinski, and Weiss, admitting he had been offered an equity position by others, to prepare a settlement agreement that Lateka Eifert's military office had already determined was based on fraud by UCF employees, to damage the Plaintiff's company and cover up evidence of the repeated patterns of criminal activity involving perjury in the USPTO, and Bustamante then coordinated in the illegal extortion, stalking, assaults, batteries and confinement during the Whistleblower proceeding, admitting he would have taken different actions had sdPhotonics offered him an equity position.

885. Defendant Bustamante retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, and Weiss, to use the illegal Florida Whistleblower proceeding and settlement agreement that Lateka Eifert's office had

determined was based on fraud, in extortion, stalking, assaults, batteries, and harassment during the proceedings, to acquire or maintain improper ownership in the Plaintiff's company, and to deter the Plaintiff from continuing in the lawsuit.

886. The Plaintiff was damaged by Defendant Bustamante's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 9: Defendant John Vetter.**

887. Plaintiff realleges and incorporates paragraphs 342-347, 386-471, 630-641, 714-716, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

888. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit.

889. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits.

890. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

891. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

892. Vetter informed the Plaintiff that the false declarations filed by Sovinski were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

893. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

894. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused. In the call Vetter became angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

895. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

896. The Plaintiff was subsequently stalked, assaulted, battered and confined over the agreement Vetter had threatened to the Plaintiff to sign.

897. Defendant Vetter agreed, conspired and engaged with the military state actors Sovinksi, Cook, and Weiss to try to extort an agreement to cover up the evidence of perjury in the USPTO, when even Lateka Eifert's office had determined the agreement was fraudulent. Vetter admitted he was part of the illegal Whistleblower proceeding, and threatened the Plaintiff that if he did not sign the

agreement, he would find out what happens to a Florida whistleblower who reports crimes committed by UCF employees to Ron DeSantis' governor's office.

898. Defendant Vetter retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to use extortion to try and force the Plaintiff to sign a settlement agreement that Lateka Eifert's office had already determined was based on fraud, threatening the Plaintiff he would find out what happens to a whistleblower in Florida if he didn't sign, afte which he was stalked, assaulted, battered, and confined during the Florida Whistleblower proceedings, all to deter the Plaintiff from continuing with the Whistleblower lawsuit.

899. The Plaintiff was damaged by Defendant Vetter's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 10: Defendant Pinsukanjana.**

900. Plaintiff realleges and incorporates paragraphs 224-231, 303-304, 395-474, 630-641, 714-716, of this Complaint as though fully set forth herein.

901. Defendant Pinsukanjana is a physicist employed by Intelligent Epitaxial Technologies, Inc. (IET). IET is an epitaxial growth foundry who provides

custom semiconductor materials for optoelectronic and III-V semiconductor devices, including VCSELs.

902. The Plaintiff and sdPhotonics' engineers worked with Defendant Pinsukanjana and IET through contracts and purchase orders that were used in developing specialized materials for sdPhotonics oxide-free VCSELs and other photonic devices, including the Cryo-VCSEL and specialized detectors.

903. Defendant Pinsukanjana worked directly with the Plaintiff to learn the special techniques needed to grow the epitaxy for the Plaintiff's Cryo-VCSEL intention that could operate at 4 K and below.

904. Defendant Pinskukanjana worked closely with Deborah Van Vechten and Milton Feng, and the Plaintiff, Pinsukanjan, Feng, and Van Vechten had meetings at the IET growth facility near Dallas, TX, in meetings and discussions concerning the sdPhotonics Cryo-VCSEL.

905. On multiple occasions, Defendant Pinsukanjana and the Plaintiff discussed the declarations that Sandra Sovinski had filed into the USPTO, and the Florida Whistleblower lawsuit that had been filed December 12, 2019 involving the evicen of perjury created by Sovinski's USPTO filings.

906. The Plaintiff received the threats from John Vetter in early November, 2020, to sign an agreement the Plaintiff had refused involving the Florida Whistleblower proceedings and evidence of perjury in the USPTO by Sovinski.

907. Pinsukanjana had learned in other discussions with the Plaintiff that he would be driving to the University of Illinois to visit Feng's laboratory and

obtain measured results on the sdPhotonics Cryo-VCSEL prototypes Feng was testing.

908. Pinsukanjana knew that Feng was testing the sdPhotonics' Cryo-VCSEL prototypes, and Pinsukanjana participated in planning meetings with Deppe, Feng, and Van Vechten.

909. Defendant Pinsukanjana made repeated phone calls to the Plaintiff while he drove to Illinois, to learn where the Plaintiff would stay. When Pinsukanjana it would be Carbondale, IL, he informed the military where to begin the stalking.

910. The Plaintiff was then stalked, assaulted, battered and confined over multiple days in Carbondale, IL and Illinois, had his financial accounts hacked, his company business account hacked, and found his house had been broken into when he returned there in Oviedo, FL in early December, 2020.

911. During the stalking in late November, 2020 and early December, 2020, Defendant Pinsukanjana contacted the Plaintiff and informed him that Pinsukanjana and IET intended to fulfill a purchase order to Yunpeng Song from the Chinese company using the sdPhotonics oxide-free VCSEL technology, and IET would take control of the sdPhotonics' growth recipes.

912. When the Plaintiff objected to the sale and informed Pinsukanjana that sdPhotonics and IET had trade secret agreements that prohibited the sale, Pinsukanjana responded that he had no choice but to fulfill the purchase order. When the Plaintiff objected that such a sale to a Chinese company would violate

ITAR agreements, Defendant Pinsukanjana ignored the ITAR, and informed the Plaintiff that Pinsukanjana's company would go forward with the sale.

913. Defendant Pinsukanjana conspired and engaged with the military's state actors Feng at the University of Illinois, and UCF's Cook, Sovinski, Shtrom, and Weiss, to take over the sdPhotonics' technology, participating in the stalking, assaults and batteries trying to force the settlement agreement UCF and the military were trying to extort, and the Plaintiff and his property were damaged.

914. Defendant Pinsukanjana retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to use extortion to try and force the Plaintiff to sign a settlement agreement that Lateka Eifert's office had already determined was based on fraud, threatening the Plaintiff he would find out what happens to a whistleblower in Florida if he didn't sign, and obtained location information from the Plaintiff that was then used in the stalking, assaulted, battered, and confinement in Q4 2020 during the Florida Whistleblower proceedings, endeavored to misappropriate trade secrets from his company as part of the harassment and stalking, all to deter the Plaintiff from continuing with the Whistleblower lawsuit.

915. The Plaintiff was damaged by Defendant Pinsukanjan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what

occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 11: Defendant John Taboada.**

916. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 631-640, 714-716, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

917. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

918. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

919. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to additional corrective assignments.

920. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

921. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

922. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

923. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

924. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

925. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

926. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

927. After Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed he was amazed that Sovinski would again engage in fraud and perjury again in the proceeding of the USPTO.

928. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO.

929. However, in November, 2020, while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics patents in October, 2021.

930. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew Sandra Sovinski had committed perjury.

931. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski.

932. Defendant Taboada admitted his agreement in the organized government crime, admitting he knew the FBI planned to frame the Plaintiff for the perjury committed by Sovinski. Defendant Taboada conspired and engaged with state actors Weiss, Cook, Sovinkski, and Shtrom, and Defendant Taboada engaged in extortion in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding, threatening the Plaintiff that the FBI would frame him for the evidence of perjury committed by Sovinski in the USPTO, and that Taboada would do nothing to stop it.

933. Defendant Taboada retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and

engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to allow Sovinski to engage in repeated perjury during the proceedings in April, 2020 and October, 2020, and use extortion to try and force the Plaintiff to sign a settlement agreement that Lateka Eifert's office had already determined was based on fraud, threatening the Plaintiff he would be framed by the FBI and Taboada would do nothing about it as part of the Q4 2020 stalking, all to deter the Plaintiff from continuing with the Whistleblower lawsuit.

934. The Plaintiff was damaged by Defendant Taboada's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 12: Defendant Charles Kuznia.**

935. Plaintiff realleges and incorporates paragraphs 297-304, 393-463, 631-640, 714-716, of this Complaint as though fully set forth herein.

936. Kuznia was CEO of Ultra Communications, Inc., a defense contracting company that worked closely with the military program monitors Mark Beranek and Michael Gerhold on SBIR contracts to develop his company's military transceivers that used VCSELs.

937. The transceiver technology Kuznia's company had developed was highly robust for use in military platforms including jet aircraft, helicopters, etc., that experience high accelerations and temperature changes, and require very high

reliability. These applications require VCSELs that can operate at higher and lower temperatures than most other applications.

938. The transceiver technology Kuznia was developing is not highly efficient relative to VCSEL transceiver standards, due to design trade-offs required to meet reliability in military platforms that operate under extreme conditions including temperature and g-force due to acceleration.

939. Kuznia repeatedly contacted the Plaintiff to discuss work with Beranek on the NAVAIR contract to develop the oxide-free VCSELs for use in Kuznia's transceivers involving a specific contract, and that Kuznia's company would work with sdPhotonics through subcontracting.

940. The Plaintiff did contact Baranek, and sdPhotonics was issued the SBIR Phase I contract monitored by Beranek. Kuznia's company was to receive a subcontract for their work in a Phase II.

941. Once the SBIR contract was in place that Kuznia had pushed for with Beranek, Beranek repeatedly claimed that Milton Feng had invented and developed the oxide-free VCSELs the Plaintiff's company was developing under the NAVAIR SBIR contract Beranek monitored.

942. The Plaintiff repeatedly corrected Beranek that Milton Feng had no involvement in the oxide-free VCSEL invention or its development.

943. Defendant Kuznia travelled with the Plaintiff was then asked by Kuznia to join him and Richard Weiss in attending meetings in Washington, D.C. in March, 2020, that Kuznia's company and Michael Gerhold had set up with

lobbyists and U.S. congressional offices as part of an effort by the military to obtain government contracts to accelerate the commercialization of the oxide-free VCSEL inventions for use in military transceivers, including by Kuznia's company.

944. In March, 2020, Defendant Kuznia, Richard Weiss, Paul Pinsukanjana, and the Plaintiff traveled to Washington, D.C. and discussed the oxide-free VCSELs at length with different congressional offices who would approve and push for the government funding.

945. The false ownership declarations that Sovinski had filed into the USPTO on the inventions at issue in the Florida Whistleblower lawsuit were also discussed at length.

946. At the beginning of November, 2020, the Plaintiff was repeatedly threatened by John Vetter to sign an agreement as part of the Florida Whistleblower proceeding that failed to correct the false declarations, and included the military for no apparent purpose and without military contracts.

947. When the Plaintiff refused claiming he only needed the corrected assignments to file with the USPTO, Vetter threatened the Plaintiff that if he refused to sign, he would "find out what happens to a whistleblower in Florida."

948. The Plaintiff was contacted by a barrage of attorneys involved in the Florida Whistleblower proceedings and engineers from various defense contractors, while the Plaintiff was being stalked in Carbondale, IL as Vetter had threatened.

949. Defendant Kuznia called the Plaintiff while the Plaintiff was being stalked in Carbondale, IL.

950. Kuznia informed the Plaintiff that he knew the military program monitors were taking over the Plaintiff's company and Kuznia wanted to take over the $2M IARPA Supercables project that was based on the Plaintiff's Cryo VCSEL invention.

951. Kuznia could provide no legitimate reason to the Plaintiff for why Kuzni's company should obtain the sdPhotonics' IARPA Supercables project and claimed it was because he knew sdPhotonics had been targeted in the military take-over.

952. Defendant Kuznia coupled the conversation to an elaborate story about how lucky everyone was to have engineering jobs in which they could work with the military, and how Kuznia was so grateful he did not have to work in menial positions instead such as a taxi driver.

953. The Plaintiff did not respond to Kuznia's claims that Kuznia's company should take over the $2M IARPA Supercables project.

954. Kuznia lacked the expertise in VCSELs to develop oxide-free VCSELs or even oxide VCSELs, and certainly not the Plaintiff's Cryo-VCSEL invention.

955. Defendant Kuznia conspired and engaged with state actor Feng who was working with Beranek, and engaged in unlawful harassment in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding. Kuznia tried to take over the IARPA Supercables project from

sdPhotonics, as part of the effort with Feng to misappropriate the Cryo-VCSEL prototypes from the Plaintiff's company, sdPhotonics.

956. Defendant Kuznia retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to harass and intimidate the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, to prevent corrections to the perjury in the USPTO by Sovinski, endeavored to misappropriate trade secrets from the Plaintiff's company as part of the harassment and stalking, all to deter the Plaintiff from continuing with the Whistleblower lawsuit.

957. The Plaintiff was damaged by Defendant Kuznia's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 13: Defendant Milton Feng.**

958. Plaintiff realleges and incorporates paragraphs 334-340, 393-463, 555-556, 561-572, 575-580, 630-641, 714, and Exhibits 2, 20 of this Complaint as though fully set forth herein.

959. Defendant Feng worked as a consultant to sdPhotonics, and was employed by the Plaintiff and sdPhotonics on the IARPA Supercables project that began in or about June, 2019.

960. The University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project, with Feng acting as the university's principal investigator to fabricate and test prototypes of sdPhotonics' new laser invention, the Cryo-VCSEL. sdPhotonics provided its proprietary epitaxial materials Feng used to fabricate and test the Plaintiff's Cryo-VCSEL invention at high-speed and 4 K.

961. Under the IARPA Supercables project, Defendant Feng was to fabricate and test the sdPhotonics' Cryo-VCSELs for high speed at 4 K, and set the tested prototypes back to sdPhotonics so that sdPhotonics could perform its own proprietary testing needed to develop a quantum mechanical current-voltage model that could be used for optimization of sdPhotonics' future Cryo-VCSEL designs.

962. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the Cryo-VCSEL prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds in excess of 80 GHz at 4 K.

963. Feng then refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to

develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

964. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototyes.

965. Once the Plaintiff had been threatened by Vetter, followed by stalking, assaults, and batteries in Carbondale, IL, the Plaintiff called Defendant Feng from Carbondale, IL, explained he was being stalked and assaulted by the military, and requested Feng's assistance.

966. However, Defendant Feng informed the Plaintiff that he had been instructed not to assist the Plaintiff or his company in any way, and refused multiple requests from the Plaintiff for help, informing the Plaintiff that he could not and was not allowed to.

967. The Plaintiff was then by the military when Deborah Van Vechten used a trick to confine the Plaintiff in the psychiatric ward of the Pavilion, on the same University of Illinois where Feng held the Plaintiff's company's Cryo-VCSEL prototypes, where the Plaintiff was harassed, threatened, extorted for trade secrets, and poisoned.

968. Once the Plaintiff was released, with the Plaintiff never having mentioned the illegal confinement by the military and Deborah Van Vechten, Defendant Feng began sending the Plaintiff emails of well-wishes and get well soon messages.

969. In or about about March, 2021, the Plaintiff received a draft of an article from Michael Gerhold and was informed by Gerhold that Gerhold and Feng had written an article about Gerhold's VCSEL projects. The Plaintiff found buried in the article claims by Gerhold and Feng claimed that Feng had developed the Cryo-VCSEL invention in his University of Illinois laboratory.

970. Gerhold agreed to correct the article, and Feng informed the Plaintiff that Gerhold had made the errors in the article.

971. By the end of the IARPA Supercables project in or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois.

972. After the project ended, the Plaintiff contacted Feng's supervisors at the University of Illinois, Rashad Bashir and Susan Martinis, and informed them that the university still possessed sdPhotonics Cryo-VCSEL prototypes from the IARPA Supercables project, had disrupted the sdPhotonics research on the project.

973. Susan Martinis' office responded with an email from Defendant Feng, John Dallesassee, and Fred Kish, claiming that the Cryo-VCSEL prototype was being withheld because of Nick Holonyak was the inventor in some way.

974. Defendant Feng and his supervisors, Bashir and Martinis, subsequently used the sdPhotonics' Cryo-VCSEL prototypes to obtain additional contracts for the University of Illinois.

975. Defendant Feng retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution

pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss participated in the stalking, assaults, batteries, and confinement of the Plaintiff in Carbondale, IL and in the Pavilion on the University of Illinois campus, to prevent corrections to the perjury in the USPTO by Sovinski, and misappropriate trade secrets from the Plaintiff's company to damage the company, all to deter the Plaintiff from continuing with the Whistleblower lawsuit.

976. The Plaintiff was damaged by Defendant Feng's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 14: Defendant Mark Beranek.**

977. Plaintiff realleges and incorporates paragraphs 301-302, 393, 427-431, 437-464, 630-641, 714-717 of this Complaint as though fully set forth herein.

978. Defendant Mark Beranek worked closely with the Plaintiff in developing a proposal to and SBIR solicitation from his employment agency, NAVAIR.

979. The NAVAIR project included sdPhotonics as a performer and Charles Kuznia's company to perform as a subcontractor to sdPhotonics in a Phase II.

980. The NAVAIR project with Defendant Beranek began in or about March, 2020, during the Florida Whistleblower proceedings, and included Kuznia's company as a proposed subcontractor on a Phase II.

981. sdPhotonics began making progress presentations in monthly phone meetings with Beranek and Beranek's colleagues who also monitored project, in which Defendant Beranek repeatedly stated or claimed to the Plaintiff that the oxide-free VCSELs being developed on his project had been invented and developed at the University of Illinois in Milton Feng's group.

982. The Plaintiff repeatedly corrected Defendant Beranek in multiple phone meetings that Milton Feng was not involved in the invention or development of the oxide-free VCSEL.

983. In early November, 2020, the Plaintiff was threatened and extorted by John Vetter to sign an agreement that included the military as part of the Florida Whistleblower lawsuit. The basis of the agreement had already been determined fraudulent by Lateka Eifert's office, and was refused by the Plaintiff.

984. The Plaintiff was then stalked, assaulted, and battered that began in Carbondale, IL, only a few days after the threats from Vetter involving the agreement. During that episode of stalking, assaults, and batteries in Carbondale, IL, the Plaintiff received multiple phone calls from attorneys, military program monitors, and defense contractors to the military.

985. Defendant Beranek was one of the military program monitors who contacted the Plaintiff by phone during the stalking, and informed the Plaintiff that

he wanted to take control of the oxide-free VCSEL inventions from sdPhotonics for his other projects.

986. Defendant Beranek then offered the Plaintiff the prospect of other defense contracts he would issue to sdPhotonics, if the Plaintiff relinquished the rights to the oxide-free VCSEL inventions.

987. The Plaintiff made no agreements and did not respond to the offers by Defendant Beranek.

988. By his own admissions, Defendant Beranek conspired and engaged with state actor Feng and UCF attorneys who were engaged in extortion with the military, and who Beranek falsely and repeatedly claimed had developed the oxide-free VCSELs even after the Plaintiff had corrected Beranek. Defendant Beranek engaged and conspired in unlawful harassment, stalking, assaults, batteries and extortion in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding.

989. Beranek tried to use the state action to take over the sdPhotonics' oxide-free VCSELs.

990. Defendant Beranek retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he harassed the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, and tried to take over technology from the Plaintiff's company as part

of the harassment and stalking, all to deter the Plaintiff from continuing with the Whistleblower lawsuit.

991. The Plaintiff was damaged by Defendant Beranek's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 15: Defendant Matt Kim.**

992. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 714-716, of this Complaint as though fully set forth herein.

993. Defendant Kim is a former University of Illinois graduate student and owner of the company QuanTera that does military contracting in semiconductors.

994. Defendant Kim specialty is semiconductor electronic devices, and Kim also consulted for the Plaintiff's company on different occasions, and often contacted the Plaintiff with questions concerning lasers.

995. Defendant Kim repeatedly contacted the Plaintiff while he was being extorted, stalked, assaulted, and battered in Carbondale, IL in Q4 2020 involving the evidence of perjury in the USPTO and the Florida Whistleblower proceedings.

996. Kim called the Plaintiff repeatedly and repeatedly asked the Plaintiff in the calls whether the Plaintiff had ever had sex with a sixteen (16) year old girl.

997. The Plaintiff informed Defendant Kim that he was being stalked by the military, and asked why was Kim was calling to ask the Plaintiff with such questions.

998. Defendant Kim could provide no legitimate reason for his phone calls or why he was asking the Plaintiff whether he had ever had sex with a sixteen (16) year old girl.

999. Defendant Kim conspired and engaged with military and the military's state actors at the University of Illinois, Feng, and UCF, Cook, Sovinski, and Weiss, to cyber-stalk, harass, and extort the Plaintiff in Q4 2020 as part of the illegal Florida Whistleblower proceeding, trying to take over the Plaintiff's company for the military.

1000. Defendant Kim retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to harass and intimidate the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, and repeatedly calling the Plaintiff to ask if the Plaintiff had ever engaged in sex with a sixteen-year-old girl, while knowing that the Plaintiff was being stalked, assaulted, and battered by the military and DOJ as part of the Florida Whistleblower proceeding, to deter the Plaintiff from continuing with the Florida Whistleblower lawsuit.

1001. The Plaintiff was damaged by Defendant Kim's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 16: Defendant Noren Pan.**

1002. Plaintiff realleges and incorporates paragraphs 393-462, 485-486, 630-641, 714-716, as though fully set forth herein.

1003. Defendant Pan is a former University of Illinois graduate student and owner of the company Microlink, Inc., that does military contracting in semiconductors.

1004. Defendant Pan and the Plaintiff's company, sdPhotonics, had performed some work before in anticipation of submitting joint research proposals for projects.

1005. The Plaintiff contacted Pan in November, 2020, while he was being stalked, assaulted, and battered in Carbondale, IL, and informed Pan about what was happening and requested his help.

1006. Defendant Pan responded by text message and informed the Plaintiff that Pan had set up a meeting in a vacant house in Chicago, and wanted the Plaintiff to meet him in the vacant house.

1007. Defendant Pan could provide no legitimate reason for why he was asking the Plaintiff to meet him in a vacant house during the stalking that took place in Carbondale, IL, in Q4 2020 during the Florida Whistleblower proceeding.

1008. The Plaintiff and Pan later discussed the military attempted take-over in January, 2021 by phone.

1009. Defendant Pan admitted in that phone call in January, 2021, that he knew the Plaintiff's company had been targeted by the military, universities, and defense contractors in intellectual property theft.

1010. Defendant Pan then asked the Plaintiff to come to Chicago, IL to discuss a project he knew was upcoming that became the "Chips + Science" government funding from the Biden administration.

1011. Defendant Pan admitted that he had agreed to harass and extort the Plaintiff during the illegal Florida Whistleblower proceeding, and Pan conspired and engaged in that harassment and extortion with the military's state actors including Feng, Cook, Sovinski, and Weiss, to use the illegal Florida proceeding to take over the sdPhotonics' oxide-free VCSELs.

1012. Defendant Pan retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to harass and intimidate the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, claiming he wanted to meet the Plaintiff in an

abandoned house in Chicago during the stalking, all to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1013. The Plaintiff was damaged by Defendant Pan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 17: Defendant Fred Kish.**

1014. Plaintiff realleges and incorporates paragraphs 393-462, 575-580, 630-641, 714-716 of this Complaint as though fully set forth herein.

1015. Defendant Kish a professor at NC State who is one of the former graduate students of Nick Holonyak. Defendant Kish contacted the Plaintiff while he was being stalked in Carbondale, IL, in November, 2020 during the Florida Whistleblower proceedings.

1016. The Plaintiff and Defendant Kish exchanged emails in which the Plaintiff informed Kish he was being stalked as part of a military take-over of his company, and that the stalking was occurring as part of the Florida Whistleblower lawsuit.

1017. Defendant Kish then informed the Plaintiff that Kish was very good friends with one of the DARPA program monitors linked to the organized crime from the military, Gordon Keeler. Defendant Kish acknowledged that he knew the

effort was to take over the Plaintiff's company and use the laser inventions to obtain further government funding.

1018. Kish advised the Plaintiff that he should file suit over the actions by the military and UCF during the stalking, assaults, and batteries in Carbondale, IL in Q4 2020 as part of the Florida Whistleblower proceeding.

1019. Defendant Kish insisted in November, 2020 while the Plaintiff was being stalked and cyber-stalked, that his own university, North Carolina State University, would not receive any of the funding related to the military efforts to use the Plaintiff's oxide-free VCSEL inventions.

1020. However, Defendant Kish later changed his position, and in or about November, 2021 falsely claimed with Milton Feng, John Dallesassee, and Susan Martini's UIUC office that Nick Holonyak had somehow made the Plaintiff's VCSEL inventions as a reason for UIUC to retain the Cryo-VCSEL invention.

1021. In or about the fall of 2018 at a meeting at UIUC, Defendant Kish had tried to enter a discussion with the Plaintiff and John Dallesassee about VCSELs, and it immediately became clear that Kish had little if any scientific knowledge of the physics needed to actually understand lasers, and Deppe and Dallesassee had to be repeatedly correct Kish and explain his confusion to him about how the devices work.

1022. Defendant Kish is a state actor conspired with Bashir, Martinis, and Feng, when he tried to claim that the Cryo-VCSEL prototypes had been invented by Nick Holonyak, to misappropriate the sdPhotonics laser inventions, and obtain

additional research contracts for the University of Illinois using the sdPhotonics' Cryo-VCSEL.

1023. Defendant Kish retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to harass and intimidate the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, to prevent corrections to the perjury in the USPTO by Sovinski, claiming he was good friends with the DARPA program monitor and telling the Plaintiff he should file lawsuits for the actions, as he endeavored to misappropriate trade secrets from the Plaintiff's company as part of the harassment and stalking, to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1024. The Plaintiff was damaged by Defendant Kish's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**<u>Count 18: Defendant Van Vechten.</u>**

1025. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 630-641, 714-717 of this Complaint as though fully set forth herein.

1026. Defendant Van Vechten participated in the IARPA Supercables project monthly reporting meetings and site visits, and from that project met the Plaintiff and learned about the Plaintiff's Cryo-VCSEL technologies.

1027. Van Vechten worked closely with the Pinsukanjana, Feng, Harrod, and the Plaintiff involving the oxide-free VCSEL and Cryo-VCSEL technologies that were invented by the Plaintiff and being developed by the Plaintiff's company sdPhotonics.

1028. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

1029. Van Vechten then used a trick after the Plaintiff had been heavily stalked and assaulted, and had contacted Milton Feng for help who had refused. Van Vechten then called and informed the Plaintiff that she had learned Trump was behind the stalking, assaults, and batteries in Carbondale, IL.

1030. Van Vechten then explained that she knew a place behind locked doors away from the stalkers for a few days close to the Univ. of Illinois campus, in the blue part of the state, and that she had connections there but that it would take her several hours to arrange the stay and would call back.

1031. Instead, Defendant Van Vechten used the trick to confine the Plaintiff in the psychiatric ward of Martin Repetto, where the Plaintif was harassed,

threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. During this time Repetto demanded to know details of the oxide-free VCSEL inventions Van Vechten was after.

1032. After the Plaintiff had been released, Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to avoid the stalkers in Illinois, and that the Plaintiff didn't understand how the military did its business with the universities.

1033. Defendant Van Vechten retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when she agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to harass, intimidate, and stalk the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, and use a trick to confine the Plaintiff in the psychiatric ward of the Pavilion on the University of Illinois campus, to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1034. The Plaintiff was damaged by Defendant Van Vechten's illegal actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 19: Defendant Nicholas Stork.**

1035. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 714-716 of this Complaint as though fully set forth herein.

1036. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1037. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1038. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1039. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking was due to then president Trump, and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1040. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1041. Several hours later during the drive Van Vechten gave the Plaintiff the information and directions to the Pavilion, while the Plaintiff was riding with Nick

Stork and his wife, and explained that she had set up a room with a medical facility on the University of Illinois campus and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1042. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1043. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1044. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1045. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will

in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1046. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

1047. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1048. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1049. Defendant Nick Stork agreed, conspired and engaged with Van Vechten and state actors at UCF, Sovinski, Shtrom, and with Weiss, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff, where he was harassed, threaten, extort, intimidate, assault, and batter, so that UCF and the military could use an extorted and fraudulent settlement agreement take over the Plaintiff's company and its technologies.

1050. Defendant N. Stork violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired, confederated and engaged with state actors Cook, Sovinski, Shtrom, and Weiss, to use the trick with Van Vechten and confined the Plaintiff during Q4 2020 of the Florida Whistleblower proceeding with extortion, to deter the Plaintiff from continuing in the Florida Whistleblower lawsuit.

1051. The Plaintiff was damaged by Defendant N. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 20: Defendant Martin Repetto.**

1052. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 714-716 of this Complaint as though fully set forth herein.

1053. Defendant Repetto was the supervising doctor who oversaw the confinement of the Plaintiff in the psychiatric ward of the Pavilion.

1054. The Plaintiff was confined against his will and without cause in the psychiatric ward under Repetto for approximately six (6) days.

1055. During that time the Plaintiff was placed in a communal sleeping center. Numerous different supposed "patients" were checked into the room, all refusing to wear masks despite covid.

1056. The Plaintiff was forced to attend supposed "group" sessions in order to be released. The sessions were clearly staged meetings of approximately a dozen people pretending to be patients with supposed mental ailments.

1057. Defendant Repetto met with the Plaintiff at least three times during the Plaintiff's confinement.

1058. Each time Repetto demanded information about the VCSEL inventions, claiming the Plaintiff was not giving him enough information. The Plaintiff had never mentioned lasers to Defendant Repetto or anyone else in the Pavilion.

1059. The supposed "mental patients" were moved continuously into and out of the communal sleeping area, none of whom wore masks despite the peak of covid in November, 2020.

1060. On the fourth day of the Plaintiff's confinement one of the staff brought the Plaintiff a supposed diagnosis from Repetto the Plaintiff was asked to sign stating the Plaintiff had bipolar mental disease.

1061. The Plaintiff refused to sign.

1062. On the fourth morning one of the supposed "mental patients" admitted to the Plaintiff in a private conversation that he had been out of work and was approached by someone who agreed to pay him to part in the intimidation scheme in the psychiatric ward of the Pavilion with the military against the Plaintiff.

1063. Later that day the Plaintiff was moved to a private room to sleep on the same floor in the same area. On that night the Plaintiff received food poisoning and vomited throughout the night, and did not sleep.

1064. The next morning several of the supposed "patients" met in the hallway, after which one of the staff members brought each of the supposed "patients" ballpoint pens. The supposed "patients" then followed the Plaintiff around the hallway with their ballpoint pens pointed towards the patient in what was obviously staged for intimidation.

1065. When that failed the supposed "patients" began checking themselves out of the Pavilion by going to the reception desk on the floor and informing the staff they were leaving. The staff signed paperwork for more than half of the dozen or so supposed "patients."

1066. On the final morning Defendant Repetto came to the Plaintiff's room and informed the Plaintiff that he wanted to keep the Plaintiff longer in the facility, and the Plaintiff demanded to be let out.

1067. Defendant Repetto conspired and engaged with Van Vechten, Nick Stork, and the military's state actors Feng at the University of Illinois and Sovinski, Shtrom, and with Weiss of UCF, and admitted to the Plaintiff directly that Repetto's reasons for the confinement involved extortion of information from the Plaintiff about the oxide-free VCSEL inventions. Repetto improperly confined the Plaintiff and harassed, threatened, extorted, intimidated, and oversaw assaults and

batteries in the Pavilion, so that UCF and the military could take over the Plaintiff's company and its technologies.

1068. Defendant Repetto retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when he engaged, agreed, and conspired with state actors, and confined the Plaintiff in the psychiatric ward of the Pavilion, and engaged in extortion, threats, stalking, assaults, batteries, demanding the Plaintiff provide him information on the laser inventions as part of the Florida Whistleblower proceeding, to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1069. The Plaintiff was damaged by Defendant Repetto's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 21: Defendant Brenda Stork.**

1070. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 714-716 of this Complaint as though fully set forth herein.

1071. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1072. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1073. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1074. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1075. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1076. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1077. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1078. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1079. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1080. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1081. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1082. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas

Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1083. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

1084. Defendant Brenda Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

1085. Defendant B. Stork retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit while engaged with state actors, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when she agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to harass, intimidate, and stalk the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, and use a trick to confine the Plaintiff in the psychiatric ward of the

Pavilion on the University of Illinois campus, to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1086. The Plaintiff was damaged by Defendant B. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 22: Defendant Larry Stork.**

1087. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 714-716 of this Complaint as though fully set forth herein.

1088. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1089. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1090. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1091. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1092. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1093. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1094. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1095. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1096. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1097. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1098. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1099. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1100. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

1101. Defendant Larry Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

1102. Defendant L. Stork retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit while engaged with state actors, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when she agreed, conspired, confederated, and engaged with the state actors Sovinski, Cook, Sweetapple, and Weiss to harass, intimidate, and stalk the Plaintiff in Carbondale, IL as part of the extortion in Q4 2020 during the illegal Florida Whistleblower proceeding, and use a trick to confine the Plaintiff in the psychiatric ward of the Pavilion on the University of Illinois campus, to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1103. The Plaintiff was damaged by Defendant L. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 23: Defendant Joe Southron.**

1104. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 714, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

1105. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings.

1106. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

1107. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

1108. However, Defendant Southron prepared an improper complaint, that brought the Florida Whistleblower Act, Fl. St. §112.3187 against a large number of individuals.

1109. Prior Florida court rulings had already disallowed what Southron was attempting, which was to bring violations of the Fl. St. §112.3187 against individuals.

1110. When the Plaintiff informed Defendant Southron that the Plaintiff would not allow the improper amended complaint that Southron had prepared to

be filed, Southron informed the Plaintiff that he was withdrawing from representation and refused to properly dismiss the Florida Whistleblower lawsuit.

1111. When the Plaintiff objected to Defendant Southron about his refusal to dismiss the complaint, Defendant Southron filed improper dismissal orders that other attorneys, Robin Foret and Kevin Keeling, caught, and explained to the Plaintiff why these could be damaging to the Plaintiff.

1112. Defendant Southron retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 1st Amendment of the U.S. Constitution pursuant to §1983, and acted under color of state law for the military's organized crime in the Florida Whistleblower proceeding to engage in fraud during the proceeding, preparing an improper federal complaint trying to prevent the evidence of perjury in the USPTO from coming into proceeding, and tried to withdraw from the case to damage it further when he was discovered, to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1113. The Plaintiff was damaged by Defendant Southron' actions and refusal to allow due process in the proceeding, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings. Defendant Southron's actions were unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**<u>Count 24: Defendant Youndy Cook.</u>**

1114. Plaintiff realleges and incorporates paragraphs 188-189, 236-275, 278-280, 289, 292, 305-329, 383-385, 600-601, 630-641, 714 and Exhibits 3-10, 16, of this Complaint as though fully set forth herein.

1115. Defendant Cook was contacted by the Plaintiff in or about October, 2019, and provided information that Sandra Sovinski had filed false declarations into the USPTO on the Plaintiff's oxide-free VCSEL inventions, and had violated the 2014 IP Agreement and UCF-2.029.

1116. Defendant Cook and Sandra Sovinski refused to correct the declaration in the USPTO.

1117. From early January, 2020 into May, 2020 during the Florida Whistleblower proceedings, Defendant Cook worked with Sandra Sovinski and Alen Hsu who sent the Plaintiff numerous drafts of an agreement that claimed UCF needed military approval to correct the false declarations Sovinski had filed into the USPTO.

1118. The drafts of the agreement included markups identified in the drafts as made by Defendant Cook, Sovinski, or Hsu.

1119. However the military had already secured government rights in the invention, and UCF had no involvement in the sdPhotonics' government contract that involved development of the oxide-free VCSEL invention under Lateka Eifert.

1120. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs

placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

1121. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings could be proven false by prior USPTO filings that were part of the applications.

1122. The declarations filed by Sovinski into the USPTO constituted perjury, in violation of both Florida statutes and federal criminal codes against perjury.

1123. After Sovinski filed the altered declarations into the USPTO in April, 2020, and again violated UCF-2.029, the Plaintiff was again presented the agreement prepared by Cook, Sovinski, and Hsu, that the Plaintiff had rejected.

1124. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that Svetlana Shtrom had contacted a separate Army office than the office that issued the government contracts to sdPhotonics monitored by Lateka Eifert, claiming that UCF had been owed a subcontract on one of the sdPhotonics' Army contracts because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics.

1125. In or about late May, 2020, Alen Hsu sent the Plaintiff the agreement that had been prepared by Cook, Sovinski, and Hsu, that falsely claimed UCF required approval from the Army office that was unrelated to the Lateka Eifert or the contracts or her military office who had issued and monitored the contracts to the Plaintiff's company.

1126. In or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her the emails by UCF to the separate Army office that claimed Eifert should have issued UCF a subcontract because O'Neal had been employed part time with UCF when the contract was issued.

1127. Eifert then informed the Plaintiff that she would need to discuss the matter with her supervisors. Eifert contacted the Plaintiff about a week later an informed him that UCF had engaged in fraud in other military contracts from her office, that Eifert's military supervisors were tired of UCF engaging in fraud on their contracts. Eifert then gave the Plaintiff instructions on reporting the fraud by the UCF employees to the SBA IG, Hannibal Ware.

1128. In or about October, 2021, the Plaintiff again contacted Defendant Cook by email about the false declarations in the USPTO filed by Sovinski and others working with UCF, after military auditors confirmed that sdPhotonics was paying patent costs on the patents at issue, and that Sovinski had breached the 2014 IP Agreement.

1129. The Plaintiff included the military auditors on the email to Cook who had verified the patent payments from sdPhotonics to UCF.

1130. Defendant Cook did not respond to the Plaintiff's contact and information in October, 2021 showing Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement.

1131. By the end of December, 2022, the Plaintiff was being electronically and physically stalked, assaulted, and battered so heavily by the DOJ and military, he was forced to leave the U.S. for his physical safety.

1132. Defendant Cook violated the 1st Amendment of the U.S. Constitution pursuant to §1983, when she retaliated against the Plaintiff for his protected activity of seeking redress in the Florida Whistleblower lawsuit, preparing fraudulent settlement agreements first with Alen Hsu and then with John Bustamante, that were then followed by extortion trying to cover up the perjury in the USPTO by UCF's Sovinski in Q4 2020, to deter the Plaintiff from continuing with the Whistleblower lawsuit.

1133. The Plaintiff damaged in his person and property by Defendant Cook's actions, and was forced to cease business operations of his company and suffered additional damages. The Plaintiff is entitled to punitive damages because of Cook's intentional and malicious acts to damage the Plaintiff and his company.

## FOURTH CAUSE OF ACTION

**42 U.S.C. §1983, 14th U.S. Constitutional Amendment, violation of due process in Florida Whistleblower and USPTO proceedings. Defendants: Sovinski, Shtrom, Weiss, Sweetapple, Hsu, Kline, Brown, Bustamante, Vetter, Taboada, Pinsukanjana, Kuznia, Baranek, Kim, Pan, Kish, Feng, Van Vechten, N. Stork, Repetto, B. Stork, L. Stork, Southron.**

1134. To establish a 42 U.S.C. § 1983 claim that Plaintiff was deprived of his Constitutionally protected 14th Amendment rights in the Florida Whistleblower lawsuit, the factual allegations must show: (1) the Plaintiff was damaged by

Defendants' actions; (2) the Defendants took their actions to damage the Plaintiff improperly and without procedural due process; and (3) Defendants' actions were taken under color of law.

1135. The U.S. Supreme Court has found that "Private persons, jointly engaged with state officials in a challenged action, are acting 'under color' of law for purposes of § 1983 actions." Dennis v. Sparks, 449 U.S. 24, 27-28 (1980). The 9th Circuit had ruled, "To prove a conspiracy between the state and private parties under § 1983, the plaintiff must show an agreement or meeting of the minds to violate constitutional rights. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each must at least share the common objective of the conspiracy." *United Steelworkers of Am. V. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989).

1136. The elements needed to prove a conspiracy in Florida are: (1) an agreement between two or more parties; (2) to do an unlawful act or to a lawful act by an unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009); *Walters v. Blankenship*, 931 So.2d 1367, 140 (Fla. 5th DCA 2006).

1137. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**<u>Count 1: Defendant Sovinski.</u>**

1138. The Plaintiff realleges and incorporates paragraphs 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 1134, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

1139. The Florida Whistleblower lawsuit was filed on or about December 12, 2019.

1140. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

1141. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

1142. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact, the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

1143. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsely represented the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached, and violated UCF-2.029.

1144. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

1145. In addition to committing perjury, Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO beginning in or about August, 2019.

1146. During this time, Sovinski worked with Youndy Cook and Alen Hsu to draft a settlement agreement, of which Hsu sent the Plaintiff's drafts, that falsely claimed Army approval was required for UCF to make any changes or corrections to the false declarations that Sovinski had filed into the USPTO.

1147. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

1148. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

1149. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on the agreement prepared by Cook, Sovinksi, and Hsu that claimed UCF required Army approval for UCF to correct the USPTO declarations.

1150. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

1151. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

1152. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

1153. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi was then sent to the Plaintiff, and again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

1154. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

1155. The Plaintiff had a federal constitutional right to seek redress through the court system for damages caused by Sovinski's actions in August, 2019 in which

she engaged in perjury against the Plaintiff and his company by filing false declarations into the USPTO onto the Plaintiff's property, his company, without retaliation.

1156. Defendant Sovinski violated the Plaintiff's rights under the 14th Amendment of the U.S. Constitution pursuant to §1983, when she used the Florida Whistleblower proceeding to engage in additional perjury in the USPTO in April, 2020, and tried to change evidence and perjury at issue in the proceeding, and drafted the fraudulent settlement agreement with Cook and Hsu that required Army approval from an office unrelated to sdPhotonics' contracts, that even Eifert's office determined was fraud, drafted a second agreement in or about October, 2020 with Bustamante and Cook, as she was directing more false declarations to be filed into the USPTO, and denied the Plaintiff due process in the Florida Whistleblower lawsuit.

1157. The Plaintiff was damaged by Defendant Sovinski's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceedings.

1158. Defendant Sovinski's actions were in fact both unlawful and criminal, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 2: Defendant Shtrom.**

1159. The Plaintiff realleges and incorporates paragraphs 138-150, 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 1134, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

1160. Florida Whistleblower lawsuit was filed on or about December 12, 2019.

1161. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

1162. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

1163. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact, the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

1164. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsely representing the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached.

1165. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

1166. Shtrom followed Sovinski USPTO filings with Shtrom's own retroactive declarations, and when she filed the declarations Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when she filed retroactive ownership.

1167. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

1168. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

1169. Defendant Shtrom again filed her own USPTO declarations soon after, again breaching the 2014 IP Agreement and UCF-2.029 during the Florida Whistleblower proceeding.

1170. In or about May, 2020, the Plaintiff used public records from public records requests and obtained emails and records that showed Svetlana Shtrom

had contacted a separate Army office than Eifert's and provided false information about Sabine O'Neal.

1171. Shtrom claimed UCF had been entitled to a subcontract on Eifert's contract to sdPhotonics because O'Neal had been a UCF employee, when in fact it was Eifert who was responsible for overseeing any subcontracts from the contract Eifert, Eifert had secured the government rights.

1172. The false claims by Shtrom to the Army office had been used in a settlement agreement that had been drafted by Cook, Sovinski, and Hsu, and required unexplained Army approval from an unspecified office after Deppe signed the agreement, and made no corrections to the perjury by Sovinski in the USPTO.

1173. After obtaining the information from the public records request and USPTO patent records, in or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her Shtrom's emails to the other Army office and claims about Sabine O'Neal and the contract Eifert had monitored, and the need for some type of Army approval related to UCF's supposed involvement in Eifert's contract.

1174. Eifert informed the Deppe when she saw the emails and records that Shtrom had sent the different Army office that she would discuss it with her supervisors and get back to him.

1175. About a week later, in mid-June, 2020, Eifert informed the Deppe that her supervisors had reviewed the emails and information Shtrom sent to the separate Army office and determined, separately from Deppe, that Shtrom and UCF had engaged in fraud on Eifert's contract to sdPhotonics.

1176. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

1177. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

1178. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

1179. Defendant Shtrom again breached the 2014 IP Agreement and UCF-2.029, when she followed Sovinski's USPTO declarations with her own retroactive declarations in or about October, 2020.

1180. Defendant Shtrom violated the Plaintiff's rights under the 14th Amendment of the U.S. Constitution pursuant to §1983, when she used the proceedings of the Whistleblower lawsuit to engage in additional breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029(4)(d), by filing retroactive declarations into the USPTO in attempts to correct prior declarations filed by Sovinski, presenting false information to an Army office about Sabine O'Neal with no connection to sdPhotonics or its contracts, and the false information she had sent to the Army office was then used to try to force the Plaintiff into signing the fraudulent settlement agreement, and denied the Plaintiff due process in the Florida Whistleblower proceeding.

1181. The Plaintiff was damaged by Defendant Shtrom's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceeding.

1182. Defendant Shtrom's actions were in fact both unlawful, malicious, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 3: Defendant Weiss.**

1183. Plaintiff realleges and incorporates paragraphs 187-194, 236-276, 284-287, 290-291, 305-315, 319-329, 355-357, 362, 365-372, 391, 630-641, 1134, and Exhibits 8-14 of this Complaint as though fully set forth herein.

1184. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1185. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1186. During the time the proceeding operated without a judge, Defendant Weiss pretended to be an officer of the illegal Whistleblower proceeding, and filed documents for his client, UCF, into the Florida Whistleblower proceedings, while he operated the proceeding without a judge.

1187. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP

Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1188. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1189. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

1190. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1191. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO, violating Fl. St. §§837.021(1), 837.07(1), (2).

1192. While Defendant Weiss pretended to be an officer of a legitimate state court proceeding, he tried to prevent evidence from coming into the proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

1193. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

1194. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

1195. At the end of June, 2020, Defendant Weiss announced he had stayed the proceedings and refused a discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

1196. In or about August, 2020, Defendant Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, that in fact Defendant Weiss had refused, and again tried to keep evidence of Sovinski's perjury in the USPTO from coming into the proceeding.

1197. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

1198. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

1199. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

1200. The Plaintiff had a federal constitutional right to seek redress through the court system for damages caused by Sovinski's actions in August, 2019 in which she engaged in perjury against the Plaintiff and his company by filing false declarations into the USPTO onto the Plaintiff's property, his company.

1201. Defendant Weiss violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he performed as the military's state actor and pretended to be an officer of the court in the illegal Florida Whistleblower proceeding as he coordinated with at least the military, UCF, trying to force the Plaintiff into a settlement agreement that even Lateka Eifert's office had determined was based on fraud by UCF employees with Shtrom, and engaged in evidence and witness tampering trying to keep evidence of perjury by Sovinski in the USPTO from entering the proceeding, to acquire or maintain improper ownership in the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1202. The Plaintiff was damaged by Defendant Weiss' actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

1203. Defendant Weiss actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 4: Defendant Sweetapple.**

1204. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 1134, and Exhibits 3-14 of this Complaint as though fully set forth herein

1205. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1206. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1207. During the time the proceeding operated without a judge, Defendant Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1208. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1209. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1210. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

1211. While Defendant Sweetapple pretended to be an officer of the illegal state court proceeding, he tried to prevent evidence from coming into the proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

1212. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1213. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

1214. In or about May, 2020, Defendant Sweetapple tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF to assign.

1215. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

1216. Defendant Sweetapple learned the Plaintiff filed the SBA IG complaint, in or about June, 2020.

1217. In or about the end of June, 2020, Defendant Sweetapple announced to the Plaintiff that Weiss had stayed the proceedings, and that because of the stay Defendant Sweetapple would not serve Weiss the discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

1218. In or about August, 2020, Jeffrey Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, when in fact Sweetapple had falsely claimed that Weiss had stayed the proceedings.

1219. The docket showed Weiss had no way to stay the proceeding, and claimed he had done so without filing a motion.

1220. When the Plaintiff instructed Defendant Sweetapple serve Weiss the discovery response, Defendant Sweetapple refused and tried to set the hearing with the Weiss for the motion to compel.

1221. When the Plaintiff fired Defendant Sweetapple, Defendant Sweetapple refused to cease work on the matter, despite that the contract between the Plaintiff and Sweetapple required Sweetapple to cease work upon being filed.

1222. Defendant Sweetapple took his actions under color of law, pretending to be an officer of the illegal state court proceeding that operated without a judge.

1223. Defendant Sweetapple violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he performed as the military's state actor in the Florida Whistleblower and coordinated with at least the military and UCF, trying to force an agreement the fraudulent agreement the military had prepared with Cook, Hsu, Sovinski, Shtrom, and Weiss, and refused to provide the services for which he was hired, to serve the Plaintiff's responses to Jeffrey Weiss, to acquire or maintain improper ownership in the Plaintiff's company while denying due process in the Florida Whistleblower proceeding.

1224. The Plaintiff was damaged by Defendant Sweetapples' actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

1225. Defendant Sweetapple actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 5: Defendant Hsu.**

1226. Plaintiff realleges and incorporates paragraphs 282-293, 315-329, 362-365, 630-641, 1134-1136, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

1227. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1228. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1229. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1230. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1231. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1232. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1233. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

1234. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

1235. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

1236. Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that included terms the Plaintiff informed Defendant Hsu he would not accept.

1237. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

1238. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

1239. Defendant Hsu learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents to prove certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

1240. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1241. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

1242. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF that Defendant Hsu had written into the agreement with Cook and Sovinski.

1243. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed

about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

1244. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

1245. Defendant Hsu contacted and warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

1246. Defendant Hsu agreed, conspired and engaged with military state actors Cook, Sovinksi, Weiss, and Sweetapple, to try to force the Plaintiff to sign the settlement agreement that even Lateka Eifert's military office that issued sdPhotonics the government contracts determined was based on fraud by UCF employees with Svetlana Shtrom. Defendant Hsu took overt actions in addition to the fraudulent settlement agreement, forcing the Plaintiff into a settlement meeting based on fraud, and engaging with Weiss and Sweetapple as part of evidence and witness tampering.

1247. Defendant Hsu violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he made his agreement and conspired and engaged with the military state actors, Cook, Sovinski, Weiss and Sweetapple, to use the Florida Whistleblower proceeding, to acquire or maintain improper ownership in the

Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1248. The Plaintiff was damaged by Defendant Hsu's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 6. Defendant Kline.**

1249. The Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 1134-1136, and Exhibits 3-14, 16 of this Complaint of this Complaint as though fully set forth.

1250. The Plaintiff hired Defendant Karen Kline in or about 2016 to provide legal advice on patents filed by the Plaintiff and his company, sdPhotonics.

1251. In or about November, 2018, the Plaintiff informed Defendant Kline he planned to resign his employment from UCF and move sdPhotonics from the UCF incubator, and asked Defendant Kline to review the patents that had been filed jointly with UCF and two additional patents.

1252. In December, 2018, Defendant Kline contacted Sandra Sovinski at Sovinski's UCF office with the patent list.

1253. In or about the beginning of January, 2019, after sending her letter, Defendant Kline informed the Plaintiff she had been contacted by Sandra Sovinski and had a new conflict of interest due to UCF, but that she wished to consult to find other attorneys to represent the Plaintiff and his company, sdPhotonics.

1254. Defendant Kline subsequently informed the Plaintiff that she had found Alen Hsu from a different firm to represent the Plaintiff.

1255. Defendant Kline continued to refuse to take action when, in August, 2019, Sandra Sovinski filed false declarations into the USPSTO, violating the same 2014 IP Agreement and UCF-2.029 patent regulations Kline had contacted Sovinski about in December, 2018.

1256. Instead, after Defendant Kline confirmed that Sovinski had violated Florida perjury laws the Plaintiff was informed that he should file the Florida Whistleblower complaint.

1257. Defendant Kline then referred Robert Sweetapple and Alen Hsu to be hired by the Plaintiff to pursue the Florida Whistleblower lawsuit.

1258. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1259. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1260. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1261. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP

Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1262. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1263. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1264. Defendant Kline then had phone meetings with Robert Sweetapple, Alen Hsu, Cook, Sovinski, and Weiss during the illegal Whistleblower proceedings, but refused and/or failed to disclose the contents to the Plaintiff as she billed him for the phone meetings, while Robert Sweetapple operated the illegal proceeding of the Florida Whistleblower's lawsuit that Kline had insisted should be filed was operated without a judge.

1265. Alen Hsu and Robert Sweetapple learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents that proved certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

1266. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1267. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

1268. Defendant Kline continued to refuse to take action in response to the clear evidence that Sandra Sovinski was engaged in a pattern of criminal activity of perjury in the USPTO.

1269. Defendant Kline conspired and engaged with state actors Cook, Sovinski, Weis, and Sweetapple, when she made the agreement not to take action in response to perjury in the USPTO at issue in the illegal Florida Whistleblower proceeding, and then took part in planning meetings with Sovinski, Cook, Sweetapple, Weiss and Hsu, while refusing to provide the Plaintiff work product or any information about the planning meetings, that used the illegal Florida Whistleblower proceedings to commit additional perjury and tried to cover-up evidence of that perjury in the USPTO.

1270. Defendant Kline violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when she conspired and engaged with the military state actors,

Cook, Sovinski, Shtrom, Weiss, and Sweetapple to use the illegal Florida Whistleblower to engage in additional perjury in the USPTO, and a trick to use an agreement that even the military contracting office to sdPhotonics determined was fraud by UCF, to acquire or maintain improper ownership in the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1271. The Plaintiff was damaged by Defendant Kline's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 7: Defendant Paetra Brownlee.**

1272. Plaintiff realleges and incorporates paragraphs 283-287, 365-366, 373-374, 478-479, 630-641, 1134, and Exhibits 8-10, 14, 16 of this Complaint as though fully set forth herein.

1273. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1274. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1275. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1276. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1277. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1278. Defendant Brownlee was not appointed as a Florida state judge until or about May 28, 2020.

1279. The docket of the Florida Whistleblower proceeding shows Paetra Brownlee knowingly took over an illegal state court proceeding that had been operated by only the two attorneys Jeffrey Weiss and Rober Sweetapple.

1280. Brownlee made her first appearance into the case in or about August, 2020, after the Plaintiff fired Robert Sweetapple for his refusal to serve the Plaintiff's discovery responses to opposing counsel, Jeffrey Weiss, and a false motion to compel filed by Weiss.

1281. Once the Plaintiff learned Brownlee had been assigned as judge to the case, the Plaintiff sent Brownlee a confidential letter to her judicial chambers that was cc'd to Weiss and Sweetapple that the Florida Whistleblower proceeding had been used by Weiss and Sweetapple in an attempt to force a settlement the Plaintiff

had refused, and had violated the Fl. St. §112.3187(4)(b) (Florida's Whistleblower Act).

1282. Brownlee then placed the confidential letter on the docket of the proceeding.

1283. Brownlee gave no legitimate reason for her action of placing the letter onto the court's docket.

1284. By early November, 2020, attorneys involved in the Florida Whistleblower proceedings began a systematic pattern of threats, intimidation, stalking, assaults, batteries, and confinement, trying to force the Plaintiff to sign a settlement agreement the Plaintiff had refused.

1285. Defendant Brownlee violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when she performed in the illegal Whistleblower proceeding as a military state actor, to commit crimes in the Florida Whistleblower proceeding, and pretended to be a judge over the illegal Whistleblower proceeding. Brownlee had no jurisdiction to take over the illegal proceeding being operated by Weiss and Sweetapple, and violated the Florida Whistleblower's Act, Fl. St. §112.3187(4)(b), to try to take over the Plaintiff's company as part of a military bribery scheme, while denying due process in the Florida Whistleblower proceeding.

1286. The Plaintiff was damaged by Defendant Brownlee's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what

occurred in the Florida Whistleblower proceedings. The Plaintiff is entitled to punitive damages for Defendant Brownlee's crimes and unlawful actions in the Florida Whistleblower proceeding.

**Count 8: Defendant John Bustamante.**

1287. Plaintiff realleges and incorporates paragraphs 236-274, 316-317, 322-329, 350-354, 375-385, 630-641, 1134-1136, and Exhibits 8-10 of this Complaint as though fully set forth herein.

1288. Defendant Bustamante was hired by the Plaintiff to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom.

1289. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1290. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1291. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the

declarations, and showed Sovinski had made the false statements in her declaration.

1292. Furthermore, Defendant Bustamante determined that in April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records violate Fl. St. §§837.021(1), 837.07(1), (2).

1293. Defendant Bustamante advised the Plaintiff that a complaint should be filed in federal court because of what had occurred in the illegal Florida Whistleblower proceeding.

1294. Bustamante then obtained information from the Plaintiff on the 2014 IP Agreement and UCF-2.029, and prepared the federal complaint to be filed in the FLMD court.

1295. Bustamante then contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

1296. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered him an equity position, Bustamante would have worked for sdPhotonics.

1297. Bustamante prepared the agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski. When the

Plaintiff reviewed the agreement, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

1298. Instead, it had the same requirement of Army approval from an unspecified office that Lateka Eifert had already confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions.

1299. Eifert had requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office, over what Defendant Bustamante had again placed in the settlement agreement he had drafted with Cook, Sovinski, and Weiss.

1300. At the beginning of November, 2020, the Plaintiff was extorted by John Vetter to sign the agreement Bustamante had prepared with Cook, Weiss, and Sovinski, or "find out what happens to a whistleblower in Florida."

1301. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

1302. Bustamante responded at that time that there was nothing he was able to do about it, when Bustamante could have taken many different legal actions,

including reporting the crimes by the other attorneys, and he had an ethical duty to do.

1303. Defendant Bustamante agreed, conspired and engaged with the military state actors Cook, Sovinski, and Weiss, admitting he had been offered an equity position by others, to prepare a settlement agreement that Lateka Eifert's military office had already determined was based on fraud by UCF employees, to damage the Plaintiff's company and cover up evidence of the repeated patterns of criminal activity involving perjury in the USPTO, and Bustamante then coordinated in the illegal extortion, stalking, assaults, batteries and confinement during the Whistleblower proceeding, admitting he would have taken different actions had sdPhotonics offered him an equity position.

1304. Defendant Bustamante violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he conspired and engaged with the military state actors Sovinski, Cook, and Weiss, to use the illegal Florida Whistleblower proceeding and settlement agreement that Lateka Eifert's office had determined was based on fraud, in extortion, stalking, assaults, and batteries, to acquire or maintain improper ownership in the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1305. The Plaintiff was damaged by Defendant Bustamante's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 9: Defendant John Vetter.**

1306. Plaintiff realleges and incorporates paragraphs 342-347, 386-471, 630-641, 1134-1136, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

1307. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit.

1308. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits.

1309. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

1310. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

1311. Vetter informed the Plaintiff that the false declarations filed by Sovinski were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

1312. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

1313. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused. In the call Vetter became

angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

1314. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

1315. The Plaintiff was subsequently stalked, assaulted, battered and confined over the agreement Vetter had threatened to the Plaintiff to sign.

1316. Defendant Vetter agreed, conspired and engaged with the military state actors Sovinksi, Cook, and Weiss to try to extort an agreement to cover up the evidence of perjury in the USPTO, when even Lateka Eifert's office had determined the agreement was fraudulent. Vetter admitted he was part of the illegal Whistleblower proceeding, and threatened the Plaintiff that if he did not sign the agreement, he would find out what happens to a Florida whistleblower who reports crimes committed by UCF employees to Ron DeSantis' governor's office.

1317. Defendant Vetter violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he conspired and engaged with the military's state actors Sovinski, Cook, Sweetapple, and Weiss working with the military and UCF, to extort the military's agreement, that Vetter and contracting office had already determined was fraudulent, and use the illegal Florida Whistleblower

proceeding, to acquire or maintain improper ownership in the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1318. The Plaintiff was damaged by Defendant Vetter's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 10: Defendant Pinsukanjana.**

1319. Plaintiff realleges and incorporates paragraphs 224-231, 303-304, 395-474, 630-641, 1134-1136, of this Complaint as though fully set forth herein.

1320. Defendant Pinsukanjana is a physicist employed by Intelligent Epitaxial Technologies, Inc. (IET). IET is an epitaxial growth foundry who provides custom semiconductor materials for optoelectronic and III-V semiconductor devices, including VCSELs.

1321. The Plaintiff and sdPhotonics' engineers worked with Defendant Pinsukanjana and IET through contracts and purchase orders that were used in developing specialized materials for sdPhotonics oxide-free VCSELs and other photonic devices, including the Cryo-VCSEL and specialized detectors.

1322. Defendant Pinsukanjana worked directly with the Plaintiff to learn the special techniques needed to grow the epitaxy for the Plaintiff's Cryo-VCSEL intention that could operate at 4 K and below.

1323. Defendant Pinskukanjana worked closely with Deborah Van Vechten and Milton Feng, and the Plaintiff, Pinsukanjan, Feng, and Van Vechten had meetings at the IET growth facility near Dallas, TX, in meetings and discussions concerning the sdPhotonics Cryo-VCSEL.

1324. On multiple occasions, Defendant Pinsukanjana and the Plaintiff discussed the declarations that Sandra Sovinski had filed into the USPTO, and the Florida Whistleblower lawsuit that had been filed December 12, 2019 involving the evicen of perjury created by Sovinski's USPTO filings.

1325. The Plaintiff received the threats from John Vetter in early November, 2020, to sign an agreement the Plaintiff had refused involving the Florida Whistleblower proceedings and evidence of perjury in the USPTO by Sovinski.

1326. Pinsukanjana had learned in other discussions with the Plaintiff that he would be driving to the University of Illinois to visit Feng's laboratory and obtain measured results on the sdPhotonics Cryo-VCSEL prototypes Feng was testing.

1327. Pinsukanjana knew that Feng was testing the sdPhotonics' Cryo-VCSEL prototypes, and Pinsukanjana participated in planning meetings with Deppe, Feng, and Van Vechten.

1328. Defendant Pinsukanjana made repeated phone calls to the Plaintiff while he drove to Illinois, to learn where the Plaintiff would stay. When Pinsukanjana it would be Carbondale, IL, he informed the military where to begin the stalking.

1329. The Plaintiff was then stalked, assaulted, battered and confined over multiple days in Carbondale, IL and Illinois, had his financial accounts hacked, his company business account hacked, and found his house had been broken into when he returned there in Oviedo, FL in early December, 2020.

1330. During the stalking in late November, 2020 and early December, 2020, Defendant Pinsukanjana contacted the Plaintiff and informed him that Pinsukanjana and IET intended to fulfill a purchase order to Yunpeng Song from the Chinese company using the sdPhotonics oxide-free VCSEL technology, and IET would take control of the sdPhotonics' growth recipes.

1331. When the Plaintiff objected to the sale and informed Pinsukanjana that sdPhotonics and IET had trade secret agreements that prohibited the sale, Pinsukanjana responded that he had no choice but to fulfill the purchase order. When the Plaintiff objected that such a sale to a Chinese company would violate ITAR agreements, Defendant Pinsukanjana ignored the ITAR, and informed the Plaintiff that Pinsukanjana's company would go forward with the sale.

1332. Defendant Pinsukanjana conspired and engaged with the military's state actors Feng at the University of Illinois, and UCF's Cook, Sovinski, Shtrom, and Weiss, to take over the sdPhotonics' technology, participating in the stalking, assaults and batteries trying to force the settlement agreement UCF and the military were trying to extort, and the Plaintiff and his property were damaged.

1333. Defendant Pinsukanjana violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired and engaged with the

military state actors Feng from the University of Illinois and Cook, Sovinski, and Weiss from UCF, to use the illegal Florida Whistleblower proceedings in Q4 2020 to extort, stalk, assault, batter, and confine the Plaintiff, all trying to obtain an agreement from the military and UCF that Lateka Eifert's office determined was based on fraud, and the violated Florida statute in making use or endeavoring to make use of the sdPhotonics trade secrets with Yunpeng Song, to acquire or maintain improper ownership in the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1334. The Plaintiff was damaged by Defendant Pinsukanjan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 11: Defendant John Taboada.**

1335. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 631-640, 1134-1136, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

1336. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

1337. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false

declarations, but informed the Plaintiff he would need to prepare the documents himself.

1338. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to additional corrective assignments.

1339. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

1340. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1341. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1342. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1343. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1344. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1345. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1346. After Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed he was amazed that Sovinski would again engage in fraud and perjury again in the proceeding of the USPTO.

1347. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO.

1348. However, in November, 2020, while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics patents in October, 2021.

1349. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew Sandra Sovinski had committed perjury.

1350. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski.

1351. Defendant Taboada admitted his agreement in the organized government crime, admitting he knew the FBI planned to frame the Plaintiff for the perjury committed by Sovinski. Defendant Taboada conspired and engaged with state actors Weiss, Cook, Sovinkski, and Shtrom, and Defendant Taboada engaged in extortion in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding, threatening the Plaintiff that the FBI would frame him for the evidence of perjury committed by Sovinski in the USPTO, and that Taboada would do nothing to stop it.

1352. Defendant Taboada violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law in the Florida Whistleblower when he conspired in the commission of perjury in the USPTO to try to take over sdPhotonics' technology with Sovinski, Cook, Sweetapple, and Weiss, to acquire or maintain improper ownership in the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1353. The Plaintiff was damaged by Defendant Taboada's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**<u>Count 12: Defendant Charles Kuznia.</u>**

1354. Plaintiff realleges and incorporates paragraphs 297-304, 393-463, 631-640, 1134-1136, of this Complaint as though fully set forth herein.

1355. Kuznia was CEO of Ultra Communications, Inc., a defense contracting company that worked closely with the military program monitors Mark Beranek and Michael Gerhold on SBIR contracts to develop his company's military transceivers that used VCSELs.

1356. The transceiver technology Kuznia's company had developed was highly robust for use in military platforms including jet aircraft, helicopters, etc., that experience high accelerations and temperature changes, and require very high reliability. These applications require VCSELs that can operate at higher and lower temperatures than most other applications.

1357. The transceiver technology Kuznia was developing is not highly efficient relative to VCSEL transceiver standards, due to design trade-offs required to meet reliability in military platforms that operate under extreme conditions including temperature and g-force due to acceleration.

1358. Kuznia repeatedly contacted the Plaintiff to discuss work with Beranek on the NAVAIR contract to develop the oxide-free VCSELs for use in Kuznia's transceivers involving a specific contract, and that Kuznia's company would work with sdPhotonics through subcontracting.

1359. The Plaintiff did contact Baranek, and sdPhotonics was issued the SBIR Phase I contract monitored by Beranek. Kuznia's company was to receive a subcontract for their work in a Phase II.

1360. Once the SBIR contract was in place that Kuznia had pushed for with Beranek, Beranek repeatedly claimed that Milton Feng had invented and developed the oxide-free VCSELs the Plaintiff's company was developing under the NAVAIR SBIR contract Beranek monitored.

1361. The Plaintiff repeatedly corrected Beranek that Milton Feng had no involvement in the oxide-free VCSEL invention or its development.

1362. Defendant Kuznia travelled with the Plaintiff was then asked by Kuznia to join him and Richard Weiss in attending meetings in Washington, D.C. in March, 2020, that Kuznia's company and Michael Gerhold had set up with lobbyists and U.S. congressional offices as part of an effort by the military to obtain government contracts to accelerate the commercialization of the oxide-free VCSEL inventions for use in military transceivers, including by Kuznia's company.

1363. In March, 2020, Defendant Kuznia, Richard Weiss, Paul Pinsukanjana, and the Plaintiff traveled to Washington, D.C. and discussed the oxide-free VCSELs at length with different congressional offices who would approve and push for the government funding.

1364. The false ownership declarations that Sovinski had filed into the USPTO on the inventions at issue in the Florida Whistleblower lawsuit were also discussed at length.

1365. At the beginning of November, 2020, the Plaintiff was repeatedly threatened by John Vetter to sign an agreement as part of the Florida

Whistleblower proceeding that failed to correct the false declarations, and included the military for no apparent purpose and without military contracts.

1366. When the Plaintiff refused claiming he only needed the corrected assignments to file with the USPTO, Vetter threatened the Plaintiff that if he refused to sign, he would "find out what happens to a whistleblower in Florida."

1367. The Plaintiff was contacted by a barrage of attorneys involved in the Florida Whistleblower proceedings and engineers from various defense contractors, while the Plaintiff was being stalked in Carbondale, IL as Vetter had threatened.

1368. Defendant Kuznia called the Plaintiff while the Plaintiff was being stalked in Carbondale, IL.

1369. Kuznia informed the Plaintiff that he knew the military program monitors were taking over the Plaintiff's company and Kuznia wanted to take over the $2M IARPA Supercables project that was based on the Plaintiff's Cryo VCSEL invention.

1370. Kuznia could provide no legitimate reason to the Plaintiff for why Kuzni's company should obtain the sdPhotonics' IARPA Supercables project and claimed it was because he knew sdPhotonics had been targeted in the military take-over.

1371. Defendant Kuznia coupled the conversation to an elaborate story about how lucky everyone was to have engineering jobs in which they could work

with the military, and how Kuznia was so grateful he did not have to work in menial positions instead such as a taxi driver.

1372. The Plaintiff did not respond to Kuznia's claims that Kuznia's company should take over the $2M IARPA Supercables project.

1373. Kuznia lacked the expertise in VCSELs to develop oxide-free VCSELs or even oxide VCSELs, and certainly not the Plaintiff's Cryo-VCSEL invention.

1374. Defendant Kuznia conspired and engaged with state actor Feng who was working with Beranek, and engaged in unlawful harassment in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding. Kuznia tried to take over the IARPA Supercables project from sdPhotonics, as part of the effort with Feng to misappropriate the Cryo-VCSEL prototypes from the Plaintiff's company, sdPhotonics.

1375. Defendant Kuznia violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law in the Florida Whistleblower when he conspired and engaged with state actors at UCF, Sovinski, Cook, and Weiss, to harass and intimidate the Plaintiff in Carbondale, IL as part of the extortion during the illegal Florida Whistleblower proceeding, to prevent corrections to the perjury in the USPTO by Sovinski, and to try to take over sdPhotonics' technologies, while denying due process in the Florida Whistleblower proceeding.

1376. The Plaintiff was damaged by Defendant Kuznia's actions, and because of the injuries and damages caused to him and his company had to cease

his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 13: Defendant Milton Feng.**

1377. Plaintiff realleges and incorporates paragraphs 334-340, 393-463, 555-556, 561-572, 575-580, 630-641, 1134, and Exhibits 2, 20 of this Complaint as though fully set forth herein.

1378. Defendant Feng worked as a consultant to sdPhotonics, and was employed by the Plaintiff and sdPhotonics on the IARPA Supercables project that began in or about June, 2019.

1379. The University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project, with Feng acting as the university's principal investigator to fabricate and test prototypes of sdPhotonics' new laser invention, the Cryo-VCSEL. sdPhotonics provided its proprietary epitaxial materials Feng used to fabricate and test the Plaintiff's Cryo-VCSEL invention at high-speed and 4 K.

1380. Under the IARPA Supercables project, Defendant Feng was to fabricate and test the sdPhotonics' Cryo-VCSELs for high speed at 4 K, and set the tested prototypes back to sdPhotonics so that sdPhotonics could perform its own proprietary testing needed to develop a quantum mechanical current-voltage model that could be used for optimization of sdPhotonics' future Cryo-VCSEL designs.

1381. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the Cryo-VCSEL prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds in excess of 80 GHz at 4 K.

1382. Feng then refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

1383. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototyes.

1384. Once the Plaintiff had been threatened by Vetter, followed by stalking, assaults, and batteries in Carbondale, IL, the Plaintiff called Defendant Feng from Carbondale, IL, explained he was being stalked and assaulted by the military, and requested Feng's assistance.

1385. However, Defendant Feng informed the Plaintiff that he had been instructed not to assist the Plaintiff or his company in any way, and refused multiple requests from the Plaintiff for help, informing the Plaintiff that he could not and was not allowed to.

1386. The Plaintiff was then by the military when Deborah Van Vechten used a trick to confine the Plaintiff in the psychiatric ward of the Pavilion, on the

same University of Illinois where Feng held the Plaintiff's company's Cryo-VCSEL prototypes, where the Plaintiff was harassed, threatened, extorted for trade secrets, and poisoned.

1387. Once the Plaintiff was released, with the Plaintiff never having mentioned the illegal confinement by the military and Deborah Van Vechten, Defendant Feng began sending the Plaintiff emails of well-wishes and get well soon messages.

1388. In or about March, 2021, the Plaintiff received a draft of an article from Michael Gerhold and was informed by Gerhold that Gerhold and Feng had written an article about Gerhold's VCSEL projects. The Plaintiff found buried in the article claims by Gerhold and Feng claimed that Feng had developed the Cryo-VCSEL invention in his University of Illinois laboratory.

1389. Gerhold agreed to correct the article, and Feng informed the Plaintiff that Gerhold had made the errors in the article.

1390. By the end of the IARPA Supercables project in or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois.

1391. Defendant Feng violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when, as a state actor, he tried to use the Florida Whistleblower proceedings to take over sdPhotonics' technology with Sovinski, Cook, Sweetapple, and Weiss, to use the Florida Whistleblower proceeding to extort an agreement that even Lateka Eifert's office determined was based on fraud, and used

harassment and confinement, while denying due process in the Florida Whistleblower proceeding.

1392. The Plaintiff was damaged by Defendant Feng's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 14: Defendant Mark Beranek.**

1393. Plaintiff realleges and incorporates paragraphs 301-302, 393, 427-431, 437-464, 631-640, 1134-1137 of this Complaint as though fully set forth herein.

1394. Defendant Mark Beranek worked closely with the Plaintiff in developing a proposal to and SBIR solicitation from his employment agency, NAVAIR.

1395. The NAVAIR project included sdPhotonics as a performer and Charles Kuznia's company to perform as a subcontractor to sdPhotonics in a Phase II.

1396. The NAVAIR project with Defendant Beranek began in or about March, 2020, during the Florida Whistleblower proceedings, and included Kuznia's company as a proposed subcontractor on a Phase II.

1397. sdPhotonics began making progress presentations in monthly phone meetings with Beranek and Beranek's colleagues who also monitored project, in which Defendant Beranek repeatedly stated or claimed to the Plaintiff that the

oxide-free VCSELs being developed on his project had been invented and developed at the University of Illinois in Milton Feng's group.

1398. The Plaintiff repeatedly corrected Defendant Beranek in multiple phone meetings that Milton Feng was not involved in the invention or development of the oxide-free VCSEL.

1399. In early November, 2020, the Plaintiff was threatened and extorted by John Vetter to sign an agreement that included the military as part of the Florida Whistleblower lawsuit. The basis of the agreement had already been determined fraudulent by Lateka Eifert's office, and was refused by the Plaintiff.

1400. The Plaintiff was then stalked, assaulted, and battered that began in Carbondale, IL, only a few days after the threats from Vetter involving the agreement. During that episode of stalking, assaults, and batteries in Carbondale, IL, the Plaintiff received multiple phone calls from attorneys, military program monitors, and defense contractors to the military.

1401. Defendant Beranek was one of the military program monitors who contacted the Plaintiff by phone during the stalking, and informed the Plaintiff that he wanted to take control of the oxide-free VCSEL inventions from sdPhotonics for his other projects.

1402. Defendant Beranek then offered the Plaintiff the prospect of other defense contracts he would issue to sdPhotonics, if the Plaintiff relinquished the rights to the oxide-free VCSEL inventions.

1403. The Plaintiff made no agreements and did not respond to the offers by Defendant Beranek.

1404. By his own admissions, Defendant Beranek conspired and engaged with state actor Feng and UCF attorneys who were engaged in extortion with the military, and who Beranek falsely and repeatedly claimed had developed the oxide-free VCSELs even after the Plaintiff had corrected Beranek. Defendant Beranek engaged and conspired in unlawful harassment, stalking, assaults, batteries and extortion in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding.

1405. Beranek tried to use the state action to take over the sdPhotonics' oxide-free VCSELs.

1406. Defendant Beranek violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law in the Florida Whistleblower when he conspired and engaged in harassment to prevent corrections to the perjury in the USPTO by Sovinski, and to try to take over sdPhotonics' technology with Sovinski, Cook, Sweetapple, and Weiss, to use the Florida Whistleblower proceeding to extort an agreement that even Lateka Eifert's office determined was based on fraud, and use the illegal Florida Whistleblower proceedings to acquire or maintain improper ownership in the technologies of the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1407. The Plaintiff was damaged by Defendant Beranek's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 15: Defendant Kim.**

1408. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 1134-1136 of this Complaint as though fully set forth herein.

1409. Defendant Kim is a former University of Illinois graduate student and owner of the company QuanTera that does military contracting in semiconductors.

1410. Defendant Kim specialty is semiconductor electronic devices, and Kim also consulted for the Plaintiff's company on different occasions, and often contacted the Plaintiff with questions concerning lasers.

1411. Defendant Kim repeatedly contacted the Plaintiff while he was being extorted, stalked, assaulted, and battered in Carbondale, IL in Q4 2020 involving the evidence of perjury in the USPTO and the Florida Whistleblower proceedings.

1412. Kim called the Plaintiff repeatedly and repeatedly asked the Plaintiff in the calls whether the Plaintiff had ever had sex with a sixteen (16) year old girl.

1413. The Plaintiff informed Defendant Kim that he was being stalked by the military, and asked why was Kim was calling to ask the Plaintiff with such questions.

1414. Defendant Kim could provide no legitimate reason for his phone calls or why he was asking the Plaintiff whether he had ever had sex with a sixteen (16) year old girl.

1415. Defendant Kim conspired and engaged with military and the military's state actors at the University of Illinois, Feng, and UCF, Cook, Sovinski, and Weiss, to cyber-stalk, harass, and extort the Plaintiff in Q4 2020 as part of the illegal Florida Whistleblower proceeding, trying to take over the Plaintiff's company for the military.

1416. Defendant Kim violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law as part of the illegal Florida Whistleblower proceedings, unable to explain why he was repeatedly calling the Plaintiff to ask if the Plaintiff had ever engaged in sex with a sixteen-year-old girl, while knowing that the Plaintiff was being stalked, assaulted, and battered by the military and DOJ as part of the Florida Whistleblower proceeding, as part of the plan with UCF, Milton Feng, and the military to take over the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1417. The Plaintiff was damaged by Defendant Kim's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 16: Defendant Pan.**

1418. Plaintiff realleges and incorporates paragraphs 393-462, 485-486, 631-640, 1134-1136, as though fully set forth herein.

1419. Defendant Pan is a former University of Illinois graduate student and owner of the company Microlink, Inc., that does military contracting in semiconductors.

1420. Defendant Pan and the Plaintiff's company, sdPhotonics, had performed some work before in anticipation of submitting joint research proposals for projects.

1421. The Plaintiff contacted Pan in November, 2020, while he was being stalked, assaulted, and battered in Carbondale, IL, and informed Pan about what was happening and requested his help.

1422. Defendant Pan responded by text message and informed the Plaintiff that Pan had set up a meeting in a vacant house in Chicago, and wanted the Plaintiff to meet him in the vacant house.

1423. Defendant Pan could provide no legitimate reason for why he was asking the Plaintiff to meet him in a vacant house during the stalking that took place in Carbondale, IL, in Q4 2020 during the Florida Whistleblower proceeding.

1424. The Plaintiff and Pan later discussed the military attempted take-over in January, 2021 by phone.

1425. Defendant Pan admitted in that phone call in January, 2021, that he knew the Plaintiff's company had been targeted by the military, universities, and defense contractors in intellectual property theft.

1426. Defendant Pan then asked the Plaintiff to come to Chicago, IL to discuss a project he knew was upcoming that became the "Chips + Science" government funding from the Biden administration.

1427. Defendant Pan admitted that he had agreed to harass and extort the Plaintiff during the illegal Florida Whistleblower proceeding, and Pan conspired and engaged in that harassment and extortion with the military's state actors including Feng, Cook, Sovinski, and Weiss, to use the illegal Florida proceeding to take over the sdPhotonics' oxide-free VCSELs.

1428. Defendant Pan violated the 14th Amendment of the U.S. Constitution pursuant to §1983, and acted under color of state law in the Florida Whistleblower when he acted in concert, with a meeting of the minds and engaged in harassment during the proceedings trying to take over sdPhotonics' oxide-free VCSEL inventions, and prevent corrections to the perjury in the USPTO by Sovinski to try to take over sdPhotonics' technology with UCF for himself and the military, while denying due process in the Florida Whistleblower proceeding.

1429. The Plaintiff was damaged by Defendant Pan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred

in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 17: Defendant Kish.**

1430. Plaintiff realleges and incorporates paragraphs 393-462, 575-580, 630-641, 1134 of this Complaint as though fully set forth herein.

1431. Defendant Kish a professor at NC State who is one of the former graduate students of Nick Holonyak. Defendant Kish contacted the Plaintiff while he was being stalked in Carbondale, IL, in November, 2020 during the Florida Whistleblower proceedings.

1432. The Plaintiff and Defendant Kish exchanged emails in which the Plaintiff informed Kish he was being stalked as part of a military take-over of his company, and that the stalking was occurring as part of the Florida Whistleblower lawsuit.

1433. Defendant Kish then informed the Plaintiff that Kish was very good friends with one of the DARPA program monitors linked to the organized crime from the military, Gordon Keeler. Defendant Kish acknowledged that he knew the effort was to take over the Plaintiff's company and use the laser inventions to obtain further government funding.

1434. Kish advised the Plaintiff that he should file suit over the actions by the military and UCF during the stalking, assaults, and batteries in Carbondale, IL in Q4 2020 as part of the Florida Whistleblower proceeding.

1435. Defendant Kish insisted in November, 2020 while the Plaintiff was being stalked and cyber-stalked, that his own university, North Carolina State University, would not receive any of the funding related to the military efforts to use the Plaintiff's oxide-free VCSEL inventions.

1436. However, Defendant Kish later changed his position, and in or about November, 2021 falsely claimed with Milton Feng, John Dallesassee, and Susan Martini's UIUC office that Nick Holonyak had somehow made the Plaintiff's VCSEL inventions as a reason for UIUC to retain the Cryo-VCSEL invention.

1437. In or about the fall of 2018 at a meeting at UIUC, Defendant Kish had tried to enter a discussion with the Plaintiff and John Dallesassee about VCSELs, and it immediately became clear that Kish had little if any scientific knowledge of the physics needed to actually understand lasers, and Deppe and Dallesassee had to be repeatedly correct Kish and explain his confusion to him about how the devices work.

1438. Defendant Kish is a state actor conspired with Bashir, Martinis, and Feng, when he tried to claim that the Cryo-VCSEL prototypes had been invented by Nick Holonyak, to misappropriate the sdPhotonics laser inventions, and obtain additional research contracts for the University of Illinois using the sdPhotonics' Cryo-VCSEL.

1439. Defendant Kish violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he took his actions in Q4 2020 to use the Florida Whistleblower proceeding to misappropriate the sdPhotonics' Cryo-VCSEL

prototypes without due process, and violated Fl. St. § 812.081(2)(a), (b), by claiming the Cryo-VCSEL was somehow invented by Nick Holonyak to retain the Cryo-VCSEL prototypes, to acquire or maintain control of the Plaintiff's company, sdPhotonics, while denying due process in the Florida Whistleblower proceeding.

1440. The Plaintiff was damaged by Defendant Kish's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 18: Defendant Van Vechten.**

1441. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 630-641, 1134-1137 of this Complaint as though fully set forth herein.

1442. Defendant Van Vechten participated in the IARPA Supercables project monthly reporting meetings and site visits, and from that project met the Plaintiff and learned about the Plaintiff's Cryo-VCSEL technologies.

1443. Van Vechten worked closely with the Pinsukanjana, Feng, Harrod, and the Plaintiff involving the oxide-free VCSEL and Cryo-VCSEL technologies that were invented by the Plaintiff and being developed by the Plaintiff's company sdPhotonics.

1444. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began

contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

1445. Van Vechten then used a trick after the Plaintiff had been heavily stalked and assaulted, and had contacted Milton Feng for help who had refused. Van Vechten then called and informed the Plaintiff that she had learned Trump was behind the stalking, assaults, and batteries in Carbondale, IL.

1446. Van Vechten then explained that she knew a place behind locked doors away from the stalkers for a few days close to the Univ. of Illinois campus, in the blue part of the state, and that she had connections there but that it would take her several hours to arrange the stay and would call back.

1447. Instead, Defendant Van Vechten used the trick to confine the Plaintiff in the psychiatric ward of Martin Repetto, where the Plaintif was harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. During this time Repetto demanded to know details of the oxide-free VCSEL inventions Van Vechten was after.

1448. After the Plaintiff had been released, Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to avoid the stalkers in Illinois, and that the Plaintiff didn't understand how the military did its business with the universities.

1449. Defendant Van Vechten violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when she agreed, confederated, conspired and

engaged with the military's state actors, including Feng, Cook, Sovinski, and Weiss, and agreed to confine the Plaintiff using a trick to extort a settlement agreement the military sought to take-over the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1450. The Plaintiff was damaged by Defendant Van Vechten's illegal actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 19: Defendant Nicholas Stork.**

1451. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 1134-1136 of this Complaint as though fully set forth herein.

1452. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1453. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1454. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1455. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking was due to then president Trump, and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1456. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1457. Several hours later during the drive Van Vechten gave the Plaintiff the information and directions to the Pavilion, while the Plaintiff was riding with Nick Stork and his wife, and explained that she had set up a room with a medical facility on the University of Illinois campus and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1458. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1459. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were

blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1460. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1461. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1462. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

1463. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1464. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they

had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1465. Defendant Nick Stork agreed, conspired and engaged with Van Vechten and state actors at UCF, Sovinski, Shtrom, and with Weiss, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff, where he was harassed, threaten, extort, intimidate, assault, and batter, so that UCF and the military could use an extorted and fraudulent settlement agreement take over the Plaintiff's company and its technologies.

1466. Defendant N. Stork violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when he took his actions engaged and in conspiracy with the military's state actors Cook, Sovinski, Shtrom, and Weiss, and confined the Plaintiff during Q4 2020 of the Florida Whistleblower proceeding, to acquire and take-over the Plaintiff's company with the military, while denying due process in the Florida Whistleblower proceeding.

1467. The Plaintiff was damaged by Defendant N. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 20: Defendant Martin Repetto.**

1468. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 1134-1136 of this Complaint as though fully set forth herein.

1469. Defendant Repetto was the supervising doctor who oversaw the confinement of the Plaintiff in the psychiatric ward of the Pavilion.

1470. The Plaintiff was confined against his will and without cause in the psychiatric ward under Repetto for approximately six (6) days.

1471. During that time the Plaintiff was placed in a communal sleeping center. Numerous different supposed "patients" were checked into the room, all refusing to wear masks despite covid.

1472. The Plaintiff was forced to attend supposed "group" sessions in order to be released. The sessions were clearly staged meetings of approximately a dozen people pretending to be patients with supposed mental ailments.

1473. Defendant Repetto met with the Plaintiff at least three times during the Plaintiff's confinement.

1474. Each time Repetto demanded information about the VCSEL inventions, claiming the Plaintiff was not giving him enough information. The Plaintiff had never mentioned lasers to Defendant Repetto or anyone else in the Pavilion.

1475. The supposed "mental patients" were moved continuously into and out of the communal sleeping area, none of whom wore masks despite the peak of covid in November, 2020.

1476. On the fourth day of the Plaintiff's confinement one of the staff brought the Plaintiff a supposed diagnosis from Repetto the Plaintiff was asked to sign stating the Plaintiff had bipolar mental disease.

1477. The Plaintiff refused to sign.

1478. On the fourth morning one of the supposed "mental patients" admitted to the Plaintiff in a private conversation that he had been out of work and was approached by someone who agreed to pay him to part in the intimidation scheme in the psychiatric ward of the Pavilion with the military against the Plaintiff.

1479. Later that day the Plaintiff was moved to a private room to sleep on the same floor in the same area. On that night the Plaintiff received food poisoning and vomited throughout the night, and did not sleep.

1480. The next morning several of the supposed "patients" met in the hallway, after which one of the staff members brought each of the supposed "patients" ballpoint pens. The supposed "patients" then followed the Plaintiff around the hallway with their ballpoint pens pointed towards the patient in what was obviously staged for intimidation.

1481. When that failed the supposed "patients" began checking themselves out of the Pavilion by going to the reception desk on the floor and informing the staff they were leaving. The staff signed paperwork for more than half of the dozen or so supposed "patients."

1482. On the final morning Defendant Repetto came to the Plaintiff's room and informed the Plaintiff that he wanted to keep the Plaintiff longer in the facility, and the Plaintiff demanded to be let out.

1483. Defendant Repetto conspired and engaged with Van Vechten, Nick Stork, and the military's state actors Feng at the University of Illinois and Sovinski, Shtrom, and with Weiss of UCF, and admitted to the Plaintiff directly that Repetto's reasons for the confinement involved extortion of information from the Plaintiff about the oxide-free VCSEL inventions. Repetto improperly confined the Plaintiff and harassed, threatened, extorted, intimidated, and oversaw assaults and batteries in the Pavilion, so that UCF and the military could take over the Plaintiff's company and its technologies.

1484. Defendant Repetto violated the 14th Amendment of the U.S. Constitution pursuant to §1983, and effectively admitted he engaged, agreed, and conspired with state actors, to use extortion, stalking, assaults, batteries, and confinement, demanding the Plaintiff provide him information on the laser inventions as part of the Florida Whistleblower proceeding, to misappropriate the sdPhotonics' laser technologies, while denying due process in the Florida Whistleblower proceeding.

1485. The Plaintiff was damaged by Defendant Repetto's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 21: Defendant Brenda Stork.**

1486. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 1134-1136 of this Complaint as though fully set forth herein.

1487. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1488. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1489. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1490. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1491. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1492. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with

a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1493. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1494. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1495. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1496. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1497. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1498. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1499. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

1500. Defendant Brenda Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

1501. Defendant B. Stork violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when she took her actions engaged and in

conspiracy with state actors Sovinski and Shtrom at UCF, with Weiss as an officer under the Florida Whistleblower proceeding, and with Feng in Q4 2020, to use extortion, stalking, assaults, batteries, and confine the Plaintiff as part of the Florida Whistleblower proceeding, each of which is illegal, to misappropriate the sdPhotonics' technologies, while denying due process in the Florida Whistleblower proceeding.

1502. The Plaintiff was damaged by Defendant B. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 22: Defendant Larry Stork.**

1503. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 1134-1136 of this Complaint as though fully set forth herein.

1504. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1505. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1506. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff

was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1507. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1508. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1509. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1510. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1511. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were

blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1512. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1513. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1514. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1515. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1516. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF

and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

1517. Defendant Larry Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

1518. Defendant L. Stork violated the 14th Amendment of the U.S. Constitution pursuant to §1983, when she took her actions engaged and in conspiracy with state actors Sovinski and Shtrom at UCF, with Weiss as an officer under the Florida Whistleblower proceeding, and with Feng in Q4 2020, to use extortion, stalking, assaults, batteries, and confined the Plaintiff as part of the Florida Whistleblower proceeding, each of which is illegal, to misappropriate the sdPhotonics' technologies, while denying due process in the Florida Whistleblower proceeding.

1519. The Plaintiff was damaged by Defendant L. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 23: Defendant Joe Southron.**

1520. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 1134, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

1521. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings.

1522. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

1523. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

1524. However, Defendant Southron prepared an improper complaint, that brought the Florida Whistleblower Act, Fl. St. §112.3187 against a large number of individuals.

1525. Prior Florida court rulings had already disallowed what Southron was attempting, which was to bring violations of the Fl. St. §112.3187 against individuals.

1526. When the Plaintiff informed Defendant Southron that the Plaintiff would not allow the improper amended complaint that Southron had prepared to

be filed, Southron informed the Plaintiff that he was withdrawing from representation and refused to properly dismiss the Florida Whistleblower lawsuit.

1527. When the Plaintiff objected to Defendant Southron about his refusal to dismiss the complaint, Defendant Southron filed improper dismissal orders that other attorneys, Robin Foret and Kevin Keeling, caught, and explained to the Plaintiff why these could be damaging to the Plaintiff.

1528. Defendant Southron violated the 14th Amendment of the U.S. Constitution pursuant to §1983, acted under color of state law for the military's organized crime in the Florida Whistleblower proceeding to engage in fraud during the proceeding, pretending he was officer of the illegal state court proceeding. Defendant Southron used tricks trying file an improper federal complaint trying to prevent the evidence of perjury in the USPTO from coming into proceeding, and tried to withdraw from the case to damage it further when he was discovered, to acquire or maintain improper ownership in the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1529. The Plaintiff was damaged by Defendant Southron' actions and refusal to allow due process in the proceeding, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings. Defendant Southron's actions were unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 24: Defendant Cook.**

1530. Plaintiff realleges and incorporates paragraphs 188-189, 236-275, 278-280, 289, 292, 305-329, 383-385, 600-601, 630-641, 1134 and Exhibits 3-10, 16, of this Complaint as though fully set forth herein.

1531. Defendant Cook was contacted by the Plaintiff in or about October, 2019, and provided information that Sandra Sovinski had filed false declarations into the USPTO on the Plaintiff's oxide-free VCSEL inventions, and had violated the 2014 IP Agreement and UCF-2.029.

1532. Defendant Cook and Sandra Sovinski refused to correct the declaration in the USPTO.

1533. From early January, 2020 into May, 2020 during the Florida Whistleblower proceedings, Defendant Cook worked with Sandra Sovinski and Alen Hsu who sent the Plaintiff numerous drafts of an agreement that claimed UCF needed military approval to correct the false declarations Sovinski had filed into the USPTO.

1534. The drafts of the agreement included markups identified in the drafts as made by Defendant Cook, Sovinski, or Hsu.

1535. However the military had already secured government rights in the invention, and UCF had no involvement in the sdPhotonics' government contract that involved development of the oxide-free VCSEL invention under Lateka Eifert.

1536. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs

placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

1537. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings could be proven false by prior USPTO filings that were part of the applications.

1538. The declarations filed by Sovinski into the USPTO constituted perjury, in violation of both Florida statutes and federal criminal codes against perjury.

1539. After Sovinski filed the altered declarations into the USPTO in April, 2020, and again violated UCF-2.029, the Plaintiff was again presented the agreement prepared by Cook, Sovinski, and Hsu, that the Plaintiff had rejected.

1540. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that Svetlana Shtrom had contacted a separate Army office than the office that issued the government contracts to sdPhotonics monitored by Lateka Eifert, claiming that UCF had been owed a subcontract on one of the sdPhotonics' Army contracts because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics.

1541. In or about late May, 2020, Alen Hsu sent the Plaintiff the agreement that had been prepared by Cook, Sovinski, and Hsu, that falsely claimed UCF required approval from the Army office that was unrelated to the Lateka Eifert or the contracts or her military office who had issued and monitored the contracts to the Plaintiff's company.

1542. In or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her the emails by UCF to the separate Army office that claimed Eifert should have issued UCF a subcontract because O'Neal had been employed part time with UCF when the contract was issued.

1543. Eifert then informed the Plaintiff that she would need to discuss the matter with her supervisors. Eifert contacted the Plaintiff about a week later an informed him that UCF had engaged in fraud in other military contracts from her office, that Eifert's military supervisors were tired of UCF engaging in fraud on their contracts. Eifert then gave the Plaintiff instructions on reporting the fraud by the UCF employees to the SBA IG, Hannibal Ware.

1544. In or about October, 2021, the Plaintiff again contacted Defendant Cook by email about the false declarations in the USPTO filed by Sovinski and others working with UCF, after military auditors confirmed that sdPhotonics was paying patent costs on the patents at issue, and that Sovinski had breached the 2014 IP Agreement.

1545. The Plaintiff included the military auditors on the email to Cook who had verified the patent payments from sdPhotonics to UCF.

1546. Defendant Cook did not respond to the Plaintiff's contact and information in October, 2021 showing Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement.

1547. By the end of December, 2022, the Plaintiff was being electronically and physically stalked, assaulted, and battered so heavily by the DOJ and military, he was forced to leave the U.S. for his physical safety.

1548. Defendant Cook violated the 14th Amendment of the U.S. Constitution pursuant to §1983, as one of the military's state actors. Cook took her actions intentionally and maliciously, preparing fraudulent settlement agreements that were then followed by extortion trying to cover up the perjury in the USPTO by UCF's Sovinski. Cook took her actions as the military's state actor to take-over the Plaintiff's company, while denying due process in the Florida Whistleblower proceeding.

1549. The Plaintiff damaged in his person and property by Defendant Cook's actions, and was forced to cease business operations of his company and suffered additional damages. The Plaintiff is entitled to punitive damages because of Cook's intentional and malicious acts to damage the Plaintiff and his company.

## FIFTH CAUSE OF ACTION

**42 U.S.C. § 1983, 5th U.S. Constitutional Amendment. Defendants: Sovinski, Shtrom, Weiss, Sweetapple, Hsu, Kline, Bustamante, Vetter, Taboada, Pinsukanjana, Kuznia, Baranek, Kim, Pan, Kish, Van Vechten, N. Stork, Repetto, B. Stork, L. Stork, Southron, Foret, Keeling, Solomon, Shainline, Klonoff, Saleh, Cook, Dallesassee, Martinis, Miguel, Taft, Maier, O'Neal, Coco, Gallagher, Harrod.**

1550. The Takings Clause of the 5th Amendment states: "nor shall private property be taken for public use, without just compensation." To establish a 42 U.S.C. § 1983 claim that Plaintiff was deprived of his Constitutionally protected 5th

Amendment rights, the factual allegations must show: (1) the Plaintiff was damaged by Defendants' actions; (2) the Defendants took their actions to damage the Plaintiff improperly and without procedural due process; and (3) Defendants' actions were taken under color of law.

1551. The U.S. Supreme Court has found that "Private persons, jointly engaged with state officials in a challenged action, are acting 'under color' of law for purposes of § 1983 actions." Dennis v. Sparks, 449 U.S. 24, 27-28 (1980). The 9th Circuit has ruled that, "To prove a conspiracy between the state and private parties under § 1983, the plaintiff must show an agreement or meeting of the minds to violate constitutional rights. To be liable, each participant in the conspiracy need not know the exact details of the plan, but each must at least share the common objective of the conspiracy." *United Steelworkers of Am. V. Phelps Dodge Corp.*, 865 F.2d 1539, 1540-41 (9th Cir. 1989).

1552. The elements needed to prove a conspiracy in Florida are: (1) an agreement between two or more parties; (2) to do an unlawful act or to a lawful act by an unlawful means; (3) the doing of some overt act in pursuance of the conspiracy; and (4) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009); *Walters v. Blankenship*, 931 So.2d 1367, 140 (Fla. 5th DCA 2006).

1553. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**Count 1: Defendant Sovinski.**

1554. The Plaintiff realleges and incorporates paragraphs 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 1550, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

1555. The Florida Whistleblower lawsuit was filed on or about December 12, 2019.

1556. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

1557. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

1558. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

1559. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsly representing the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached.

1560. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

1561. In addition to committing perjury, Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO beginning in or about August, 2019.

1562. During this time, Sovinski worked with Youndy Cook and Alen Hsu to draft a settlement agreement, of which Hsu sent the Plaintiff's drafts, that falsely claimed Army approval was required for UCF to make any changes or corrections to the false declarations that Sovinski had filed into the USPTO.

1563. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

1564. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

1565. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on the agreement prepared by Cook, Sovinksi, and Hsu that claimed UCF required Army approval for UCF to correct the USPTO declarations.

1566. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

1567. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

1568. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

1569. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi was then sent to the Plaintiff, and again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

1570. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

1571. The Plaintiff had a federal constitutional right to seek redress through the court system for damages caused by Sovinski's actions in August, 2019 in which

she engaged in perjury against the Plaintiff and his company by filing false declarations into the USPTO onto the Plaintiff's property, his company, without retaliation.

1572. Defendant Sovinski violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when engaged in perjury in the USPTO in or about August, 2019 on multiple patents jointly owned by sdPhotonics, breached the 2014 IP Agreement and violated UCF Regulations UCF-2.029, used the proceedings of the Whistleblower lawsuit to engage in additional perjury in the USPTO in April, 2020 during the proceedings, and tried to change evidence and perjury at issue in the proceeding, and drafted the fraudulent settlement agreement with Cook and Hsu that required Army approval from an office unrelated to sdPhotonics' contracts, that even Eifert's office determined was fraud, drafted a second agreement in or about October, 2020 with Bustamante and Cook, as she was directing more false declarations to be filed into the USPTO, to acquire and obtain control of the Plaintiff's company, without due process.

1573. The Plaintiff was damaged by Defendant Sovinski's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceedings.

1574. Defendant Sovinski's actions were in fact both unlawful and criminal, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 2: Defendant Shtrom.**

1575. The Plaintiff realleges and incorporates paragraphs 138-150, 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 1550, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

1576. Florida Whistleblower lawsuit was filed on or about December 12, 2019.

1577. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

1578. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

1579. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact, the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

1580. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsely representing the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached.

1581. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

1582. Shtrom followed Sovinski USPTO filings with Shtrom's own retroactive declarations, and when she filed the declarations Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when she filed retroactive ownership.

1583. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

1584. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

1585. Defendant Shtrom again filed her own USPTO declarations soon after, again breaching the 2014 IP Agreement and UCF-2.029 during the Florida Whistleblower proceeding.

1586. In or about May, 2020, the Plaintiff used public records from public records requests and obtained emails and records that showed Svetlana Shtrom

had contacted a separate Army office than Eifert's and provided false information about Sabine O'Neal.

1587. Shtrom claimed UCF had been entitled to a subcontract on Eifert's contract to sdPhotonics because O'Neal had been a UCF employee, when in fact it was Eifert who was responsible for overseeing any subcontracts from the contract Eifert, Eifert had secured the government rights.

1588. The false claims by Shtrom to the Army office had been used in a settlement agreement that had been drafted by Cook, Sovinski, and Hsu, and required unexplained Army approval from an unspecified office after Deppe signed the agreement, and made no corrections to the perjury by Sovinski in the USPTO.

1589. After obtaining the information from the public records request and USPTO patent records, in or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her Shtrom's emails to the other Army office and claims about Sabine O'Neal and the contract Eifert had monitored, and the need for some type of Army approval related to UCF's supposed involvement in Eifert's contract.

1590. Eifert informed the Deppe when she saw the emails and records that Shtrom had sent the different Army office that she would discuss it with her supervisors and get back to him.

1591. About a week later, in mid-June, 2020, Eifert informed the Deppe that her supervisors had reviewed the emails and information Shtrom sent to the separate Army office and determined, separately from Deppe, that Shtrom and UCF had engaged in fraud on Eifert's contract to sdPhotonics.

1592. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

1593. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

1594. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

1595. Defendant Shtrom again breached the 2014 IP Agreement and UCF-2.029, when she followed Sovinski's USPTO declarations with her own retroactive declarations in or about October, 2020.

1596. Defendant Shtrom retaliated against the Plaintiff for filing the Florida Whistleblower lawsuit, and violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she used the proceedings of the Whistleblower lawsuit to engage in additional breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029(4)(d), by filing retroactive declarations into the USPTO in attempts to correct prior declarations filed by Sovinski, presenting false information to an Army office about Sabine O'Neal with no connection to sdPhotonics or its contracts, and the false information she had sent to the Army office was then used to try to force the Plaintiff into signing the fraudulent

settlement agreement, to acquire and obtain control of the Plaintiff's company, without due process.

1597. The Plaintiff was damaged by Defendant Shtrom's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceedings.

1598. Defendant Shtrom's actions were in fact both unlawful, malicious, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 3: Defendant Weiss.**

1599. Plaintiff realleges and incorporates paragraphs 187-194, 236-276, 284-287, 290-291, 305-315, 319-329, 355-357, 362, 365-372, 391, 630-641, 1550, and Exhibits 8-14 of this Complaint as though fully set forth herein.

1600. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1601. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1602. During the time the proceeding operated without a judge, Defendant Weiss pretended to be an officer of the illegal Whistleblower proceeding, and filed documents for his client, UCF, into the Florida Whistleblower proceedings, while he operated the proceeding without a judge.

1603. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1604. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1605. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

1606. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1607. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO, violating Fl. St. §§837.021(1), 837.07(1), (2).

1608. While Defendant Weiss pretended to be an officer of a legitimate state court proceeding, he tried to prevent evidence from coming into the proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

1609. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

1610. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

1611. At the end of June, 2020, Defendant Weiss announced he had stayed the proceedings and refused a discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

1612. In or about August, 2020, Defendant Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, that in fact Defendant Weiss had refused, and again tried to keep evidence of Sovinski's perjury in the USPTO from coming into the proceeding.

1613. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

1614. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

1615. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

1616. The Plaintiff had a federal constitutional right to seek redress through the court system for damages caused by Sovinski's actions in August, 2019 in which she engaged in perjury against the Plaintiff and his company by filing false declarations into the USPTO onto the Plaintiff's property, his company.

1617. Defendant Weiss violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of law and pretended to be an officer of the court in the illegal Florida Whistleblower proceeding that operated without a judge, and tried to force the Plaintiff into a settlement agreement that even Lateka Eifert's office had determined was based on fraud by UCF employees with Shtrom, and engaged in evidence and witness tampering using a false motion to compel to keep evidence of perjury by Sovinski in the USPTO from entering the proceeding, to take over the Plaintiff's company for the military and UCF without due process.

1618. The Plaintiff was damaged by Defendant Weiss' actions, and because of the injuries and damages caused to him and his company had to cease his

business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

1619. Defendant Weiss actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 4: Defendant Sweetapple.**

1620. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 1550, and Exhibits 3-14 of this Complaint as though fully set forth herein

1621. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1622. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1623. During the time the proceeding operated without a judge, Defendant Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1624. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1625. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1626. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

1627. While Defendant Sweetapple pretended to be an officer of the illegal state court proceeding, he tried to prevent evidence from coming into the proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

1628. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1629. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

1630. In or about May, 2020, Defendant Sweetapple tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF to assign.

1631. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

1632. Defendant Sweetapple learned the Plaintiff filed the SBA IG complaint, in or about June, 2020.

1633. In or about the end of June, 2020, Defendant Sweetapple announced to the Plaintiff that Weiss had stayed the proceedings, and that because of the stay Defendant Sweetapple would not serve Weiss the discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

1634. In or about August, 2020, Jeffrey Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, when in fact Sweetapple had falsely claimed that Weiss had stayed the proceedings.

1635. The docket showed Weiss had no way to stay the proceeding, and claimed he had done so without filing a motion.

1636. When the Plaintiff instructed Defendant Sweetapple serve Weiss the discovery response, Defendant Sweetapple refused and tried to set the hearing with the Weiss for the motion to compel.

1637. When the Plaintiff fired Defendant Sweetapple, Defendant Sweetapple refused to cease work on the matter, despite that the contract between the Plaintiff and Sweetapple required Sweetapple to cease work upon being filed.

1638. Defendant Sweetapple took his actions under color of law, pretending to be an officer of the illegal state court proceeding that operated without a judge.

1639. Defendant Sweetapple violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of law and pretended to be officer of the illegal Florida Whistleblower proceeding that operated without a judge, and coordinated with at least the military and UCF to try to force the Plaintiff into an agreement that even Lateka Eifert's office determined was fraudulent, and refused to serve discovery responses to Weiss in a scheme to withhold evidence from the proceeding, to take over the Plaintiff's company without due process.

1640. The Plaintiff was damaged by Defendant Sweetapple's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

1641. Defendant Sweetapple actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 5: Defendant Hsu.**

1642. Plaintiff realleges and incorporates paragraphs 282-293, 315-329, 362-365, 630-641, 1550-1552, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

1643. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1644. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1645. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1646. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1647. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1648. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1649. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

1650. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

1651. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

1652. Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that included terms the Plaintiff informed Defendant Hsu he would not accept.

1653. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

1654. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

1655. Defendant Hsu learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents to prove certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

1656. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1657. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

1658. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF that Defendant Hsu had written into the agreement with Cook and Sovinski.

1659. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed

about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

1660. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

1661. Defendant Hsu contacted and warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

1662. Defendant Hsu agreed, conspired and engaged with military state actors Cook, Sovinksi, Weiss, and Sweetapple, to try to force the Plaintiff to sign the settlement agreement that even Lateka Eifert's military office that issued sdPhotonics the government contracts determined was based on fraud by UCF employees with Svetlana Shtrom. Defendant Hsu took overt actions in addition to the fraudulent settlement agreement, forcing the Plaintiff into a settlement meeting based on fraud, and engaging with Weiss and Sweetapple as part of evidence and witness tampering.

1663. Defendant Hsu violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he made his agreement and conspired and engaged with the military state actors, Cook, Sovinski, Weiss and Sweetapple, to use the Florida

Whistleblower proceeding, to take over the Plaintiff's company without due process.

1664. The Plaintiff was damaged by Defendant Hsu's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 6. Defendant Kline.**

1665. The Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 1550-1552, and Exhibits 3-14, 16 of this Complaint of this Complaint as though fully set forth.

1666. The Plaintiff hired Defendant Karen Kline in or about 2016 to provide legal advice on patents filed by the Plaintiff and his company, sdPhotonics.

1667. In or about November, 2018, the Plaintiff informed Defendant Kline he planned to resign his employment from UCF and move sdPhotonics from the UCF incubator, and asked Defendant Kline to review the patents that had been filed jointly with UCF and two additional patents.

1668. In December, 2018, Defendant Kline contacted Sandra Sovinski at Sovinski's UCF office with the patent list.

1669. In or about the beginning of January, 2019, after sending her letter, Defendant Kline informed the Plaintiff she had been contacted by Sandra Sovinski and had a new conflict of interest due to UCF, but that she wished to consult to find other attorneys to represent the Plaintiff and his company, sdPhotonics.

1670. Defendant Kline subsequently informed the Plaintiff that she had found Alen Hsu from a different firm to represent the Plaintiff.

1671. Defendant Kline continued to refuse to take action when, in August, 2019, Sandra Sovinski filed false declarations into the USPSTO, violating the same 2014 IP Agreement and UCF-2.029 patent regulations Kline had contacted Sovinski about in December, 2018.

1672. Instead, after Defendant Kline confirmed that Sovinski had violated Florida perjury laws the Plaintiff was informed that he should file the Florida Whistleblower complaint.

1673. Defendant Kline then referred Robert Sweetapple and Alen Hsu to be hired by the Plaintiff to pursue the Florida Whistleblower lawsuit.

1674. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1675. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1676. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1677. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP

Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1678. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1679. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1680. Defendant Kline then had phone meetings with Robert Sweetapple, Alen Hsu, Cook, Sovinski, and Weiss during the illegal Whistleblower proceedings, but refused and/or failed to disclose the contents to the Plaintiff as she billed him for the phone meetings, while Robert Sweetapple operated the illegal proceeding of the Florida Whistleblower's lawsuit that Kline had insisted should be filed was operated without a judge.

1681. Alen Hsu and Robert Sweetapple learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents that proved certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

1682. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

1683. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

1684. Defendant Kline continued to refuse to take action in response to the clear evidence that Sandra Sovinski was engaged in a pattern of criminal activity of perjury in the USPTO.

1685. Defendant Kline conspired and engaged with state actors Cook, Sovinski, Weis, and Sweetapple, when she made the agreement not to take action in response to perjury in the USPTO at issue in the illegal Florida Whistleblower proceeding, and then took part in planning meetings with Sovinski, Cook, Sweetapple, Weiss and Hsu, while refusing to provide the Plaintiff work product or any information about the planning meetings, that used the illegal Florida Whistleblower proceedings to commit additional perjury and tried to cover-up evidence of that perjury in the USPTO.

1686. Defendant Kline violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she conspired and engaged with the military state actors,

Cook, Sovinski, Shtrom, Weiss, and Sweetapple to use the illegal Florida Whistleblower to engage in additional perjury in the USPTO, and a trick to use an agreement that even the military contracting office to sdPhotonics determined was fraud by UCF, to take over the Plaintiff's company for UCF and the military without due process.

1687. The Plaintiff was damaged by Defendant Kline's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 7: Defendant Paetra Brownlee.**

1688. Plaintiff realleges and incorporates paragraphs 283-287, 365-366, 373-374, 478-479, 630-641, 1550, and Exhibits 8-10, 14, 16 of this Complaint of this Complaint as though fully set forth herein.

1689. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1690. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1691. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1692. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1693. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1694. Defendant Brownlee was not appointed as a Florida state judge until or about May 28, 2020.

1695. The docket of the Florida Whistleblower proceeding shows Paetra Brownlee knowingly took over an illegal state court proceeding that had been operated by only the two attorneys Jeffrey Weiss and Rober Sweetapple.

1696. Brownlee made her first appearance into the case in or about August, 2020, after the Plaintiff fired Robert Sweetapple for his refusal to serve the Plaintiff's discovery responses to opposing counsel, Jeffrey Weiss, and a false motion to compel filed by Weiss.

1697. Once the Plaintiff learned Brownlee had been assigned as judge to the case, the Plaintiff sent Brownlee a confidential letter to her judicial chambers that was cc'd to Weiss and Sweetapple that the Florida Whistleblower proceeding had been used by Weiss and Sweetapple in an attempt to force a settlement the Plaintiff

had refused, and had violated the Fl. St. §112.3187(4)(b) (Florida's Whistleblower Act).

1698. Brownlee then placed the confidential letter on the docket of the proceeding.

1699. Brownlee gave no legitimate reason for her action of placing the letter onto the court's docket.

1700. By early November, 2020, attorneys involved in the Florida Whistleblower proceedings began a systematic pattern of threats, intimidation, stalking, assaults, batteries, and confinement, trying to force the Plaintiff to sign a settlement agreement the Plaintiff had refused.

1701. Defendant Brownlee violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she performed in the illegal Whistleblower proceeding as a military state actor, to commit crimes in the Florida Whistleblower proceeding, and pretended to be a judge over the illegal Whistleblower proceeding. Brownlee had no jurisdiction to take over the illegal proceeding being operated by Weiss and Sweetapple, and violated the Florida Whistleblower's Act, Fl. St. §112.3187(4)(b), to take over the Plaintiff's company as part of a military bribery scheme without due process.

1702. The Plaintiff was damaged by Defendant Brownlee's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings. The Plaintiff is entitled to

punitive damages for Defendant Brownlee's crimes and unlawful actions in the Florida Whistleblower proceeding.

**Count 8: Defendant John Bustamante.**

1703. Plaintiff realleges and incorporates paragraphs 316-317, 322-329, 350-354, 375-385, 630-641, 1550-1552, and Exhibits 8-10 of this Complaint as though fully set forth herein.

1704. Defendant Bustamante was hired by the Plaintiff to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom.

1705. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1706. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1707. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the

declarations, and showed Sovinski had made the false statements in her declaration.

1708. Furthermore, Defendant Bustamante determined that in April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records violate Fl. St. §§837.021(1), 837.07(1), (2).

1709. Defendant Bustamante advised the Plaintiff that a complaint should be filed in federal court because of what had occurred in the illegal Florida Whistleblower proceeding.

1710. Bustamante then obtained information from the Plaintiff on the 2014 IP Agreement and UCF-2.029, and prepared the federal complaint to be filed in the FLMD court.

1711. Bustamante then contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

1712. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered him an equity position, Bustamante would have worked for sdPhotonics.

1713. Bustamante prepared the agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski. When the

Plaintiff reviewed the agreement, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

1714. Instead, it had the same requirement of Army approval from an unspecified office that Lateka Eifert had already confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions.

1715. Eifert had requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office, over what Defendant Bustamante had again placed in the settlement agreement he had drafted with Cook, Sovinski, and Weiss.

1716. At the beginning of November, 2020, the Plaintiff was extorted by John Vetter to sign the agreement Bustamante had prepared with Cook, Weiss, and Sovinski, or "find out what happens to a whistleblower in Florida."

1717. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

1718. Bustamante responded at that time that there was nothing he was able to do about it, when Bustamante could have taken many different legal actions,

including reporting the crimes by the other attorneys, and he had an ethical duty to do.

1719. Defendant Bustamante agreed, conspired and engaged with the military state actors Cook, Sovinski, and Weiss, admitting he had been offered an equity position by others, to prepare a settlement agreement that Lateka Eifert's military office had already determined was based on fraud by UCF employees, to damage the Plaintiff's company and cover up evidence of the repeated patterns of criminal activity involving perjury in the USPTO, and Bustamante then coordinated in the illegal extortion, stalking, assaults, batteries and confinement during the Whistleblower proceeding, admitting he would have taken different actions had sdPhotonics offered him an equity position.

1720. Defendant Bustamante violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he conspired and engaged with the military state actors Sovinski, Cook, and Weiss, to use the illegal Florida Whistleblower proceeding and settlement agreement that Lateka Eifert's office had determined was based on fraud, in extortion, stalking, assaults, and batteries, to take over the Plaintiff's company without due process.

1721. The Plaintiff was damaged by Defendant Bustamante's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 9: Defendant John Vetter.**

1722. Plaintiff realleges and incorporates paragraphs 342-347, 386-471, 630-641, 1550-1552, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

1723. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit.

1724. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits.

1725. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

1726. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

1727. Vetter informed the Plaintiff that the false declarations filed by Sovinski were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

1728. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

1729. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused. In the call Vetter became

angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

1730. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

1731. The Plaintiff was subsequently stalked, assaulted, battered and confined over the agreement Vetter had threatened to the Plaintiff to sign.

1732. Defendant Vetter agreed, conspired and engaged with the military state actors Sovinksi, Cook, and Weiss to try to extort an agreement to cover up the evidence of perjury in the USPTO, when even Lateka Eifert's office had determined the agreement was fraudulent. Vetter admitted he was part of the illegal Whistleblower proceeding, and threatened the Plaintiff that if he did not sign the agreement, he would find out what happens to a Florida whistleblower who reports crimes committed by UCF employees to Ron DeSantis' governor's office.

1733. Defendant Vetter violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he conspired and engaged with the military's state actors Sovinski, Cook, Sweetapple, and Weiss working with the military and UCF, to extort the military's agreement, that Vetter and contracting office had already determined was fraudulent, and use the illegal Florida Whistleblower proceeding,

to take over the Plaintiff's company and its technologies for the military and UCF without due process.

1734. The Plaintiff was damaged by Defendant Vetter's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 10: Defendant Pinsukanjana.**

1735. Plaintiff realleges and incorporates paragraphs 224-231, 303-304, 395-474, 630-641, 1550-1552, of this Complaint as though fully set forth herein.

1736. Defendant Pinsukanjana is a physicist employed by Intelligent Epitaxial Technologies, Inc. (IET). IET is an epitaxial growth foundry who provides custom semiconductor materials for optoelectronic and III-V semiconductor devices, including VCSELs.

1737. The Plaintiff and sdPhotonics' engineers worked with Defendant Pinsukanjana and IET through contracts and purchase orders that were used in developing specialized materials for sdPhotonics oxide-free VCSELs and other photonic devices, including the Cryo-VCSEL and specialized detectors.

1738. Defendant Pinsukanjana worked directly with the Plaintiff to learn the special techniques needed to grow the epitaxy for the Plaintiff's Cryo-VCSEL intention that could operate at 4 K and below.

1739. Defendant Pinskukanjana worked closely with Deborah Van Vechten and Milton Feng, and the Plaintiff, Pinsukanjan, Feng, and Van Vechten had meetings at the IET growth facility near Dallas, TX, in meetings and discussions concerning the sdPhotonics Cryo-VCSEL.

1740. On multiple occasions, Defendant Pinsukanjana and the Plaintiff discussed the declarations that Sandra Sovinski had filed into the USPTO, and the Florida Whistleblower lawsuit that had been filed December 12, 2019 involving the evicen of perjury created by Sovinski's USPTO filings.

1741. The Plaintiff received the threats from John Vetter in early November, 2020, to sign an agreement the Plaintiff had refused involving the Florida Whistleblower proceedings and evidence of perjury in the USPTO by Sovinski.

1742. Pinsukanjana had learned in other discussions with the Plaintiff that he would be driving to the University of Illinois to visit Feng's laboratory and obtain measured results on the sdPhotonics Cryo-VCSEL prototypes Feng was testing.

1743. Pinsukanjana knew that Feng was testing the sdPhotonics' Cryo-VCSEL prototypes, and Pinsukanjana participated in planning meetings with Deppe, Feng, and Van Vechten.

1744. Defendant Pinsukanjana made repeated phone calls to the Plaintiff while he drove to Illinois, to learn where the Plaintiff would stay. When Pinsukanjana it would be Carbondale, IL, he informed the military where to begin the stalking.

1745. The Plaintiff was then stalked, assaulted, battered and confined over multiple days in Carbondale, IL and Illinois, had his financial accounts hacked, his company business account hacked, and found his house had been broken into when he returned there in Oviedo, FL in early December, 2020.

1746. During the stalking in late November, 2020 and early December, 2020, Defendant Pinsukanjana contacted the Plaintiff and informed him that Pinsukanjana and IET intended to fulfill a purchase order to Yunpeng Song from the Chinese company using the sdPhotonics oxide-free VCSEL technology, and IET would take control of the sdPhotonics' growth recipes.

1747. When the Plaintiff objected to the sale and informed Pinsukanjana that sdPhotonics and IET had trade secret agreements that prohibited the sale, Pinsukanjana responded that he had no choice but to fulfill the purchase order. When the Plaintiff objected that such a sale to a Chinese company would violate ITAR agreements, Defendant Pinsukanjana ignored the ITAR, and informed the Plaintiff that Pinsukanjana's company would go forward with the sale.

1748. Defendant Pinsukanjana conspired and engaged with the military's state actors Feng at the University of Illinois, and UCF's Cook, Sovinski, Shtrom, and Weiss, to take over the sdPhotonics' technology, participating in the stalking, assaults and batteries trying to force the settlement agreement UCF and the military were trying to extort, and the Plaintiff and his property were damaged.

1749. Defendant Pinsukanjana violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he agreed, conspired and engaged with the

military state actors Feng from the University of Illinois and Cook, Sovinski, and Weiss from UCF, to use the illegal Florida Whistleblower proceedings in Q4 2020 to extort, stalk, assault, batter, and confine the Plaintiff, all trying to obtain an agreement from the military and UCF that Lateka Eifert's office determined was based on fraud, and the violated Florida statute in making use or endeavoring to make use of the sdPhotonics trade secrets with Yunpeng Song, to take over the Plaintiff's company and its technologies with the military without due process.

1750. The Plaintiff was damaged by Defendant Pinsukanjan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 11: Defendant John Taboada.**

1751. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 631-640, 1550-1552, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

1752. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

1753. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

1754. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to additional corrective assignments.

1755. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

1756. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

1757. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

1758. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

1759. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

1760. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

1761. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

1762. After Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed he was amazed that Sovinski would again engage in fraud and perjury again in the proceeding of the USPTO.

1763. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO.

1764. However, in November, 2020, while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics patents in October, 2021.

1765. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew Sandra Sovinski had committed perjury.

1766. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski.

1767. Defendant Taboada admitted his agreement in the organized government crime, admitting he knew the FBI planned to frame the Plaintiff for

the perjury committed by Sovinski. Defendant Taboada conspired and engaged with state actors Weiss, Cook, Sovinkski, and Shtrom, and Defendant Taboada engaged in extortion in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding, threatening the Plaintiff that the FBI would frame him for the evidence of perjury committed by Sovinski in the USPTO, and that Taboada would do nothing to stop it.

1768. Defendant Taboada violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law in the Florida Whistleblower when he conspired in the commission of perjury in the USPTO to try to take over sdPhotonics' technology with Sovinski, Cook, Sweetapple, and Weiss, to take over the Plaintiff's company without due process.

1769. The Plaintiff was damaged by Defendant Taboada's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 12: Defendant Charles Kuznia.**

1770. Plaintiff realleges and incorporates paragraphs 297-304, 393-463, 631-640, 1550-1552, of this Complaint as though fully set forth herein.

1771. Kuznia was CEO of Ultra Communications, Inc., a defense contracting company that worked closely with the military program monitors Mark Beranek

and Michael Gerhold on SBIR contracts to develop his company's military transceivers that used VCSELs.

1772. The transceiver technology Kuznia's company had developed was highly robust for use in military platforms including jet aircraft, helicopters, etc., that experience high accelerations and temperature changes, and require very high reliability. These applications require VCSELs that can operate at higher and lower temperatures than most other applications.

1773. The transceiver technology Kuznia was developing is not highly efficient relative to VCSEL transceiver standards, due to design trade-offs required to meet reliability in military platforms that operate under extreme conditions including temperature and g-force due to acceleration.

1774. Kuznia repeatedly contacted the Plaintiff to discuss work with Beranek on the NAVAIR contract to develop the oxide-free VCSELs for use in Kuznia's transceivers involving a specific contract, and that Kuznia's company would work with sdPhotonics through subcontracting.

1775. The Plaintiff did contact Baranek, and sdPhotonics was issued the SBIR Phase I contract monitored by Beranek. Kuznia's company was to receive a subcontract for their work in a Phase II.

1776. Once the SBIR contract was in place that Kuznia had pushed for with Beranek, Beranek repeatedly claimed that Milton Feng had invented and developed the oxide-free VCSELs the Plaintiff's company was developing under the NAVAIR SBIR contract Beranek monitored.

1777. The Plaintiff repeatedly corrected Beranek that Milton Feng had no involvement in the oxide-free VCSEL invention or its development.

1778. Defendant Kuznia travelled with the Plaintiff was then asked by Kuznia to join him and Richard Weiss in attending meetings in Washington, D.C. in March, 2020, that Kuznia's company and Michael Gerhold had set up with lobbyists and U.S. congressional offices as part of an effort by the military to obtain government contracts to accelerate the commercialization of the oxide-free VCSEL inventions for use in military transceivers, including by Kuznia's company.

1779. In March, 2020, Defendant Kuznia, Richard Weiss, Paul Pinsukanjana, and the Plaintiff traveled to Washington, D.C. and discussed the oxide-free VCSELs at length with different congressional offices who would approve and push for the government funding.

1780. The false ownership declarations that Sovinski had filed into the USPTO on the inventions at issue in the Florida Whistleblower lawsuit were also discussed at length.

1781. At the beginning of November, 2020, the Plaintiff was repeatedly threatened by John Vetter to sign an agreement as part of the Florida Whistleblower proceeding that failed to correct the false declarations, and included the military for no apparent purpose and without military contracts.

1782. When the Plaintiff refused claiming he only needed the corrected assignments to file with the USPTO, Vetter threatened the Plaintiff that if he refused to sign, he would "find out what happens to a whistleblower in Florida."

1783. The Plaintiff was contacted by a barrage of attorneys involved in the Florida Whistleblower proceedings and engineers from various defense contractors, while the Plaintiff was being stalked in Carbondale, IL as Vetter had threatened.

1784. Defendant Kuznia called the Plaintiff while the Plaintiff was being stalked in Carbondale, IL.

1785. Kuznia informed the Plaintiff that he knew the military program monitors were taking over the Plaintiff's company and Kuznia wanted to take over the $2M IARPA Supercables project that was based on the Plaintiff's Cryo VCSEL invention.

1786. Kuznia could provide no legitimate reason to the Plaintiff for why Kuzni's company should obtain the sdPhotonics' IARPA Supercables project and claimed it was because he knew sdPhotonics had been targeted in the military take-over.

1787. Defendant Kuznia coupled the conversation to an elaborate story about how lucky everyone was to have engineering jobs in which they could work with the military, and how Kuznia was so grateful he did not have to work in menial positions instead such as a taxi driver.

1788. The Plaintiff did not respond to Kuznia's claims that Kuznia's company should take over the $2M IARPA Supercables project.

1789. Kuznia lacked the expertise in VCSELs to develop oxide-free VCSELs or even oxide VCSELs, and certainly not the Plaintiff's Cryo-VCSEL invention.

1790. Defendant Kuznia conspired and engaged with state actor Feng who was working with Beranek, and engaged in unlawful harassment in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding. Kuznia tried to take over the IARPA Supercables project from sdPhotonics, as part of the effort with Feng to misappropriate the Cryo-VCSEL prototypes from the Plaintiff's company, sdPhotonics.

1791. Defendant Kuznia violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law in the Florida Whistleblower when he conspired and engaged with state actors at UCF, Sovinski, Cook, and Weiss, to harass and intimidate the Plaintiff in Carbondale, IL as part of the extortion during the illegal Florida Whistleblower proceeding, to prevent corrections to the perjury in the USPTO by Sovinski, to take over sdPhotonics' contracts and technologies without due process.

1792. The Plaintiff was damaged by Defendant Kuznia's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 13: Defendant Milton Feng.**

1793. Plaintiff realleges and incorporates paragraphs 334-340, 393-463, 555-556, 561-572, 575-580, 630-641, 1550, and Exhibits 2, 20 of this Complaint as though fully set forth herein.

1794. Defendant Feng worked as a consultant to sdPhotonics, and was employed by the Plaintiff and sdPhotonics on the IARPA Supercables project that began in or about June, 2019.

1795. The University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project, with Feng acting as the university's principal investigator to fabricate and test prototypes of sdPhotonics' new laser invention, the Cryo-VCSEL. sdPhotonics provided its proprietary epitaxial materials Feng used to fabricate and test the Plaintiff's Cryo-VCSEL invention at high-speed and 4 K.

1796. Under the IARPA Supercables project, Defendant Feng was to fabricate and test the sdPhotonics' Cryo-VCSELs for high speed at 4 K, and set the tested prototypes back to sdPhotonics so that sdPhotonics could perform its own proprietary testing needed to develop a quantum mechanical current-voltage model that could be used for optimization of sdPhotonics' future Cryo-VCSEL designs.

1797. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the Cryo-VCSEL prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds in excess of 80 GHz at 4 K.

1798. Feng then refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to

develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

1799. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototyes.

1800. Once the Plaintiff had been threatened by Vetter, followed by stalking, assaults, and batteries in Carbondale, IL, the Plaintiff called Defendant Feng from Carbondale, IL, explained he was being stalked and assaulted by the military, and requested Feng's assistance.

1801. However, Defendant Feng informed the Plaintiff that he had been instructed not to assist the Plaintiff or his company in any way, and refused multiple requests from the Plaintiff for help, informing the Plaintiff that he could not and was not allowed to.

1802. The Plaintiff was then by the military when Deborah Van Vechten used a trick to confine the Plaintiff in the psychiatric ward of the Pavilion, on the same University of Illinois where Feng held the Plaintiff's company's Cryo-VCSEL prototypes, where the Plaintiff was harassed, threatened, extorted for trade secrets, and poisoned.

1803. Once the Plaintiff was released, with the Plaintiff never having mentioned the illegal confinement by the military and Deborah Van Vechten, Defendant Feng began sending the Plaintiff emails of well-wishes and get well soon messages.

1804. In or about about March, 2021, the Plaintiff received a draft of an article from Michael Gerhold and was informed by Gerhold that Gerhold and Feng had written an article about Gerhold's VCSEL projects. The Plaintiff found buried in the article claims by Gerhold and Feng claimed that Feng had developed the Cryo-VCSEL invention in his University of Illinois laboratory.

1805. Gerhold agreed to correct the article, and Feng informed the Plaintiff that Gerhold had made the errors in the article.

1806. By the end of the IARPA Supercables project in or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois.

1807. After the project ended, the Plaintiff contacted Feng's supervisors at the University of Illinois, Rashad Bashir and Susan Martinis, and informed them that the university still possessed sdPhotonics Cryo-VCSEL prototypes from the IARPA Supercables project, had disrupted the sdPhotonics research on the project.

1808. Susan Martinis' office responded with an email from Defendant Feng, John Dallesassee, and Fred Kish, claiming that the Cryo-VCSEL prototype was being withheld because of Nick Holonyak was the inventor in some way.

1809. Defendant Feng and his supervisors, Bashir and Martinis, subsequently used the sdPhotonics' Cryo-VCSEL prototypes to obtain additional contracts for the University of Illinois.

1810. Defendant Feng violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when, as a state actor, he tried to use the Florida Whistleblower

proceedings to take over sdPhotonics' technology with Sovinski, Cook, Sweetapple, and Weiss, to use the Florida Whistleblower proceeding to extort an agreement that even Lateka Eifert's office determined was based on fraud, and used harassment and confinement, to take over the Plaintiff's company and its technologies without due process.

1811. The Plaintiff was damaged by Defendant Feng's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 14: Defendant Mark Beranek.**

1812. Plaintiff realleges and incorporates paragraphs 301-302, 393, 427-431, 437-464, 631-640, 1550-1553, of this Complaint as though fully set forth herein.

1813. Defendant Mark Beranek worked closely with the Plaintiff in developing a proposal to and SBIR solicitation from his employment agency, NAVAIR.

1814. The NAVAIR project included sdPhotonics as a performer and Charles Kuznia's company to perform as a subcontractor to sdPhotonics in a Phase II.

1815. The NAVAIR project with Defendant Beranek began in or about March, 2020, during the Florida Whistleblower proceedings, and included Kuznia's company as a proposed subcontractor on a Phase II.

1816. sdPhotonics began making progress presentations in monthly phone meetings with Beranek and Beranek's colleagues who also monitored project, in which Defendant Beranek repeatedly stated or claimed to the Plaintiff that the oxide-free VCSELs being developed on his project had been invented and developed at the University of Illinois in Milton Feng's group.

1817. The Plaintiff repeatedly corrected Defendant Beranek in multiple phone meetings that Milton Feng was not involved in the invention or development of the oxide-free VCSEL.

1818. In early November, 2020, the Plaintiff was threatened and extorted by John Vetter to sign an agreement that included the military as part of the Florida Whistleblower lawsuit. The basis of the agreement had already been determined fraudulent by Lateka Eifert's office, and was refused by the Plaintiff.

1819. The Plaintiff was then stalked, assaulted, and battered that began in Carbondale, IL, only a few days after the threats from Vetter involving the agreement. During that episode of stalking, assaults, and batteries in Carbondale, IL, the Plaintiff received multiple phone calls from attorneys, military program monitors, and defense contractors to the military.

1820. Defendant Beranek was one of the military program monitors who contacted the Plaintiff by phone during the stalking, and informed the Plaintiff that he wanted to take control of the oxide-free VCSEL inventions from sdPhotonics for his other projects.

1821. Defendant Beranek then offered the Plaintiff the prospect of other defense contracts he would issue to sdPhotonics, if the Plaintiff relinquished the rights to the oxide-free VCSEL inventions.

1822. The Plaintiff made no agreements and did not respond to the offers by Defendant Beranek.

1823. By his own admissions, Defendant Beranek conspired and engaged with state actor Feng and UCF attorneys who were engaged in extortion with the military, and who Beranek falsely and repeatedly claimed had developed the oxide-free VCSELs even after the Plaintiff had corrected Beranek. Defendant Beranek engaged and conspired in unlawful harassment, stalking, assaults, batteries and extortion in Q4 2020 during the stalking in Carbondale, IL as part of the Florida Whistleblower proceeding.

1824. Beranek tried to use the state action to take over the sdPhotonics' oxide-free VCSELs.

1825. Defendant Beranek violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law in the Florida Whistleblower when he conspired and engaged in harassment to prevent corrections to the perjury in the USPTO by Sovinski, and to try to take over sdPhotonics' technology with Sovinski, Cook, Sweetapple, and Weiss, to use the Florida Whistleblower proceeding to extort an agreement that even Lateka Eifert's office determined was based on fraud, and use the illegal Florida Whistleblower

proceedings to acquire or maintain improper ownership in the technologies of the Plaintiff's company without due process.

1826. The Plaintiff was damaged by Defendant Beranek's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 15: Defendant Matt Kim.**

1827. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 1550-1552 of this Complaint as though fully set forth herein.

1828. Defendant Kim is a former University of Illinois graduate student and owner of the company QuanTera that does military contracting in semiconductors.

1829. Defendant Kim specialty is semiconductor electronic devices, and Kim also consulted for the Plaintiff's company on different occasions, and often contacted the Plaintiff with questions concerning lasers.

1830. Defendant Kim repeatedly contacted the Plaintiff while he was being extorted, stalked, assaulted, and battered in Carbondale, IL in Q4 2020 involving the evidence of perjury in the USPTO and the Florida Whistleblower proceedings.

1831. Kim called the Plaintiff repeatedly and repeatedly asked the Plaintiff in the calls whether the Plaintiff had ever had sex with a sixteen (16) year old girl.

1832. The Plaintiff informed Defendant Kim that he was being stalked by the military, and asked why was Kim was calling to ask the Plaintiff with such questions.

1833. Defendant Kim could provide no legitimate reason for his phone calls or why he was asking the Plaintiff whether he had ever had sex with a sixteen (16) year old girl.

1834. Defendant Kim conspired and engaged with military and the military's state actors at the University of Illinois, Feng, and UCF, Cook, Sovinski, and Weiss, to cyber-stalk, harass, and extort the Plaintiff in Q4 2020 as part of the illegal Florida Whistleblower proceeding, trying to take over the Plaintiff's company for the military.

1835. Defendant Kim violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he acted under color of state law as part of the illegal Florida Whistleblower proceedings, unable to explain why he was repeatedly calling the Plaintiff to ask if the Plaintiff had ever engaged in sex with a sixteen-year-old girl, while knowing that the Plaintiff was being stalked, assaulted, and battered by the military and DOJ as part of the Florida Whistleblower proceeding, as part of the plan with UCF, Milton Feng, and the military, to take over the Plaintiff's company without due process.

1836. The Plaintiff was damaged by Defendant Kim's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred

in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 16: Defendant Noren Pan.**

1837. Plaintiff realleges and incorporates paragraphs 393-462, 485-486, 631-640, 1550-1552, as though fully set forth herein.

1838. Defendant Pan is a former University of Illinois graduate student and owner of the company Microlink, Inc., that does military contracting in semiconductors.

1839. Defendant Pan and the Plaintiff's company, sdPhotonics, had performed some work before in anticipation of submitting joint research proposals for projects.

1840. The Plaintiff contacted Pan in November, 2020, while he was being stalked, assaulted, and battered in Carbondale, IL, and informed Pan about what was happening and requested his help.

1841. Defendant Pan responded by text message and informed the Plaintiff that Pan had set up a meeting in a vacant house in Chicago, and wanted the Plaintiff to meet him in the vacant house.

1842. Defendant Pan could provide no legitimate reason for why he was asking the Plaintiff to meet him in a vacant house during the stalking that took place in Carbondale, IL, in Q4 2020 during the Florida Whistleblower proceeding.

1843. The Plaintiff and Pan later discussed the military attempted take-over in January, 2021 by phone.

1844. Defendant Pan admitted in that phone call in January, 2021, that he knew the Plaintiff's company had been targeted by the military, universities, and defense contractors in intellectual property theft.

1845. Defendant Pan then asked the Plaintiff to come to Chicago, IL to discuss a project he knew was upcoming that became the "Chips + Science" government funding from the Biden administration.

1846. Defendant Pan admitted that he had agreed to harass and extort the Plaintiff during the illegal Florida Whistleblower proceeding, and Pan conspired and engaged in that harassment and extortion with the military's state actors including Feng, Cook, Sovinski, and Weiss, to use the illegal Florida proceeding to take over the sdPhotonics' oxide-free VCSELs.

1847. Defendant Pan violated the 5th Amendment of the U.S. Constitution pursuant to §1983, and acted under color of state law in the Florida Whistleblower when he acted in concert, with a meeting of the minds and engaged in harassment during the proceedings trying to take over sdPhotonics' oxide-free VCSEL inventions, and prevent corrections to the perjury in the USPTO by Sovinski to take over sdPhotonics' technology with UCF for himself and the military, without due process.

1848. The Plaintiff was damaged by Defendant Pan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred

in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 17: Defendant Fred Kish.**

1849. Plaintiff realleges and incorporates paragraphs 393-462, 575-580, 630-641, 1550 of this Complaint as though fully set forth herein.

1850. Defendant Kish a professor at NC State who is one of the former graduate students of Nick Holonyak. Defendant Kish contacted the Plaintiff while he was being stalked in Carbondale, IL, in November, 2020 during the Florida Whistleblower proceedings.

1851. The Plaintiff and Defendant Kish exchanged emails in which the Plaintiff informed Kish he was being stalked as part of a military take-over of his company, and that the stalking was occurring as part of the Florida Whistleblower lawsuit.

1852. Defendant Kish then informed the Plaintiff that Kish was very good friends with one of the DARPA program monitors linked to the organized crime from the military, Gordon Keeler. Defendant Kish acknowledged that he knew the effort was to take over the Plaintiff's company and use the laser inventions to obtain further government funding.

1853. Kish advised the Plaintiff that he should file suit over the actions by the military and UCF during the stalking, assaults, and batteries in Carbondale, IL in Q4 2020 as part of the Florida Whistleblower proceeding.

1854. Defendant Kish insisted in November, 2020 while the Plaintiff was being stalked and cyber-stalked, that his own university, North Carolina State University, would not receive any of the funding related to the military efforts to use the Plaintiff's oxide-free VCSEL inventions.

1855. However, Defendant Kish later changed his position, and in or about November, 2021 falsely claimed with Milton Feng, John Dallesassee, and Susan Martini's UIUC office that Nick Holonyak had somehow made the Plaintiff's VCSEL inventions as a reason for UIUC to retain the Cryo-VCSEL invention.

1856. In or about the fall of 2018 at a meeting at UIUC, Defendant Kish had tried to enter a discussion with the Plaintiff and John Dallesassee about VCSELs, and it immediately became clear that Kish had little if any scientific knowledge of the physics needed to actually understand lasers, and Deppe and Dallesassee had to be repeatedly correct Kish and explain his confusion to him about how the devices work.

1857. Defendant Kish is a state actor conspired with Bashir, Martinis, and Feng, when he tried to claim that the Cryo-VCSEL prototypes had been invented by Nick Holonyak, to misappropriate the sdPhotonics laser inventions, and obtain additional research contracts for the University of Illinois using the sdPhotonics' Cryo-VCSEL.

1858. Defendant Kish violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he took his actions in Q4 2020 to use the Florida Whistleblower proceeding to misappropriate the sdPhotonics' Cryo-VCSEL

prototypes without due process, and violated Fl. St. § 812.081(2)(a), (b), by claiming the Cryo-VCSEL was somehow invented by Nick Holonyak to retain the Cryo-VCSEL prototypes, to acquire or maintain control of the Plaintiff's company and its technologies without due process.

1859. The Plaintiff was damaged by Defendant Kish's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**<u>Count 18: Defendant Van Vechten.</u>**

1860. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 630-641, 1550-1553 of this Complaint as though fully set forth herein.

1861. Defendant Van Vechten participated in the IARPA Supercables project monthly reporting meetings and site visits, and from that project met the Plaintiff and learned about the Plaintiff's Cryo-VCSEL technologies.

1862. Van Vechten worked closely with the Pinsukanjana, Feng, Harrod, and the Plaintiff involving the oxide-free VCSEL and Cryo-VCSEL technologies that were invented by the Plaintiff and being developed by the Plaintiff's company sdPhotonics.

1863. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began

contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

1864. Van Vechten then used a trick after the Plaintiff had been heavily stalked and assaulted, and had contacted Milton Feng for help who had refused. Van Vechten then called and informed the Plaintiff that she had learned Trump was behind the stalking, assaults, and batteries in Carbondale, IL.

1865. Van Vechten then explained that she knew a place behind locked doors away from the stalkers for a few days close to the Univ. of Illinois campus, in the blue part of the state, and that she had connections there but that it would take her several hours to arrange the stay and would call back.

1866. Instead, Defendant Van Vechten used the trick to confine the Plaintiff in the psychiatric ward of Martin Repetto, where the Plaintif was harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. During this time Repetto demanded to know details of the oxide-free VCSEL inventions Van Vechten was after.

1867. After the Plaintiff had been released, Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to avoid the stalkers in Illinois, and that the Plaintiff didn't understand how the military did its business with the universities.

1868. Defendant Van Vechten violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she agreed, confederated, conspired and

engaged with the military's state actors, including Feng, Cook, Sovinski, and Weiss, and agreed to confine the Plaintiff using a trick to extort a settlement agreement the military and take-over the Plaintiff's company without due process.

1869. The Plaintiff was damaged by Defendant Van Vechten's illegal actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 19: Defendant Nicholas Stork.**

1870. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 1550-1552, of this Complaint as though fully set forth herein.

1871. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1872. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1873. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1874. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking was due to then president Trump, and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1875. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1876. Several hours later during the drive Van Vechten gave the Plaintiff the information and directions to the Pavilion, while the Plaintiff was riding with Nick Stork and his wife, and explained that she had set up a room with a medical facility on the University of Illinois campus and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1877. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1878. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were

blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1879. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1880. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1881. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

1882. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1883. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they

had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1884. Defendant Nick Stork agreed, conspired and engaged with Van Vechten and state actors at UCF, Sovinski, Shtrom, and with Weiss, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff, where he was harassed, threaten, extort, intimidate, assault, and batter, so that UCF and the military could use an extorted and fraudulent settlement agreement take over the Plaintiff's company and its technologies.

1885. Defendant N. Stork violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he took his actions engaged and in conspiracy with the military's state actors Cook, Sovinski, Shtrom, and Weiss, and confined the Plaintiff during Q4 2020 of the Florida Whistleblower proceeding, to acquire and take-over the Plaintiff's company with the military without due process.

1886. The Plaintiff was damaged by Defendant N. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 20: Defendant Martin Repetto.**

1887. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 1550-1552 of this Complaint as though fully set forth herein.

1888. Defendant Repetto was the supervising doctor who oversaw the confinement of the Plaintiff in the psychiatric ward of the Pavilion.

1889. The Plaintiff was confined against his will and without cause in the psychiatric ward under Repetto for approximately six (6) days.

1890. During that time the Plaintiff was placed in a communal sleeping center. Numerous different supposed "patients" were checked into the room, all refusing to wear masks despite covid.

1891. The Plaintiff was forced to attend supposed "group" sessions in order to be released. The sessions were clearly staged meetings of approximately a dozen people pretending to be patients with supposed mental ailments.

1892. Defendant Repetto met with the Plaintiff at least three times during the Plaintiff's confinement.

1893. Each time Repetto demanded information about the VCSEL inventions, claiming the Plaintiff was not giving him enough information. The Plaintiff had never mentioned lasers to Defendant Repetto or anyone else in the Pavilion.

1894. The supposed "mental patients" were moved continuously into and out of the communal sleeping area, none of whom wore masks despite the peak of covid in November, 2020.

1895. On the fourth day of the Plaintiff's confinement one of the staff brought the Plaintiff a supposed diagnosis from Repetto the Plaintiff was asked to sign stating the Plaintiff had bipolar mental disease.

1896. The Plaintiff refused to sign.

1897. On the fourth morning one of the supposed "mental patients" admitted to the Plaintiff in a private conversation that he had been out of work and was approached by someone who agreed to pay him to part in the intimidation scheme in the psychiatric ward of the Pavilion with the military against the Plaintiff.

1898. Later that day the Plaintiff was moved to a private room to sleep on the same floor in the same area. On that night the Plaintiff received food poisoning and vomited throughout the night, and did not sleep.

1899. The next morning several of the supposed "patients" met in the hallway, after which one of the staff members brought each of the supposed "patients" ballpoint pens. The supposed "patients" then followed the Plaintiff around the hallway with their ballpoint pens pointed towards the patient in what was obviously staged for intimidation.

1900. When that failed the supposed "patients" began checking themselves out of the Pavilion by going to the reception desk on the floor and informing the staff they were leaving. The staff signed paperwork for more than half of the dozen or so supposed "patients."

1901. On the final morning Defendant Repetto came to the Plaintiff's room and informed the Plaintiff that he wanted to keep the Plaintiff longer in the facility, and the Plaintiff demanded to be let out.

1902. Defendant Repetto conspired and engaged with Van Vechten, Nick Stork, and the military's state actors Feng at the University of Illinois and Sovinski, Shtrom, and with Weiss of UCF, and admitted to the Plaintiff directly that Repetto's reasons for the confinement involved extortion of information from the Plaintiff about the oxide-free VCSEL inventions. Repetto improperly confined the Plaintiff and harassed, threatened, extorted, intimidated, and oversaw assaults and batteries in the Pavilion, so that UCF and the military could take over the Plaintiff's company and its technologies.

1903. Defendant Repetto violated the 5th Amendment of the U.S. Constitution pursuant to §1983, and effectively admitted he engaged, agreed, and conspired with state actors, to use extortion, stalking, assaults, batteries, and confinement, demanding the Plaintiff provide him information on the laser inventions as part of the Florida Whistleblower proceeding, to misappropriate the sdPhotonics' laser technologies and take over the company with the military and universities without due process.

1904. The Plaintiff was damaged by Defendant Repetto's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 21: Defendant Brenda Stork.**

1905. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 1550-1552 of this Complaint as though fully set forth herein.

1906. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1907. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1908. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1909. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1910. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1911. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with

a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1912. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1913. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1914. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1915. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1916. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1917. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1918. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

1919. Defendant Brenda Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

1920. Defendant B. Stork violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she took her actions engaged and in

conspiracy with state actors Sovinski and Shtrom at UCF, with Weiss as an officer under the Florida Whistleblower proceeding, and with Feng in Q4 2020, to use extortion, stalking, assaults, batteries, and confinement as part of the Florida Whistleblower proceeding, and take over the Plaintiff's company and its technologies without due process.

1921. The Plaintiff was damaged by Defendant B. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 22: Defendant Larry Stork.**

1922. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 1550-1552 of this Complaint as though fully set forth herein.

1923. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

1924. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

1925. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff

was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

1926. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

1927. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

1928. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

1929. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

1930. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were

blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

1931. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

1932. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

1933. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

1934. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

1935. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF

and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

1936. Defendant Larry Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

1937. Defendant L. Stork violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she took her actions engaged and in conspiracy with state actors Sovinski and Shtrom at UCF, with Weiss as an officer under the Florida Whistleblower proceeding, and with Feng in Q4 2020, to use extortion, stalking, assaults, batteries, and confinement as part of the Florida Whistleblower proceeding, and take over sdPhotonics without due process.

1938. The Plaintiff was damaged by Defendant L. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 23: Defendant Robin Foret.**

1939. Plaintiff realleges and incorporates paragraphs 119, 487-488, 491, 499-518, 525-527, 1550-1552 of this Complaint as though fully set forth herein.

1940. In or about August, 2019, the Plaintiff leased an apartment in Richardson, TX, close to his company's location.

1941. The Plaintiff met Defendant Foret while living in Richardson, TX, and they dated some while he was in Texas.

1942. The Plaintiff and Defendant Foret stopped dating in or about November, 2019.

1943. The Florida Whistleblower lawsuit was filed in Florida's 9th Judicial Circuit state court because of retroactive declarations Sovinski and other employees were filing into the USPTO on patents covering the Plaintiff's oxide-free VCSEL inventions being developed by the Plaintiff's company.

1944. The Plaintiff returned to his house in Oviedo, FL, or about the end of March, 2020 as his apartment lease was ending during the initial peaks of the covid pandemic, to be safer from the covid pandemic and work from home.

1945. In Q4 2020, during the Florida Whistleblower proceedings, the Plaintiff was extorted, stalked, assaulted and battered, over the evidence of government crimes involving perjury by UCF employees and the USPTO declarations filed by Sandra Sovinski.

1946. In or about the end of December, 2020, the Plaintiff contacted Defendant Foret to explain what had occurred in Q4 2020 involving the Florida Whistleblower proceedings, and obtain legal advice she may be able to provide.

1947. The Plaintiff requested Defendant Foret review work by the attorney Joe Southron who the Plaintiff had hired to dismiss the Florida Whistleblower lawsuit.

1948. Defendant Foret agreed to review documents prepared by Southron and verify that he was not trying to further sabotage the proceedings of the lawsuit.

1949. Defendant Foret did review for the Plaintiff documents Joe Southron filed into the Florida Whistleblower proceeding.

1950. Defendant Foret then made unusual referrals to the two Texas attorneys to address the false declarations Sandra Sovinski had filed into the USPTO, Kevin Keeling and Mark Solomon, explaining that Solomon would be particularly helpful because he had a doctorate.

1951. Defendant Foret could not explain why an attorney possessing a doctorate would be helpful.

1952. The Plaintiff did hire Keeling and Solomon based on Defendant Foret's recommendation.

1953. After being hired, and obtaining control over the patent applications with a power of attorney, Kevin Keeling and Mark Solomon refused to correct the false declarations because Mark Solomon had a doctorate.

1954. Kevin Keeling and Mark Solomon then used the power of attorney they had obtained through the Foret referral to allow additional attorneys working with UCF to file additional declarations onto new patent applications filed by the Plaintiff or his company.

1955. In or about the end of March, 2020, Defendant Foret provided the Plaintiff additional information that the military had used inspector generals in the organized crime, and that it was at the level of the U.S. president, Joe Biden. Defendant Foret and the Plaintiff had not discussed the SBA IG Hannibal Ware, who was involved in the crimes with the military employees.

1956. Defendant Foret used a trick, and agreed, conspired and engaged with the military's state actors Sovinski, Shtrom, and with Weiss at UCF, to maintain control of the patents covering the oxide-free VCSEL inventions by transferring control to Keeling and Solomon, and admitted she knew the actions were part of the military take over the Plaintiff's company and its technologies using the state actors at UCF.

1957. Defendant Foret violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she used a trick during the Florida Whistleblower proceedings to shift control of the patents at issue upon with Sovinski had committed perjury in the USPTO, to transfer control of those patents to Keeling and Solomon, who allowed attorneys working with UCF to file additional false declarations on patents owned by the Plaintiff's company, to take over the Plaintiff's company without due process.

1958. The Plaintiff was damaged by Defendant Foret's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of Keeling and

Solomon allowing further damage to the Plaintiff's company by attorneys working with UCF, and the Plaintiff is entitled to punitive damage.

**Count 24: Defendant Joe Southron.**

1959. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 1550, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

1960. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings.

1961. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

1962. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

1963. However, Defendant Southron prepared an improper complaint, that brought the Florida Whistleblower Act, Fl. St. §112.3187 against a large number of individuals.

1964. Prior Florida court rulings had already disallowed what Southron was attempting, which was to bring violations of the Fl. St. §112.3187 against individuals.

1965. When the Plaintiff informed Defendant Southron that the Plaintiff would not allow the improper amended complaint that Southron had prepared to be filed, Southron informed the Plaintiff that he was withdrawing from representation and refused to properly dismiss the Florida Whistleblower lawsuit.

1966. When the Plaintiff objected to Defendant Southron about his refusal to dismiss the complaint, Defendant Southron filed improper dismissal orders that other attorneys, Robin Foret and Kevin Keeling, caught, and explained to the Plaintiff why these could be damaging to the Plaintiff.

1967. Defendant Southron violated the 5th Amendment of the U.S. Constitution pursuant to §1983, acted under color of state law for the military's organized crime in the Florida Whistleblower proceeding to engage in fraud during the proceeding, pretending he was officer of the illegal state court proceeding. Defendant Southron used tricks trying file an improper federal complaint trying to prevent the evidence of perjury in the USPTO from coming into proceeding, and tried to withdraw from the case to damage it further when he was discovered, to acquire or maintain improper ownership in the Plaintiff's company, without due process.

1968. The Plaintiff was damaged by Defendant Southron' actions and refusal to allow due process in the proceeding, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings. Defendant Southron's actions were unlawful and

criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 25: Defendant Gerhold.**

1969. Plaintiff realleges and incorporates paragraphs 86-88, 296-300, 496-497, 561-566, 630-641, 1550-1553 and Exhibit 2 of this Complaint of this Complaint as though fully set forth herein.

1970. Defendant Gerhold had a separate SBIR project with the Plaintiff's company, sdPhotonics, to develop the oxide-free VCSEL and optical interconnect for focal plane array cameras that operate at 77 K and that undergo thermal cycling.

1971. Defendant Gerhold had worked with Charles Kuznia and Washington, D.C. meetings in March, 2020 with congressional offices to seek additional funding, during the Florida Whistleblower proceedings involving the false declarations that UCF's Sandra Sovinski had filed into the USPTO.

1972. Defendant Gerhold contacted the Plaintiff by phone in or about January, 2021, to discuss the oxide-free and Cryo-VCSEL inventions from sdPhotonics.

1973. Defendant Gerhold admitted to the Plaintiff that he had been contacted by Deborah Van Vechten who had informed Gerhold that sdPhotonics would be giving up ownership of its VCSEL technologies.

1974. The Plaintiff informed Gerhold in response that sdPhotonics was not relinquishing ownership of its VCSEL inventions. Gerhold then responded that he

was glad to hear that, and had additional funding for sdPhotonics to test reliability, and asked the Plaintiff for details on equipment and facilities to test the VCSELs.

1975. In or about March, 2021, the Plaintiff received an article written by Defendant Gerhold about sdPhotonics new VCSEL technologies, and buried in the article were several statements claiming the Cryo-VCSEL invention had come from Milton Feng's laboratory at the University of Illinois.

1976. The Plaintiff responded to Gerhold with Feng cc'd after reading the article and informed Gerhold that the article was incorrect, and that sdPhotonics had invented and developed the Cryo-VCSEL invention, not Milton Feng.

1977. Defendant Gerhold was then forced to correct the article after Milton Feng admitted in response that it was sdPhotonics and the Plaintiff who had invented and developed the Cryo-VCSEL invention.

1978. Defendant Gerhold violated Fl. St. §812.081(2), which makes it unlawful for a person "to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently: (a) Deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) Appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

1979. Defendant Gerhold violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when agreed, conspired, engaged and endeavored with the military's state actor Milton Feng to shift control and invention ownership of the Cryo-VCSEL prototypes to Milton Feng while Gerhold also knew that UCF

had filed false declarations on the patents owned by the Plaintiff's company, sdPhotonics, so that UCF and the military could take over the Plaintiff's company and its technologies without due process.

1980. The Plaintiff was damaged by Defendant Gerhold's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 26: Defendant Kevin Keeling.**

1981. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 1550-1552 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

1982. The Plaintiff hired Defendant Keeling along with Mark Solomon, in or about January, 2021, at the recommendation of Robin Foret, and after Keeling and Solomon confirmed that their review of the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

1983. Defendant Keeling assisted the Plaintiff to dismiss the Florida Whistleblower proceeding, by reviewing the dismissal orders that were prepared by Joe Southron and providing legal explanations as to why what Southron had prepared could be damaging to the Plaintiff.

1984. Defendant Keeling then reviewed the dismissal order prepared by Southron that was in fact filed to dismiss the case without prejudice, and confirmed that this dismissal order prepared by Southron was proper.

1985. However, following the dismissal of the Florida Whistleblower lawsuit, Kevin Keeling refused to take the actions he had promised, and refused to take any action to correct past USPTO declarations.

1986. Instead, Defendant Keeling relied on the power of attorney that had been given to his partner, Mark Solomon, and claimed that Solomon had a doctorate and knew what he was doing, as Keeling and Solomon allowed us attorneys to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company.

1987. Once Solomon had obtained a power of attorney needed to correct the evidence of perjury by Sovinski in the proceedings of the USPTO, Defendant Keeling refused to take action related to the evidence of perjury in the USPTO proceeding. Instead, Keeling allowed other attorneys working with Sovinski to file the false ownership declarations onto new patent applications that were filed by the Plaintiff or his company.

1988. Keeling finally admitted with Solomon that he was doing so because he had knowledge that the judges of the courts had been corrupted by the military.

1989. Defendant Keeling violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he admitted he had agreed to intentionaly allow attorneys working with UCF to continue to file false USPTO declarations on

the patent applications filed by the Plaintiff's company, and agreed, conspired, confederated, and engaged with the military's state actor Sandra Sovinski at UCF, to allow the filing of additional false declarations into the USPTO that Keeling had been hired to protect, and instead let the attorneys working Sovinski and UCF file the false USPTO declarations, breaching the 2014 IP Agreement and engaging in perjury, so that UCF and the military could take over the Plaintiff's company and its technologies without due process.

1990. The Plaintiff was damaged by Defendant Keeling's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 27: Defendant Solomon.**

1991. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 1550-1552 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

1992. Plaintiff hired Defendant Solomon and his associate or partner, Kevin Keeling, in or about January, 2021, at the recommendation of Robin Foret.

1993. Defendant Solomon confirmed in his review of records from the Florida Whistleblower lawsuit, that the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

1994. Defendant Solomon informed the Plaintiff that Solomon could assist the Plaintiff with legal works to correct the false declarations at issue that had been filed by Sandra Sovinski into the USPTO.

1995. However, after obtaining a power of attorney from the Plaintiff, Solomon refused to take actions to correct the false declarations that Solomon had already determined constituted fraud and perjury in the USPTO.

1996. Defendant Solomon claimed instead that since Solomon had a doctorate, he knew what he was doing, and the Plaintiff should not question Defedant Solomon about not making corrections to the false declarations at issue, as Solomon had promised before obtaining the power of attorney.

1997. Instead of correcting the false declarations that had been filed by Sovinski into the USPTO, Defendant Solomon used his power of attorney to allow other attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company.

1998. Once Solomon had obtained a power of attorney needed to correct the evidence of perjury by Sovinski in the proceedings of the USPTO, Defendant Solomon refused to take action related to the evidence of perjury in the USPTO proceeding. Instead, Solomon allowed other attorneys working with Sovinski to file the false ownership declarations onto new patent applications that were filed by the Plaintiff or his company. Solomon finally admitted with Keeling that he was doing so because he had knowledge that the judges of the courts had been corrupted by the military.

1999. Defendant Solomon violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he admitted he had agreed to intentionally use the power of attorney he possessed from the Plaintiff and sdPhotonics, to allow attorneys working with UCF to continue to file false USPTO declarations on the patent applications filed by the Plaintiff's company, and agreed, conspired, confederated, and engaged with the military's state actor Sandra Sovinski at UCF, to allow the filing of additional false declarations into the USPTO that Solomon had been hired to protect, and instead let the attorneys working Sovinski and UCF file the false USPTO declarations, breaching the 2014 IP Agreement and engaging in perjury, so that UCF and the military could take over the Plaintiff's company and its technologies without due process.

2000. The Plaintiff was damaged by Defendant Solomon's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 28: Defendant Jeffrey Shainline.**

2001. Plaintiff realleges and incorporates paragraphs 546-561, 1550-1552 and Exhibit 20 of this Complaint as though fully set forth herein.

2002. Defendant Shainline repeatedly contacted the Plaintiff and informed him that his organization, NIST, wished to work with sdPhotonics on the large government project NIST was targeted to oversee which at that point was known

as "Build Back Better" under the Biden Administration, and later became "Chips + Science."

2003. Shainline had numerous phone calls in or about April, 2021, to learn details of how sdPhotonics oxide-free VCSEL invention could be integrated onto silicon platforms and why certain approaches that had been tried such as by Bowers at UCSB had been failures.

2004. After numerous phone calls in which the Plaintiff explained the technical issues to Shainline and what needed to be implemented for successful integration, the Plaintiff asked Shainline for more details on the proposal so that sdPhotonics could begin making plans to provide the proposal to Shainline.

2005. Instead, Shainline informed the Plaintiff that Shainline and NIST intended to use the Cryo-VCSEL prototypes that Feng had refused to return to sdPhotonics as part of IARPA Supercables.

2006. Defendant Shainline violated Fl. St. §812.081(2)(a) and/or (b), when he sought to obtain and use the Cryo-VCSEL prototypes of sdPhotonics from the IARPA Supercables project that Milton Feng had refused to return. Fl. St. § Fl. St. §812.081(2) which states in relevant part that it is (a) "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2007. Defendant Shainline taunted and harassed the Plaintiff, informing the Plaintiff that Shainline did not believe money was important to the Plaintiff or his company, and repeating flawed studies that Feng had claimed he would do at the University of Illinois.

2008. Defendant Shainline did not contact the Plaintiff again after Shainline confirmed to the Plaintiff that Shainline had obtained control of the sdPhotonics' Cryo-VCSEL prototypes that were being tested by Feng at the University of Illinois, and intended to use the Cryo-VCSEL prototype in his own projects to obtain additional funding and develop.

2009. Defendant Shainline violated the 5th Amendment of the U.S. Constitution pursuant to §1983, tried to use taunts and harass the Plaintiff, and while doing so Shainline admitted he had made an agreement, had conspired, and engaged with the military's state actor Milton Feng, to obtain access to the Plaintiff's Cryo-VCSEL inventions, and informed the Plaintiff how Shainline intended to use those prototypes. Shainline admitted he intended to use the Cryo-VCSEL prototypes to obtain further funding and engage in commercialization efforts on the technology owned by the Plaintiff's company, and would do so without due process.

2010. The Plaintiff was damaged by Defendant Shainline's actions, and was forced to cease the business operations of his company, sdPhotonics. Defendant Shainline's actions were intentional and malicious, and the Plaintiff is entitled to punitive damages due to Shainline's unlawful actions.

**Count 29: Defendant Sabine O'Neal.**

2011. Plaintiff realleges and incorporates paragraphs 94-116, 161-167, 172-174, 588-594, 630-641, 1550 of this Complaint as though fully set forth herein.

2012. Defendant O'Neal was employed by sdPhotonics as its president from about 2008 until or about December, 2015.

2013. Defendant O'Neal's employment responsibilities with sdPhotonics were to serve as principal investigator and she oversaw the company's financial records and tax filings.

2014. Defendant O'Neal's employment responsibilities with sdPhotonics had included writing and filing proposals to obtain research contracts, serving as principal investigator on those contracts, and overseeing the company's financial records and tax filings with a tax accountant.

2015. In or about 2012, sdPhotonics needed to close out an SBIR Phase II contract with the military, and the military sent an auditor to visit the company and audit the accounting records for direct costs expenditures made on the contract and indirect costs expended on the contract, comprising overhead.

2016. O'Neal worked with the military auditor for about five (5) hours alone in O'Neal's office.

2017. Following the meeting with the auditor, O'Neal claimed the military audit of the company's direct and indirect cost expenditures were nearly perfect, and had only one small accounting error of a few dollars.

2018. Defendant O'Neal then generated accounting records that falsely represented the contract had been properly closed out.

2019. Sometime after the audit, in or about 2013, sdPhotonics lost a contract that had been awarded because the awarding agency could not verify the company's overhead numbers from prior audits.

2020. Because of this, the Plaintiff then requested the overhead information and accounting records from Defendant O'Neal.

2021. When the Plaintiff asked Defendant O'Neal for the accounting records of the direct and indirect company costs, O'Neal claimed she had no understanding of the overhead accounting or indirect costs, and could not provide the records.

2022. The Plaintiff had no experience in maintaining financial records at that time, and in or about 2014 the Plaintiff hired a separate accountant to oversee the sdPhotonics financial accounts.

2023. Defendant O'Neal insisted on working with that accountant.

2024. After sdPhotonics had the false ownership declarations filed onto its oxide-free VCSEL patents, and the Plaintiff targeted in extortion, stalking, assaults, and batteries, and its prototypes misappropriated by the military and university employees, the Plaintiff was forced to cease business operations for the company.

2025. In or about September, 2021, the Plaintiff began work with military auditors to audit the company's financial records and close out the company's remaining contracts.

2026. By or about April, 2022, the military auditors admitted that the military had engaged in fraud with O'Neal when it was discovered that O'Neal had set the company up on the incorrect accounting system not allowed for government contracts.

2027. By or about June, 2021, the auditors that O'Neal had not provided overhead or indirect costs in the audit in or about 2012, and yet the auditor at that time claimed to have reviewed and approved the overhead expenditures.

2028. This also explained why O'Neal had refused to provide any accounting information to the Plaintiff in 2013 and 2014, and instead resigned from the company at the end of December, 2014.

2029. Furthermore, the military auditors admitted to knowing prior to issuing the contracts that O'Neal had set up the accounting system with an improper accounting method not allowed by the military in tax filing.

2030. As the Plaintiff discovered in or about June, 2022, and the auditors confirmed, O'Neal had set up the company's accounting with an incorrect accounting system that could be used to damage the company's contracts and tax filings, and sabotage the company's business operations at some time in the future because of the incorrect filings.

2031. Defendant O'Neal then engaged in accounting fraud with the military auditor in or about 2012, to cover up the earlier fraud and improper tax filings, this fraud was discovered in or about June, 2022 by the Plaintiff with the military auditors.

2032. Defendant O'Neal violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she acted under color of law and engaged in fraud and constructive fraud with military auditors, in or about 2013, which was discovered in or about June, 2022, and prior to that in setting up an improper accounting scheme, so that military and UCF could use the accounting errors to damage the Plaintiff's company, and take over the company without due process.

2033. Defendant O'Neal's actions were intentional, repeated, and malicious, and the Plaintiff had to cease business operations of his company, and is entitled to punitive damages.

**<u>Count 30: Defendant Linda Coco.</u>**

2034. Plaintiff realleges and incorporates paragraphs 114-137, 586-596, 630-641, 1550-1552 of this Complaint as though fully set forth herein.

2035. Defendant Coco was a law professor living in Orlando, FL and began dating the Plaintiff in or about 2015.

2036. Defendant Coco sought to become involved in the Plaintiff's company expressing an interest in learning how start-ups and military contracting worked.

2037. Defendant Coco consulted for the Plaintiff and his company, assisting in hiring and setting up financial accounts.

2038. In or about 2016, Defendant Coco then began making threats against the Plaintiff and his company for reasons she was unable to explain. Coco made threats that she would report the Plaintiff's company to the IRS, but did not say why.

2039. Defendant Coco then made threats with Angela Ghallagher that she and Angela Gallagher, the wife of the former UCF dean Neal Gallagher, would stalk and cyber-stalk the Plaintiff "for the rest of his life," and the Plaintiff was stalked and cyber-stalked.

2040. Defendant Coco then made false complaints to UCF administrators, claiming that the Plaintiff's company had withheld W-2's from employees, which even the UCF administrators admitted had been a false claim by Coco.

2041. In or about Spring, 2022, during reviews of financial records with military auditors, Defendant Coco was found to have placed errors in the sdPhotonics' retirement accounts of its employees and former employees, and that affected the company's IRS tax filings, and that the company was forced to correct.

2042. The errors sent retirement checks into incorrect accounts, and some checks to no accounts at all, consistent with Defendant Coco's threats that she had taken actions to damage the Plaintiff's company through errors she placed in the company's financial records and tax filings with the IRS.

2043. Defendant Coco violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she agreed, conspired, and engaged with the military's state actors at UCF, working at least with Chritina Serra in false reporting against the Plaintiff's company that even Serra was forced to admit that Serra had lied about, and Serra admitting that Coco had tried to damage the Plaintiff's company, and placing fraud in the sdPhotonics retirement accounts that was discovered in

or about March, 2022, so that the military and UCF could take over the company and its technology without due process.

2044. Defendant Coco's actions were intentional, repeated, and malicious, and the Plaintiff had to cease business operations of his company, and is entitled to punitive damages.

**Count 31: Defendant Angela Gallagher.**

2045. Plaintiff realleges and incorporates paragraphs 114-118, 132-137, 630-641, 1550-1552 of this Complaint as though fully set forth herein.

2046. Defendant Gallagher is the wife of the former UCF dean, Neal Gallagher, who was in a personal relationship with Linda Coco when Coco began making threats against the Plaintiff and his company, in or about 2016.

2047. Defendant Gallagher worked with Linda Coco in an attempt to use Coco's own IRS records from sdPhotonics pursuant to her 1099 document.

2048. Defendant Gallagher informed the Plaintiff that she would give Coco's 1099 form to Coco, after Coco had made threats that she would take some type of action with the IRS against the Plaintiff's company, at the same time she told the Plaintiff she would take legal action if the Plaintiff tried to contact her in any way.

2049. The Plaintiff then gave Gallagher a copy of Coco's 1099 document in a sealed envelope to give to Linda Coco.

2050. However, Coco use the information that the Plaintiff had given Gallagher the 1099 form to give to Coco to make additional threats against the

Plaintiff and his company because he had given the 1099 form to Gallagher, at the same time Coco had threatened legal action if the Plaintiff tried to contact her.

2051. After the incident with Gallagher involving Coco's 1099 IRS document, Gallagher made threats with Coco that they would both stalk and cyber-stalk the Plaintiff for the rest of his life.

2052. Defendant Gallagher continued to cyber-stalk the Plaintiff as he was being stalked, sometimes sending suggestive text messages with photos, sometimes including Sabine O'Neal.

2053. Defendant Gallagher violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she agreed, conspired, and engaged with Linda Coco who further engaged with state actors at UCF, and Gallagher setting up IRS tax issues involving Linda Coco's 1099 form, which Coco worked at least with Chritina Serra at UCF in false reporting against the Plaintiff's company that even Serra was forced to admit that Serra had lied about, and Serra admitting that Coco had tried to damage the Plaintiff's company, so that the military could take over the company with its state actors at UCF, without due process.

2054. Defendant Gallagher's actions were intentional, repeated, and malicious, and the Plaintiff had to cease business operations of his company, and is entitled to punitive damages.

**<u>Count 32: Defendant Youndy Cook.</u>**

2055. Plaintiff realleges and incorporates paragraphs 188-189, 236-275, 278-280, 289, 292, 305-329, 383-385, 600-601, 630-641, 1550 and Exhibits 3-10, 16, of this Complaint as though fully set forth herein.

2056. Defendant Cook was contacted by the Plaintiff in or about October, 2019, and provided information that Sandra Sovinski had filed false declarations into the USPTO on the Plaintiff's oxide-free VCSEL inventions, and had violated the 2014 IP Agreement and UCF-2.029.

2057. Defendant Cook and Sandra Sovinski refused to correct the declaration in the USPTO.

2058. From early January, 2020 into May, 2020 during the Florida Whistleblower proceedings, Defendant Cook worked with Sandra Sovinski and Alen Hsu who sent the Plaintiff numerous drafts of an agreement that claimed UCF needed military approval to correct the false declarations Sovinski had filed into the USPTO.

2059. The drafts of the agreement included markups identified in the drafts as made by Defendant Cook, Sovinski, or Hsu.

2060. However the military had already secured government rights in the invention, and UCF had no involvement in the sdPhotonics' government contract that involved development of the oxide-free VCSEL invention under Lateka Eifert.

2061. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs

placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

2062. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings could be proven false by prior USPTO filings that were part of the applications.

2063. The declarations filed by Sovinski into the USPTO constituted perjury, in violation of both Florida statutes and federal criminal codes against perjury.

2064. After Sovinski filed the altered declarations into the USPTO in April, 2020, and again violated UCF-2.029, the Plaintiff was again presented the agreement prepared by Cook, Sovinski, and Hsu, that the Plaintiff had rejected.

2065. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that Svetlana Shtrom had contacted a separate Army office than the office that issued the government contracts to sdPhotonics monitored by Lateka Eifert, claiming that UCF had been owed a subcontract on one of the sdPhotonics' Army contracts because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics.

2066. In or about late May, 2020, Alen Hsu sent the Plaintiff the agreement that had been prepared by Cook, Sovinski, and Hsu, that falsely claimed UCF required approval from the Army office that was unrelated to the Lateka Eifert or the contracts or her military office who had issued and monitored the contracts to the Plaintiff's company.

2067. In or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her the emails by UCF to the separate Army office that claimed Eifert should have issued UCF a subcontract because O'Neal had been employed part time with UCF when the contract was issued.

2068. Eifert then informed the Plaintiff that she would need to discuss the matter with her supervisors. Eifert contacted the Plaintiff about a week later an informed him that UCF had engaged in fraud in other military contracts from her office, that Eifert's military supervisors were tired of UCF engaging in fraud on their contracts. Eifert then gave the Plaintiff instructions on reporting the fraud by the UCF employees to the SBA IG, Hannibal Ware.

2069. In or about October, 2021, the Plaintiff again contacted Defendant Cook by email about the false declarations in the USPTO filed by Sovinski and others working with UCF, after military auditors confirmed that sdPhotonics was paying patent costs on the patents at issue, and that Sovinski had breached the 2014 IP Agreement.

2070. The Plaintiff included the military auditors on the email to Cook who had verified the patent payments from sdPhotonics to UCF.

2071. Defendant Cook did not respond to the Plaintiff's contact and information in October, 2021 showing Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement.

2072. By the end of December, 2022, the Plaintiff was being electronically and physically stalked, assaulted, and battered so heavily by the DOJ and military, he was forced to leave the U.S. for his physical safety.

2073. Defendant Cook violated the 5th Amendment of the U.S. Constitution pursuant to §1983, as one of the military's state actors. Cook took her actions with the military intentionally and maliciously, preparing multiple fraudulent settlement agreements with the military, that were then followed by extortion trying to cover up the perjury in the USPTO by UCF's Sovinski, so that UCF and the military could take-over the Plaintiff's company without due process.

2074. The Plaintiff damaged in his person and property by Defendant Cook's actions, and was forced to cease business operations of his company and suffered additional damages. The Plaintiff is entitled to punitive damages because of Cook's intentional and malicious acts to damage the Plaintiff and his company.

**<u>Count 33: Defendant Bahaa Saleh.</u>**

2075. Plaintiff realleges and incorporates paragraphs 106-109, 151-161, 166-183, 630-641, 1550 of this Complaint of this Complaint as though fully set forth herein.

2076. Defendant Saleh oversaw the UCF Photonics Incubator that was part of the larger UCF High Technology Incubator system that has multiple site locations.

2077. Defendant Saleh also supervised Sabine O'Neal after she had become a full-time employee of UCF, and met with her monthly to learn about her consulting work with sdPhotonics.

2078. In or about April, 2018, Sabine O'Neal learned from the Plaintiff that he intended to move his company sdPhotonics from the UCF Photonics Incubator, and that it would take approximately 24 months to arrange and complete the move.

2079. In or about September, 2018, after Sabine O'Neal learned the Plaintiff planned to move the Defendant Saleh took action against the Plaintiff's company, demanding the company be moved immediately.

2080. sdPhotonics had just signed a new one-year lease with the head of the UCF Technology Incubator in August, 2018, that had gone through the necessary levels of approval.

2081. Defendant Saleh knew the move would damage the sdPhotonics' business operations by preventing it from work on the company's research and development contracts.

2082. Because sdPhotonics had already signed a one-year lease, Defendant Saleh instead refused to sign the necessary paperwork to allow the Plaintiff to continue to be employed by both UCF and sdPhotonics to force the immediate move of the Plaintiff's company.

2083. The director of the UCF High Technology Incubator then stepped in and in October, 2021, obtain an 18-month time period for the Plaintiff to exit his

company from the incubator, to give time to find alternative facilities to house the company's crystal growth, and not damage the company's contracts.

2084. However, Sandra Sovinski continued the actions that Bahaa Saleh had started, and tried to force the eviction of the Plaintiff's company to damage its business operations, and followed this by filing false declarations in the USPTO involving inventions she and Saleh knew the Plaintiff had under development with his company.

2085. Defendant Saleh violated the 5th Amendment of the U.S. Constitution pursuant to §1983, Saleh tried to damage the business operations of the Plaintiff's company sdPhotonics, to take over its technology by forcing the company to cease operations due to improper lease eviction, and acted in concert with Sovinski to complete the lease eviction, to acquire or maintain control of the Plaintiff's company, without due process.

2086. The Plaintiff was damaged by Saleh's actions that were intentional and malicious, and had to cease operations of his company, and is entitled to punitive damages.

**Count 34: Defendant Elizabeth Klonoff.**

2087. Plaintiff realleges and incorporates paragraphs 110-111, 162-166, 188-189, 192, 236-276, 630-641, 1550, and Exhibit 6 of this Complaint of this Complaint as though fully set forth herein.

2088. Defendant Klonoff repeatedly sought to obtain direct access to intellectual property being developed by the Plaintiff's company through Sabine O'Neal.

2089. Defendant Klonoff used Sabine O'Neal who consulted for sdPhotonics to request proposals from the Plaintiff's company on how they would solve certain technology problems using sdPhotonics inventions, with claims the contracts would be in the range of $250,000 ~ $350,000 to perform the initial work.

2090. Despite multiple such requests, Klonoff always worked through O'Neal as opposed to the Plaintiff directly.

2091. The email records from Karen Kline's contact to Sandra Sovinski show that Defendant Klonoff then participated in the plan with Sovinski to file false ownership declarations in violation of UCF Regulations UCF-2.029(4)(d) into the USPTO.

2092. In or about the end of December, 2018, Sandra Sovinski made the plan with Defendant Klonoff, Youndy Cook, Svetlana Shtrom, and John Miner that became the false declarations and breaches of the 2014 IP Agreement and UCF-2.029 that Klonoff oversees, that Sandra Sovinski filed into the USPTO creating the dispositive evidence of perjury.

2093. The declarations filed by Sovinski into the USPTO attaches a 2014 IP Agreement that is pursuant to UCF-2.029, and that Klonoff is required to follow.

2094. The declarations filed by Sovinski make statements about the patent filings and inventor rights to inventions that contradict the 2014 IP Agreement.

2095. Defendant Klonoff knew that Sovinski claims in her USPTO declaration that the Plaintiff exchanged his employment rights to give UCF unrestricted rights to his inventions were false, and that the 2014 IP Agreement states the terms of those rights are pursuant to UCF Regulations UCF-2.029.

2096. Klonoff knew at the time Sovinski filed the declarations into the USPTO, that the plan she participated in with Sovinski that UCF was required to follow UCF-2.029, and that Deppe's employment rights were in fact contained in UCF-2.029 that Sovinski and Shtrom were violating with their retroactive USPTO declarations.

2097. Defendant Klonoff violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she agreed, conspired, and engaged in the perjury in the USPTO with Sovinski, violating state and federal laws, to take over the Plaintiff's company sdPhotonics, to damage and take over the Plaintiff's company without due process.

2098. Defendant Klonoff took her actions maliciously, intentionally damaging the Plaintiff's company, which had to cease business operations, and the Plaintiff is entitled to punitive damages.

**<u>Count 35: Defendant Rashid Bashir.</u>**

2099. Plaintiff realleges and incorporates paragraphs 575-580, 1550 of this Complaint of this Complaint as though fully set forth herein.

2100. Defendant Bashir and the Plaintiff discussed the Plaintiff's research in meetings prior to the issuance of the IARPA Supercables project to sdPhotonics.

2101. Defendant Bashir was interested in learning about the Plaintiff's research into quantum dot light sources for quantum computing, and led into a strange discussion about the government funding the University of Illinois may obtain for the quantum dot light sources the Plaintiff was researching.

2102. The IARPA Supercables project was issued to sdPhotonics in or about June, 2019, and a subcontract issued from sdPhotonics to Bashir's College of Engineering to perform high-speed testing on the sdPhotonics Cryo-VCSEL, using a transceiver design and laser design for the Cryo-VCSEL the Plaintiff had developed for operation at cryogenic temperatures down to zero kelvin.

2103. The Plaintiff was to develop a quantum mechanical current-voltage model on the Supercables project using the same Cryo-VCSEL prototypes tested by Feng at Illinois.

2104. However, after Feng tested the sdPhotonics' Cryo-VCSEL prototypes and confirmed the Plaintiff's design and record speed levels, Feng refused to return the Cryo-VCSEL prototypes to sdPhotonics so the company could complete it work.

2105. Instead, Defendant Bashir oversaw graduate students from the Univ. of Illinois publish a press release in or about July, 2022, that claimed Feng and his students had developed the Cryo-VCSEL laser in the University of Illinois laboratory.

2106. In or about November, 2021, after the IARPA Supercables program had ended, and Feng and IARPA had been instructed by the Plaintiff to cease work

on the sdPhotonics' Cryo-VCSEL invention and return the prototypes, the Plaintiff contacted Bashir, Feng, and Martinis by email, and requested the return of the Cryo-VCSEL prototypes.

2107. The Plaintiff explained to Bashir, Martinis and Feng that explained that sdPhotonics' own research and testing on its prototypes on the IARPA Supercables project had been disrupted by the refusal to return the Cryo-VCSEL, and requested that Defendant Bashir return the sdPhotonics Cryo-VCSEL prototype.

2108. Instead of Defendant Bashir returning the prototype, the Plaintiff received an email from Susan Martinis office that included Milton Feng, John Dallesassee, and Fred Kish, and that claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

2109. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

2110. Defendant Bashir, Susan Martinis, and Milton Feng then produced scientific articles and Illinois press releases with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

2111. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from William Harrod at IARPA for the University of Illinois using the sdPhotonics' Cryo-VCSEL that Bashir, Martinis, and Feng refused to return.

2112. Defendant Bashir violated Fl. St. §812.081(2)(a) (b) when he refused to return the Cryo-VCSEL prototypes to the Plaintiff's company, sdPhotonics, and instead used the trade secrets in the prototypes to obtain additional contracts for his university and to benefit from additional funding he would bring in to his college from the military.

2113. Fl. St. §812.081(2)(a), (b), states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2114. Defendant Bashir is a military state actor who violated the 5th Amendment of the U.S. Constitution pursuant to §1983, and knew his actions with Milton Feng were taken without due process, and would damage the Plaintiff's company sdPhotonics, by misappropriating the Cryo-VCSEL prototypes, and yet took his actions as a state actor anyway, refusing to return the sdPhotonics prototypes so sdPhotonics could complete its own research, and took the sdPhotonics Cryo-VCSEL prototypes without due process.

2115. Defendant Bashir took his actions maliciously, intentionally damaging the Plaintiff's company, which had to cease business operations, and the Plaintiff is entitled to punitive damages.

**Count 36: Defendant Susan Martinis.**

2116. Plaintiff realleges and incorporates paragraphs 575-580, 1550 of this Complaint of this Complaint as though fully set forth herein.

2117. The IARPA Supercables project was issued to sdPhotonics in or about June, 2019, and a subcontract issued from sdPhotonics to Bashir's College of Engineering to perform high-speed testing on the sdPhotonics Cryo-VCSEL, using a transceiver design and laser design for the Cryo-VCSEL the Plaintiff had developed for operation at cryogenic temperatures down to zero kelvin.

2118. In or about November, 2021, after the IARPA Supercables program had ended, Feng and IARPA had been instructed by the Plaintiff to cease work on the sdPhotonics' Cryo-VCSEL invention and return the prototypes.

2119. When Feng refused, the Plaintiff contacted Defendant Martinis by email, and requested the return of the Cryo-VCSEL prototypes.

2120. The Plaintiff explained to Defendant Martinis that sdPhotonics' own research and testing on its prototypes on the IARPA Supercables project had been disrupted by the refusal to return the Cryo-VCSEL, and requested that Defendant Martinis return the sdPhotonics Cryo-VCSEL prototype.

2121. Instead of Defendant Martinis returning the Cryo-VCSEL prototype, the Plaintiff received an email from Susan Martinis office that included Milton Feng, John Dallesassee, and Fred Kish, and that claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

2122. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

2123. Defendant Bashir, Susan Martinis, and Milton Feng then produced scientific articles and Illinois press releases with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

2124. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from Harrod based on the device for the University of Illinois using the sdPhotonics' Cryo-VCSEL that Bashir, Martinis, and Feng refused to return.

2125. Defendant Martinis is a military state actor who violated Fl. St. §812.081(2)(a), (b), which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2126. Defendant Martinis violated Fl. St. §812.081(2)(a) (b) when she refused to return the Cryo-VCSEL prototypes to sdPhotonics, claimed they were somehow invented by Nick Holonyak, and instead used them to obtain additional contracts for her university and to advance her career.

2127. Fl. St. §812.081(2) states in relevant part in (a) that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2128. Defendant Martinis is a military state actor who violated the 5th Amendment of the U.S. Constitution pursuant to §1983, and took her actions knowing they would damage the Plaintiff's company sdPhotonics, by misappropriating the Cryo-VCSEL prototypes, and yet took her actions as the military's state actor anyway, refusing to return the sdPhotonics prototypes so sdPhotonics could complete its own research, and took the sdPhotonics Cryo-VCSEL prototypes without due process.

2129. Defendant Martinis took her actions maliciously, intentionally damaging the Plaintiff's company, which had to cease business operations, and the Plaintiff is entitled to punitive damages.

**Count 37: Defendant John Dallesassee.**

2130. Plaintiff realleges and incorporates paragraphs 575-580, 1550 of this Complaint of this Complaint as though fully set forth herein.

2131. Defendant John Dallesassee is a professor at the University of Illinois and former graduate student of Nick Holonyak.

2132. The IARPA Supercables project was issued to sdPhotonics in or about June, 2019, and a subcontract issued from sdPhotonics to the College of Engineering at the University of Illinois to perform high-speed testing on the sdPhotonics Cryo-VCSEL, using a transceiver design and laser design for the Cryo-VCSEL the Plaintiff had developed for operation at cryogenic temperatures down to zero kelvin.

2133. In or about November, 2021, after the IARPA Supercables program had ended, Feng and IARPA's William Harrod had been instructed by the Plaintiff to cease work on the sdPhotonics' Cryo-VCSEL invention and return the prototypes.

2134. When Feng continued to refuse to return the prototypes, the Plaintiff contacted Defendant Martinis by email, and requested the return of the Cryo-VCSEL prototypes.

2135. The Plaintiff explained to Defendant Martinis that sdPhotonics' own research and testing on its prototypes on the IARPA Supercables project had been disrupted by the refusal to return the Cryo-VCSEL, and requested that Defendant Martinis return the sdPhotonics Cryo-VCSEL prototype.

2136. Instead, Defendant Dallesassee joined Susan Martinis. Milton Feng, and Fred Kish, and claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

2137. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

2138. Defendant Bashir, Susan Martinis, and Milton Feng then produced scientific articles and Illinois press releases with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

2139. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from Harrod based on the device for the University of Illinois using the sdPhotonics' Cryo-VCSEL that Bashir, Martinis, and Feng refused to return.

2140. Defendant Dallesassee is a military state actor who violated Fl. St. §812.081(2)(a), (b), which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2141. Defendant Dallesassee violated the 5th Amendment of the U.S. Constitution pursuant to §1983, knew his actions with Milton Feng were without due process, and would damage the Plaintiff's company sdPhotonics, by misappropriating the Cryo-VCSEL prototypes, and yet took his actions as a state actor anyway, using a false claim that hit had been invented by Nick Holonyak, and refusing to return the sdPhotonics laser prototypes so sdPhotonics could complete

its own research, and took the sdPhotonics Cryo-VCSEL prototypes without due process.

2142. Defendant Dallessasse took his actions maliciously, intentionally damaging the Plaintiff's company, which had to cease business operations, and the Plaintiff is entitled to punitive damages.

**Count 38: Defendant Melinda Miguel.**

2143. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 630-641, 1550, and Exhibits 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

2144. The Plaintiff contacted Defendant Miguel in or about November, 2022, and provided information and records that employees working with UCF had engaged in perjury in the USPTO, and stalking, assaults, and batteries were being used against the Plaintiff in retaliation for his prior reporting through the Florida Whistleblower Act, and that the retaliation from coming from the UCF office of Robert Taft and Tina Maier.

2145. Despite that Defendant Miguel is prohibited by the Florida Whistleblower Act in Fl. St. §112.3187(4)(b) from taking any adverse action against the Plaintiff, Miguel sent the Plaintiff a letter not long after that she was sending the information he had provided to her to Robert Taft at UCF, cc'd Robert Taft at UCF.

2146. Miguel claimed she was sending Robert Taft at UCF the information and records the Plaintiff provided her pursuant to the Florida Whistleblower's Act.

2147. The information and records that contained evidence the UCF employee Sandra Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement, and that the office of Taft and Maier had engaged in retaliation in violation of the Florida Whistleblower's Act.

2148. Defendant Miguel sent the information to Robert Taft and Tina Maier at UCF, despite they had been implicated in retaliation in violation of the Florida Whistleblower's Act by the BCLP investigative report she had received from the prior Florida governor's office.

2149. After Miguel sent the letter to the Plaintiff, he became stalked, assaulted, and battered so heavily that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

2150. Defendant Miguel admitted in her letter she knew that UCF employees were engaged in crimes of perjury in the USPTO, extortion, stalking, assaults, and batteries, tax fraud, identity theft, and more, and yet placed false information in her letter that none of these were under her jurisdiction. Miguel then directly violated the Florida Whistleblower's Act she oversees, sent the information about Taft and Maier at UCF to Taft and Maier, knowing the Plaintiff was being stalked as she took her actions.

2151. Defendant Miguel violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she took her actions in violation of the Fl. St. §112.3187(4)(b), falsifying her job obligations in her letter, and continued the

UCF and military effort to take over and control the Plaintiff's company through crimes including perjury in the USPTO and other crimes without due process.

2152. Defendant Miguel took her actions maliciously and intentionally, and the Plaintiff was forced to cease the business operations of his company and loss of its value, and the Plaintiff is entitled to punitive damages.

**Count 39: Defendant Tina Maier.**

2153. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 630-641, 1550, and Exhibits 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

2154. Defendant Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that involved the UCF employees Taft and Maier, back to Taft and Maier who were implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

2155. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

2156. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, and/or the military, did not constitute malfeasance or misfeasance.

2157. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

2158. Defendant Maier admitted in her letter she knew that UCF employees were engaged in crimes of perjury in the USPTO, extortion, stalking, assaults, and batteries, tax fraud, identity theft, and more, and yet placed false information in her letter claiming none of these rose to the level of malfeasance or misfeasance.

2159. Defendant Maier violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when she took her actions in violation of the Fl. St. §112.3187(4)(b), falsifying in her letter of her findings that perjury in the USPTO and other crimes were not malfeasance, as she knew the Plaintiff was being stalked, and continued the UCF and military effort to take over the Plaintiff's company, using perjury in the USPTO and other crimes, without due process.

2160. Defendant Maier took her actions maliciously and intentionally, and the Plaintiff was forced to cease the business operations of his company and loss of its value, and the Plaintiff is entitled to punitive damages.

**Count 40: Defendant Taft.**

2161. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 630-641, 1550, and Exhibits 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

2162. Defendant Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that involved the UCF employees Taft and Maier, back to Taft who had been implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

2163. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that cc'd Defendant Taft and falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

2164. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, did not constitute malfeasance or misfeasance.

2165. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

2166. Defendant Maier violated Fl. St. §914.22(1)(a), when she used a trick that claimed the Florida Whistleblower Act did not consider perjury in the USPTO by a UCF employee malfeasance, or the stalking assaults and batteries malfeasance or misfeasance, and used the Florida Whistleblower Act, Fl. St. §112.3187 as a cover for the letter and to send to the Plaintiff and cc to Defendant Taft, in attempts by

Miguel, Taft, and Maier to cover up the evidence of perjury in the USPTO by the UCF employee Sandra Sovinski.

2167. Defendant Taft received the letters from his investigator Tina Maier in which she admitted in her letter she knew that UCF employees were engaged in crimes of perjury in the USPTO, extortion, stalking, assaults, and batteries, tax fraud, identity theft, and more, and yet placed false information in her letter claiming none of these rose to the level of malfeasance or misfeasance.

2168. Defendant Taft's actions were unlawful and violated the Fl. St. §112.3187(4)(b), without due process, falsifying that perjury in the USPTO and other crimes were not malfeasance, as Taft had been informed by Miguel that the Plaintiff was being stalked, and continued the UCF and military effort to take over the Plaintiff's company, using perjury in the USPTO and other crimes, without due process.

2169. Defendant Taft violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he took his actions maliciously and intentionally, without due process and in violation of Fl. St. §113.3187(4)(b), to intentionally damage and control the Plaintiff's company, so that the military and UCF could acquire and/or take control of the company without due process.

2170. The Plaintiff was injured in person and property, and forced to cease the business operations of his company and loss of its value, and the Plaintiff is entitled to punitive damages.

**Count 41: Defendant William Harrod.**

2171. Plaintiff realleges and incorporates paragraphs 335-336, 566-575, 579-580, 1550-1552, and Exhibits 1, 2 of this Complaint as though fully set forth herein.

2172. Defendant Harrod was the IARPA program monitor who oversaw the IARPA Supercables project issued to sdPhotonics that began in or about June, 2019, and in which sdPhotonics issued a subcontract to the University of Illinois under Miltron.

2173. Defendant Feng's laboratory at the University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project to fabricate and test prototypes of its new laser invention, the Cryo-VCSEL, using sdPhotonics' proprietary epitaxial material.

2174. Feng's laboratory received the proprietary epitaxial material from sdPhotonics for the sdPhotonics' prototypes, based on the 4 K design that had been developed by the Plaintiff.

2175. Feng used his standard fabrication process for high speed VCSELs to fabricate prototypes of the sdPhotonics epitaxial structure that could be tested at high speed, and then return the sdPhotonics' prototypes to sdPhotonics so it could perform its own electrical testing on the same prototype devices, and development of a quantum mechanical current-voltage model that could be used for optimization of future sdPhotonics designs.

2176. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds.

2177. Feng refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

2178. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototypes.

2179. By the beginning of or about August, 2020, Defendant Harrod began demanding in phone meetings that the Plaintiff allow IARPA to use the sdPhotonics' Cryo-VCSELs in other projects. However, Harrod could provide no legitimate reason.

2180. Instead, Harrod demanded control of the prototypes, claiming his IARPA Director, Catherine Marsh, had told him to obtain the prototypes for other projects, and that Harrod himself knew nothing about the issue, and he was only doing what Catherine Marsh was instructing him to do.

2181. The Plaintiff refused to provide Harrod any permission and demanded the return of the sdPhotonics' Cryo-VCSEL prototypes.

2182. By the end of the IARPA Supercables project near the end or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois, and Harrod was agreeing with Feng.

2183. Harrod then issued Feng additional contracts after the IARPA Supercables ended, based on the sdPhotonics' Cryo-VCSEL prototypes, with Feng publishing articles on the Cryo-VCSELs with claims the lasers were developed at the University of Illinois in his laboratory.

2184. Defendant Harrod made an agreement with the military's state actor Milton Feng, at the University of Illinois, to take the Cryo-VCSEL prototype and its trade-secrets and withhold control of those trade secrets from sdPhotonics, while demanding control of the prototype for his project in the overt action of blaming the IARPA Director, Catherine Marsh for his demands, and then worked with Milton Feng after the IARPA Supercables project, to damage the Plaintiff and his company.

2185. Defendant Harrod violated the 5th Amendment of the U.S. Constitution pursuant to §1983, when he conspired with Milton Feng of the University of Illinois, and misappropriated the Cryo-VCSEL over the objections of the Plaintiff to take over the prototype and its trade secrets, for his, IARPA's, and Feng's separate projects, depriving the Plaintiff and Plaintiff's company of benefit of the prototypes and trade secrets, without due process.

2186. Defendant Harrod's illegal actions damaged the Plaintiff in person and property, and the Plaintiff was forced to cease his business operations.

Defendant Harrod's actions were intentional and malicious, and the Plaintiff is entitled to punitive damages.

## SIXTH CAUSE OF ACTION

**Civil Remedies for Criminal Practices: Fl. St. §§ 772.103, 772.104. Defendants: Sovinski, Shtrom, Weiss, Sweetapple, Hsu, Kline, Bustamante, Vetter, Taboada, Pinsukanjana, Kuznia, Baranek, Kim, Pan, Kish, Van Vechten, N. Stork, Repetto, B. Stork, L. Stork, Southron, Foret, Keeling, Solomon, Shainline, Baird, Klonoff, Saleh, Cook, Dallesassee, Martinis, O'Neal, Coco, Miguel, Maier, Taft.**

2187. Fl. St. §772 in Fl. St. §772.102(1)(a) provides the definitions of those criminal practices for which damages can be recovered through civil actions.

2188. Fl. St. §772.102(3) defines an "enterprise" relevant to this claim as "any individual, ... or any association, or group of individuals associated in fact though not a legal entity; and the term includes illicit as well as licit enterprises and governmental, as well as other, entities."

2189. Fl. St. §772.102(4) defines "pattern of criminal activity" relevant to this claim means "engaging in at least two incidents of criminal activity that have the same or similar intents, results, accomplices, victims, or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents; provided that the last of such incidents occurred within 5 years after a prior incident of criminal activity..."

2190. Relevant to this claim, Fl. St. §772.103(2) makes it unlawful for any person "through a pattern of criminal activity... to acquire or maintain, directly or indirectly, any interest or control of any enterprise..."

2191. Relevant to this claim, Fl. St. §772.103(3) makes it unlawful for any person to be "employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal behavior..."

2192. Relevant to this claim, Fl. St. §772.103(4) makes it unlawful for any person "to conspire or endeavor to violate any of the provisions of... subsection (2)..."

2193. Fl. St. §777.04(3) defines conspiracy for violations of criminal law as "A person who agrees, conspires, combines, or confederates with another person or persons to commit any offense or an attempt to commit the offense commits the offense of criminal conspiracy..."

2194. Relevant to this claim, the Plaintiff's company, sdPhotonics LLC is a licit enterprise pursuant to Fl. St. §772.103(2) in which defendants acquired or maintained, directly or indirectly, an interest in or control of.

2195. Relevant to this claim, the defendants are alleged to have formed an illicit enterprise pursuant to Fl. St. §772.102(2), (3), or (4), and engaged in the pattern of criminal behavior in violation of criminal statutes listed in Fl. St. §772.102(1)(a) described herein, to acquire or maintain, directly or indirectly, an interest or control of Plaintiff's company, sdPhotonics LLC.

2196. Fl. St. § 772.104(1) gives the civil cause of actions as: "Any person who proves by clear and convincing evidence that he or she has been injured by reason

of any violation of the provisions of s. 772.103 shall have a cause of action for threefold the actual damages sustained...

2197. Fl. St. §784.048(1)(a) defines the crime of harassment as "to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose."

2198. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**Count 1: Defendant Sovinski, Fl. St. §§772.103(2), 772.103(3), 772.104, 837, 914.22(1)(b).**

2199. Plaintiff alleges and incorporates paragraphs 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 2187-2197, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint of this Complaint as though fully set forth herein.

2200. In or about August, 2019, Sandra Sovinski filed declarations into the USPTO retroactively under the penalty of perjury after patents had issued or were about to issue, that had been filed jointly owned by UCF and the Plaintiff's company, sdPhotonics LLC. One of these declarations is shown in **Exhibit 8**.

2201. Sandra Sovinski attached an agreement to the declaration, which is identified in this case as the 2014 IP Agreement in **Exhibit 9**.

2202. The 2014 IP Agreement Sandra Sovinski attached to her USPTO declaration states that each term of the agreement related to Deppe's rights to his inventions is pursuant to UCF Regulations UCF-2.029.

2203. The declaration Sandra Sovinski filed into the USPTO contradicted the 2014 IP Agreement, and Sovinski falsely claimed the 2014 IP Agreement granted UCF unrestricted rights to Deppe's inventions, and that those rights were not pursuant to UCF-2.029.

2204. Sovinski made the contradictory statement in the declaration to acquire control of the Plaintiff's company, sdPhotonics, by preventing the company from exercising its ownership rights in its key patents to the company.

2205. The patent prosecution with the USPTO constitutes an official proceeding pursuant to Fl. St. §837.011(1).

2206. Sovinski violated Fl. St. §837.021(1) when she knowingly and willfully made two or more contradictory statements under oath in an official proceeding, when she filed her declaration under the penalty of perjury into USPTO that claimed Deppe had granted UCF unrestricted rights to his inventions pursuant to the 2014 IP Agreement, contradicting the 2014 IP Agreement that state each of term of the rights is pursuant to UCF Regulations UCF-2.029.

2207. Sovinski violated Fl. St. §837.02(1) when she knowingly and willfully made a false statement under oath in an official proceeding, when she filed her declaration under the penalty of perjury into USPTO that claimed a 2014 IP Agreement Deppe had signed granted UCF unrestricted rights to his inventions

pursuant to the 2014 IP Agreement, when the 2014 IP Agreement in fact states that each of term of the rights is pursuant to UCF Regulations UCF-2.029.

2208. Deppe filed the Florida Whistleblower lawsuit at issue in this complaint on December 13, 2019.

2209. During the proceedings of the Florida Whistleblower lawsuit, Defendant Sovinski learned that the statements from her USPTO declaration shown below were contradicted by prior filings into the USPTO patent records.

2210. In April, 2020, during the Florida Whistleblower lawsuit proceedings, Sovinski filed new declarations into the USPTO under the penalty of perjury dated April 7, 2020, that placed strikethroughs in the statements she knew could be proven false as shown below, and again produced dispositive proof of her perjury in April, 2020 in violation of Fl. St. §837.02(1).

> Previously Recorded Document is erroneous. Dennis Deppe filed Provisional application no. 62/459,078, *pro se*, contrary to UCF regulations and policies~~, and improperly designated his own company, sdPhotonics, LLC, as a co-applicant~~. ~~UCF's prosecution counsel carried on the improper co-applicant designation during the non-provisional phase.~~ UCF's prosecution counsel also did not record any assignment documents for the application, also contrary to UCF policies. [handwritten initials] 4/7/2020

2211. Defendant Sovinski then tried to use a trick, and violated Fl. St. §914.22(1)(b) during the Florida Whistleblower lawsuit proceedings, when she knowingly altered declarations that she had filed into the USPTO in or about August, 2019, and resubmitted the altered declarations into the USPTO in April, 2020 at issue during the Florida Whistleblower lawsuit, to impair the integrity and availability of the declarations in the proceeding.

2212. As part of the trick, she then worked with Youndy Cook and Alen Hsu and drafted a fraudulent settlement agreement for the military and UCF, that claimed the military was required to approve the agreement after Deppe signed the agreement.

2213. Defendant Sovinski was her own illicit enterprise associated in fact in violation of Fl. St. §772.103(2), with her actions to file false declarations into the USPTO in or about August, 2019 in violation of Fl. St.§837.02(1) and §837.021(1), and the changed declarations filed into the USPTO during the Florida Whistleblower lawsuit in April, 2020, and violated Fl. St.§837.02(1) and §837.021(1), and used a trick with a fraudulent settlement agreement in violation of Fl. St. §914.22(1)(b), to acquire and maintain control of the Plaintiff's company, sdPhotonics.

2214. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 2: Defendant Shtrom Fl. St. §§ 772.103(3), 772.104(1), 817.034(4)(a), 914.22(1)(a).**

2215. Plaintiff realleges and incorporates paragraphs 138-150, 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 2187-2197, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint of this Complaint as though fully set forth herein.

2216. In December, 2018, Defendant Shtrom was emailed by Sandra Sovinski to confirm that sdPhotonics had joint ownership (co-ownership) of the patents covering Deppe's oxide-free VCSEL inventions.

2217. In the same email to Defendant Shtrom, Sandra Sovinski confirmed to Defendant Shtrom that she saw in records prepared by Shtrom's office at UCF that sdPhotonics was paying patent costs for the patents.

2218. Defendant Shtrom is an expert on agreements involving intellectual property, and knows that the terms of the 2014 IP Agreement signed by the Plaintiff are pursuant to UCF-2.029.

2219. Defendant Shtrom is also an expert on UCF Regulations UCF-2.029, and knows that UCF-2.029(4)(d) prohibited any further actions by UCF to assert additional rights to the oxide-free VCSEL inventions that Sandra Sovinski contacted Defendant Shtrom about, in or about December, 2018.

2220. Sandra Sovinski made a plan with Defendant Shtrom to file additional declarations on patents covering the oxide-free VCSEL inventions, which Sandra Sovinski carried out as shown in the declarations filed by Sovinski into the USPTO under the penalty of perjury, with dates of or about May 19, 2019, and filed into the USPTO in or about the August, 2019 time frame.

2221. Defendant Shtrom then followed Sovinski's USPTO filings with her own filings, asserting UCF ownership of the inventions.

2222. Defendant Shtrom breached the 2014 IP Agreement when she filed additional declarations into the USPTO in or about August, 2019.

2223. Defendant Shtrom also violated UCF Regulations UCF-2.029(4)(d) when she filed the separate declarations into the USPTO on the oxide-free VCSEL patents at issue.

2224. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

2225. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings could be proven false by prior USPTO filings that were part of the applications.

2226. After Sovinski filed the altered declarations into the USPTO in April, 2020, Defendant Shtrom also again filed additional declarations into the USPTO asserting new ownership rights in the oxide-free VCSEL inventions at issue.

2227. Defendant Shtrom again breached the 2014 IP Agreement and UCF-2.029 when she filed her declarations into the USPTO on the oxide-free VCSELs after or about the time Sovinski filed the changed declarations in April, 2020.

2228. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that, in the same time period of the changed declarations being filed into the USPTO, Defendant Shtrom had contacted a separate Army office than Lateka's Eifert's office that issued the government contracts to sdPhotonics, claiming that UCF had been owed a subcontract on the contract Lateka Eifert monitored for the sdPhotonics' Army contracts.

2229. Defendant Shtrom claimed that because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics, UCF should have been issued a contract.

2230. However, Defendant Shtrom placed false information in her correspondence to the separate Army office UCF, since the argument she made about O'Neal in no way justified or required a subcontract to UCF.

2231. Furthermore, Lateka Eifert knew Sabine O'Neal had resigned from sdPhotonics in December, 2015, to work full time with UCF, knew Sabine O'Neal, and Defendant Shtrom's arguments to a different Army office than issued the contract made no sense.

2232. In addition, Lateka Eifert and her supervisors concluded Defendant Shtrom had committed fraud on their contract, and gave the Plaintiff instructions to report the fraud to the SBA IG, Hannibal Ware.

2233. Fl. St. §817.034(1)(d) defines "Scheme to defraud" in relevant part as "a systematic, ongoing course of conduct with intent to defraud one or more persons, or with intent to obtain property from one or more persons by false or fraudulent pretenses, representations, endorsements of nonconsenting parties, or promises or willful representations of a future act."

2234. Fl. St. §817.034(a) states in relevant part "Any person who engages in a scheme to defraud and obtains property thereby commits organized fraud..."

2235. Defendant Shtrom violated Fl. St. §817.034(4)(a), when she engaged in a scheme to defraud by breaching the 2014 IP Agreement and UCF Regulations

UCF-2.029 in or about August, 2019 and again in or about April, 2020, and used the breaches to assert ownership in patents after sdPhotonics had paid patent and research and development costs.

2236. Defendant Shtrom then furthered the scheme to defraud in violation of Fl. St. §817.034(4)(a), by presenting false information to an unrelated Army under false pretense of ownership in the patents due to a nonexistent subcontract, and false pretenses involving Sabine O'Neal's employment, or that employment's relationship to a subcontract, to be used in the settlement agreement by Cook, Sovinski, and Hsu.

2237. Defendant Shtrom violated Fl. St. §914.22(1)(a), when she used a scheme based on contacting a separate Army office than Eifert's involving information they wished to add to a settlement agreement that used false information that UCF had been owed a subcontract on sdPhotonic's government contracts, and contacted a separate government office than the office that issued and monitored the contract, for which the agreement would be used in the Florida Whistleblower proceedings to cover up the evidence of perjury in the USPTO.

2238. Defendant Shtrom became her own illicit enterprise associated in fact in violation of Fl. St. §772.103(2), with her actions to file false declarations into the USPTO in or about August, 2019 in violation of Fl. St. §817.034, and the changed declarations filed into the USPTO during the Florida Whistleblower lawsuit in April, 2020 in violation of Fl. St. §§ 817.034, and her contact with false information

to the Army office in violation of 914.22(1)(b), to acquire and maintain control of the Plaintiff's company, sdPhotonics.

2239. In the alternative, Defendant Shtrom violated Fl. St. §772.103(3), or in the alternative Fl. St. §772.103(4), when she became employed by or associated with the illicit enterprise involving the military and Sandra Sovinski, or endeavored to do so, with her actions to file false declarations into the USPTO in or about August, 2019 in violation of Fl. St. §817.034(4)(a), and the changed declarations filed into the USPTO during the Florida Whistleblower lawsuit in April, 2020 in violation of Fl. St. §§ 817.034 and 914.22(1)(b), to acquire and maintain control of the Plaintiff's company, sdPhotonics.

2240. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 3: Defendant Weiss, Fl. St. §§ 772.103(3), 772.104, 843.0855(3), 914.22(1)(a).**

2241. Plaintiff realleges and incorporates paragraphs 187-194, 236-276, 284-287, 290-291, 305-315, 319-329, 355-357, 362, 365-372, 391, 630-641, 2187-2197, and Exhibits 8-14 of this Complaint of this Complaint as though fully set forth herein.

2242. The complaint of the Florida Whistleblower lawsuit was filed on or about December 12, 2019. At issue were the false ownership declarations filed into the USPTO by Defendant Sandra Sovinski, and that Sovinski had breached the 2014 IP Agreement and UCF-2.029(4)(d) by filing the declarations.

2243. However, the records show that the 9th Judicial Circuit of Florida set the Florida Whistleblower lawsuit up without a judge, and to be operated only by the two attorneys Jeffrey Weiss and Robert Sweetapple.

2244. Defendant Weiss purported to represent UCF as he pretended to be an officer of the court in the illegal proceeding with Robert Sweetapple, that operated with no judge.

2245. In or about Q1 2020 Defendant Hsu and Sweetapple learned that certain statements Sovinski had made in the declarations she had filed into the USPTO in or about August, 2019, were proven false by prior USPTO patent records.

2246. In response to a discovery request Weiss had served to Sweetapple, the Plaintiff prepared the responses that included UCF email records that showed Sovinski had set up the plan to file false ownership declarations into the USPTO beginning in December, 2018, with Youndy Cook, Svetlana Shtrom, and Elizabeth Klonoff, to breach the 2014 IP Agreement and UCF-2.029, and commit perjury in the USPTO in or about August, 2019 by filing false declarations on the patents covering the oxide-free VCSEL invention.

2247. In April, 2020 during the Florida Whistleblower proceeding, Sandra Sovinski filed patent declarations into the USPTO in which she tried to cross out some of those statements that were proven false by prior USPTO patent records.

2248. Then, in or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a meeting involving a settlement agreement the Plaintiff had refused that had been prepared by Alen Hsu, Youndy Cook, and Sandra Sovinski.

2249. Defendant Weiss insisted to the Plaintiff that he knew the Army wanted the technology, and that Plaintiff was required to sign the agreement.

2250. However, the Army and U.S. government had already obtained the government rights in the inventions through the contract Lateka Eifert monitored, and there was no Army office specified in the agreement.

2251. The agreement failed to correct the false USPTO declarations, and required Army approval after the Plaintiff signed the agreement.

2252. The Plaintiff used public records requests to obtain emails from UCF that showed Svetlana Shtrom had contacted an office different than Lateka Eifert's who issued the contract, and provided false information about Sabine O'Neal and the contract Eifert monitored.

2253. Eifert reviewed the email records from Shtrom concerning O'Neal, and took them to her supervisor. In early June, 2020, Eifert met with the Plaintiff and informed him that her supervisors determined that UCF had engaged in fraud on their contract, and asked the Plaintiff to file the fraud complaint to the SBA IG and gave the Plaintiff the instructions to do so.

2254. At the end of June, 2020, Weiss refused the discovery responses Deppe had prepared, and claimed instead he had stayed the proceedings. The court's docket show that Weiss did not file a motion to stay the proceedings.

2255. In or about August, 2020, Weiss filed a false motion to compel claiming Deppe had refused to provide discovery requests.

2256. Weiss filed the false motion to compel to prevent the evidence of the false USPTO declarations that Sandra Sovinski filed into the USPTO April, 2020, and email records showing Sovinski had made the plans with Cook, Klonoff, and Shtrom to commit perjury in the USPSTO, from coming into the Florida Whistleblower proceedings.

2257. Defendant Weiss violated Fl. St. §843.0855(3) makes it unlawful, when he pretended to be an officer of the illegal proceeding that operated without a judge to try to throw the case for UCF and the military. Defendant Weiss engaged in constructive fraud while pretending to an officer of the fraudulent state court proceeding that operated without a judge, and had been set up for the military by the 9th Judicial Circuit.

2258. Fl. St. §914.22(1)(a) made it unlawful for Defendant Weiss to engage in misleading conduct toward the Plaintiff, and use the scheme of claiming that he had stayed the proceedings to prevent the service of discovery responses the Plaintiff had prepared, when in fact he had filed no motion to stay, and the proceedings were being operated without a judge, and then file the motion to compel that falsely claimed Deppe had refused to respond to discovery requests, with the intent to cause the discovery response Deppe had prepared to be withheld from the proceeding.

2259. Defendant Weiss violated Fl. St. §772.103(2), when he became his own illicit enterprise to engage in a pattern of criminal activity that include the Fl. St. §843.085(3) and Fl. St. §914.22(1)(a), to acquire and/or maintain control of the Plaintiff's company, sdPhotonics.

2260. In the alternative, Defendant Weiss violated Fl. St. §772.103(3), when he engaged in a pattern of criminal activity to operate the Florida Whistleblower lawsuit as an officer of the court in an unlawful simulated proceeding in violation of Fl. St. 843.0855(3), and used a trick or scheme to withhold the USPTO records of evidence from the Florida Whistleblower proceedings in violation of Fl. St. §914.22(1)(a), to acquire or maintain, directly or indirectly, control in the Plaintiff's company, sdPhotonics.

2261. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 4: Defendant Sweetapple §§ 772.103(3), 772.104(1), 843.0855(3), 914.22(1)(a).**

2262. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 2187-2197, and Exhibits 3-14 of this Complaint of this Complaint as though fully set forth herein.

2263. The complaint of the Florida Whistleblower lawsuit was filed on or about December 12, 2019. At issue were the false ownership declarations filed into the USPTO by Defendant Sandra Sovinski, and that Sovinski had breached the 2014 IP Agreement and UCF-2.029(4)(d) by filing the declarations.

2264. Defendant Sweetapple was hired to represent the Plaintiff in the Florida Whistleblower lawsuit.

2265. However, the records show that the 9th Judicial Circuit of Florida set the Florida Whistleblower lawsuit up without a judge, and to be operated only by the two attorneys Jeffrey Weiss and Robert Sweetapple.

2266. Defendant Sweetapple pretended to be an officer of the court in the illegal proceeding with Jeffrey Weiss, that operated with no judge.

2267. In or about Q1 2020 Defendant Hsu and Sweetapple learned that certain statements Sovinski had made in the declarations she had filed into the USPTO in or about August, 2019, were proven false by prior USPTO patent records.

2268. In April, 2020, during the Florida Whistleblower proceedings, Sandra Sovinski filed declarations into the USPTO that placed strikethroughs in statements she learned could be proven false by prior USPTO patent records.

2269. Defendant Sweetapple refused to take action in response to the declarations filed in April, 2020 by Sovinski.

2270. Defendant Sweetapple instead tried to force Deppe into a settlement meeting with Jeffrey Weiiss and Alen Hsu over the settlement agreement Alen Hsu had prepared concerning the same false declarations, and Deppe had already rejected.

2271. As part of the meeting, Jeffrey Weiss insisted to the Plaintiff that he knew the Army wanted the technology, and that Plaintiff was required to sign the agreement.

2272. However, the Army and U.S. government had already obtained the government rights in the inventions through the contract Lateka Eifert monitored, and there was no Army office specified in the agreement.

2273. The agreement failed to correct the false USPTO declarations, and required Army approval after the Plaintiff signed the agreement.

2274. The Plaintiff used public records requests to obtain emails from UCF that showed Svetlana Shtrom had contacted an office different than Lateka Eifert's who issued the contract, and provided false information about Sabine O'Neal and the contract Eifert monitored.

2275. Eifert reviewed the email records from Shtrom concerning O'Neal, and took them to her supervisor. In early June, 2020, Eifert met with the Plaintiff and informed him that her supervisors determined that UCF had engaged in fraud on their contract, and asked the Plaintiff to file the fraud complaint to the SBA IG and gave the Plaintiff the instructions to do so.

2276. At the end of June, 2020, Defendant Sweetapple claimed to the Plaintiff that Jeffrey Weiss had stayed the proceedings, and because of this Sweetapple would not serve Weiss the discovery responses the Plaintiff had prepared. The court's docket show that Weiss did not file a motion to stay the proceedings.

2277. In August, 2020, Jeffrey Weiss filed a false motion to compel that claimed the Plaintiff had refused to reply to the discovery request.

2278. Defendant Sweetapple, refused to serve the discovery response the Plaintiff prepared to Weiss after the motion to compel, and instead used the false motion to compel to try and prevent the evidence of the false USPTO declarations that Sandra Sovinski filed into the USPTO April, 2020, and email records showing Sovinski had made the plans with Cook, Klonoff, and Shtrom to commit perjury in the USPSTO, from coming into the Florida Whistleblower proceedings.

2279. Defendant Sweetapple violated Fl. St. §843.0855(3) when he acted as officer in the illegal Florida Whistleblower proceeding with Jeffrey Weiss that had no judge, and used the unlawful proceeding in attempts to cover up the evidence of perjury by Sovinski through filing false ownership declarations into the USPTO.

2280. Defendant Sweetapple violated Fl. St. §914.22(1)(a) when Sweetapple engaged in misleading conduct toward the Plaintiff, and used the scheme in which Sweetapple falsely claiming that Weiss had stayed the proceedings, and then refused to serve Weiss the discovery responses the Plaintiff had prepared, and instead coordinated with Weiss on the false motion to compel.

2281. Defendant Sweetapple violated Fl. St. §772.103(3), and participated directly in a pattern of criminal activity and formed an illicit enterprise in which he operated the Florida Whistleblower lawsuit as an officer of the court in a simulated legal proceeding in violation of Fl. St. 843.0855(3), and used a trick or scheme to withhold the USPTO records of evidence from the Florida

Whistleblower proceedings in violation of Fl. St. §914.22(1)(a), to acquire or maintain, directly or indirectly, control in the Plaintiff's company, sdPhotonics.

2282. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 5: Defendant Hsu. Fl. St. §§ 772.103(3), 772.104(1), 837, 843.0855(3), 914.22(1)(a).**

2283. Plaintiff realleges and incorporates paragraphs 282-293, 315-329, 362-365, 630-641, 2187-2197, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

2284. The Plaintiff filed the Florida Whistleblower lawsuit December 13, 2019. At issue were the false ownership declarations filed into the USPTO by Defendant.

2285. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

2286. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

2287. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

2288. Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that included terms the Plaintiff informed Defendant Hsu he would not accept.

2289. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

2290. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

2291. Defendant Hsu learned from the Plaintiff that prior USPTO patent filings proved certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

2292. Sandra Sovinski then filed the changed declarations into the USPTO in April, 2020, in which place strikethroughs in some of those statements that Hsu had learned were proven false by prior USPTO records.

2293. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into the meeting with Weiss and Sweetapple involving the agreements that Hsu and prepared with Cook and Sovinski.

2294. As part of the meeting, Jeffrey Weiss insisted to the Plaintiff that he knew the Army wanted the technology, and that Plaintiff was required to sign the agreement.

2295. However, the Army and U.S. government had already obtained the government rights in the inventions through the contract Lateka Eifert monitored, and there was no Army office specified in the agreement.

2296. The agreement failed to correct the false USPTO declarations, and required Army approval after the Plaintiff signed the agreement.

2297. The Plaintiff used public records requests to obtain emails from UCF that showed Svetlana Shtrom had contacted an office different than Lateka Eifert's who issued the contract, and provided false information about Sabine O'Neal and the contract Eifert monitored.

2298. Eifert reviewed the email records from Shtrom concerning O'Neal, and took them to her supervisor. In early June, 2020, Eifert met with the Plaintiff and informed him that her supervisors determined that UCF had engaged in fraud on their contract, and asked the Plaintiff to file the fraud complaint to the SBA IG and gave the Plaintiff the instructions to do so.

2299. At the end of June, 2020, Defendant Sweetapple claimed to the Plaintiff that Jeffrey Weiss had stayed the proceedings, and because of this Sweetapple would not serve Weiss the discovery responses the Plaintiff had prepared. The court's docket show that Weiss did not file a motion to stay the proceedings.

2300. Lateka Eifert and her military supervisors eventually determined in early June, 2020 during the Florida Whistleblower proceeding that what Hsu had used in the agreement with the different Army office was fraudulent, and asked the Plaintiff to file the complaint with the SBA IG, Hannibal Ware.

2301. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

2302. Defendant Hsu warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

2303. Defendant Hsu violated Fl. St. §914.22(1)(a) when, in or about May, 2020, he tried to use the trick of a fraudulent settlement agreement that required separate Army approval for inventions based on the false information Shtrom provided about Sabine O'Neal, and for inventions that the Army and government had already secured government rights through Lateka Eifert's military contract.

2304. Defendant Hsu violated Fl. St. §914.22(1)(a) when, in or about August, 2020, Hsu knowingly used intimidation and threatened the Plaintiff to not interfere with the scheme being used by Weiss and Sweetapple to withhold records involving emails and the USPTO declarations from the Florida Whistleblower proceeding.

2305. Defendant Hsu violated Fl. St. §772.103(3), or in the alternative Fl. St. §772.103(4), when he became employed and associated with the illicit enterprise set up by Sovinski to conduct or participate in criminal activity to operate the Florida Whistleblower lawsuit as simulated legal proceeding that operated without a judge in violation of Fl. St. 843.0855(3), and used the trick of the fraudulent settlement agreement with Cook, Sovinski, and Shtrom in violation of Fl. St. §914.22(1)(a) based on false information Shtrom provided to a separate Army office, and again violated Fl. St. §914.22(1)(a) trying to intimidate the Plaintiff into

not taking action in response to the false motion to compel designed to withhold the USPTO records that show perjury from the Florida Whistleblower proceedings.

2306. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 6. Defendant Kline. Fl. St. §§ 772.103(4), 772.104(1), 777.04(3), 837, 843.0855(3).**

2307. The Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 2187-2197, and Exhibits 3-14, 16 of this Complaint of this Complaint as though fully set forth.

2308. The Plaintiff hired Defendant Karen Kline in or about 2016 to provide legal advice on patents filed by the Plaintiff and his company, sdPhotonics.

2309. In or about November, 2018, the Plaintiff informed Defendant Kline he planned to resign his employment from UCF and move sdPhotonics from the UCF incubator, and asked Defendant Kline to review the patents that had been filed jointly with UCF and two additional patents.

2310. In December, 2018, Defendant Kline contacted Sandra Sovinski at Sovinski's UCF office with the patent list.

2311. In or about the beginning of January, 2019, after sending her letter, Defendant Kline informed the Plaintiff she had been contacted by Sandra Sovinski and had a new conflict of interest due to UCF, but that she wished to consult to find other attorneys to represent the Plaintiff and his company, sdPhotonics.

2312. Defendant Kline subsequently informed the Plaintiff that she had found Alen Hsu from a different firm to represent the Plaintiff.

2313. Defendant Kline continued to refuse to take action when, in August, 2019, Sandra Sovinski filed false declarations into the USPSTO, violating the same 2014 IP Agreement and UCF-2.029 patent regulations Kline had contacted Sovinski about in December, 2018.

2314. Instead, the Plaintiff was informed that he should file the Florida Whistleblower complaint.

2315. Defendant Kline then referred Robert Sweetapple and Alen Hsu to be hired by the Plaintiff to pursue the Florida Whistleblower lawsuit, which the records show was operated without a judge for more than six months.

2316. Defendant Kline took part in phone conferences with Jeffrey Weiss, Robert Sweetapple, Youndy Cook, Sandra Sovinski, and Alen Hsu in May, 2020 concerning the additional declarations filed by Sandra Sovinski in April, 2020 during the Florida Whistleblower lawsuit, and billed the Plaintiff for her time.

2317. However, Defendant Kline refused and/or failed to inform the Plaintiff as to specific information discussed in those phone conferences, and never provided any work product for the "consulting" she did with Weiss, Cook, Sovinski, Hsu, and Sweetapple.

2318. Defendant Kline violated Fl. St. §777.04(3), when she agreed, conspired, combined and confederated in the illicit enterprise with Sovinski to commit perjury in the USPTO in or about August, 2019 in violation of Fl. St. §837,

agreeing not to take action in response to the crimes while admitting the perjury, and participated in criminal activity to operate the Florida Whistleblower lawsuit as simulated legal proceeding without a judge and only Weiss and Sweetapple acting as state court officers in the proceeding in violation of Fl. St. §843.0855(3), and again in violation of Fl. St. §837 in April, 2020 when Sovinski filed changed declarations into the USPTO during the Florida Whistleblower proceedings.

2319. Defendant Kline violated Fl. St. §772.103(4), when she agreed, conspired, combined or confederated and endeavored with Cook and Sovinski to commit perjury using false declarations Sovinski filed into the USPTO in or about August, 2019 in violation of Fl. St. §837, and to operate the Florida Whistleblower proceedings as an illegal proceeding in violation of Fl. St. §843.0855(3), and in perjury again in April, 2020 in violation of Fl. St. §837 during the Florida Whistleblower proceedings, to acquire and/or maintain control in the Plaintiff's company.

2320. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**<u>Count 7: Defendant Paetra Brownlee: Fl. St. §§ 772.103(3), 772.104(1), 843.0855(3), 914.22(3).</u>**

2321. Plaintiff realleges and incorporates paragraphs 283-287, 365-366, 373-374, 478-479, 630-641, 2187-2197, and Exhibits 8-10, 14, 16 of this Complaint of this Complaint as though fully set forth herein.

2322. The Florida Whistleblower complaint was filed on December 13, 2019.

2323. Defendant Brownlee was not appointed as judge until or about May ??, 2020, and the time prior to her appear.

2324. The docket of the Florida Whistleblower proceeding shows Paetra Brownlee as the only judge of record, and that there was no judge over the Florida Whistleblower proceeding while Jeffrey Weiss and Robert Sweetapple served as officers of the 9th Judicial Circuit court in the proceedings (Exhibit ??).

2325. Brownlee made her first appearance into the case in or about August, 2020, after the Plaintiff fired Robert Sweetapple for his refusal to serve the Plaintiff's discovery responses to opposing counsel, Jeffrey Weiss, and a false motion to compel filed by Weiss.

2326. Once the Plaintiff learned Brownlee had been assigned as judge to the case, the Plaintiff sent Brownlee a confidential letter to her judicial chambers that was cc'd to Weiss and Sweetapple that the Florida Whistleblower proceeding had been used by Weiss and Sweetapple in an attempt to force a settlement the Plaintiff had refused, and had violated the Fl. St. §112.3187(4)(b) (Florida's Whistleblower Act).

2327. Brownlee then placed the confidential letter on the docket of the proceeding.

2328. Brownlee gave no legitimate reason for her action of placing the letter onto the court's docket.

2329. By early November, 2020, attorneys involved in the Florida Whistleblower proceedings began a systematic pattern of threats, intimidation,

stalking, assaults, batteries, and confinement, trying to force the Plaintiff to sign a settlement agreement the Plaintiff had refused.

2330. Defendant Brownlee violated Fl. St. §843.0855(3) when she pretended to be the judge of record in the Florida Whistleblower proceedings, while knowing those proceedings had been operated by only Jeffrey Weiss and Robert Sweetapple and that the proceedings were based on fraud.

2331. Defendant Brownlee engaged in harassment and violated Fl. St. §914.22(3)(a), when she published the Plaintiff's letter that was properly sent her under Fl. St. §112.3187(4)(b), and which she placed on the docket with no legitimate purpose, and instead to harass and threaten the Plaintiff, and attempt to dissuade the Plaintiff from continuing and testifying in the proceeding.

2332. Defendant Brownlee violated Fl. St. §772.103(3), when she became employed by and/or associated with the illicit enterprise that included Sandra Sovinski, Svetlana Shtrom, Jeffrey Weiss, Robert Sweetapple, and the military to cover up the evidence of perjury in the USPTO, and used intimidation as part of that illicit enterprise to withhold government records of evidence of perjury in the USPTO from court proceedings, and intimidation, extortion, stalking, assaults, and batteries to attempt to force the Plaintiff to sign a settlement agreement, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2333. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 8: Defendant John Bustamante: Fl. St. §§ 772.103(3), 772.104(1), 784,048(2), 914.22(1)(a), 914.22(3)(a).**

2334. Plaintiff realleges and incorporates paragraphs 236-274, 316-317, 322-329, 350-354, 375-385, 630-641, 2187-2197, and Exhibits 8-10 of this Complaint as though fully set forth herein.

2335. Defendant Bustamante was hired by the Plaintiff in or about July, 2020, to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom.

2336. Defendant Bustamante advised the Plaintiff that a complaint should be filed in federal court because of what had occurred in the Florida Whistleblower lawsuit.

2337. Bustamante then obtained information from the Plaintiff on the 2014 IP Agreement and UCF-2.029, and prepared the federal complaint to be filed in the FLMD court.

2338. Prior to filing the complaint however, Bustamante called the Plaintiff and informed him that Bustamante had learned that a Trump judge would be assigned to the case, and that her name was Wendy Berger.

2339. Defendant Bustamante could not or would not explain how he had obtained the name of the federal judge prior to filing the complaint.

2340. Not long after Bustamante filed the federal complaint, UCF filed a motion to dismiss the complaint because they had sovereign immunity against suit in federal court.

2341. The Plaintiff then insisted Bustamante dismiss the federal complaint because Bustamante had brought the lawsuit improperly.

2342. Bustamante then contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

2343. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered the defendant an equity position, he would have worked for sdPhotonics.

2344. Bustamante prepared the agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

2345. When the Plaintiff reviewed the agreement, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

2346. Instead, the agreement required the same military approval after the Plaintiff signed that had been in the earlier agreement that Cook and Sovinski prepared with Hsu, from a different office than Lateka Efert's, and based on the same fraud that Eifert advised the Plaintiff to file involving UCF in June, 2020, to the SBA IG Hannibal Ware.

2347. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

2348. Bustamante responded at that time that there was nothing he was able to do about it.

2349. Fl. St. §784.048(1) defines "Harass" as "to engage in a course of conduct directed at a specific person which causes substantial emotional distress and serves no legitimate purpose."

2350. Defendant Bustamante violated Fl. St.§784.048(2), which in relevant part states "a person who willfully, maliciously, and repeatedly... harass... another person commits he offense of stalking..."

2351. Defendant Bustamante harassed the Plaintiff when he tried to use the information that he had received about the corrupt FLMD court and its violations of local rules to choose which judges to assign to cases to intimidate the Plaintiff, in this case the FLMD judge Wendy Berger, and cause substantial emotional distress, for no legitimate purpose.

2352. Defendant Bustamante continued the harassment into the Florida Whistleblower case, telling the Plaintiff that if sdPhotonics had offered Bustamante an equity position, Bustamante would have worked for sdPhotonics. However, Bustamante was employed by sdPhotonics, and being paid by sdPhotonics to provide legal services.

2353. Defendant Bustamante violated Fl. St. §914.22(3)(a) because the Plaintiff was a witness in both the federal proceeding and the Florida Whistleblower proceeding as Bustamante was engaging in the harassment of the Plaintiff, and the harassment were attempts to hinder, delay, or prevent the Plaintiff from testifying and making his case in those proceedings.

2354. Bustamante violated Fl. St. §914.22(1)(a) when he used a trick with the federal complaint, bringing it against UCF who had sovereign immunity from suit in federal court, in violation of 914.22(1)(a), to prevent the evidence from coming into the proceedings and damaging the Plaintiff's position on the matter.

2355. Defendant Bustmante further violated Fl. St. 914.22(1) when he used the scheme of the agreement that required military approval from an unspecified office that the Plaintiff and Eifert had already determined was fraudulent, did not correct the declarations in the USPTO, and was then used in extortion, stalking, assaults, and batteries during the Florida Whistleblower proceedings.

2356. Defendant Bustamante violated Fl. St. §772.103(3), when he became associated or employed by the illicit enterprise that included the military program monitors, Sandra Sovinski, and the collection of attorneys assembled by the DOJ to commit organized crime as part of the illicit enterprise, to cover up the evidence of perjury in the USPTO, and a pattern of criminal activity, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2357. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 9: Defendant John Vetter: Fl. St. §§ 772.103(3), 772.104(1), 836.05(1), 914.22(1)(a).**

2358. Plaintiff realleges and incorporates paragraphs 342-347, 386-471, 630-641, 2187-2197 and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

2359. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit.

2360. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits.

2361. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

2362. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

2363. Vetter informed the Plaintiff that the false declarations filed by Sovinski into the USPTO were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

2364. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

2365. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused, that required military

approval when the government had already secured its rights, was based on what the Plaintiff and Lateka Eifert with her supervisors determined was fraud by UCF and Shtrom, and failed to correct the false declarations in the USPTO.

2366. In the call Vetter became angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

2367. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

2368. The Plaintiff was subsequently stalked, assaulted, battered and confined over the agreement Vetter had threatened to the Plaintiff to sign.

2369. Fl. St. §836.05(1) makes it a criminal violation in relevant part to "maliciously threatens an injury to the person, property, or reputation of another, or maliciously expose another to disgrace, .... With intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his will, commits a felony of the second degree..."

2370. Defendant Vetter violated Fl. St. §836.05(1) in early November, 2020 when Vetter threatened the Plaintiff to sign the agreement the Plaintiff had refused, or find out what happens to a whistleblower in Florida. The Plaintiff suffered was stalked, assaulted, battered, and confined after Vetter's threats.

2371. Defendant Vetter violated Fl. St. §914.22(1)(a), when he used intimidation with the intent to cause the Plaintiff to sign the agreement, that would be used to end the Florida Whistleblower proceedings without needed corrections to the false declarations filed into the USPTO in or about August, 2019, and again in April, 2020, to withhold these records from the Florida Whistleblower proceedings.

2372. Defendant Vetter violated Fl. St. §772.103(3), when he became associated or employed by the illicit enterprise with Sovinski to cover up the evidence of perjury in the USPTO, engaged in a pattern of criminal activity, and violated Fl. St. §836.05(1) and Fl. St. §914.22(1)(a), to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2373. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 10: Defendant Paul Pinsukanjana: Fl. St. §§ 772.103(2), 772.103(3), 772.104(1), 914.22(3)(a), 812.081(2)(a), (b).**

2374. Plaintiff realleges and incorporates paragraphs 224-231, 303-304, 395-474, 630-641, 2187-2197, of this Complaint as though fully set forth herein.

2375. Defendant Pinsukanjana is a physicist employed by Intelligent Epitaxial Technologies, Inc. (IET).

2376. IET is an epitaxial growth foundry who provides custom semiconductor materials for optoelectronic and III-V semiconductor devices, including VCSELs.

2377. The Plaintiff and sdPhotonics' engineers worked with Defendant Pinsukanjana and IET through contracts and purchase orders that were used in developing specialized materials for sdPhotonics oxide-free VCSELs and other photonic devices, including the Cryo-VCSEL and specialized detectors.

2378. Defendant Pinsukanjana also obtained contracts from the military to develop new materials for military applications.

2379. Defendant Pinsukanjana worked directly with the Plaintiff to learn the special techniques needed to grow the epitaxy for the Plaintiff's Cryo-VCSEL intention that could operate at 4 K and below.

2380. Defendant Pinskukanjana worked closely with Deborah Van Vechten and Milton Feng, and the Plaintiff, Pinsukanjan, Feng, and Van Vechten had meetings at the IET growth facility near Dallas, TX, in meetings and discussions concerning the sdPhotonics Cryo-VCSEL.

2381. On multiple occasions, Defendant Pinsukanjana and the Plaintiff discussed the declarations that Sandra Sovinski had filed into the USPTO, and the Florida Whistleblower lawsuit that had been filed December 12, 2019 involving the evicen of perjury created by Sovinski's USPTO filings.

2382. The Plaintiff received the threats from John Vetter in early November, 2020, to sign an agreement the Plaintiff had refused involving the Florida Whistleblower proceedings and evidence of perjury in the USPTO by Sovinski.

2383. Pinsukanjana had learned in other discussions that the Plaintiff would be driving to the University of Illinois to visit Feng's laboratory and obtain measured results on the sdPhotonics Cryo-VCSEL prototypes Feng was testing.

2384. Defendant Pinsukanjana then made repeated phone calls to the Plaintiff while he drove to Illinois, asking each time where the Plaintiff intended to stay that night, to which the Plaintiff answered he was unsure.

2385. After driving for several hours, the Plaintiff decided to stay in Carbondale, IL. When Pinsukanjana again called the Plaintiff about multiple other issues and then asked if the Plaintiff had decided where he would stay, the Plaintiff informed Pinsukanjana it would be Carbondale, IL.

2386. When the Plaintiff arrived in Carbondale, IL, the Plaintiff became heavily followed by other cars. After the Plaintiff checked into the hotel in Carbondale, IL, he was repeatedly followed on foot by unknown individuals outside the hotel.

2387. The Plaintiff was eventually stalked, assaulted, battered and confined over multiple days in Carbondale, IL and Illinois, and after during travel, had his financial accounts hacked, his company business account hacked, and found his house had been broken into when he returned there in Oviedo, FL in early December, 2020.

2388. During the stalking in late November, 2020 and early December, 2020, Defendant Pinsukanjana contacted the Plaintiff and informed him that

Pinsukanjana intended to fulfil a purchase order that his company had received involving Yunpeng Song from the Chinese company.

2389. When the Plaintiff objected to the sale and informed Pinsukanjana that sdPhotnoics and IET had trade secret agreements that prohibited the sale, Pinsukanjana responded that he had no choice but to fulfill the purchase order.

2390. When the Plaintiff objected that such a sale to a Chinese company would violate ITAR agreements, Defendant Pinsukanjana ignored the ITAR, and informed the Plaintiff that Pinsukanjana's company would go forward with the sale.

2391. Defendant Pinsukanjana violated Fl. St. §914.22(1)(a), when he used harassment that initiated the stalking, assaults, batteries, and confinement of the Plaintiff in November, 2020 involving the Florida Whistleblower proceeding, with the intent to cause the Plaintiff to sign the agreement, that would be used to end the Florida Whistleblower proceedings without needed corrections to the false declarations filed into the USPTO in or about August, 2019, and again in April, 2020, to withhold these records from the Florida Whistleblower proceedings.

2392. Defendant Pinsukanjana violated Fl. St. §812.081(2)(a) and or §812.081(b), when he willfully and without authorization, obtain or used, or endeavored to obtain or use, the trade secrets of the Plaintiff's company with the intent to either temporarily or permanently: (a) Deprive or withhold from the Plaintiff and his company who owned the trade secrets the control or benefit of the

trade secrets; and/or (b), to appropriate the trade secret to his own use or to the use of another person, Yunpeng Song, not entitled to the trade secrets.

2393. Defendant Pinsukanjana violated Fl. St. §772.103(2), or in the alternative Fl. St. §772.10(3), or in the alternative Fl. St. §772.104(4), when he formed an enterprise and engaged in a pattern of crimes in violating Fl. St. §914.22(1)(a) and Fl. St. §812.081(2)(a) and/or §812.081(2)(b) to acquire or maintain control in the Plaintiff's company, or became associated or employed by the illicit enterprise that included the military Sandra Sovinski and Svetlana Shtrom, to cover up the evidence of perjury in the USPTO, by violating Fl. St. §914.22(1)(a) and Fl. St. §812.081(2)(a) and/or §812.081(2)(b) to acquire or maintain control in the Plaintiff's company, or conspired or endeavored to violate Fl. St. §772.104(4) with the illicit enterprise formed by the military to use a pattern of criminal activity, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2394. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 11: Defendant John Taboada: Fl. St. §§ 772.103(2), 772.103(3), 772.103(4), 772.104(1), 784.048(2), 836.05(1), 914.22(1)(b), 914.22(3)(a).**

2395. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 630-641, 2187-2197, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

2396. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

2397. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

2398. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to additional corrective assignments.

2399. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

2400. After the Plaintiff filed the Florida Whistleblower complaint, and Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed he was amazed that Sovinski would again engage in fraud.

2401. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO.

2402. However, in November, 2020, while the Plaintiff was allegedly being stalked, assaulted, and battered as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics patents in October, 2021.

2403. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew that these were false.

2404. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski.

2405. Defendant Taboada violated Fl. St. §836.05(1) against extortion, which states in relevant part that "whoever, either verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offense, or by such communication threatens an injury to the person, property, or reputation of another, or maliciously threatens to expose another to disgrace... with intent to compel the person so threatened,... to do any act or refrain from doing any act against his... will, commits a felony of the second degree..."

2406. Defendant Taboada violated Fl. St. §836.05(1) when he called the Plaintiff while he wave being stalked in Carbondale, IL, and informed the Plaintiff that additional declarations by Sovinski containing the evidence Taboada knew was perjury had been filed into the USPTO in October, 2021, and that Taboada knew the FBI were intending to frame the Plaintiff, and that Taboada intended to take no action in response to the USPTO filings or plans of the FBI.

2407. Defendant Taboada violated Fl. St. §914.22(1)(a) when he engaged in misleading conduct against the Plaintiff, and used a trick, refusing to file the additional corrective assignments during the proceeding of the patent prosecution

in the USPTO to correct the declarations Sovinski had filed, and forcing the Plaintiff to file the Florida Whistleblower lawsuit that was used in April 2020 to alter the declarations Sovinski had originally filed in or about August, 2019, and again in October, 2021 during the proceeding.

2408. Defendant Taboada violated Fl. St. §784.048(2) by harassing the Plaintiff when Taboada informed the Plaintiff in November, 2020 that additional false declarations had been filed into the USPTO in October, 2020 just prior to the stalking in Carbondale, IL, and that the FBI was intending to frame the Plaintiff for the false ownership declarations, all while Taboada himself refused to take action to correct or address the false declarations that had been filed by Sovinski.

2409. Defendant Taboada violated Fl. St. §914.22(3)(a) when he harassed the Plaintiff during the stalking in Q4 2020 as part of the extortion during the Florida Whistleblower lawsuit, informed the Plaintiff that the FBI was intending to frame him for the evidence of perjury committed by Sovinski in the USPTO, and Taboada could provide no legitimate reason for giving the Plaintiff the information while Taboada was refusing to take action.

2410. Defendant Taboada violated Fl. St. §772.103(2), when he engaged in the pattern of criminal activity that includes the above violations of Fl. St. §§ 748.048(2), 836.05(1), 914.22(1)(a), and 914.22(3)(a), to acquire or maintain, directly or indirectly, an interest or control of the Plaintiff's company, sdPhotonics.

2411. In the alternative, Defendant Taboada violated Fl. St. §772.103(3), when he became associated or employed by the illicit enterprise engaged in a

pattern of criminal activity to acquire or maintain control of the Plaintiff's company, and Taboada violated Fl. St. §§ 748.048(2), 836.05(1), 914.22(1)(a), and 914.22(3)(a), as part of the pattern of criminal activity of the illicit enterprise.

2412. In the alternative, Defendant Taboada violated Fl. St. §772.103(4), when he conspired or endeavored to be associated or employed by the illicit enterprise engaged in a pattern of criminal activity to acquire or maintain control of the Plaintiff's company, and Taboada violated Fl. St. §§ 748.048(2), 836.05(1), 914.22(1)(a), and 914.22(3)(a), as part of the pattern of criminal activity of the illicit enterprise.

2413. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 12: Defendant Charles Kuznia: Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 914.22(3)(a).**

2414. Plaintiff realleges and incorporates paragraphs 297-304, 393-463, 631-640, 2187-2197, of this Complaint as though fully set forth herein.

2415. Kuznia was CEO of Ultra Communications, Inc., a defense contracting company worked closely with the military program monitors Mark Beranek and Michael Gerhold on SBIR contracts to develop his company's VCSEL transceivers.

2416. The transceiver technology Kuznia's company had developed was highly robust for use in military platforms including jet aircraft, helicopters, etc., that experience high accelerations and temperature changes, and require very high

reliability. These applications require VCSELs that can operate at higher temperatures than most other applications.

2417. The transceiver technology Kuznia was developing is not highly efficient relative to VCSEL transceiver standards, due to design trade-offs required to meet reliability in military platforms that operate under extreme conditions including temperature and acceleration.

2418. Kuznia repeatedly contacted the Plaintiff to discuss work with Beranek on the NAVAIR contract to develop the oxide-free VCSELs for use in Kuznia's transceivers involving a specific contract, and that Kuznia's company would work with sdPhotonics through subcontracting.

2419. The Plaintiff did contact Baranek, and sdPhotonics was issued the SBIR Phase I contract monitored by Beranek. Kuznia's company was to receive a subcontract for their work in a Phase II.

2420. Once the SBIR contract was in place that Kuznia had pushed for with Beranek, Beranek repeatedly claimed that Milton Feng had invented and developed the oxide-free VCSELs the Plaintiff's company was developing under the NAVAIR SBIR contract Beranek monitored.

2421. The Plaintiff repeatedly corrected Beranek that Milton Feng had no involvement in the oxide-free VCSEL invention or its development.

2422. Defendant Kuznia travelled with the Plaintiff was then asked by Kuznia to join him and Richard Weiss in attending meetings in Washington, D.C. in March, 2020, that Kuznia's company and Michael Gerhold had set up with

lobbyists and U.S. congressional offices as part of an effort by the military to obtain government contracts to accelerate the commercialization of the oxide-free VCSEL inventions for use in military transceivers, including by Kuznia's company.

2423. In March, 2020, Defendant Kuznia, Richard Weiss, Paul Pinsukanjana, and the Plaintiff traveled to Washington, D.C. and discussed the oxide-free VCSELs at length with different congressional offices who would approve and push for the government funding.

2424. The false ownership declarations that Sovinski had filed into the USPTO on the inventions at issue in the Florida Whistleblower lawsuit were also discussed at length.

2425. At the beginning of November, 2020, the Plaintiff was repeatedly threatened by John Vetter to sign an agreement as part of the Florida Whistleblower proceeding that failed to correct the false declarations, and included the military for no apparent purpose and without military contracts.

2426. When the Plaintiff refused claiming he only needed the corrected assignments to file with the USPTO, Vetter threatened the Plaintiff that if he refused to sign, he would "find out what happens to a whistleblower in Florida."

2427. The Plaintiff was contacted by a barrage of attorneys involved in the Florida Whistleblower proceedings and engineers from various defense contractors, while the Plaintiff was being stalked in Carbondale, IL as Vetter had threatened.

2428. Defendant Kuznia called the Plaintiff while the Plaintiff was being stalked in Carbondale, IL.

2429. Kuznia informed the Plaintiff that he knew the military program monitors were taking over the Plaintiff's company and Kuznia wanted to take over the $2M IARPA Supercables project that was based on the Plaintiff's Cryo VCSEL invention.

2430. Kuznia could provide no legitimate reason to the Plaintiff for why Kuzni's company should obtain the sdPhotonics' IARPA Supercables project and claimed it was because he knew sdPhotonics had been targeted in the military take-over.

2431. Defendant Kuznia coupled the conversation to an elaborate story about how lucky everyone was to have engineering jobs in which they could work with the military, and how Kuznia was so grateful he did not have to work in menial positions instead such as a taxi driver.

2432. The Plaintiff did not respond to Kuznia's claims that Kuznia's company should take over the $2M IARPA Supercables project.

2433. Kuznia lacked the expertise in VCSELs to develop oxide-free VCSELs or even oxide VCSELs, and certainly not the Plaintiff's Cryo-VCSEL invention.

2434. Fl. St. §748.048(1)(a) defines "Harass" in relevant part "to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose."

2435. Defendant Kuznia violated Fl. St. §914.22(3)(a) when he harassed the Plaintiff during the stalking in Q4 2020, informing the Plaintiff that Kuznia was so fortunate to be able to work with the military on his technology, and not have to take a menial job doing something else, identifying one of the menial jobs as a taxi driver.

2436. Defendant Kuznia violated Fl. St. §812.081(2)(a) and/or (b), as part of the extortion, stalking, assaults, and batteries during the Florida Whistleblower lawsuit, attempting to take over sdPhotonics' $2M IARPA Supercables project and the record-setting Cryo-VCSEL prototypes.

2437. Defendant Kuznia violated Fl. St. §772.103(2), when Kuznia formed his own illicit enterprise and engaged in a pattern of criminal activity, or in the alternative §772.103(3) when Kuzina was employed by or associated with the illicit enterprise set up by the military and UCF to carry out extortion, stalking, assaults, and batteries to extort a settlement agreement to cover up the perjury in the USPTO at issue in the Florida Whistleblower lawsuit, or in the alternative when Kuznia conspired or endeavored to violate and engaged in a pattern of criminal activity to acquire or maintain control of the Plaintiff's company, and Kuznia violated Fl. St. §914.22(3)(a) by joining the extortion, stalking, assaults, and batteries to harass the Plaintiff during the Q4 2020 stalking, assaults, and batteries as part of the pattern of criminal activity of the illicit enterprise, and violated Fl. St. §812.081(2)(a) and/or (b) to obtain and make use of the sdPhotonics' business

plans and trade secrets, to acquire and/or maintain control of the Plaintiff's company, sdPhotonics.

2438. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 13: Defendant Milton Feng: Fl. St. §§ 772.103(3), 772.104(1), 914.22(1)(a), 914.22(3)(a), 914.23(1), 812.081(2)(a), (b).**

2439. Plaintiff realleges and incorporates paragraphs Plaintiff realleges and incorporates paragraphs 334-340, 393-463, 555-556, 561-572, 575-580, 630-641, 2187-2197, and Exhibits 2, 20 of this Complaint as though fully set forth herein.

2440. Defendant Feng worked as a consultant to the Plaintiff and his company, sdPhotonics, who was employed on the IARPA Supercables project that began in or about June, 2019, and as a subcontractor with the University of Illinois.

2441. Defendant Feng's laboratory at the University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project to fabricate and test prototypes of its new laser invention, the Cryo-VCSEL, using sdPhotonics' proprietary epitaxial material.

2442. Defendant Feng's laboratory was to receive the proprietary epitaxial material from sdPhotonics, use their standard fabrication process for high speed VCSELs to fabricate prototypes of those materials and test at high speed, and then return to sdPhotonics for further testing and development of a quantum mechanical current-voltage model that could be used for optimization of future designs.

2443. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds.

2444. Feng refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

2445. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototyes.

2446. Once the Plaintiff had been threatened by Vetter, followed by stalking, assaults, and batteries in Carbondale, IL, the Plaintiff called Defendant Feng from Carbondale, IL, and requested Feng's assistance.

2447. However, Defendant Feng informed the Plaintiff that he had been instructed not to assist the Plaintiff or his company in any way, and refused multiple informing the Plaintiff that he could not and was not allowed to.

2448. The Plaintiff was then confined against the Plaintiff's will in the PBHS on the University of Illinois campus for multiple days. Once the Plaintiff was released, Defendant Feng began sending the Plaintiff email of well-wishes and get well soon messages.

2449. In or about about March, 2021, the Plaintiff received a draft of an article from Michael Gerhold and was informed by Gerhold that Gerhold and Feng

had written an article about Gerhold's VCSEL projects. The Plaintiff found buried in the article claims by Gerhold and Feng claimed that Feng had developed the Cryo-VCSEL invention in his University of Illinois laboratory.

2450. Gerhold agreed to correct the article, and Feng informed the Plaintiff that Gerhold had made the errors in the article.

2451. By the end of the IARPA Supercables project in or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois.

2452. After the project ended, the Plaintiff contacted Feng's supervisors at the University of Illinois, Rashad Bashir and Susan Martinis, and informed them that the university still possessed sdPhotonics Cryo-VCSEL prototypes from the IARPA Supercables project, had disrupted the sdPhotonics research on the project.

2453. Susan Martinis' office responded with an email from Defendant Feng, John Dallesassee, and Fred Kish, claiming that the Cryo-VCSEL prototype was being withheld because of Nick Holonyak was the inventor in some way.

2454. Defendant Feng and his supervisors, Bashir and Martinis, subsequently used the sdPhotonics' Cryo-VCSEL prototypes to obtain additional contracts for the University of Illinois.

2455. Defendant Feng violated Fl. St. §914.22(1)(a) and §914.22(3)(a) when he used intimidation and harassment against the Plaintiff during the extortion, stalking, assaults, batteries, and confinement that were used in the Florida Whistleblower proceedings, trying to force the Plaintiff to sign a settlement

agreement that could be used to cover up the perjury in the USPTO at issue in the Florida Whistleblower lawsuit.

2456. Defendant Feng violated Fl. St. §812.081(2)(a) (b) when he refused to return the Cryo-VCSEL prototypes to sdPhotonics, which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2457. Defendant Feng violated Fl. St. §772.103(2), or in the alternative §772.103(3), or in the alternative §772.104(4), when he formed his own illicit enterprise that engaged in a pattern of criminality in violating Fl. St. §§ 914.22(1)(a), 914.22(3)(a) and Fl. St. §812.081(2)(a) and/or (b), or became associated with or employed by the illicit enterprise with UCF and the military to cover up the evidence of perjury in the USPTO in those violations, or conspired or endeavored to be associated with or employed by the illicit enterprise, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2458. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 14: Defendant Mark Beranek: Fl. St. §§ 772.103(4), 772.104(1).**

2459. Plaintiff realleges and incorporates paragraphs 301-302, 393, 427-431, 437-464, 631-640, 2187-2198 of this Complaint as though fully set forth herein.

2460. Defendant Mark Beranek worked closely with the Plaintiff in developing a proposal to and SBIR solicitation from his employment agency, NAVAIR.

2461. The NAVAIR project included sdPhotonics as a performer and Charles Kuznia's company to perform as a subcontractor to sdPhotonics in a Phase II.

2462. The NAVAIR project with Defendant Beranek began in or about September, 2020.

2463. sdPhotonics began making progress presentations in periodic phone meetings with Beranek and Beranek's colleagues who also monitored project.

2464. In the meetings Defendant Beranek repeatedly stated or claimed to the Plaintiff that the oxide-free VCSELs being developed on his project had been invented and developed at the University of Illinois in Milton Feng's group.

2465. The Plaintiff repeatedly corrected Defendant Beranek in multiple phone meetings that Milton Feng was not involved in the invention or development of the oxide-free VCSEL.

2466. In early November, 2020, the Plaintiff was threatened by John Vetter to sign an agreement as part of the Florida Whistleblower lawsuit that included the military, and the Plaintiff had refused.

2467. The Plaintiff was then stalked, assaulted, and battered that began in Carbondale, IL, only a few days after the threats from Vetter involving the agreement. During that episode of stalking, assaults, and batteries in Carbondale, IL, the Plaintiff received multiple phone calls from attorneys, military program monitors, and defense contractors to the military.

2468. Defendant Beranek was one of the military program monitors who contacted the Plaintiff by phone during the stalking, and informed the Plaintiff that he wanted to take control of the oxide-free VCSEL inventions from sdPhotonics for his other projects.

2469. Defendant Beranek then offered the Plaintiff the prospect of other defense contracts he would issue to sdPhotonics, if the Plaintiff relinquished the rights to the oxide-free VCSEL inventions.

2470. The Plaintiff made no agreements and did not respond to the offers by Defendant Beranek.

2471. Fl. St. §772.103(4) makes it unlawful for any person "To conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3)" of Fl. St. §772.103.

2472. Fl. St. §777.04(3) further defines a criminal conspiracy "A person who agrees, conspires, combines, or confederates with another person or persons to commit any other offense commits the offense of criminal conspiracy..."

2473. Defendant Beranek violated Fl. St. §772.103(4), when he conspired, agreed, combined, or confederated, or endeavored to become, employed by or

associated with the illicit enterprise to use the extortion, stalking, assaults, and batteries, and the agreement involving the military, and the false declarations in the USPTO at issue in the Florida Whistleblower proceedings, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2474. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 15: Defendant Matt Kim. Fl. St. §§ 772.103(3), 772.104(1), 748.048(2), 914.22(3)(a).**

2475. Plaintiff realleges and incorporates paragraphs 393-463, 631-640, 2187-2197 of this Complaint as though fully set forth herein.

2476. Defendant Kim is a former University of Illinois graduate student and owner of the company QuanTera that does military contracting in semiconductors.

2477. Defendant Kim specialty is semiconductor electronic devices, and Kim also consulted for the Plaintiff's company on different occasions, and often contacted the Plaintiff with questions concerning lasers.

2478. Defendant Kim repeatedly contacted the Plaintiff while he was being extorted, stalked, assaulted, and battered in Carbondale, IL in Q4 2020 involving the evidence of perjury in the USPTO and the Florida Whistleblower proceedings.

2479. Kim called the Plaintiff repeatedly and repeatedly asked the Plaintiff in the calls whether the Plaintiff had ever had sex with a sixteen (16) year old girl.

2480. The Plaintiff informed Defendant Kim that he was being stalked by the military, and asked why was Kim was calling to ask the Plaintiff with such questions.

2481. Defendant Kim could provide no legitimate reason for his phone calls or why he was asking the Plaintiff whether he had ever had sex with a sixteen (16) year old girl.

2482. Fl. St. §748.048(1)(a) defines "Harass" as meaning "to engage in a course of conduct directed at a specific persona which causes substantial emotional distress to that person and serves no legitimate purpose."

2483. Fl. St. §748.048(1)(b) defines "Course of conduct" as meaning "a pattern of conduct composed of a series of acts over a period of time, however short, which evidences a continuity of purpose..."

2484. Fl. St. §748.048(d) defines "Cyberstalk" as "to engage in a course of conduct to communicate, or to cause to be communicated, directly or indirectly, words, images, or language by or through the use of electronic mail or electronic communication, directed at or pertaining to a specific person... causing substantial emotional distress to that persona and serving no legitimate purpose.

2485. Defendant Kim violated Fl. St. §748.048(2) which states that "a person who willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person commits the offense of stalking...," when he repeatedly called the Plaintiff to ask illegitimate questions involving the Plaintiff somehow engaging in sex with minors, in the alleged attempted military take-over with the universities.

2486. Defendant Kim further violated Fl. St. §914.22(3)(a), when he used cyberstalking and intentionally harassed the Plaintiff with phone calls and questions about whether the Plaintiff had engaged in sex with minors, to cause the Plaintiff to cease the Florida Whistleblower lawsuit and allow the take-over of the Plaintiff's company by the military and universities.

2487. Defendant Kim violated Fl. St. §772.103(3), or in the alternative Fl. St. §772.103(4), when he became employed by or associated with illicit enterprise, or conspired or endeavored to be employed by the illicit enterprise, that had been set up by UCF and the military, and Kim cyberstalked and harassed the Plaintiff during the Q4 2020 stalking, assaults, and batteries involving the Florida Whistleblower proceeding, in an attempt to force the Plaintiff to cease the lawsuit, and allow the military and universities to take over the Plaintiff's company, sdPhotonics.

2488. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 16: Defendant Noren Pan. Fl. St. §§ 772.103(3), 772.104(4), 772.104(1), 914.22(3)(a).**

2489. Plaintiff realleges and incorporates paragraphs 393-462, 485-486, 631-640, 2187-2197 as though fully set forth herein.

2490. Defendant Pan is a former University of Illinois graduate student and owner of the company Microlink, Inc., that does military contracting in semiconductors.

2491. Defendant Pan and the Plaintiff's company, sdPhotonics, had performed some work before in anticipation of submitting joint research proposals for projects.

2492. The Plaintiff contacted Pan in November, 2020, while he was being stalked, assaulted, and battered in Carbondale, IL, and informed Pan about what was happening and requested his help.

2493. Defendant Pan responded by text message and informed the Plaintiff that Pan had set up a meeting in a vacant house in Chicago, and wanted the Plaintiff to meet him in the vacant house.

2494. Defendant Pan could provide no legitimate reason for why he was asking the Plaintiff to meet him in a vacant house during the stalking that took place in Carbondale, IL, in Q4 2020 during the Florida Whistleblower proceeding.

2495. The Plaintiff and Pan later discussed the military attempted take-over in January, 2021 by phone.

2496. Defendant Pan admitted in that phone call in January, 2021, that he knew the Plaintiff's company had been targeted by the military, universities, and defense contractors in intellectual property theft.

2497. Defendant Pan then asked the Plaintiff to come to Chicago, IL to discuss a project he knew was upcoming that became the "Chips + Science" government funding from the Biden administration.

2498. Fl. St. §748.048(1)(a) defines "Harass" as meaning "to engage in a course of conduct directed at a specific persona which causes substantial emotional distress to that person and serves no legitimate purpose."

2499. Defendant Pan further violated Fl. St. §914.22(3)(a), when he harassed the Plaintiff informing him that Pan had set up a meeting in a vacant house in Chicago, while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

2500. Defendant Pan violated Fl. St. §772.103(3), or in the alternative Fl. St. §772.103(4), when he became employed by or associated with illicit enterprise that had been set up by the military, and cyberstalked and harassed the Plaintiff during the Q4 2020 stalking, assaults, and batteries involving the Florida Whistleblower proceeding, in an attempt to force the Plaintiff to cease the lawsuit, and allow the military and universities to take over the Plaintiff's company, sdPhotonics.

2501. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 17: Defendant Fred Kish. Fl. St. §§ 772.103(3), 772.104(a), 772.104(2), 812.081(2)(a), (b), 914.22(3)(a).**

2502. Plaintiff realleges and incorporates paragraphs 393-462, 575-580, 630-641, 2187-2197 of this Complaint as though fully set forth herein.

2503. The Plaintiff was contacted by Defendant Kish is one of the former graududate students of Nick Holonyak who contacted the Plaintiff while he was

being stalked in Carbondale, IL, in November, 2020 during the Florida Whistleblower proceedings.

2504. The Plaintiff and Defendant Kish exchanged emails in which the Plaintiff informed Kish he was being stalked as part of a military take-over of his company, and that the stalking was occurring as part of the Florida Whistleblower lawsuit.

2505. Defendant Kish then informed the Plaintiff that Kish was very good friends with a DARPA program monitor supposedly linked to the organized government crime by the military, Gordon Keeler.

2506. Defendant Kish acknowledged that he knew the effort was to take over the Plaintiff's company and use the laser inventions to obtain further government funding.

2507. Defendant Kish insisted in November, 2020 while the Plaintiff was being stalked and cyber-stalked, that his own university, North Carolina State University, was not part of the what was occurring, and would not receive any of the funding.

2508. The IARPA Supercables project was issued to sdPhotonics in or about June, 2019, and a subcontract issued from sdPhotonics to the College of Engineering at the University of Illinois to perform high-speed testing on the sdPhotonics Cryo-VCSEL, using a transceiver design and laser design for the Cryo-VCSEL the Plaintiff had developed for operation at cryogenic temperatures down to zero kelvin.

2509. In or about November, 2021, after the IARPA Supercables program had ended, Feng and IARPA had been instructed by the Plaintiff to cease work on the sdPhotonics' Cryo-VCSEL invention and return the prototypes.

2510. When Feng refused, the Plaintiff contacted Susan Martinis by email, and requested the return of the Cryo-VCSEL prototypes.

2511. The Plaintiff explained to Susan Martinis that sdPhotonics' own research and testing on its prototypes on the IARPA Supercables project had been disrupted by the refusal to return the Cryo-VCSEL, and requested that Defendant Martinis return the sdPhotonics Cryo-VCSEL prototype.

2512. Instead, Defendant Kish joined Susan Martinis. Milton Feng, and John Dallesassee, and that claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

2513. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

2514. Bashir, Susan Martinis, and Milton Feng then produced scientific articles and Illinois press releases with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

2515. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from Harrod based on the device for the University of Illinois using the sdPhotonics' Cryo-VCSEL that Bashir, Martinis, and Feng refused to return.

2516. Fl. St. §748.048(1)(a) defines "Harass" as meaning "to engage in a course of conduct directed at a specific persona which causes substantial emotional distress to that person and serves no legitimate purpose."

2517. Defendant Kish violated Fl. St. §914.22(3)(a) when he attempted to use harassment to hinder, delay, prevent or dissuade the Plaintiff from continuing the Florida Whistleblower proceeding as part of his cyberstalking.

2518. Defendant Kish violated Fl. St. §812.081(2)(a) and/or (b) when he claimed the Cryo-VCSEL prototypes were somehow invented by Nick Holonyak, and instead used them to obtain additional contracts for his university or the University of Illinois. Fl. St. §812.081(2) states in relevant part in (a) that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2519. Defendant Kish violated Fl. St. §772.103(3), and in the alternative Fl. St. §772.103(4), by being employed by or associated with the illicit enterprise to engage in harassment and cyberstalking in violation of Fl. St. § 914.22(3)(a) in Q4 2020 during the Florida Whistleblower proceeding, and by violating Fl. St. § 812.081(2)(a),(b) by claiming the Cryo-VCSEL was somehow invented by Nick Holonyak to retain the Cryo-VCSEL prototypes, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2520. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 18: Defendant Van Vechten: Fl. St. §§ 772.103(2), 772.103(3), 772.103(4), 772.104(1), 784.048(2), 836.05(1), 914.22(1)(a), 914.22(3)(a), 914.23(1).**

2521. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 631-640, 2187-2197 of this Complaint as though fully set forth herein.

2522. Defendant Van Vechten participated in the IARPA Supercables project monthly reporting meetings and site visits, and from that project met the Plaintiff and learned about the Plaintiff's Cryo-VCSEL technologies.

2523. Van Vechten worked closely with the Pinsukanjana, Feng, Harrod, and the Plaintiff involving the oxide-free VCSEL and Cryo-VCSEL technologies being developed by the Plaintiff's company, and sought to fund sdPhotonics.

2524. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

2525. After being stalked, assaulted, harassed, constantly awoken in the hotel, and repeatedly exposed to covid, the Plaintiff had been surrounded by unknown and threatening individuals in a parking lot, where he became extremely concerned for his safety.

2526. Exhausted, the walked into a grocery store where the workers behind the counter allowed the Plaintiff to use a store phone. The Plaintiff then called Milton Feng and explained he was being stalked and threatened, and asking for Feng's help.

2527. When Feng repeatedly refused and claimed he had been instructed not to help, and the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

2528. Van Vechten then called almost immediately after the Plaintiff had contacted his nephew, Nick Stork and informed the Plaintiff that she knew the Plaintiff was being stalked, had information about the stalkers, and that it was coming from part of the military that was working with Donald Trump, that the government and UCF were defending themselves because of the Plaintiff's accusations in the Florida whistleblower lawsuit, and that Trump hated whistleblowers.

2529. Van Vechten then used a trick, informing the Plaintiff that Trump had lots of supporters in So. Illinois and he should stay out of the hotels, and that he needed to get to a blue part of the state. Van Vechten then explained that she knew a place behind locked doors away from the stalkers for a few days close to the Univ. of Illinois campus, in the blue part of the state, and that the military had connections there but would take her several hours to arrange the stay and would call back.

2530. Once the Plaintiff's nephew arrived with his wife, Mindy Stork, the Plaintiff explained to them that he was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

2531. Several hours later during the drive Van Vechten called back and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and the Plaintiff could stay for a few days.

2532. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

2533. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

2534. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and his sister Brenda Stork and brother-in-law Larry Stork.

2535. Each claimed that they had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility.

2536. Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to avoid the stalkers in Southern Illinois, and that the Plaintiff didn't understand how the military did business.

2537. Defendant Van Vechten violated Fl. St. §914.22(1)(a) when she used misleading conduct against the Plaintiff during the Florida Whistleblower proceeding, when she used a trick and the scheme to trust her to assist during the stalking in Carbondale, IL, and instead Defendant Van Vechten used the trick to get the Plaintiff confined for six days in a psychiatric ward where he was harassed, poisoned, threatened and assaulted, with the intent to cause the Plaintiff to withhold further testimony from the proceeding and sign the agreement.

2538. Defendant Van Vechten violated Fl. St. §914.22(3)(a), when she intentionally harassed the Plaintiff, telling the Plaintiff that Trump was sending the stalkers against the Plaintiff because of the Florida Whistleblower lawsuit, that she expected to benefit in her retirement from taking over the Plaintiff's

inventions, and trying to direct him to remote places to stay after he was stalked, all in order to hinder, delay, prevent or dissuade the Plaintiff from further attending or testifying in the Florida Whistleblower lawsuit, and instead sign the agreement he had been presented.

2539. Defendant Van Vechten violated Fl. St. 914.23(1), when she knowingly engaged in conduct to cause bodily harm to the Plaintiff as part of the stalking and during confinement, in retaliation against the Plaintiff for filing the Florida Whistleblower lawsuit and presenting the evidence that showed the military was engaged in organized crime committing perjury in the USPTO as part of stealing intellectual property and early-stage technology for herself and her retirement.

2540. Defendant Van Vechten violated Fl. St. 772.103(2) and created her own organized crime wave in forming her illicit enterprise as she engaged in a pattern of criminal activity violating Fl. St. §§914.22(1)(1), 914.22(3)(a), 914.23(1) involving the Florida Whistleblower proceeding, motivated to steal from the Plaintiff and U.S. taxpayers, and improve her financial position and retirement with the Plaintiff's inventions and early-stage technologies.

2541. In the alternative, Defendant Van Vechten violated Fl. St. §772.103(3), when she became associated or employed by the illicit enterprise that included Sandra Sovinski and Svetlana Shtrom, and engaged in multiple violations of Fl. St. §914.22(1)(a) using tricks, scheme, and force, and harassment in violation of Fl. St. §914.22(3)(a), and retaliation in violation of Fl. St. §914.23(1). to cover up the evidence of perjury in the USPTO, in attempts to force the Plaintiff to sign a

settlement agreement, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2542. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 19: Defendant Nicholas Stork: Fl. St. §§ 772.103(3), 772.104(1), 914.22(1)(a), 914.23(1).**

2543. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 2187-2197 of this Complaint as though fully set forth herein.

2544. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

2545. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

2546. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

2547. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

2548. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

2549. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

2550. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

2551. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

2552. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was

finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

2553. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

2554. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

2555. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

2556. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

2557. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to force the Plaintiff to sign over property to them that the

Plaintiff held in Southern Illinois, claiming they would take more action with the military.

2558. Defendant Nicholas Stork violated Fl. St. §914.22(1)(a) when he used a trick against the Plaintiff during the Florida Whistleblower proceeding, filing paperwork that placed the Plaintiff in a psychiatric ward of the Pavilion, without the Plaintiff's knowledge, after which Defendant Stork claimed the Pavilion had prevented Defendant Stork from contacting the Plaintiff while he was held there against his will, when instead Defendant Stork was shown on Pavilion records to have been in repeated contact with the Pavilion while they held the Plaintiff, and additional contacts from Defendant Stork to the Pavilion after the Plaintiff was released.

2559. Defendant Nick Stork violated Fl. St. 914.23(1), when he knowingly engaged in conduct to cause bodily harm to the Plaintiff using confinement as part of the military scheme to prevent the Plaintiff from attending or continuing the Florida Whistleblower lawsuit.

2560. Defendant Nick Stork violated Fl. St. §772.103(3), when he became associated with or employed by the illicit enterprise set up by the military that included Sandra Sovinski and Svetlana Shtrom, and engaged in multiple violations of Fl. St. §914.22(1)(a) using a scheme to obtain the Plaintiff's physical confinement in violation of Fl. St. §914.22(3)(a), and retaliation in violation of Fl. St. §914.23(1), to cover up the evidence of perjury in the USPTO, and in attempts to force the Plaintiff to sign a settlement agreement, to acquire or maintain control

of the Plaintiff's company, sdPhotonics, and extort additional property from the Plaintiff.

2561. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 20: Defendant Martin Repetto: Fl. St. §§ 772.103(2), 772.103(3), 772.103(4), 772.104(1), 784.021, 784.045(2), 787.02(2), 812.081(2)(a),(b), 836.05(1), 914.22(1)(a), 914.22(3)(a), 914.23(1).**

2562. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 2187-2197 of this Complaint as though fully set forth herein.

2563. Defendant Repetto was the supervising doctor who oversaw the confinement of the Plaintiff in the psychiatric ward of the Pavilion.

2564. The Plaintiff was confined against his will and without cause in the psychiatric ward for approximately six (6) days.

2565. During that time the Plaintiff was placed in a communal sleeping center. Numerous different supposed "dangerous patients" were checked into the room, all refusing to wear masks despite covid.

2566. The Plaintiff was told by certain staff that he would be forced to attend supposed "group" sessions for their patience in order to be released at the end of the six days.

2567. The sessions were clearly staged meetings of approximately a dozen people pretending to be patients with supposed mental ailments.

2568. Defendant Repetto met with the Plaintiff at least three times during the Plaintiff's confinement in the psychiatric ward.

2569. Each time Repetto requested to meet with the Plaintiff, Defendant Repetto demanded information about the lasers, claiming the Plaintiff was not giving him enough information, and Repetto wanted more information on the lasers.

2570. The Plaintiff had never mentioned lasers to Defendant Repetto or anyone else in the Pavilion.

2571. The supposed "psychiatric patients" were moved continuously into and out of the communal sleeping area without masks, and claiming they had never been tested for covid.

2572. On the fourth day of the Plaintiff's confinement one of the staff brought the Plaintiff a supposed diagnosis from Repetto the Plaintiff was asked to sign stating the Plaintiff had bipolar mental disease.

2573. The Plaintiff refused to sign.

2574. On the fourth morning one of the supposed "psychiatric patients" admitted he was out of work and had been approached by someone who was paying him to part in the elaborate intimidation scheme.

2575. Later that day the Plaintiff was moved to a private room to sleep on the same floor in the same area.

2576. On that night the Plaintiff received food poisoning and vomited throughout the night, and did not sleep.

2577. The next morning several of the supposed "patients" met in the hallway, after which one of the staff members brought each of the supposed

"patients" ballpoint pens. The supposed "patients" then followed the Plaintiff around the hallway with their ballpoint pens pointed towards the patient in what was obviously staged for intimidation.

2578. When that failed the supposed "patients" began checking themselves out of the Pavilion by going to the reception desk on the floor and informing the staff they were leaving. The staff signed paperwork for more than half of the dozen or so supposed "patients."

2579. On the final morning Defendant Repetto came to the Plaintiff's room and informed the Plaintiff that he wanted to keep the Plaintiff longer in the facility, and the Plaintiff demanded to be let out.

2580. Defendant Repetto informed the Plaintiff that they had called his nephew, Nicholas Stork, who would meet him outside the Pavilion facility.

2581. Defendant Repetto violated Fl. St. §914.22(1)(a), which states in relevant part that it is a crime to "knowingly use intimidation or physical force, or threaten another person, or attempt to do so, or engage in to cause or induce any person to withhold testimony, or withhold a record, document, ...from an official proceeding."

2582. Defendant Repetto violated Fl. St. §914.22(3)(a), which states in relevant part that it is a crime to "intentionally harass another person and thereby hinder, delays, ...any person from attending or testifying in an official proceeding..."

2583. Defendant Repetto violated Fl. St. §914.23(1), which states in relevant part that it is a crime to "knowingly engage in any conduct that causes bodily injury to another person, or threatens to do so, with intent to retaliate against any person for the attendance of a witness or party at an official proceeding, or for any testimony given or any record, document, or other object produced by a witness in an official proceeding..."

2584. Defendant Repetto violated Fl. St. §836.05(1), which states in relevant part that it is a crime to "maliciously threaten an injury to the person, property, or reputation of another, or maliciously expose another to disgrace, .... With intent to compel the person so threatened, or any other person, to do any act or refrain from doing any act against his will, commits a felony of the second degree..."

2585. Defendant Repetto violated Fl. St. §812.081(2)(a), (b), which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2586. Defendant Repetto violated Fl. St. §784.021 against aggravated assault, using unlawful threats by his acts while he had the Plaintiff confined, exposing the Plaintiff to deadly covid risks, poisoning, and additional threats of violence by his staff and staged "patients," with the demands to obtain trade secrets.

2587. Defendant Repetto violated Fl. St. §784.045(2) against aggravated battery, when he exposed the Plaintiff to the repeated risks of the deadly covid virus in the Pavilion and poisoning.

2588. Defendant Repetto violated Fl. St. §787.02(2) against false imprisonment by confining the Plaintiff in the Pavilion against his will as part of the trick with Van Vechten and the military. Fl. St. §787.02(2) states in relevant part that "a person who commits the offense of false imprisonment is guilty of a felony of the third degree..." Fl. St. §787.02(1)(a) defines false imprisonment as "forcibly, by threat, or secretly confining, abducting, imprisoning, or restraining another person without lawful authority and against her or his will."

2589. Defendant Repetto violated Fl. St. §772.103(2), when he engaged in a pattern of criminal activity involving violations of Fl. St. §§784.021, 784.045(2), 787.02(2), 812.081(2)(a), (b), 836.05(1), 914.22(1)(a), 914.22(3)(a), 914.23(1) to acquire or maintain control in the Plaintiff's company, sdPhotonics.

2590. In the alternative, Defendant Repetto violated Fl. St. §772.103(3), when he became associated or employed by the illicit enterprise that included Sandra Sovinski, to use confinement in the PBHS combined with threats, harassment, intimidation, exposure to the deadly covid virus, and poisoning, to learn trade secrets from the Plaintiff about sdPhotonics' laser inventions, and to cover up the evidence of perjury in the USPTO in the Florida Whistleblower proceeding, and violated Fl. St. §§784.021, 784.045(2), 787.02(2), 812.081(2)(a),

(b), 836.05(1), 914.22(1)(a), 914.22(3)(a), 914.23(1), to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2591. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 21: Defendant Brenda Stork: Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 914.22(1)(a), 914.22(3)(a), 914.23(1).**

2592. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 2187-2197 of this Complaint as though fully set forth herein.

2593. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

2594. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

2595. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

2596. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

2597. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

2598. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

2599. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

2600. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

2601. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was

finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

2602. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

2603. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

2604. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

2605. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

2606. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF

and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

2607. Defendant Brenda Stork violated Fl. St. §914.22(1)(a) when she used a trick against the Plaintiff during the Florida Whistleblower proceeding.

2608. Defendant Brenda Stork violated Fl. St. 914.23(1), when she knowingly engaged in conduct intended to cause bodily harm to the Plaintiff using confinement as part of the military scheme to prevent the Plaintiff from attending or continuing the Florida Whistleblower lawsuit.

2609. Defendant Brenda Stork violated Fl. St. §772.103(3), when he became associated with or employed by the illicit enterprise set up by the military that included Sandra Sovinski and Svetlana Shtrom, and engaged in multiple violations of Fl. St. §914.22(1)(a) using a scheme to obtain the Plaintiff's physical confinement in violation of Fl. St. §914.22(3)(a), and retaliation in violation of Fl. St. §914.23(1), to cover up the evidence of perjury in the USPTO, and in attempts to force the Plaintiff to sign a settlement agreement, to acquire or maintain control of the Plaintiff's company, sdPhotonics, and extort additional property from the Plaintiff.

2610. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 22: Defendant Larry Stork: Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 914.22(1)(a), 914.22(3)(a), 914.23(1).**

2611. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 2187-2197 of this Complaint as though fully set forth herein.

2612. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

2613. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

2614. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

2615. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

2616. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

2617. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with

a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

2618. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

2619. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

2620. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

2621. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

2622. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

2623. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

2624. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records in or about August, 2021 that showed phone calls between Nicholas Stork and the Pavilion, Brenda Stork, Larry Stork, and Deborah Baird admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

2625. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and the military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

2626. Defendant Larry Stork violated Fl. St. §914.22(1)(a) when she used a trick against the Plaintiff during the Florida Whistleblower proceeding.

2627. Defendant Larry Stork violated Fl. St. 914.23(1), when she knowingly engaged in conduct intended to cause bodily harm to the Plaintiff using

confinement as part of the military scheme to prevent the Plaintiff from attending or continuing the Florida Whistleblower lawsuit.

2628. Defendant Larry Stork violated Fl. St. §772.103(3), when he became associated with or employed by the illicit enterprise set up by the military that included Sandra Sovinski and Svetlana Shtrom, and engaged in multiple violations of Fl. St. §914.22(1)(a) using a scheme to obtain the Plaintiff's physical confinement in violation of Fl. St. §914.22(3)(a), and retaliation in violation of Fl. St. §914.23(1), to cover up the evidence of perjury in the USPTO, and in attempts to force the Plaintiff to sign a settlement agreement, to acquire or maintain control of the Plaintiff's company, sdPhotonics, and extort additional property from the Plaintiff.

2629. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 23: Defendant Robin Foret. Fl. St. §§ 772.103(2), 772.103(3), 772.103(4), 772.104(1), 914.22(1)(a), 914.22(3)(a).**

2630. Plaintiff realleges and incorporates paragraphs realleges and incorporates paragraphs 119, 487-488, 491, 499-518, 525-527, 2187-2197 of this Complaint as though fully set forth herein of this Complaint as though fully set forth herein.

2631. In or about August, 2019, the Plaintiff leased an apartment in Richardson, TX, close to his company's location.

2632. The Plaintiff met Defendant Foret while living in Richardson, TX, and they dated some while he was in Texas.

2633. The Plaintiff and Defendant Foret stopped dating in or about November, 2019.

2634. The Florida Whistleblower lawsuit was filed in Florida's 9th Judicial Circuit state court because of retroactive declarations Sovinski and other employees were filing into the USPTO on patents covering the Plaintiff's oxide-free VCSEL inventions being developed by the Plaintiff's company.

2635. The Plaintiff returned to his house in Oviedo, FL, or about the end of March, 2020 as his apartment lease was ending during the initial peaks of the covid pandemic, to be safer from the covid pandemic and work from home.

2636. In Q4 2020, during the Florida Whistleblower proceedings, the Plaintiff was extorted, stalked, assaulted and battered, over the evidence of government crimes involving perjury by UCF employees and the USPTO declarations filed by Sandra Sovinski.

2637. In or about the end of December, 2020, the Plaintiff contacted Defendant Foret to explain what had occurred in Q4 2020 involving the Florida Whistleblower proceedings, and obtain legal advice she may be able to provide.

2638. The Plaintiff requested Defendant Foret review work by the attorney Joe Southron who the Plaintiff had hired to dismiss the Florida Whistleblower lawsuit.

2639. Defendant Foret agreed to review documents prepared by Southron and verify that he was not trying to further sabotage the proceedings of the lawsuit.

2640. Defendant Foret did review for the Plaintiff documents Joe Southron filed into the Florida Whistleblower proceeding.

2641. Defendant Foret then made unusual referrals to the two Texas attorneys to address the false declarations Sandra Sovinski had filed into the USPTO, Kevin Keeling and Mark Solomon, explaining that Solomon would be particularly helpful because he had a doctorate.

2642. Defendant Foret could not explain why an attorney possessing a doctorate would be helpful.

2643. The Plaintiff did hire Keeling and Solomon based on Defendant Foret's recommendation.

2644. After being hired, and obtaining control over the patent applications with a power of attorney, Kevin Keeling and Mark Solomon refused to correct the false declarations because Mark Solomon had a doctorate.

2645. Kevin Keeling and Mark Solomon then used the power of attorney they had obtained through the Foret referral to allow additional attorneys working with UCF to file additional declarations onto new patent applications filed by the Plaintiff or his company.

2646. In or about the end of March, 2020, Defendant Foret provided the Plaintiff additional information that the military had used inspector generals in the organized crime.

2647. Defendant Foret and the Plaintiff had not discussed Hannibal Ware, who was involved in the crimes with the military employees.

2648. Defendant Foret violated Fl. St. §914.22(1)(a) when she knowingly used the trick or the scheme and claimed Keeling and Solomon would assist the Plaintiff in obtaining corrections to the declarations Sovinski had filed that contained evidence of perjury in the USPTO, and claimed that Solomon would be especially helpful because he had a doctorate.

2649. Fl. St. §914.22(1)(a) states in relevant part, "A person who knowingly... engages in misleading conduct towards another person... with intent to cause or induce any person to... withhold a record, document, or other object, from an... official proceeding... commits the crime of tampering with a witness..."

2650. Defendant Foret violated Fl. St. §914.22(3)(a) by harassing the Plaintiff during the Florida Whistleblower proceeding and the proceeding of the patent application of the USPTO to hinder, delay, prevent, or dissuade the Plaintiff from further testifying or placing evidence in both proceedings, or attempting to do so, with the claim that Solomon had a doctorate and could address the evidence of perjury on the patent applications, for no legitimate purpose, to cause further damage to the Plaintiff's company.

2651. Defendant Foret violated Fl. St. §772.103(2) when she engaged in a pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St. §914.22(3)(a) using tricks, schemes, and harassment, to prevent evidence from entering official

proceedings in the Florida Whistleblower lawsuit and the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2652. In the alternative, Defendant Foret violated Fl. St. §772.103(3) when she became employed by, or associated with, the enterprise set up by employees of the DOJ working with the military, universities, judges, and attorneys, and engaged in her pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St. §914.22(3)(a) using tricks, schemes, and harassment to prevent evidence from entering official proceedings in the Florida Whistleblower lawsuit and the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2653. In the alternative, Defendant Foret violated Fl. St. §772.103(4), when she confederated with the illicit enterprise and endeavored to cover up the evidence of perjury in the USPTO by facilitating the transfer of control of the patents to attorneys Keeling and Solomon, who then used a power of attorney agreement to prevent corrections to the false Sovinski USPTO declarations and acquire or maintain control of the Plaintiff's company, sdPhotonics.

2654. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 24: Defendant Joe Southron. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 914.22(1)(a), 914.22(3)(a).**

2655. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 2187-2197, and Exhibits 8-10, 14, 16 of this Complaint as though fully set forth herein.

2656. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings.

2657. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

2658. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

2659. However, Defendant Southron prepared an improper complaint, that brought the Florida Whistleblower Act, Fl. St. §112.3187 against improperly against individuals, and for a large number of individuals.

2660. Prior Florida court rulings had already disallowed what Southron was attempting, which was to bring violations of the Fl. St. §112.3187 against individuals.

2661. When the Plaintiff informed Defendant Southron that the Plaintiff would not allow the improper amended complaint that Southron had prepared to

be filed, Southron informed the Plaintiff that he was withdrawing from representation and refused to properly dismiss the Florida Whistleblower lawsuit.

2662. When the Plaintiff objected to Defendant Southron about his refusal to dismiss the complaint, Defendant Southron filed improper dismissal orders that other attorneys, Robin Foret and Kevin Keeling, caught, and explained to the Plaintiff why these could be damaging to the Plaintiff.

2663. Defendant Southron violated Fl. St. §914.22(1)(a) when he knowingly used the trick or the scheme of preparing an improper complaint that brought the Florida Whistleblower Act against individuals, to prevent evidence of perjury in the USPTO from entering the proceeding through a proper complaint.

2664. Fl. St. §914.22(1)(a) states in relevant part, "A person who knowingly... engages in misleading conduct towards another person... with intent to cause or induce any person to... withhold a record, document, or other object, from an... official proceeding... commits the crime of tampering with a witness..."

2665. Defendant Southron violated Fl. St. §914.22(3)(a) by harassing the Plaintiff during the Florida Whistleblower proceeding and for no legitimate purpose refused to properly dismiss the Florida Whistleblower lawsuit, until Southron was forced to do otherwise, to prevent the Plaintiff from being able to bring future claims involving perjury in the USPTO by UCF employees and attorneys.

2666. Defendant Southron violated Fl. St. §772.103(2) when he engaged in a pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St.

§914.22(3)(a) using tricks, schemes, and harassment, to prevent evidence from entering official proceedings in the Florida Whistleblower lawsuit and the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2667. In the alternative, Defendant Southron violated Fl. St. §772.103(3) when he became employed by, or associated with, the enterprise set up by employees of the DOJ working with the military, universities, judges, and attorneys, and engaged in her pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St. §914.22(3)(a) using tricks, schemes, and harassment to prevent evidence from entering official proceedings in the Florida Whistleblower lawsuit and the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2668. In the alternative, Defendant Southron violated Fl. St. §772.103(4), when he confederated with the illicit enterprise and endeavored to cover up the evidence of perjury in the USPTO with the improper amended complaint, and refused to properly dismiss the Whistleblower lawsuit until he was forced to do so.

2669. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 25: Defendant Gerhold. Fl. St. §§ 772.103(4), 772.104(1), 777.04(3), 748.048(2), 812.081(2)(a), (b).**

2670. Plaintiff realleges and incorporates paragraphs 86-88, 296-300, 496-497, 561-566, 630-641, 2187-2198 and Exhibit 2 of this Complaint of this Complaint as though fully set forth herein.

2671. Defendant Gerhold had a separate SBIR project with the Plaintiff's company, sdPhotonics, to develop the oxide-free VCSEL and optical interconnect for focal plane array cameras that operate at 77 K and that undergo thermal cycling.

2672. Defendant Gerhold had worked with Charles Kuznia and Washington, D.C. meetings in March, 2020 with congressional offices to seek additional funding, during the Florida Whistleblower proceedings involving the false declarations that UCF's Sandra Sovinski had filed into the USPTO.

2673. Defendant Gerhold contacted the Plaintiff by phone in or about January, 2021, to discuss the oxide-free and Cryo-VCSEL inventions from sdPhotonics.

2674. Defendant Gerhold informed the Plaintiff that he had been contacted by Deborah Van Vechten who had informed Gerhold that sdPhotonics would be giving up ownership of its VCSEL technologies.

2675. The Plaintiff informed Gerhold in response that sdPhotonics was not relinquishing ownership of its VCSEL inventions. Gerhold then responded that he was glad to hear that, and had additional funding for sdPhotonics to test reliability, and asked the Plaintiff for details on equipment and facilities to test the VCSELs.

2676. In or about March, 2021, the Plaintiff received an article written by Defendant Gerhold about sdPhotonics new VCSEL technologies, and buried in the

article were several statements claiming the Cryo-VCSEL invention had come from Milton Feng's laboratory at the University of Illinois.

2677. The Plaintiff responded to Gerhold with Feng cc'd after reading the article and informed Gerhold that the article was incorrect, and that sdPhotonics had invented and developed the Cryo-VCSEL invention, not Milton Feng.

2678. Defendant Gerhold agreed to correct the article after Milton Feng admitted in response that it was sdPhotonics and the Plaintiff who had invented and developed the Cryo-VCSEL invention.

2679. Fl. St. §812.081(2) makes it unlawful for a person "to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently: (a) Deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) Appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2680. Defendant Gerhold violated Fl. St. §772.103(3) when he violated Fl. St. §812.081(2)(a), (b) trying to shift control and invention ownership of the Cryo-VCSEL prototypes to Milton Feng, while he was employed by, or associated with, the illicit enterprise involving attorneys, Van Vechten, and UCF employees who engaged in perjury filing false declarations into the USPTO, or in the alternative conspired, combined, confederated, or endeavored in violation of Fl. St. §772.103(4), to become employed by or associated with the illicit enterprise, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2681. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 26: Defendant Kevin Keeling. Fl. St. §§ 772.103(2), 772.103(3), 772.103(4), 772.104(1), 748.048(2), 817.034(4)(a), 914.22(1)(a), 914.22(3)(a).**

2682. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 2187-2197 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

2683. The Plaintiff hired Defendant Keeling along with Mark Solomon, in or about January, 2021, at the recommendation of Robin Foret, and after Keeling and Solomon confirmed that their review of the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

2684. Defendant Keeling assisted the Plaintiff to dismiss the Florida Whistleblower proceeding, by reviewing the dismissal orders that were prepared by Joe Southron and providing legal explanations as to why what Southron had prepared could be damaging to the Plaintiff.

2685. Defendant Keeling then reviewed the dismissal order prepared by Southron that was in fact filed to dismiss the case without prejudice, and confirmed that this dismissal order prepared by Southron was proper.

2686. However, following the dismissal of the Florida Whistleblower lawsuit, Kevin Keeling refused to take the actions he had promised, and refused to take any action to correct past USPTO declarations.

2687. Instead, Defendant Keeling relied on the power of attorney that had been given to his partner, Mark Solomon, and claimed that Solomon had a doctorate and knew what he was doing, as Keeling and Solomon allowed other attorneys working with UCF to file additional false declarations on the new USPTO patent applications filed by the Plaintiff or his company.

2688. Fl. St. §914.21(4)(c) defines an official proceeding as "a proceeding before a federal agency that is authorized by law."

2689. The USPTO patent prosecution constitutes an official proceeding pursuant to Fl. St. §914.21(4)(c).

2690. Fl. St. §914.22(1)(a) states in relevant part, "A person who knowingly... engages in misleading conduct towards another person... with intent to cause or induce any person to... withhold a record, document, or other object, from an... official proceeding... commits the crime of tampering with a witness..."

2691. Defendant Keeling violated Fl. St. §914.22(1)(a) when he knowingly used the trick or the scheme involving a power of attorney and claimed he and Solomon would assist the Plaintiff in obtaining corrections to the declarations Sovinski had filed that contained evidence of perjury in the USPTO because of the extortion and additional false declarations filed in or about April, 2020, and October, 2020, during the Florida Whistleblower proceeding.

2692. Once Solomon had obtained a power of attorney needed to correct the evidence of perjury by Sovinski in the proceedings of the USPTO, Defendant Keeling refused to take action related to the evidence of perjury in the USPTO

proceeding. Instead, Keeling allowed other attorneys working with Sovinski to file the false ownership declarations onto new patent applications that were filed by the Plaintiff or his company.

2693. Defendant Keeling violated Fl. St. §914.22(3)(a) by harassing the Plaintiff during the Florida Whistleblower proceeding and the proceeding of the patent application of the USPTO to hinder, delay, prevent, or dissuade the Plaintiff from further testifying or placing evidence in both proceedings, or attempting to do so, with the claim that Solomon had a doctorate and could address the evidence of perjury on the patent applications, for no legitimate purpose, to cause further damage to the Plaintiff's company.

2694. Defendant Keeling violated Fl. St. §772.103(2) when he engaged in a pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St. §914.22(3)(a) using tricks, schemes, and harassment, to prevent evidence from entering official proceedings in the Florida Whistleblower lawsuit and the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2695. In the alternative, Defendant Keeling violated Fl. St. §772.103(3) when he became employed by, or associated with, the enterprise set up by employees of the DOJ working with the military, universities, judges, and attorneys, and engaged in her pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St. §914.22(3)(a) using tricks, schemes, and harassment to prevent evidence from entering official proceedings in the Florida Whistleblower

lawsuit and the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2696. In the alternative, Defendant Keeling violated Fl. St. §772.103(4), when he confederated with the illicit enterprise and endeavored to cover up the evidence of perjury in the USPTO by facilitating the transfer of control of the patents to himself and Solomon, who then used a power of attorney agreement to prevent corrections to the false Sovinski USPTO declarations and acquire or maintain control of the Plaintiff's company, sdPhotonics.

2697. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 27: Defendant Solomon. Fl. St. §§ 772.103(2), 772.103(3), 772.103(4), 772.104(1), 748.048(2), 817.034(4)(a), 914.22(1)(a), 914.22(3)(a).**

2698. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 2187-2197 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

2699. Plaintiff hired Defendant Solomon and his associate or partner, Kevin Keeling, in or about January, 2021, at the recommendation of Robin Foret.

2700. Defendant Solomon confirmed in his review of records from the Florida Whistleblower lawsuit, that the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

2701. Defendant Solomon informed the Plaintiff that Solomon could assist the Plaintiff with legal works to correct the false declarations at issue that had been filed by Sandra Sovinski into the USPTO.

2702. However, after obtaining a power of attorney from the Plaintiff, Solomon refused to take actions to correct the false declarations that Solomon had already determined constituted fraud and perjury in the USPTO.

2703. Defendant Solomon claimed instead that since Solomon had a doctorate, he knew what he was doing, and the Plaintiff should not question Solomon about not making corrections to the false declarations at issue, as Solomon had promised before obtaining the power of attorney.

2704. Instead of correcting the false declarations that had been filed by Sovinski into the USPTO, Defendant Solomon used his power of attorney to allow other attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company.

2705. Fl. St. §914.21(4)(c) defines an official proceeding as "a proceeding before a federal agency that is authorized by law."

2706. The USPTO patent prosecution constitutes an official proceeding pursuant to Fl. St. §914.21(4)(c).

2707. Fl. St. §914.22(1)(a) states in relevant part, "A person who knowingly... engages in misleading conduct towards another person... with intent to cause or induce any person to... withhold a record, document, or other object, from an... official proceeding... commits the crime of tampering with a witness..."

2708. Defendant Solomon violated Fl. St. §914.22(1)(a) when he knowingly used the trick or the scheme involving a power of attorney and claimed he and Solomon would assist the Plaintiff in obtaining corrections to the declarations Sovinski had filed that contained evidence of perjury in the USPTO because of the extortion and additional false declarations filed in or about April, 2020, and October, 2020, during the Florida Whistleblower proceeding.

2709. Once Solomon had obtained a power of attorney needed to correct the evidence of perjury by Sovinski in the proceedings of the USPTO, Defendant Solomon refused to take action related to the evidence of perjury in the USPTO proceeding. Instead, Solomon allowed other attorneys working with UCF to file the false ownership declarations onto new patent applications that were filed by the Plaintiff or his company.

2710. Defendant Solomon violated Fl. St. §914.22(3)(a) by harassing the Plaintiff during involving the official proceeding of the patent application of the USPTO to hinder, delay, prevent, or dissuade the Plaintiff from further filing evidence or corrections in the USPSTO, or attempting to do so, with the claim that Solomon had a doctorate that he chose to use as the reason to not address the evidence of perjury on the patent applications, or additional filings by attorneys working with UCF, for no legitimate purpose, and to further damage to the Plaintiff and the Plaintiff's company.

2711. Defendant Solomon violated Fl. St. §772.103(2) when he engaged in a pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St. §914.22(3)(a)

using tricks, schemes, and harassment, to prevent evidence from entering USPTO proceeding on the patents, instead allowing other attorneys working with UCF and the military to file false declarations on the patents, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2712. In the alternative, Defendant Solomon violated Fl. St. §772.103(3) when he became employed by, or associated with, the enterprise set up by employees of the DOJ working with the military, universities, judges, and attorneys, and engaged in her pattern of criminal activity, violating Fl. St. §914.22(1)(a) and Fl. St. §914.22(3)(a) using tricks, schemes, and harassment to prevent evidence from entering official proceedings in the Florida Whistleblower lawsuit and the USPTO, and used his power of attorney to let others file false declarations on patents, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2713. In the alternative, Defendant Solomon violated Fl. St. §772.103(4), when he confederated with the illicit enterprise and endeavored to cover up the evidence of perjury in the USPTO by facilitating the transfer of control of the patents to himself and Solomon, who then used a power of attorney agreement to prevent corrections to the false Sovinski USPTO declarations and acquire or maintain control of the Plaintiff's company, sdPhotonics.

2714. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 28: Defendant Jeffrey Shainline. Fl. St. §§ 772.103(2), 772.103(3), 772.103(4), 772.104(1), 748.048(2), 812.081(2)(a), (b).**

2715. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 2187-2198 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

2716. Defendant Shainline repeatedly contacted the Plaintiff and informed him that his organization, NIST, wished to work with sdPhotonics on the large government project NIST was targeted to oversee which at that point was known as "Build Back Better" under the Biden Administration, and later became "Chips + Science."

2717. Shainline had numerous phone calls in or about April, 2021, to learn details of how sdPhotonics oxide-free VCSEL invention could be integrated onto silicon platforms and why certain approaches that had been tried such as by Bowers at UCSB had been failures.

2718. After numerous phone calls in which the Plaintiff explained the technical issues to Shainline and what needed to be implemented for successful integration, the Plaintiff asked Shainline for more details on the proposal so that sdPhotonics could begin making plans to provide the proposal to Shainline.

2719. Instead, Shainline sent the Plaintiff the email informing the Plaintiff that Shainline and NIST intended to use the Cryo-VCSEL prototypes that Feng had refused to return to sdPhotonics as part of IARPA Supercables.

2720. Defendant Shainline had no involvement in the IARPA Supercables project.

2721. Defendant Shainline taunted and harassed the Plaintiff, informing the Plaintiff that Shainline did not believe money was important to the Plaintiff or his company, and repeating flawed studies that Feng had claimed he would do on the Cryo-VCSEL prototypes at the University of Illinois.

2722. Defendant Shainline did not contact the Plaintiff again after confirming to the Plaintiff that Shainline had obtained control of the sdPhotonics' Cryo-VCSEL prototypes that were being tested by Feng at the University of Illinois, and intended to use the Cryo-VCSEL prototype in his own projects to obtain additional funding and develop.

2723. Fl. St. §748.048(1)(a) defines harassment as "to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose."

2724. Defendant Shainline violated Fl. St. §748.048(2) when he repeatedly called the Plaintiff without legitimate reason to do so, engaging in harassment in violation of §748.048(2), and in fact was to obtain trade secrets and sdPhotonics' information for the NIST proposal that he would submit, and yet by Shainline's own admission would use the trade secrets and information for his own use without sdPhotonics.

2725. Defendant Shainline violated Fl. St. §812.081(2)(a) and/or (b), when he obtained or used, or endeavored to obtain or use, the Cryo-VCSEL prototypes

of sdPhotonics from the IARPA Supercables project that Milton Feng had refused to return. Fl. St. § Fl. St. §812.081(2) which states in relevant part that it is (a) "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2726. Defendant Shainline violated Fl. St. §772.104(2), or in the alternative §772.103(3), or in the alternative §772.103(4), when he formed an illicit enterprise and engaged in a pattern of criminal activity to misappropriate sdPhotonics' business plans and trade secrets for his own use, and obtained or attempted to obtain the sdPhotonics' Cryo-VCSEL prototypes, which used sdPhotonics' trade secrets and in fact constituted a trade-secret, or was employed by or associated with the illicit enterprise set up by the military and employees University of Illinois, or conspired or endeavored to be employed by the illicit enterprise involving the crimes of §748.048(2) and §812.081(2)(a) and/or (b).

2727. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 29: Defendant Sabine O'Neal. Fl. St. §§ 772.103(2), 772.103(3), 772.104(1). 817.15.**

2728. Plaintiff realleges and incorporates paragraphs 94-116, 161-167, 172-174, 588-594, 630-641, 2187-2197 of this Complaint as though fully set forth herein.

2729. Defendant O'Neal was employed by sdPhotonics as its president from about 2008 until or about December, 2015.

2730. Defendant O'Neal's employment responsibilities with sdPhotonics were to serve as principal investigator and she oversaw the company's financial records and tax filings.

2731. Defendant O'Neal's employment responsibilities with sdPhotonics had included writing and filing proposals to obtain research contracts, serving as principal investigator on those contracts, and overseeing the company's financial records and tax filings with a tax accountant.

2732. In or about 2012, sdPhotonics needed to close out an SBIR Phase II contract with the military, and the military sent an auditor to visit the company and audit the accounting records for direct costs expenditures made on the contract and indirect costs expended on the contract, comprising overhead.

2733. O'Neal worked with the military auditor for about five (5) hours alone in O'Neal's office.

2734. Following the meeting with the auditor, O'Neal claimed the military audit of the company's direct and indirect cost expenditures were nearly perfect, and had only one small accounting error of a few dollars.

2735. Defendant O'Neal then generated accounting records that falsely represented the contract had been properly closed out.

2736. Sometime after the audit, in or about 2013, sdPhotonics lost a contract that had been awarded because the awarding agency could not verify the company's overhead numbers from prior audits.

2737. Because of this, the Plaintiff then requested the overhead information and accounting records from Defendant O'Neal.

2738. When the Plaintiff asked Defendant O'Neal for the accounting records of the direct and indirect company costs, O'Neal claimed she had no understanding of the overhead accounting or indirect costs, and could not provide the records.

2739. The Plaintiff had no experience in maintaining financial records at that time, and in or about 2014 the Plaintiff hired a separate accountant to oversee the sdPhotonics financial accounts.

2740. Defendant O'Neal insisted on working with that accountant.

2741. After sdPhotonics had the false ownership declarations filed onto its oxide-free VCSEL patents, and the Plaintiff targeted in extortion, stalking, assaults, and batteries, and its prototypes misappropriated by the military and university employees, the Plaintiff was forced to cease business operations for the company.

2742. In or about September, 2021, the Plaintiff began work with military auditors to audit the company's financial records and close out the company's remaining contracts.

2743. By or about April, 2022, the military auditors admitted that the military had engaged in fraud with O'Neal when it was discovered that O'Neal had set the company up on the incorrect accounting system not allowed for government contracts.

2744. By or about June, 2021, the auditors that O'Neal had not provided overhead or indirect costs in the audit in or about 2012, and yet the auditor at that time claimed to have reviewed and approved the overhead expenditures.

2745. This also explained why O'Neal had refused to provide any accounting information to the Plaintiff in 2013 and 2014, and instead resigned from the company at the end of December, 2014.

2746. Furthermore, the military auditors led by ?? also admitted to knowing prior to issuing the contracts that O'Neal had set up the accounting system with an improper accounting method not allowed by the military in tax filing.

2747. As the Plaintiff discovered in or about June, 2022, and the auditors confirmed, O'Neal had set up the company's accounting with an incorrect accounting system that could be used to damage the company's contracts and tax filings, and sabotage the company's business operations at some time in the future because of the incorrect filings.

2748. Defendant O'Neal then engaged in accounting fraud with the military auditor in or about 2012, to cover up the earlier fraud and improper tax filings, this fraud was discovered in or about June, 2022 by the Plaintiff with the military auditors.

2749. Defendant O'Neal violated Fl. St. §817.15 when she falsified the sdPhotonics business records in or about 2012, representing that the sdPhotonics contract had been properly closed out.

2750. Fl. St. §817.15 which states in relevant part "Any officer, agent, clerk or servant of a business entity who makes a false entry in the books thereof, with intent to defraud..."

2751. Defendant O'Neal furthermore engaged in constructive fraud, when she set up sdPhotonics accounting using the incorrect accounting system for tax filing and cost accrual basis required for government contracts.

2752. Defendant O'Neal violated Fl. St. §772.103(3), when she became employed by or associated with the illicit enterprise involving UCF and the military that used a pattern of criminal activity that included Defendant O'Neal who violated Fl. St. §817.15 and engaged in constructive fraud on tax filings, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2753. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 30: Defendant Linda Coco. Fl. St. §§ 772.103(3), 772.104(1), 784.048(2), 784.048(3), 817.034, 817.15.**

2754. Plaintiff realleges and incorporates paragraphs 114-137, 586-596, 630-641, 2187-2197 of this Complaint as though fully set forth herein.

2755. Defendant Coco was a law professor living in Orlando, FL and began dating the Plaintiff in or about 2015.

2756. Defendant Coco sought to become involved in the Plaintiff's company expressing an interest in learning how start-ups and military contracting worked.

2757. Defendant Coco consulted for the Plaintiff and his company, assisting in hiring and setting up financial accounts.

2758. In or about 2016, Defendant Coco then began making threats against the Plaintiff and his company for reasons she was unable to explain. Coco made threats that she would report the Plaintiff's company to the IRS, but did not say why.

2759. Defendant Coco then made threats with Angela Ghallagher that she and Angela Gallagher, the wife of the former UCF dean Neal Gallagher, would stalk and cyber-stalk the Plaintiff "for the rest of his life," and the Plaintiff was stalked and cyber-stalked.

2760. Defendant Coco then made false complaints to UCF administrators, claiming that the Plaintiff's company had withheld W-2's from employees, which even the UCF administrators admitted had been a false claim by Coco.

2761. In or about Spring, 2022, during reviews of financial records with military auditors, Defendant Coco was found to have placed errors in the sdPhotonics' retirement accounts of its employees and former employees, and that affected the company's IRS tax filings, and that the company was forced to correct.

2762. The errors sent retirement checks into incorrect accounts, and some checks to no accounts at all, consistent with Defendant Coco's threats that she had

taken actions to damage the Plaintiff's company through errors she placed in the company's financial records and tax filings with the IRS.

2763. Defendant Coco violated Fl. St. §772.103(3), or in the alternative Fl. St. §772.103(4), when was employed by or associated with, or when she conspired and confederated, with UCF administrators to make false reports against the Plaintiff and his company, threatened the stalking and cyber-stalking that in fact occurred, and engaged in constructive fraud in the financial accounts and tax filings of the Plaintiff's company, and endeavored to take part in the illicit enterprise set up by the military with UCF, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2764. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 31: Defendant Youndy Cook. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 817.034(4)(a), 914.22(1)(a).**

2765. Plaintiff realleges and incorporates paragraphs 188-189, 236-275, 278-280, 289, 292, 305-329, 383-385, 600-601, 630-641, 2187-2197 and Exhibits 3-10, 16, of this Complaint as though fully set forth herein.

2766. Defendant Cook was contacted by the Plaintiff in or about October, 2019, and provided information that Sandra Sovinski had filed false declarations into the USPTO on the Plaintiff's oxide-free VCSEL inventions, and had violated the 2014 IP Agreement and UCF-2.029.

2767. Defendant Cook and Sandra Sovinski refused to correct the declaration in the USPTO.

2768. The Plaintiff was then advised by Alen Hsu, John Taboada, and Karen Kline that he should file the Florida Whistleblower lawsuit to obtain the corrections.

2769. The Florida Whistleblower complaint was filed on or about December 12, 2019, and the complaint was served to UCF's legal counsel including Youndy Cook.

2770. From early January, 2020 into May, 2020 during the Florida Whistleblower proceedings, Defendant Cook worked with Sandra Sovinski and Alen Hsu who sent the Plaintiff numerous drafts of an agreement that claimed UCF needed military approval to correct the false declarations Sovinski had filed into the USPTO.

2771. The drafts of the agreement included markups identified in the drafts as made by Defendant Cook, Sovinski, or Hsu.

2772. However the military had already secured government rights in the invention, and UCF had no involvement in the sdPhotonics' government contract that involved development of the oxide-free VCSEL invention under Lateka Eifert.

2773. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

2774. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings were proven false by prior USPTO filings that were part of the applications.

2775. After Sovinski filed the altered declarations into the USPTO in April, 2020, and again violated UCF-2.029, the Plaintiff was again presented the agreement prepared by Cook, Sovinski, and Hsu, that the Plaintiff had rejected.

2776. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that Svetlana Shtrom had contacted a separate Army office than the office that issued the government contracts to sdPhotonics monitored by Lateka Eifert, claiming that UCF had been owed a subcontract on one of the sdPhotonics' Army contracts because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics.

2777. In or about late May, 2020, Alen Hsu sent the Plaintiff the agreement that had been prepared by Cook, Sovinski, and Hsu, that falsely claimed UCF required approval from the Army office that was unrelated to the Lateka Eifert or the contracts, or Eifert's own military office who had issued and monitored the contracts to the Plaintiff's company.

2778. In or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her the emails by UCF to the separate Army office that claimed Eifert should have issued UCF a subcontract because O'Neal had been employed part time with UCF when the contract was issued.

2779. Eifert then informed the Plaintiff that she would need to discuss the matter with her supervisors.

2780. Eifert contacted the Plaintiff about a week later an informed him that UCF had engaged in fraud in what Shtrom had sent the other office, and had engaged in fraud on their other military contracts from her office.

2781. Eifert then informed the Plaintiff that her supervisors wanted the Plaintiff to file a complaint with the SBA IG with the records showing what Shtrom had done, and gave the Plaintiff instructions on reporting the fraud by the UCF employees to the SBA IG, Hannibal Ware.

2782. In or about October, 2022, the Plaintiff again contacted Defendant Cook by email again in October, 2022, after military auditors confirmed that sdPhotonics was paying patent costs on the patents at issue, and that Sovinski had breached the 2014 IP Agreement.

2783. The Plaintiff included the military auditors on the email to Cook who had verified the patent payments from sdPhotonics to UCF.

2784. Defendant Cook did not respond to the Plaintiff's contact and information in October, 2021 showing Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement.

2785. By the end of December, 2022, the Plaintiff was being electronically and physically stalked, assaulted, and battered so heavily by the DOJ and military, he was forced to leave the U.S. for his physical safety.

2786. Defendant Cook violated Fl. St. §914.22(1)(a), when she used a scheme based on a settlement agreement that used false information that UCF had been owed a subcontract on sdPhotonic's government contracts, that use a separate government office than the office that issued and monitored the contract to sdPhotonics, for which Cook intended to use in the Florida Whistleblower proceedings to cover up the evidence of perjury in the USPTO by Sovinski in or about August, 2019 and again in April, 2020.

2787. Defendant Cook violated Fl. St. §772.103(2) when she engaged in the pattern of criminal activity involving perjury in the USPTO by Sovinski in or about August, 2019, and again in April, 2020, violating Fl. St. §914.22(1)(a) using tricks and schemes involving an Army office unrelated to sdPhotonics' government contracts, that she then used in an agreement that even Lateka Eifert determined was fraudulent, with the intent to prevent evidence from entering official proceedings in the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2788. In the alternative, Defendant Cook violated Fl. St. §772.103(3) when he became employed by, or associated with, the enterprise set up by employees of the DOJ working with the military, universities, judges, and attorneys, and engaged in the pattern of criminal activity involving the repeated commission of perjury in the USPTO by Sovinski in or about August, 2019, and again in April, 2020 during the Florida Whistleblower proceeding, violating Fl. St. §914.22(1)(a) using tricks and schemes involving an Army office unrelated to sdPhotonics'

government contracts, with the intent to prevent evidence from entering official proceedings in the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2789. In the alternative, Defendant Cook violated Fl. St. §772.103(4), when she confederated with the illicit enterprise engaged in the pattern of criminal activity involving the repeated commission of perjury in the USPTO by Sovinski in or about August, 2019, and again in April, 2020 during the Florida Whistleblower proceeding, violating Fl. St. §914.22(1)(a) using tricks and schemes involving an Army office unrelated to sdPhotonics' government contracts, with the intent to prevent evidence from entering official proceedings in the USPTO, to acquire or maintain, directly or indirectly, control of the Plaintiff's company, sdPhotonics.

2790. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 32: Defendant Bahaa Saleh. Fl. St. §§ 772.103(4), 772.104(1).**

2791. Plaintiff realleges and incorporates paragraphs 481, 485-534, 581-582, 630-641, 2187-2197 of this Complaint of this Complaint as though fully set forth herein.

2792. Defendant Saleh oversaw the UCF Photonics Incubator that was part of the larger UCF High Technology Incubator system that has multiple site locations.

2793. Defendant Saleh also supervised Sabine O'Neal after she had become a full-time employee of UCF, and met with her monthly to learn about her consulting work with sdPhotonics.

2794. In or about April, 2018, Sabine O'Neal learned from the Plaintiff that he intended to move his company sdPhotonics from the UCF Photonics Incubator, and that it would take approximately 24 months to arrange and complete the move.

2795. In or about September, 2018, after Sabine O'Neal learned the Plaintiff planned to move the Defendant Saleh took action against the Plaintiff's company, demanding the company be moved immediately.

2796. sdPhotonics had just signed a new one-year lease with the head of the UCF Technology Incubator in August, 2018, that had gone through the necessary levels of approval.

2797. Defendant Saleh knew the move would damage the sdPhotonics' business operations by preventing it from work on the company's research and development contracts.

2798. Because sdPhotonics had already signed a one-year lease, Defendant Saleh instead refused to sign the necessary paperwork to allow the Plaintiff to continue to be employed by both UCF and sdPhotonics to force the immediate move of the Plaintiff's company.

2799. The director of the UCF High Technology Incubator then stepped in and in October, 2021, obtain an 18-month time period for the Plaintiff to exit his

company from the incubator, to give time to find alternative facilities to house the company's crystal growth, and not damage the company's contracts.

2800. However, Sandra Sovinski continued the actions, and in January, 2020 tried to damage the Plaintiff's company by forcing the immediate eviction that Saleh was seeking in September, 2018.

2801. Defendant Saleh violated Fl. St. §772.103(4), when he confederated, combined, and endeavor to be associated with the illicit enterprise that had been set up in UCF with the military, to engage in a pattern of criminal activity to damage the Plaintiff's company, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2802. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs

**Count 33: Defendant Elizabeth Klonoff. Fl. St. §§ 772.103(4), 772.104(1), 777.04(4).**

2803. Plaintiff realleges and incorporates paragraphs Plaintiff realleges and incorporates paragraphs 110-111, 162-166, 188-189, 192, 236-276, 2187-2197 and Exhibit 6 of this Complaint as though fully set forth herein.

2804. Defendant Klonoff repeatedly sought to obtain direct access to intellectual property being developed by the Plaintiff's company through Sabine O'Neal.

2805. Defendant Klonoff used Sabine O'Neal who consulted for sdPhotonics to request proposals from the Plaintiff's company on how they would solve certain

technology problems using sdPhotonics inventions, with claims the contracts would be in the range of $250,000 ~ $350,000 to perform the initial work.

2806. Despite multiple such requests, Klonoff always worked through O'Neal as opposed to the Plaintiff directly.

2807. The email records from Karen Kline's contact to Sandra Sovinski show that Defendant Klonoff then participated in the plan with Sovinski to file false ownership declarations in violation of UCF Regulations UCF-2.029(4)(d) into the USPTO.

2808. In or about the end of December, 2018, Sandra Sovinski made the plan with Defendant Klonoff, Youndy Cook, Svetlana Shtrom, and John Miner that became the false declarations and breaches of the 2014 IP Agreement and UCF-2.029 that Klonoff oversees, that Sandra Sovinski filed into the USPTO creating the dispositive evidence of perjury.

2809. The declarations filed by Sovinski into the USPTO attaches a 2014 IP Agreement that is pursuant to UCF-2.029, and that Klonoff is required to follow.

2810. The declarations filed by Sovinski make statements about the patent filings and inventor rights to inventions that contradict the 2014 IP Agreement.

2811. Sovinski claimed that the Plaintiff exchanged his employment rights to give UCF unrestricted rights to his inventions, while the 2014 IP Agreement states the terms of those rights are pursuant to UCF Regulations UCF-2.029.

2812. Klonoff knew at the time Sovinski filed the declarations into the USPTO, that the plan she participated in with Sovinski that UCF was required to

follow UCF-2.029, and that Deppe's employment rights were in fact contained in UCF-2.029 that Sovinski and Shtrom were violating with their retroactive USPTO declarations.

2813. Defendant Klonoff violated Fl. St. §772.103(4) when she agreed, conspired, combined and/or confederated, and endeavored to be employed by or associated with the illicit enterprise with Sovinski to commit perjury in the USPTO, in violation of Fl. St. §837, and with the illicit enterprise set up by the military with UCF, to acquire or maintain control over the Plaintiff's company.

2814. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 34: Defendant Rashid Bashir. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 812.081(2)(a), (b).**

2815. Plaintiff realleges and incorporates paragraphs 481, 485-534, 581-582, 2187-2197 of this Complaint of this Complaint as though fully set forth herein.

2816. Defendant Bashir and the Plaintiff discussed the Plaintiff's research in meetings prior to the issuance of the IARPA Supercables project to sdPhotonics.

2817. Defendant Bashir was interested in learning about the Plaintiff's research into quantum dot light sources for quantum computing, and led into a strange discussion about the government funding the University of Illinois may obtain for the quantum dot light sources the Plaintiff was researching.

2818. The IARPA Supercables project was issued to sdPhotonics in or about June, 2019, and a subcontract issued from sdPhotonics to Bashir's College of

Engineering to perform high-speed testing on the sdPhotonics Cryo-VCSEL, using a transceiver design and laser design for the Cryo-VCSEL the Plaintiff had developed for operation at cryogenic temperatures down to zero kelvin.

2819. The Plaintiff was to develop a quantum mechanical current-voltage model on the Supercables project using the same Cryo-VCSEL prototypes tested by Feng at Illinois.

2820. However, after Feng tested the sdPhotonics' Cryo-VCSEL prototypes and confirmed the Plaintiff's design and record speed levels, Feng refused to return the Cryo-VCSEL prototypes to sdPhotonics so the company could complete it work.

2821. Instead, Defendant Bashir had graduate students from the Univ. of Illinois publish an article in or about June, 2022 that claimed Feng had developed the Cryo-VCSEL laser in the University of Illinois laboratory.

2822. In or about November, 2021, after the IARPA Supercables program had ended, and Feng and IARPA had been instructed by the Plaintiff to cease work on the sdPhotonics' Cryo-VCSEL invention and return the prototypes, the Plaintiff contacted Bashir, Feng, and Martinis by email, and requested the return of the Cryo-VCSEL prototypes.

2823. The Plaintiff explained to Bashir, Martinis and Feng that explained that sdPhotonics' own research and testing on its prototypes on the IARPA Supercables project had been disrupted by the refusal to return the Cryo-VCSEL,

and requested that Defendant Bashir return the sdPhotonics Cryo-VCSEL prototype.

2824. Instead of Defendant Bashir returning the prototype, the Plaintiff received an email from Susan Martinis office that included Milton Feng, John Dallesassee, and Fred Kish, and that claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

2825. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

2826. Defendant Bashir, Susan Martinis, and Milton Feng then produced scientific articles and Illinois press releases with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

2827. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from William Harrod at IARPA for the University of Illinois using the sdPhotonics' Cryo-VCSEL that Bashir, Martinis, and Feng refused to return.

2828. Defendant Bashir violated Fl. St. §812.081(2)(a) (b) when he refused to return the Cryo-VCSEL prototypes to the Plaintiff's company, sdPhotonics, and instead used the trade secrets in the prototypes to obtain additional contracts for his university and to benefit from additional funding he would bring in to his college from the military.

2829. Fl. St. §812.081(2)(a), (b), states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2830. Defendant Bashir violated Fl. St. §772.103(3), and in the alternative Fl. St. §772.103(4), by being employed by or associated with the illicit enterprise involving Milton Feng, attorneys, and military program monitors, in their pattern of criminal activity by violating Fl. St. 812.081(2)(a), (b), by refusing to return the Cryo-VCSEL invention, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2831. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 35: Defendant Susan Martinis. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 748.048(2), 812.081(2)(a), (b).**

2832. Plaintiff realleges and incorporates paragraphs 481, 485-534, 581-582, 2187-2197 of this Complaint of this Complaint as though fully set forth herein.

2833. The IARPA Supercables project was issued to sdPhotonics in or about June, 2019, and a subcontract issued from sdPhotonics to Bashir's College of Engineering to perform high-speed testing on the sdPhotonics Cryo-VCSEL, using

a transceiver design and laser design for the Cryo-VCSEL the Plaintiff had developed for operation at cryogenic temperatures down to zero kelvin.

2834. In or about November, 2021, after the IARPA Supercables program had ended, Feng and IARPA had been instructed by the Plaintiff to cease work on the sdPhotonics' Cryo-VCSEL invention and return the prototypes.

2835. When Feng refused, the Plaintiff contacted Defendant Martinis by email, and requested the return of the Cryo-VCSEL prototypes.

2836. The Plaintiff explained to Defendant Martinis that sdPhotonics' own research and testing on its prototypes on the IARPA Supercables project had been disrupted by the refusal to return the Cryo-VCSEL, and requested that Defendant Martinis return the sdPhotonics Cryo-VCSEL prototype.

2837. Instead of Defendant Martinis returning the Cryo-VCSEL prototype, the Plaintiff received an email from Susan Martinis office that included Milton Feng, John Dallesassee, and Fred Kish, and that claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

2838. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

2839. Defendant Bashir, Susan Martinis, and Milton Feng then produced scientific articles and Illinois press releases with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

2840. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from Harrod based on the device for the University of Illinois using the sdPhotonics' Cryo-VCSEL that Bashir, Martinis, and Feng refused to return.

2841. Defendant Martinis violated Fl. St. §812.081(2)(a), (b), which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2842. Defendant Martinis violated Fl. St. §812.081(2)(a) (b) when she refused to return the Cryo-VCSEL prototypes to sdPhotonics, claimed they were somehow invented by Nick Holonyak, and instead used them to obtain additional contracts for her university and to advance her career.

2843. Fl. St. §812.081(2) states in relevant part in (a) that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2844. Defendant Martinis violated Fl. St. §772.103(3), and in the alternative Fl. St. §772.103(4), by being employed by or associated with the illicit enterprise

involving Milton Feng, attorneys, and military program monitors, in their pattern of criminal activity by violating Fl. St. 812.081(2)(a),(b), by refusing to return the Cryo-VCSEL invention, and claiming it was somehow invented by Nick Holonyak, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2845. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 36: Defendant John Dallessasse. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 748.048(2), 812.081(2)(a), (b).**

2846. Plaintiff realleges and incorporates paragraphs 575-580, 2187-2197 of this Complaint of this Complaint as though fully set forth herein.

2847. Defendant John Dallesassee is a professor at the University of Illinois and former graduate student of Nick Holonyak.

2848. The IARPA Supercables project was issued to sdPhotonics in or about June, 2019, and a subcontract issued from sdPhotonics to the College of Engineering at the University of Illinois to perform high-speed testing on the sdPhotonics Cryo-VCSEL, using a transceiver design and laser design for the Cryo-VCSEL the Plaintiff had developed for operation at cryogenic temperatures down to zero kelvin.

2849. In or about November, 2021, after the IARPA Supercables program had ended, Feng and IARPA's William Harrod had been instructed by the Plaintiff to cease work on the sdPhotonics' Cryo-VCSEL invention and return the prototypes.

2850. When Feng continued to refuse to return the prototypes, the Plaintiff contacted Defendant Martinis by email, and requested the return of the Cryo-VCSEL prototypes.

2851. The Plaintiff explained to Defendant Martinis that sdPhotonics' own research and testing on its prototypes on the IARPA Supercables project had been disrupted by the refusal to return the Cryo-VCSEL, and requested that Defendant Martinis return the sdPhotonics Cryo-VCSEL prototype.

2852. Instead, Defendant Dallesassee joined Susan Martinis. Milton Feng, and Fred Kish, and claimed Nick Holonyak had invented the VCSEL, and because of this they would not return the Cryo-VCSEL.

2853. Nick Holonyak had no involvement in any of the Plaintiff's VCSEL inventions.

2854. Defendant Bashir, Susan Martinis, and Milton Feng then produced scientific articles and Illinois press releases with William Harrod of IARPA, claiming that Milton Feng and his graduate students had developed the Cryo-VCSEL invention in Milton Feng's University of Illinois laboratory.

2855. Defendant Bashir, Martinis, and Feng then used the Cryo-VCSEL prototypes to obtain additional research contracts from Harrod based on the device for the University of Illinois using the sdPhotonics' Cryo-VCSEL that Bashir, Martinis, and Feng refused to return.

2856. Fl. St. §784.048(2), states in relevant part, "A person who willfully, maliciously, and repeatedly... harasses... another person commits the offense of staking..."

2857. Defendant Dallesassee violated Fl. St. §784.048(2) when he joined others to repeat the false claims that his former thesis advisor, Nick Holonyak, had somehow invented the Cryo-VCSEL, and supported this as the reason why Feng, Bashir, and Martinis refused to return the prototype of the Plaintiff's Cryo-VCSEL invention.

2858. Defendant Dallesassee violated Fl. St. §812.081(2)(a), (b), which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2859. Defendant Dallesassee violated Fl. St. §812.081(2)(a) (b) when he claimed the Cryo-VCSEL prototypes were somehow invented by Nick Holonyak, and instead used them to obtain additional contracts for his university and to advance his career with his administrators and the military.

2860. Defendant Dallesassee violated Fl. St. §772.103(3), and in the alternative Fl. St. §772.103(4), by being employed by or associated with the illicit enterprise involving the military, Milton Feng, Bashir, Martinis, and military program monitors, in their pattern of criminal activity by violating Fl. St. §§

784.048(2), 817.034(4)(a), 812.081(2)(a), (b), to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2861. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 37: Defendant Melinda Miguel. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 914.22(1)(a).**

2862. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 630-641, 2187-2197, and Exhibits 8-10, 16, 24, 25of this Complaint as though fully set forth herein.

2863. The Plaintiff contacted Defendant Miguel in or about November, 2022, and provided information and records that employees working with UCF had engaged in perjury in the USPTO, and stalking, assaults, and batteries were being used against the Plaintiff in retaliation for his prior reporting through the Florida Whistleblower Act, and that the retaliation from coming from the UCF office of Robert Taft and Tina Maier.

2864. Despite that Defendant Miguel is prohibited by the Florida Whistleblower Act in Fl. St. §112.3187(4)(b) from taking any adverse action against the Plaintiff, Miguel sent the Plaintiff a letter not long after that she was sending the information he had provided to her to Robert Taft at UCF, cc'd Robert Taft at UCF.

2865. Miguel claimed she was sending Robert Taft at UCF the information and records the Plaintiff provided her pursuant to the Florida Whistleblower's Act.

2866. The information and records that contained evidence the UCF employee Sandra Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement, and that the office of Taft and Maier had engaged in retaliation in violation of the Florida Whistleblower's Act.

2867. Defendant Miguel sent the information to Robert Taft and Tina Maier at UCF, despite they had been implicated in retaliation in violation of the Florida Whistlblower's Act by the BCLP investigative report she had received from the prior Florida governor's office.

2868. After Miguel sent the letter to the Plaintiff, he became stalked, assaulted, and battered so heavily that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

2869. Defendant Miguel violated Fl. St. §914.22(1)(a), when she used a trick of claiming the Florida Whistleblower Act required her to send the Plaintiff's information about UCF back to Taft and Maier at UCF, with the intent to prevent the evidence of perjury by Sandra Sovinski in the USPTSO from entering other investigations or proceedings.

2870. Defendant Miguel violated Fl. St. §914.22(3)(b), when she harassed the Plaintiff by informing the Plaintiff she was sending his information to Taft and Maier at UCF, who Miguel acknowledged had been reported by the Plaintiff for retaliation in violation of the Florida Whistleblower's Act, in an attempt to prevent the Plaintiff from reporting the evidence of the crimes including perjury in the USPTO by employees and attorneys working with UCF and the military.

2871. Defendant Miguel violated Fl. St. §772.103(2), or in the alternative Fl. St. §772.103(3), or in the alternative Fl. St. §772.104(4), when she engaged in the pattern of criminal activity in or about November, 2022, knowing the military was involved in the alleged stalking, assaults, and batteries with UCF's office under Taft and Maier, violating Fl. St. §914.22(1)(a) using tricks and the scheme of sending information and records showing employees at UCF were engaged in crimes of perjury, back to the UCF audit office of Taft and Maier to use the Florida Whistleblower's Act to cover-up the evidence with a false letter, and violating Fl. St. §914.23(3)(b), by sending the Plaintiff letter that she was sending the information, without legitimate reason, to Robert Taft who the Plaintiff had implicated in earlier retaliation, all to acquire and maintain control of the Plaintiff's company, sdPhotonics.

2872. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 38: Defendant Tina Maier. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 914.22(1)(a).**

2873. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 630-641, 2187-2197, and Exhibits 8-10, 16, 24, 25 of this Complaint of this Complaint as though fully set forth herein.

2874. Defendant Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that

involved the UCF employees Taft and Maier, back to Taft and Maier who were implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

2875. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

2876. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, and/or the military, did not constitute malfeasance or misfeasance.

2877. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

2878. Defendant Maier violated Fl. St. §914.22(1)(a), when she used a trick that claimed the Florida Whistleblower Act did not consider perjury in the USPTO by a UCF employee malfeasance, or the stalking assaults and batteries malfeasance or misfeasance, and used the Florida Whistleblower Act, Fl. St. §112.3187, in attempts to cover up the evidence of perjury in the USPTO by Sandra Sovinski.

2879. Defendant Maier violated Fl. St. §772.103(3), or in the alternative Fl. St. §772.104(4), when was employed by or associated with the illicit enterprise set

up by UCF and the military, and she engaged in the pattern of criminal activity in or about November, 2022, violating Fl. St. §914.22(1)(a) using the Florida Whistleblower Act in a scheme to write a false letter that claimed perjury in the USPTO would not constitute malfeasance, or conspired and endeavored to become employed by or associated with the illicit enterprise, all to acquire and maintain control of the Plaintiff's company, sdPhotonics.

2880. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 39: Defendant Taft. Fl. St. §§ 772.103(4), 772.104(1), 914.22(1)(a).**

2881. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 630-641, 2187-2197, and Exhibits 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

2882. Defendant Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that involved the UCF employees Taft and Maier, back to Taft who had been implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

2883. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that cc'd Defendant Taft and falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

2884. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, did not constitute malfeasance or misfeasance.

2885. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

2886. Defendant Maier violated Fl. St. §914.22(1)(a), when she used a trick that claimed the Florida Whistleblower Act did not consider perjury in the USPTO by a UCF employee malfeasance, or the stalking assaults and batteries malfeasance or misfeasance, and used the Florida Whistleblower Act, Fl. St. §112.3187 as a cover for the letter and to send to the Plaintiff and cc to Defendant Taft, in attempts by Miguel, Taft, and Maier to cover up the evidence of perjury in the USPTO by the UCF employee Sandra Sovinski.

2887. Defendant Taft violated Fl. St. §772.104(4), when he conspired or endeavored to be part of the illicit enterprise that had been set up by Sovinski engaged in the pattern of criminal activity involving perjury in the USPTO, that used extortion, stalking, assaults, and batteries, and false letters from Taft's office intended to use the Florida Whistleblower's Act to cover-up perjury in the

USPTSO, violating Fl. St. §914.22(1)(a), to cover up evidence of the crimes and to acquire and/or maintain control of the Plaintiff's company, sdPhotonics.

2888. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages given at the end of this cause of action, and attorneys' fees and court costs.

**Count 40: William Harrod. Fl. St. §§ 772.103(3), 772.103(4), 772.104(1), 748.048(2), 812.081(2)(a), (b).**

2889. Plaintiff realleges and incorporates paragraphs 335-336, 566-575, 579-580, 2187-2198, and Exhibits 1, 2 of this Complaint as though fully set forth herein.

2890. Defendant Harrod was the IARPA program monitor who oversaw the IARPA Supercables project issued to sdPhotonics that began in or about June, 2019, and in which sdPhotonics issued a subcontract to the University of Illinois under Miltron.

2891. Defendant Feng's laboratory at the University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project to fabricate and test prototypes of its new laser invention, the Cryo-VCSEL, using sdPhotonics' proprietary epitaxial material.

2892. Feng's laboratory received the proprietary epitaxial material from sdPhotonics for the sdPhotonics' prototypes, based on the 4 K design that had been developed by the Plaintiff.

2893. Feng used his standard fabrication process for high speed VCSELs to fabricate prototypes of the sdPhotonics epitaxial structure that could be tested at

high speed, and then return the sdPhotonics' prototypes to sdPhotonics so it could perform its own electrical testing on the same prototype devices, and development of a quantum mechanical current-voltage model that could be used for optimization of future sdPhotonics designs.

2894. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds.

2895. However, Feng refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

2896. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototypes.

2897. By the beginning of or about August, 2021, Defendant Harrod began demanding in phone meetings that the Plaintiff allow IARPA to use the sdPhotonics' Cryo-VCSELs in other projects. However, Harrod could provide no legitimate reason.

2898. Instead, Harrod demanded control of the prototypes, claiming his IARPA Director, Catherine Marsh, had told him to obtain the prototypes for other

projects, and that Harrod himself knew nothing about the issue, and he was only doing what Catherine Marsh was instructing him to do.

2899. The Plaintiff refused to provide Harrod any permission and demanded the return of the sdPhotonics' Cryo-VCSEL prototypes.

2900. By the end of the IARPA Supercables project near the end or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois, and Harrod was agreeing with Feng.

2901. Harrod then issued Feng additional contracts after the IARPA Supercables ended, based on the sdPhotonics' Cryo-VCSEL prototypes, with Feng publishing articles on the Cryo-VCSELs with claims the lasers were developed at the University of Illinois in his laboratory.

2902. Defendant Harrod violated Fl. St. §812.081(2)(a) (b) when Harrod used the sdPhotonics Cryo-VCSEL prototypes in publications and contracts, which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

2903. Defendant Harrod violated Fl. St. §772.103(3), or in the alternative §772.104(4), when Harrod was employed by, or associated with, the illicit enterprise with Feng, Van Vechten, Martinis, Rashid, Kish, and Dallessasee, and by Harrod's own admission his IARPA director, Catherine Marsh, and UCF and

the military, that engaged in a pattern of criminality including extortion, stalking, assaults, and confinement during the Florida Whistleblower proceeding, and the pattern of criminal activity in violations Fl. St. §812.081(2)(a) and/or (b) through misappropriation of the Cryo-VCSEL prototypes, to acquire or maintain control of the Plaintiff's company, sdPhotonics.

2904. Pursuant to Fl. St. §772.104(1), the Plaintiff is entitled to treble damages described in this cause of action, and attorneys' fees and court costs.

## SEVENTH CAUSE OF ACTION

**Negligence and Gross Negligence: Violation of the Florida Whistleblower's Act. Fl. St. §§112.3187, 768.28(9)(a), 768.72(1). Defendants: DeSantis, Moody, Miguel, Taft, Maier, Eifert, Ware.**

2905. The elements needed to prove negligence in Florida are: 1.) Defendant owed a duty to Plaintiff to protect the Plaintiff from a particular injury or damage; 2.) Defendant breached this duty; 3.) Defendant's breach was the proximate cause of injury or damage to Plaintiff; and 4.) Plaintiff suffered damages caused by the breach.

2906. Fl. St. § 768.28 (9)(a) states that an officer, employee, or agent of the state of Florida becomes individually liable for torts or violations of law when the "officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property."

2907. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**Count 1: Defendant DeSantis. Gross negligence.**

2908. Plaintiff realleges and incorporates paragraphs 195-200, 284-286, 630-641, 2905-2906, and Exhibit 1, 14 of this Complaint as though fully set forth herein.

2909. An external investigation into UCF by the BCLP law-firm was pending when Defendant DeSantis assumed the governor's office of Florida in early January, 2019.

2910. The BCLP law firm investigated apparent accounting fraud by UCF administrators that was eventually found to total an estimated $80M over several years.

2911. Pursuant to the Florida Whistleblower Act, Fl. St. §112.3187(5)(b), the apparent accounting fraud by UCF administrators constitute gross mismanagement and gross neglect of duty by UCF administrators that should have been subject to protected whistleblower reporting to the Florida governor's office of Ron DeSantis.

2912. The BCLP investigative report found that the misspending of the state funds had taken place by UCF administrators as other upper management UCF administrators who knew of the malfeasance and misfeasance were too afraid to

report the evidence of massive accounting fraud through the UCF audit office of Taft and Maier for reporting under the Florida Whistleblower Act.

2913. The BCLP investigative report left little doubt that Robert Taft and Tina Maier were violating the Florida Whistleblower Act using their state employment for the purpose of engaging and protecting criminality and public corruption by UCF administrators.

2914. The Plaintiff's whistleblower report filed in or about November, 2018 involving retaliation by UCF administrators was also apparently under investigation by the Chief Inspector General under the prior governor, Rick Scott.

2915. This all changed when Ron DeSantis became governor.

2916. Defendant DeSantis had a duty to protect the Florida Whistleblower Act and address the issue of independent reporting that the UCF office of Taft and Maier were participating, or at least not preventing, violation of Fl. St. §112.3187(4)(a) or (b).

2917. The records now show that the UCF administrators and attorneys in addition to misspending of state funds also intended to support the UCF infrastructure in its laboratories and facility support personell, the UCF administrator were also stealing taxpayer funded science and early-stage technologies as part of bribery schemes set up by the military.

2918. Ron DeSantis appointed Melinda Miguel as Florida's Chief Inspector General engaged in the organized government crime and public corruption of

misspending state funds, and stealing science and early-stage technology in bribery schemes that had been set up by the military using the DOJ.

2919. The bribery schemes set up by the DOJ include corrupt state and federal judges employed by Florida court systems, one of whom, Paetra Brownlee, DeSantis directly appointed.

2920. The Plaintiff, with no knowledge of the BCLP investigation, filed a separate whistleblower report with the Florida governor's office in or about November, 2018, and provided information that he and his company were being retaliated against by UCF administrators in violation of the Florida Whistleblower Act.

2921. Defendant DeSantis failed his duty to address the failed whistleblower procedures being overseen by Robert Taft and Tina Maier.

2922. The records show that as the head of law enforcement in Florida, Ron DeSantis is a failure as a public official, promoting organized government crime in his own state and placing and retaining white-collar criminals for his Florida governor's office to participate with the military in organized government crime with the DOJ as part of government bribery schemes from the military.

2923. As a direct cause of Defendant DeSantis's failure to take action he was required to take under the Florida Whistleblower's Act, and to allow the retaliation in violation of the Fl. St. §112.3187(4)(a), (b), the Plaintiff suffered damages and injuries due to false declarations filed by UCF employees against the Plaintiff's company's patents, had the Florida Whistleblower lawsuit set up by the 9th Judicial

Circuit Court to operate without a judge and only attorneys, and was extorted, stalked, assaulted, and battered as part of the proceeding under the Florida Whistleblower Act, Fl. St. §112.3187, and subjected to evidence and witness tampering by those attorneys.

2924. Defendant DeSantis had prior and independent knowledge from the BCLP investigative report that UCF administrators that UCF administrators were violating the Florida Whistleblower Act, and that Taft and Maier were failing to prevent the retaliation, and his negligent actions were in bad faith and willful disregard of safety, human rights, and property.

2925. Fl. St. § 768.28 (9)(a) does not entitle Defendant DeSantis to qualified immunity for his actions and/or inactions that has allowed organized government crime at issue involving perjury in the USPTO, extortion, stalking, assaults, batteries, state court proceedings allowed to operate without judges involving the corruption from DeSantis' own office with Miguel, Paetra Brownlee, and from the military, UCF, and the DOJ.

2926. Ron DeSantis is subject to punitive damages for his acts and omissions of acts. Pursuant to Fl. St. §768.72(2)(b), Defendant DeSantis engaged in gross negligence, which is defined by "conduct that was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to the conduct."

**Count 2: Defendant Moody.**

2927. Plaintiff realleges and incorporates paragraphs 387-389, 483-484, 630-641, 2905-2906, and Exhibits 1, 14 of this Complaint as though fully set forth herein.

2928. In or about the start of January, 2019, the Plaintiff contacted Florida Attorney General, Defendant Ashley Moody, and informed her that he had been extorted, stalked, assaulted, and battered involving attorneys and employees of UCF as part of the Florida Whistleblower lawsuit.

2929. At the time, Defendant Moody oversaw the Office of Statewide Prosecution that, pursuant to Fl. St. §16.56(1)(a), states in relevant part may "investigate and prosecute the offenses of: 1. Bribery, ...extortion, ...perjury..." and under Fl. St. §1656(1)(a) 16. "when any such offense is occurring, or has occurred, in two or more judicial circuits as part of a related transaction..."

2930. Therefore, the Plaintiff's report of the extortion, stalking, assaults, and batteries involving attorneys and employees of UCF in the Florida Whistleblower lawsuit was under the jurisdiction of Defendant Moody.

2931. However, Defendant Moody responded to the Plaintiff that she was not allowed to take action because the criminal activity was by attorneys as part of the Florida Whistleblower lawsuit.

2932. Defendant Moody owed the Plaintiff the duty to follow her job duties, and yet misrepresented these job duties to the Plaintiff to avoid taking action involving the organized government crime that was going on in the state of Florida involving the Florida Whistleblower proceeding.

2933. As a direct cause of Defendant Moody's failure to take action in response to Plaintiff's complaints of the extortion, stalking, assaults, and batteries that occurred in the Florida Whistleblower proceeding, the Plaintiff was subjected to further retaliation, injuries, and damages to his property.

2934. Defendant Moody took her negligent actions in misrepresenting her job duties and omission to act in response to the reports of the crimes in the Florida Whistleblower proceedings in bad faith and willful disregard of safety, human rights, and property.

2935. Fl. St. § 768.28 (9)(a) does not entitle Defendant Moody to qualified immunity for her actions and/or inactions.

2936. Pursuant to Fl. St. §768.72(2)(b), Defendant Moody engaged in gross negligence, which is defined by "conduct that was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to the conduct."

**Count 3: Defendant Miguel.**

2937. Plaintiff realleges and incorporates paragraphs 195-200, 204-208, 211-219, 284-286, 630-641, 2905-2906, and Exhibits 1, 14 of this Complaint as though fully set forth herein.

2938. An external investigation into UCF by the BCLP law-firm was pending when Defendant Miguel assumed the position of Chief Inspector General of the Florida governor's office in early January, 2019.

2939. The BCLP investigation was into how apparent accounting fraud had taken place by UCF administrators that was eventually found to total an estimated $80M over several years, and the report was prepared for the prior chief inspector general under then Florida governor, Rick Scott.

2940. Pursuant to the Florida Whistleblower Act, Fl. St. §112.3187(5)(b), this act of misspending in apparent accounting fraud is gross mismanagement and gross neglect of duty by UCF administrators, and reporting such malfeasance and misfeasance should have been subject to protected whistleblower reporting to the UCF audit office of Taft and Maier.

2941. The BCLP investigative report found that the misspending of the state funds had gone on in part because even upper management UCF administrators who knew of the malfeasance and misfeasance were too afraid to risk retaliation and violation of Fl. St. §112.3187(5)(a), (b) that would be allowed to occur under the UCF audit office of Taft and Maier.

2942. The Plaintiff, with no knowledge of the BCLP investigation, filed a separate whistleblower report with the Florida governor's office in or about November, 2018, and provided information that the Plaintiff and his company were also being retaliated against by UCF administrators.

2943. The Plaintiff's whistleblower report filed in or about November, 2018 involving retaliation by UCF administrators was also apparently under investigation by the Chief Inspector General under the prior governor, Rick Scott.

2944. This all changed when Defendant Miguel became Chief Inspector General. Defendant Miguel had a duty to protect the Florida Whistleblower Act and address the issue of independent reporting that the UCF office of Taft and Maier were participating, or at least not preventing, violation of Fl. St. §112.3187(4)(a) or (b).

2945. Defendant Miguel failed her duty to address the failed whistleblower procedures being overseen by Robert Taft and Tina Maier.

2946. As a direct cause of Defendant Miguel's failure to take action to correct the UCF whistleblower procedures, and to allow the retaliation in violation of the Fl. St. §112.3187(5)(a), (b), the Plaintiff suffered damages and injuries due to false declarations filed by UCF employees against the Plaintiff's company's patents, had the Florida Whistleblower lawsuit set up by the 9th Judicial Circuit Court to operate without a judge and only attorneys, and was extorted, stalked, assaulted, and battered as part of the proceeding under the Florida Whistleblower Act, Fl. St. §112.3187, and subjected to evidence and witness tampering by those attorneys.

2947. Defendant Miguel had prior and independent knowledge from the BCLP investigative report that UCF administrators were violating the Florida Whistleblower Act, and that Taft and Maier were failing to prevent the retaliation, and her negligent actions were in bad faith and willful disregard of safety, human rights, and property.

2948. Fl. St. § 768.28 (9)(a) does not entitle Miguel to qualified immunity for her actions and/or inactions.

2949. Pursuant to Fl. St. §768.72(2)(b), Defendant Miguel engaged in gross negligence, which is defined by "conduct that was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to the conduct."

**Count 4: Defendant Taft.**

2950. Plaintiff realleges and incorporates paragraphs 195-200, 204-208, 211-219, 284-286, 630-641, 2905-2906, and Exhibits 1, 14 of this Complaint as though fully set forth herein.

2951. An external investigation into UCF by the BCLP law-firm was pending when Defendant Miguel assumed the position of Chief Inspector General of the Florida governor's office in early January, 2019.

2952. The BCLP investigation was into how apparent accounting fraud had taken place by UCF administrators that was eventually found to total an estimated $80M over several years, and the report was prepared for the prior chief inspector general under then Florida governor, Rick Scott.

2953. Pursuant to the Florida Whistleblower Act, Fl. St. §112.3187(5)(b), this act of misspending in apparent accounting fraud is gross mismanagement and gross neglect of duty by UCF administrators, and reporting such malfeasance and misfeasance should have been subject to protected whistleblower reporting to the UCF audit office of Taft and Maier.

2954. The BCLP investigative report found that the misspending of the state funds had gone on in part because even upper management UCF administrators

who knew of the malfeasance and misfeasance were too afraid to risk retaliation and violation of Fl. St. §112.3187(5)(a), (b) that would be allowed to occur under the UCF audit office of Taft and Maier.

2955. The Plaintiff, with no knowledge of the BCLP investigation, filed a separate whistleblower report with the Florida governor's office in or about November, 2018, and provided information that the Plaintiff and his company were also being retaliated against by UCF administrators.

2956. The Plaintiff's whistleblower report filed in or about November, 2018 involving retaliation by UCF administrators was also apparently under investigation by the Chief Inspector General under the prior governor, Rick Scott.

2957. This all changed when Defendant Miguel became Chief Inspector General. Despite the change in the Chief Inspector General, Defendant had a duty to take steps to insure possible violations of Fl. St. §112.3187(4)(a) or (b) in response to the BDLP investigative report.

2958. Defendant Taft failed his duty to address the failed whistleblower procedures his office was overseeing, along with Tina Maier.

2959. As a direct cause of Defendant Taft's failure to take action to correct the UCF whistleblower procedures, and to allow the retaliation in violation of the Fl. St. §112.3187(4)(b), the Plaintiff suffered damages and injuries due to false declarations filed by UCF employees against the Plaintiff's company's patents, had the Florida Whistleblower lawsuit set up by the 9th Judicial Circuit Court to operate without a judge and only attorneys, and was extorted, stalked, assaulted, and

battered as part of the proceeding under the Florida Whistleblower Act, Fl. St. §112.3187, and subjected to evidence and witness tampering by those attorneys.

2960. Defendant Taft had prior and independent knowledge from the BCLP investigative report that UCF administrators were violating the Florida Whistleblower Act, and that his UCF office and Tina Maier were reported failing to prevent the retaliation. Taft's negligent actions in failing to address the reported problems with his office identified in the BCLP investigative report were in bad faith and willful disregard of safety, human rights, and property.

2961. The Plaintiff is entitled to damages to his company and his other property due to Defendant Tafts's failure to perform his duties under the Florida Whistleblower's Act, and the Plaintiff is entitled to punitive damages because her failures were intentional and involved injuries to those UCF administrators choose to target using the Florida Whistleblower's reporting procedures.

2962. Pursuant to Fl. St. §768.72(2)(b), Defendant Taft engaged in gross negligence, which is defined by "conduct that was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to the conduct."

**Count 5: Defendant Maier.**

2963. Plaintiff realleges and incorporates paragraphs Plaintiff realleges and incorporates paragraphs 195-200, 204-208, 211-219, 284-286, 630-641, 2905-2906, and Exhibits 1, 14 of this Complaint as though fully set forth herein.

2964. An external investigation into UCF by the BCLP law-firm was pending when Defendant Miguel assumed the position of Chief Inspector General of the Florida governor's office in early January, 2019.

2965. The BCLP investigation was into how apparent accounting fraud had taken place by UCF administrators that was eventually found to total an estimated $80M over several years, and the report was prepared for the prior chief inspector general under then Florida governor, Rick Scott.

2966. Pursuant to the Florida Whistleblower Act, Fl. St. §112.3187(5)(b), this act of misspending in apparent accounting fraud is gross mismanagement and gross neglect of duty by UCF administrators, and reporting such malfeasance and misfeasance should have been subject to protected whistleblower reporting to the UCF audit office of Taft and Maier.

2967. The BCLP investigative report found that the misspending of the state funds had gone on in part because even upper management UCF administrators who knew of the malfeasance and misfeasance were too afraid to risk retaliation and violation of Fl. St. §112.3187(5)(a), (b) that would be allowed to occur under the UCF audit office of Taft and Maier.

2968. The Plaintiff, with no knowledge of the BCLP investigation, filed a separate whistleblower report with the Florida governor's office in or about November, 2018, and provided information that the Plaintiff and his company were also being retaliated against by UCF administrators.

2969. The Plaintiff's whistleblower report filed in or about November, 2018 involving retaliation by UCF administrators was also apparently under investigation by the Chief Inspector General under the prior governor, Rick Scott.

2970. This all changed when Defendant Miguel became Chief Inspector General. Defendant Maier had a duty to protect the Florida Whistleblower Act and address the issue of independent reporting in the BCLP investigative report that the UCF office of Taft and Maier were participating, or at least not preventing, violation of Fl. St. §112.3187(4)(a) or (b).

2971. Defendant Maier failed her duty to address the failed whistleblower procedures being overseen by Robert Taft and Tina Maier.

2972. Instead, Tina Maier announced her intentions to the Plaintiff in or about March, 2019, to find reasons to take adverse actions against the Plaintiff for his reporting through the Florida Whistleblower Act.

2973. As a direct cause of Defendant Maier's failure to take action to correct the UCF whistleblower procedures, and to allow the retaliation in violation of the Fl. St. §112.3187(4)(b), the Plaintiff suffered damages and injuries due to false declarations filed by UCF employees against the Plaintiff's company's patents, had the Florida Whistleblower lawsuit set up by the 9th Judicial Circuit Court to operate without a judge and only attorneys, and was extorted, stalked, assaulted, and battered as part of the proceeding under the Florida Whistleblower Act, Fl. St. §112.3187, and subjected to evidence and witness tampering by those attorneys.

2974. Defendant Maier had prior and independent knowledge from the BCLP investigative report that UCF administrators were violating the Florida Whistleblower Act, and that Taft and Maier were failing to prevent the retaliation, and her negligent actions were in bad faith and willful disregard of safety, human rights, and property.

2975. The Plaintiff is entitled to damages to his company and his other property due to Defendant Maier's failure to perform her duties under the Florida Whistleblower's Act, and the Plaintiff is entitled to punitive damages because her failures were intentional and involved injuries to those UCF administrators choose to target using the Florida Whistleblower's reporting through UCF's office directed by Taft and Maier.

2976. Pursuant to Fl. St. §768.72(2)(b), Defendant Maier engaged in gross negligence, which is defined by "conduct that was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to the conduct."

**Count 6: Defendant Eifert.**

2977. Plaintiff realleges and incorporates paragraphs 233-234, 316-317, 324-329, 630-641, 2905, 2907, and Exhibits 1, 17 of this Complaint as though fully set forth herein.

2978. Defendant Eifert oversaw the military contract issued to the Plaintiff's company to develop the oxide-free VCSEL inventions and is a trained in the government rules and regulations for such contracts.

2979. The Plaintiff contacted Lateka Eifert and informed her in or about October, 2019, that Sandra Sovinski had filed false declarations into the USPTO on the patents covering the oxide-free VCSELs sdPhotonics was developing under a contract issued from Eifert's military office.

2980. Eifert then reviewed her contract and worked with the Plaintiff to make sure that all paperwork was properly filed through the contracts and USPTO for the military to secure government rights through the contract that had been issued to sdPhotonics.

2981. Then, in April, 2020, Sandra Sovinski filed additional false declarations into the USPTO in which she placed strikethroughs in certain statements she had learned from the Florida Whistleblower proceedings could be proven false by prior USPTO patent records.

2982. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF that showed Svetlana Shtrom had contacted an Army office different than Eifert's that had issued the contract, claiming UCF had been owed a subcontract on the contract Eifert monitored, because Sabine O'Neal was a UCF employee.

2983. The Plaintiff met again with Eifert and showed her the emails and claims from Shtrom to the other Army office. Eifert reviewed the emails and claims by Shtrom concerning the contract Eifert had monitored, and had the documents and records reviewed by her supervisors.

2984. Eifert informed the Plaintiff that her supervisors had determined Shtrom engaged in fraud on the contract, that UCF was repeatedly engaging in fraud on their military contract, and asked the Plaintiff to file a complaint about UCF and the separate Army office to the SBA IG, Hannibal Ware.

2985. However, Eifert sent the Plaintiff down a dangerous path, and had a duty to the Plaintiff to report the fraud herself by UCF and its contact to the other Army office, through proper military channels since UCF was a contractor to the military Eifert's supervisors had already determined had engaged in fraud on other military contracts.

2986. The correct office for Eifert to report the repeated fraud by UCF was the Fort Belvoir, VA office of Karen Carlisle. However, Karen Carlisly was already involved in the organized military crime.

2987. As a result of Eifert's failure to perform her own reporting through proper military channels, and instead sent the Plaintiff through the SBA IG, Hannibal Ware, the Plaintiff was stalked, assaulted, extorted, battered, and confined by state actors at UCF and in the Florida governor's office working with the military.

2988. Defendant Eifert and her supervisors had a duty to report UCF and its employees, Sovinski and Shtrom, to the military offices that investigate fraud of its contractors, since UCF is a military contractor.[13,14,15]

[13] https://www.army.mil/article/283657/army_takes_proactive_approach_to_fighting_fraud
[14] https://www.gao.gov/products/gao-25-108500
[15] https://www.cid.army.mil/

2989. Instead, Defendant Eifert sent the Plaintiff into a dangerous path of filing to, Hannibal Ware, who worked as a puppet IG for the SBA overseeing its government crimes of shipping early-stage U.S. research and technologies to foreign entities.

2990. As a direct cause of Defendant Eifert's failure to take action to report the UCF attorneys and employees engaged in perjury in the USPTO and fraud on her contract to proper military offices, the Plaintiff was stalked, extorted, assaulted, battered, and confined, and forced to dismiss the Florida Whistleblower lawsuit, when the Hannibal Ware refused to take action on the complaint.

2991. The Plaintiff is entitled to injuries and damages to his company and his other property due to Defendant Eifert's failure to perform her duties and properly report the fraud she and her supervisors had found through the proper office in Fort Belvoir, VA.

**Count 7: Defendant Hannibal Ware.**

2992. Plaintiff realleges and incorporates paragraphs 233-234, 316-317, 324-329, 337-338, 341, 344, 384-477, 630-641, 2905, 2097, and Exhibits 1, 17 of this Complaint of this Complaint as though fully set forth herein.

2993. In or about late June, 2020, the Plaintiff filed an SBA fraud complaint to Hannibal Ware at his SBA IG office, as advised by Lateka Eifert.

2994. Lateka Eifert oversaw the contracts the military issued to the Plaintiff's company to develop the oxide-free VCSEL inventions, whose patents were affected by the false declarations Sandra Sovinski filed into the USPTO.

2995. Lateka Eifert was directly identified in the complaint to Ware's office about UCF and its employees, and their contacts to the wrong military office with false information about Sabine O'Neal.

2996. Despite the evidence of perjury in the USPTO by Sandra Sovinski involving the contracts that were SBIR contracts overseen by the SBA, Ware took no action against Sovinski or UCF based on the Plaintiff's complaint.

2997. There is no evidence Ware ever investigated the perjury by Sovinski in the USPTO, or ever conducted an investigation into military fraud on SBA contract under Eifert, despite Eifert was named in the SBA fraud complaint about UCF.

2998. Instead of Ware investigating and taking action on the clear evidence of perjury by attorneys working with UCF on SBIR contracts covered by the SBA, as he has a duty to do, the Plaintiff was instead extorted, stalked, assaulted, battered, and confined by the military and attorneys working with the military.

2999. Then in March, 2022, after the extortion, stalking, assaults, batteries and confinement during the Florida Whistleblower proceeding in Q4 2020, the Plaintiff again filed a complaint to the SBA IG, Hannibal Ware, informing Ware that the Plaintiff was confined, and that the DOJ was part of the organized crime with the military.

3000. This time in response to the complaint sent to Ware's SBA IG office, the Plaintiff became stalked so heavily with military tactics and these nasty RF transmitters used by the DOJ for stalking, assaults, and batteries.

3001. Defendant Ware had a duty to carry out his duties to investigate the fraud complaint against UCF involving the military, and instead engaged in gross negligence, failing to act on two separate complaints to his IG office, after which the Plaintiff was stalked by his own military and DOJ out of his own country with military tactics and technologies they gave to the DOJ.

3002. The Plaintiff is entitled to injuries and damages to his company and his other property, and punitive damages due to Defendant Ware's refusal and neglect to perform the duties he was paid to perform as the SBA IG, by U.S. taxpayers.

## EIGHTH CAUSE OF ACTION

**Abuse of Process. Defendants: Sovinski, Shtrom, Weiss, Sweetapple, Hsu, Bustamante, Taboada, Pinsukanjana, Kuznia, Baranek, Kim, Pan, Kish, Van Vechten, N. Stork, Repetto, B. Stork, L. Stork, Southron, Keeling, Solomon.**

3003. The elements needed to prove abuse of process in Florida are that the: 1.) Defendants willfully or intentionally made illegal, improper, or perverted use of process; 2.) Defendants had ulterior motive or purpose in exercising the process; and 3.) Defendants' actions caused injury to Plaintiff.

3004. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**Count 1: Defendant Sovinski.**

3005. The Plaintiff realleges and incorporates paragraphs 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 3003, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

3006. The Florida Whistleblower lawsuit was filed on or about December 12, 2019.

3007. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

3008. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

3009. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

3010. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsly representing the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached.

3011. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

3012. In addition to committing perjury, Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO beginning in or about August, 2019.

3013. During this time, Sovinski worked with Youndy Cook and Alen Hsu to draft a settlement agreement, of which Hsu sent the Plaintiff's drafts, that falsely claimed Army approval was required for UCF to make any changes or corrections to the false declarations that Sovinski had filed into the USPTO.

3014. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

3015. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

3016. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on the agreement prepared by Cook, Sovinksi, and Hsu that claimed UCF required Army approval for UCF to correct the USPTO declarations.

3017. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

3018. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

3019. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

3020. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi was then sent to the Plaintiff, and again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

3021. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

3022. The Plaintiff had a federal constitutional right to seek redress through the court system for damages caused by Sovinski's actions in August, 2019 in which

she engaged in perjury against the Plaintiff and his company by filing false declarations into the USPTO onto the Plaintiff's property, his company, without retaliation.

3023. Defendant Sovinski engaged in abuse of process, when engaged in perjury in the USPTO in or about August, 2019 on multiple patents jointly owned by sdPhotonics, breached the 2014 IP Agreement and violated UCF Regulations UCF-2.029, used the proceedings of the Whistleblower lawsuit to engage in additional perjury in the USPTO in April, 2020 during the proceedings, and tried to change evidence and perjury at issue in the proceeding, and drafted the fraudulent settlement agreement with Cook and Hsu that required Army approval from an office unrelated to sdPhotonics' contracts, that even Eifert's office determined was fraud, drafted a second agreement in or about October, 2020 with Bustamante and Cook, as she was directing more false declarations to be filed into the USPTO, with the ulterior motive to acquire and obtain control of the Plaintiff's company, without due process.

3024. The Plaintiff was damaged by Defendant Sovinski's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceedings.

3025. Defendant Sovinski's actions were in fact both unlawful and criminal, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**<u>Count 2: Defendant Shtrom.</u>**

3026. The Plaintiff realleges and incorporates paragraphs 138-150, 186-194, 202, 209-210, 236-281, 289, 292, 305-315, 318, 383, 629, 630-641, 3003, and Exhibits 3-6, 8-13, 16, 18-21, 23 of this Complaint as though fully set forth herein.

3027. Florida Whistleblower lawsuit was filed on or about December 12, 2019.

3028. At issue in the Florida Whistleblower lawsuit were that, in or about August, 2019, the UCF employee Sandra Sovinski had engaged in multiple counts of perjury by filing false declarations into the USPTO on patents and patent applications covering oxide-free VCSEL inventions being developed by the Plaintiff's company.

3029. Sandra Sovinski had attached the 2014 IP Agreement to her declarations that she filed into the USPTO. In her declarations, Sovisnki, falsified and contradicted the terms of the 2014 IP Agreement.

3030. Sovinski claimed the 2014 IP Agreement gave UCF unrestricted rights to Deppe's inventions in exchange for his employment position with UCF. In fact, the terms of the 2014 IP Agreement are strictly pursuant to UCF Regulations UCF-2.029, which restricts UCF rights to Deppe's inventions.

3031. Sandra Sovinski's declaration provide dispositive proof she violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, falsely representing the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029, and that Sovinski attached.

3032. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a declaration with false claims about the terms of the 2014 IP Agreement.

3033. Shtrom followed Sovinski USPTO filings with Shtrom's own retroactive declarations, and when she filed the declarations Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when she filed retroactive ownership.

3034. In April, 2020, during the proceeding, Defendant Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned during the proceeding were proven false by prior USPTO patent records.

3035. The changed declarations filed by Sovinski in April, 2020 provided additional dispositive proof of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO in or about August, 2019, and violating Fl. St. §837.021(1) trying to recant the false statements, pursuant to ¶837.07(1), (2).

3036. Defendant Shtrom again filed her own USPTO declarations soon after, again breaching the 2014 IP Agreement and UCF-2.029 during the Florida Whistleblower proceeding.

3037. In or about May, 2020, the Plaintiff used public records from public records requests and obtained emails and records that showed Svetlana Shtrom

had contacted a separate Army office than Eifert's and provided false information about Sabine O'Neal.

3038. Shtrom claimed UCF had been entitled to a subcontract on Eifert's contract to sdPhotonics because O'Neal had been a UCF employee, when in fact it was Eifert who was responsible for overseeing any subcontracts from the contract Eifert, Eifert had secured the government rights.

3039. The false claims by Shtrom to the Army office had been used in a settlement agreement that had been drafted by Cook, Sovinski, and Hsu, and required unexplained Army approval from an unspecified office after Deppe signed the agreement, and made no corrections to the perjury by Sovinski in the USPTO.

3040. After obtaining the information from the public records request and USPTO patent records, in or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her Shtrom's emails to the other Army office and claims about Sabine O'Neal and the contract Eifert had monitored, and the need for some type of Army approval related to UCF's supposed involvement in Eifert's contract.

3041. Eifert informed the Deppe when she saw the emails and records that Shtrom had sent the different Army office that she would discuss it with her supervisors and get back to him.

3042. About a week later, in mid-June, 2020, Eifert informed the Deppe that her supervisors had reviewed the emails and information Shtrom sent to the separate Army office and determined, separately from Deppe, that Shtrom and UCF had engaged in fraud on Eifert's contract to sdPhotonics.

3043. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

3044. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

3045. Also, in or about October, 2020, Sovinski directed additional false declarations be filed into the USPTO during the Whistleblower proceeding.

3046. Defendant Shtrom again breached the 2014 IP Agreement and UCF-2.029, when she followed Sovinski's USPTO declarations with her own retroactive declarations in or about October, 2020.

3047. Defendant Shtrom engaged in abuse of process, when she used the proceedings of the Whistleblower lawsuit to engage in additional breaches of the 2014 IP Agreement and violations of UCF Regulations UCF-2.029(4)(d), by filing retroactive declarations into the USPTO in attempts to correct prior declarations filed by Sovinski, presenting false information to an Army office about Sabine O'Neal with no connection to sdPhotonics or its contracts, and the false information she had sent to the Army office was then used to try to force the Plaintiff into signing the fraudulent settlement agreement, with the ulterior motive to acquire and obtain control of the Plaintiff's company.

3048. The Plaintiff was damaged by Defendant Shtrom's actions, and had to had to cease his company's business operations, and incurred additional damages in the Florida Whistleblower proceedings.

3049. Defendant Shtrom's actions were in fact both unlawful, malicious, and intentional, and she is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 3: Defendant Weiss.**

3050. Plaintiff realleges and incorporates paragraphs 187-194, 236-276, 284-287, 290-291, 305-315, 319-329, 355-357, 362, 365-372, 391, 630-641, 3003, and Exhibits 8-14 of this Complaint as though fully set forth herein.

3051. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

3052. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3053. During the time the proceeding operated without a judge, Defendant Weiss pretended to be an officer of the illegal Whistleblower proceeding, and filed documents for his client, UCF, into the Florida Whistleblower proceedings, while he operated the proceeding without a judge.

3054. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP

Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

3055. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

3056. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

3057. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

3058. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proving she had made false statements in her declarations when she filed the declarations at issue in the USPTO, violating Fl. St. §§837.021(1), 837.07(1), (2).

3059. While Defendant Weiss pretended to be an officer of a legitimate state court proceeding, he tried to prevent evidence from coming into the proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

3060. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

3061. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

3062. At the end of June, 2020, Defendant Weiss announced he had stayed the proceedings and refused a discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

3063. In or about August, 2020, Defendant Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, that in fact Defendant Weiss had refused, and again tried to keep evidence of Sovinski's perjury in the USPTO from coming into the proceeding.

3064. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

3065. The agreement by Bustamante, Chang, Weiss, Cook, and Sovinksi again used the fraudulent claim that Army approval from some unspecified office was required after the Plaintiff signed the agreement.

3066. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

3067. Defendant Weiss engaged in abuse of process, when he acted as an officer of the illegal Florida Whistleblower proceeding, thried to force the Plaintiff into a settlement agreement that even Lateka Eifert's office had determined was based on fraud by UCF employees with Shtrom, and filed a false motion to compel to keep evidence of perjury by Sovinski in the USPTO from entering the proceeding, with an ulterior motive to acquire or maintain improper ownership in the Plaintiff's company.

3068. The Plaintiff was damaged by Defendant Weiss' actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

3069. Defendant Weiss actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 4: Defendant Sweetapple.**

3070. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 3003, and Exhibits 3-14 of this Complaint as though fully set forth herein.

3071. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

3072. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3073. During the time the proceeding operated without a judge, Defendant Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

3074. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

3075. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

3076. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had filed a false declaration.

3077. While Defendant Sweetapple pretended to be an officer of the illegal state court proceeding, he tried to prevent evidence from coming into the

proceedings while he pretended to be an officer of the illegal Whistleblower proceeding.

3078. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

3079. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

3080. In or about May, 2020, Defendant Sweetapple tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF to assign.

3081. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

3082. Defendant Sweetapple learned the Plaintiff filed the SBA IG complaint, in or about June, 2020.

3083. In or about the end of June, 2020, Defendant Sweetapple announced to the Plaintiff that Weiss had stayed the proceedings, and that because of the stay Defendant Sweetapple would not serve Weiss the discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

3084. In or about August, 2020, Jeffrey Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, when in fact Sweetapple had falsely claimed that Weiss had stayed the proceedings.

3085. The docket showed Weiss had no way to stay the proceeding, and claimed he had done so without filing a motion.

3086. When the Plaintiff instructed Defendant Sweetapple serve Weiss the discovery response, Defendant Sweetapple refused and tried to set the hearing with the Weiss for the motion to compel.

3087. When the Plaintiff fired Defendant Sweetapple, Defendant Sweetapple refused to cease work on the matter, despite that the contract between the Plaintiff and Sweetapple required Sweetapple to cease work upon being filed.

3088. Defendant Sweetapple took his actions under color of law, pretending to be an officer of the illegal state court proceeding that operated without a judge.

3089. Defendant Sweetapple engaged in abuse of process, when he acted as an officer of the illegal Florida Whistleblower proceeding, tried to force the Plaintiff into a settlement agreement that even Lateka Eifert's office had determined was based on fraud by UCF employees with Shtrom, refused to serve Jeffrey Weiss discovery responses after Weiss filed a false motion to compel to keep evidence of perjury by Sovinski in the USPTO from entering the proceeding, and refused to be fired, with an ulterior motive to acquire or maintain improper ownership in the Plaintiff's company.

3090. The Plaintiff was damaged by Defendant Sweetapples' actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

3091. Defendant Sweetapple actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 5: Defendant Hsu.**

3092. Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 3003, and Exhibits 3-14, 16 of this Complaint of this Complaint as though fully set forth herein.

3093. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

3094. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3095. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

3096. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

3097. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

3098. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

3099. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

3100. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

3101. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

3102. Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that included terms the Plaintiff informed Defendant Hsu he would not accept.

3103. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

3104. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

3105. Defendant Hsu learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents to prove certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

3106. In April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records.

3107. The changed declarations filed by Sovinski in April, 2020 further proved her crimes of perjury in the USPTO, proved Sovinski had made false statements in her declarations when she filed the declarations at issue in the USPTO, and her April, 2020 declarations violate Fl. St. §§837.021(1), 837.07(1), (2).

3108. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into a settlement meeting based on claims by Weiss that UCF required Army approval for UCF that Defendant Hsu had written into the agreement with Cook and Sovinski.

3109. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions. Eifert requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office.

3110. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

3111. Defendant Hsu contacted and warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

3112. Defendant Hsu engaged in abuse of process, when he prepared an agreement tried to force the Plaintiff into the settlement meeting involving an agreement that even Lateka Eifert's office determined was based on fraud by UCF

employees with Shtrom, and tried to prevent the Plaintiff from intervening after Jeffrey Weiss and Robert Sweetapple, with an ulterior motive to acquire or maintain improper ownership in the Plaintiff's company.

3113. The Plaintiff was damaged by Defendant Hsu's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 6: Defendant John Bustamante.**

3114. Plaintiff realleges and incorporates paragraphs 236-274, 316-317, 322-329, 350-354, 375-385, 630-641, 3003, and Exhibits 8-10 of this Complaint as though fully set forth herein.

3115. Defendant Bustamante was hired by the Plaintiff to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom.

3116. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

3117. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration

that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

3118. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

3119. Furthermore, Defendant Bustamante determined that in April, 2020, during the proceeding, Sandra Sovinski filed additional declarations into the USPSTO on the patents covering the oxide-free VCSELs, placing strikethroughs in certain statements Sovinski had learned were proven false by prior USPTO patent records violate Fl. St. §§837.021(1), 837.07(1), (2).

3120. Defendant Bustamante advised the Plaintiff that a complaint should be filed in federal court because of what had occurred in the illegal Florida Whistleblower proceeding.

3121. Bustamante then obtained information from the Plaintiff on the 2014 IP Agreement and UCF-2.029, and prepared the federal complaint to be filed in the FLMD court.

3122. Bustamante then contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

3123. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered him an equity position, Bustamante would have worked for sdPhotonics.

3124. Bustamante prepared the agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski. When the Plaintiff reviewed the agreement, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

3125. Instead, it had the same requirement of Army approval from an unspecified office that Lateka Eifert had already confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which was the basis of Defendant Hsu's false claims, and that Army had already obtained its government rights in the inventions.

3126. Eifert had requested the Plaintiff file a fraud complaint to the SBA IG in response to what Weiss had claimed about the Army requiring approval for the agreement, and that Eifert and her supervisors determined was fraud by Shtrom in contacting the other Army office, over what Defendant Bustamante had again placed in the settlement agreement he had drafted with Cook, Sovinski, and Weiss.

3127. At the beginning of November, 2020, the Plaintiff was extorted by John Vetter to sign the agreement Bustamante had prepared with Cook, Weiss, and Sovinski, or "find out what happens to a whistleblower in Florida."

3128. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

3129. Bustamante responded at that time that there was nothing he was able to do about it, when Bustamante could have taken many different legal actions, including reporting the crimes by the other attorneys, and he had an ethical duty to do.

3130. Defendant Bustamante engaged in abuse of process, when he drafted the settlement agreement in or about October, 2020, requiring military approval from the wrong office after the Plaintiff signed the agreement, that Lateka Eifert's office had determined was based on fraud, and was then used in extortion, stalking, assaults, and batteries, as Bustamante admitted he had been offered an equity position from someone else to take his unlawful actions, with the ulterior motive to acquire or take over the Plaintiff's company, sdPhotonics.

3131. The Plaintiff was damaged by Defendant Bustamante's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings.

**Count 7: Defendant John Vetter.**

3132. Plaintiff realleges and incorporates paragraphs 342-347, 386-471, 630-641, 3003, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

3133. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit.

3134. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits.

3135. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

3136. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

3137. Vetter informed the Plaintiff that the false declarations filed by Sovinski were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

3138. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

3139. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused. In the call Vetter became angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

3140. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

3141. The Plaintiff was subsequently stalked, assaulted, battered and confined over the agreement Vetter had threatened to the Plaintiff to sign.

3142. Defendant Vetter engaged in abuse of process, using the Florida Whistleblower proceeding for extortion and threats to force the signing of a settlement agreement that even Lateka Eifert's military office had determined was based on fraud, for the ulterior motive to acquire or maintain improper ownership in the Plaintiff's company, with the ulterior motive to acquire or maintain improper ownership in the Plaintiff's company.

3143. The Plaintiff was damaged by Defendant Vetter's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 8: Defendant Pinsukanjana.**

3144. Plaintiff realleges and incorporates paragraphs 224-231, 303-304, 395-474, 630-641, 3003 of this Complaint of this Complaint as though fully set forth herein.

3145. Defendant Pinsukanjana is a physicist employed by Intelligent Epitaxial Technologies, Inc. (IET). IET is an epitaxial growth foundry who provides custom semiconductor materials for optoelectronic and III-V semiconductor devices, including VCSELs.

3146. The Plaintiff and sdPhotonics' engineers worked with Defendant Pinsukanjana and IET through contracts and purchase orders that were used in developing specialized materials for sdPhotonics oxide-free VCSELs and other photonic devices, including the Cryo-VCSEL and specialized detectors.

3147. Defendant Pinsukanjana worked directly with the Plaintiff to learn the special techniques needed to grow the epitaxy for the Plaintiff's Cryo-VCSEL intention that could operate at 4 K and below.

3148. Defendant Pinskukanjana worked closely with Deborah Van Vechten and Milton Feng, and the Plaintiff, Pinsukanjan, Feng, and Van Vechten had meetings at the IET growth facility near Dallas, TX, in meetings and discussions concerning the sdPhotonics Cryo-VCSEL.

3149. On multiple occasions, Defendant Pinsukanjana and the Plaintiff discussed the declarations that Sandra Sovinski had filed into the USPTO, and the Florida Whistleblower lawsuit that had been filed December 12, 2019 involving the evicen of perjury created by Sovinski's USPTO filings.

3150. The Plaintiff received the threats from John Vetter in early November, 2020, to sign an agreement the Plaintiff had refused involving the Florida Whistleblower proceedings and evidence of perjury in the USPTO by Sovinski.

3151. Pinsukanjana had learned in other discussions with the Plaintiff that he would be driving to the University of Illinois to visit Feng's laboratory and obtain measured results on the sdPhotonics Cryo-VCSEL prototypes Feng was testing.

3152. Pinsukanjana knew that Feng was testing the sdPhotonics' Cryo-VCSEL prototypes, and Pinsukanjana participated in planning meetings with Deppe, Feng, and Van Vechten.

3153. Defendant Pinsukanjana made repeated phone calls to the Plaintiff while he drove to Illinois, to learn where the Plaintiff would stay. When Pinsukanjana it would be Carbondale, IL, he informed the military where to begin the stalking.

3154. The Plaintiff was then stalked, assaulted, battered and confined over multiple days in Carbondale, IL and Illinois, had his financial accounts hacked, his company business account hacked, and found his house had been broken into when he returned there in Oviedo, FL in early December, 2020.

3155. During the stalking in late November, 2020 and early December, 2020, Defendant Pinsukanjana contacted the Plaintiff and informed him that Pinsukanjana and IET intended to fulfill a purchase order to Yunpeng Song from the Chinese company using the sdPhotonics oxide-free VCSEL technology, and IET would take control of the sdPhotonics' growth recipes.

3156. When the Plaintiff objected to the sale and informed Pinsukanjana that sdPhotonics and IET had trade secret agreements that prohibited the sale,

Pinsukanjana responded that he had no choice but to fulfill the purchase order. When the Plaintiff objected that such a sale to a Chinese company would violate ITAR agreements, Defendant Pinsukanjana ignored the ITAR, and informed the Plaintiff that Pinsukanjana's company would go forward with the sale.

3157. Defendant Pinsukanjana engaged in abuse of process, using the Florida Whistleblower proceeding for extortion to use the illegal Florida Whistleblower proceedings in Q4 2020 to extort, stalk, assault, batter, and confine the Plaintiff, all trying to obtain an agreement from the military and UCF that Lateka Eifert's office determined was based on fraud, and trying to use the stalking to take over the sdPhotonics trade secrets on oxide-free VCSELs with Yunpeng Song, with the ulterior motive to acquire or maintain improper ownership in the Plaintiff's company.

3158. The Plaintiff was damaged by Defendant Pinsukanjan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damages.

**Count 9: Defendant John Taboada.**

3159. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 630-641, 3003, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

3160. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

3161. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

3162. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to additional corrective assignments.

3163. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

3164. The Florida Whistleblower lawsuit against UCF involving allegedly false declarations filed into the USPTO by Sandra Sovinski on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

3165. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3166. During the time the proceeding operated without a judge, Defendant Hsu worked with Robert Sweetapple as Sweetapple pretended to be an officer of the illegal Whistleblower proceeding the proceeding without a judge.

3167. At issue in the Florida Whistleblower lawsuit were perjury in the USPTO, and Sandra Sovinski and Svetlana Shtrom breached the 2014 IP

Agreement and violated UCF-2.029 when they filed retroactive ownership declarations into the USPSTO.

3168. The declarations in the USPTO filed by Sandra Sovinski under the penalty of perjury violated Fl. St. §837.021(1) against contradictory statements in an official proceeding, when she attached the 2014 IP Agreement to her declaration that made contradictory statements to the actual terms of the 2014 IP Agreement that are pursuant to UCF-2.029.

3169. Furthermore, Sovinski violated Fl. St. §837.02(1) against false statements in an official proceeding, since the 2014 IP Agreement predated the declarations, and showed Sovinski had made the false statements in her declaration.

3170. After Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed he was amazed that Sovinski would again engage in fraud and perjury again in the proceeding of the USPTO.

3171. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO.

3172. However, in November, 2020, while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics patents in October, 2021.

3173. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew Sandra Sovinski had committed perjury.

3174. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski.

3175. Defendant Taboada engaged in abuse of process, to use the illegal Florida Whistleblower proceedings in Q4 2020 to extort, stalk, assault, batter, and confine the Plaintiff, informing the Plaintiff as part of the stalking that additiona perjury had been committed on the sdPhotonics' patents in October, 2020, and that the Plaintiff would be framed by the FBI for the perjury, with the ulterior motive to acquire or obtain improper ownership in the Plaintiff's company.

3176. The Plaintiff was damaged by Defendant Taboada's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 10: Defendant Charles Kuznia.**

3177. Plaintiff realleges and incorporates paragraphs 297-304, 393-463, 630-641, 3003, of this Complaint as though fully set forth herein.

3178. Kuznia was CEO of Ultra Communications, Inc., a defense contracting company that worked closely with the military program monitors Mark Beranek

and Michael Gerhold on SBIR contracts to develop his company's military transceivers that used VCSELs.

3179. The transceiver technology Kuznia's company had developed was highly robust for use in military platforms including jet aircraft, helicopters, etc., that experience high accelerations and temperature changes, and require very high reliability. These applications require VCSELs that can operate at higher and lower temperatures than most other applications.

3180. The transceiver technology Kuznia was developing is not highly efficient relative to VCSEL transceiver standards, due to design trade-offs required to meet reliability in military platforms that operate under extreme conditions including temperature and g-force due to acceleration.

3181. Kuznia repeatedly contacted the Plaintiff to discuss work with Beranek on the NAVAIR contract to develop the oxide-free VCSELs for use in Kuznia's transceivers involving a specific contract, and that Kuznia's company would work with sdPhotonics through subcontracting.

3182. The Plaintiff did contact Baranek, and sdPhotonics was issued the SBIR Phase I contract monitored by Beranek. Kuznia's company was to receive a subcontract for their work in a Phase II.

3183. Once the SBIR contract was in place that Kuznia had pushed for with Beranek, Beranek repeatedly claimed that Milton Feng had invented and developed the oxide-free VCSELs the Plaintiff's company was developing under the NAVAIR SBIR contract Beranek monitored.

3184. The Plaintiff repeatedly corrected Beranek that Milton Feng had no involvement in the oxide-free VCSEL invention or its development.

3185. Defendant Kuznia travelled with the Plaintiff was then asked by Kuznia to join him and Richard Weiss in attending meetings in Washington, D.C. in March, 2020, that Kuznia's company and Michael Gerhold had set up with lobbyists and U.S. congressional offices as part of an effort by the military to obtain government contracts to accelerate the commercialization of the oxide-free VCSEL inventions for use in military transceivers, including by Kuznia's company.

3186. In March, 2020, Defendant Kuznia, Richard Weiss, Paul Pinsukanjana, and the Plaintiff traveled to Washington, D.C. and discussed the oxide-free VCSELs at length with different congressional offices who would approve and push for the government funding.

3187. The false ownership declarations that Sovinski had filed into the USPTO on the inventions at issue in the Florida Whistleblower lawsuit were also discussed at length.

3188. At the beginning of November, 2020, the Plaintiff was repeatedly threatened by John Vetter to sign an agreement as part of the Florida Whistleblower proceeding that failed to correct the false declarations, and included the military for no apparent purpose and without military contracts.

3189. When the Plaintiff refused claiming he only needed the corrected assignments to file with the USPTO, Vetter threatened the Plaintiff that if he refused to sign, he would "find out what happens to a whistleblower in Florida."

3190. The Plaintiff was contacted by a barrage of attorneys involved in the Florida Whistleblower proceedings and engineers from various defense contractors, while the Plaintiff was being stalked in Carbondale, IL as Vetter had threatened.

3191. Defendant Kuznia called the Plaintiff while the Plaintiff was being stalked in Carbondale, IL.

3192. Kuznia informed the Plaintiff that he knew the military program monitors were taking over the Plaintiff's company and Kuznia wanted to take over the $2M IARPA Supercables project that was based on the Plaintiff's Cryo VCSEL invention.

3193. Kuznia could provide no legitimate reason to the Plaintiff for why Kuzni's company should obtain the sdPhotonics' IARPA Supercables project and claimed it was because he knew sdPhotonics had been targeted in the military take-over.

3194. Defendant Kuznia coupled the conversation to an elaborate story about how lucky everyone was to have engineering jobs in which they could work with the military, and how Kuznia was so grateful he did not have to work in menial positions instead such as a taxi driver.

3195. The Plaintiff did not respond to Kuznia's claims that Kuznia's company should take over the $2M IARPA Supercables project.

3196. Kuznia lacked the expertise in VCSELs to develop oxide-free VCSELs or even oxide VCSELs, and certainly not the Plaintiff's Cryo-VCSEL invention.

3197. Defendant Kuznia engaged in abuse of process, to use the illegal Florida Whistleblower proceedings in Q4 2020 to extort, stalk, assault, and batter the Plaintiff in Carbondale, IL, as part of the Florida Whistleblower proceeding, with the ulterior motives to take over the IARPA Supercables project from sdPhotonics, and take over the company's business operations for the military.

3198. The Plaintiff was damaged by Defendant Kuznia's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 11: Defendant Milton Feng.**

3199. Plaintiff realleges and incorporates paragraphs 334-340, 393-463, 555-556, 561-572, 575-580, 630-641, 3003 and Exhibits 2, 20 of this Complaint of this Complaint as though fully set forth herein.

3200. Defendant Feng worked as a consultant to sdPhotonics, and was employed by the Plaintiff and sdPhotonics on the IARPA Supercables project that began in or about June, 2019.

3201. The University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project, with Feng acting as the university's principal investigator to fabricate and test prototypes of sdPhotonics' new laser invention, the Cryo-VCSEL. sdPhotonics provided its proprietary epitaxial materials Feng

used to fabricate and test the Plaintiff's Cryo-VCSEL invention at high-speed and 4 K.

3202. Under the IARPA Supercables project, Defendant Feng was to fabricate and test the sdPhotonics' Cryo-VCSELs for high speed at 4 K, and set the tested prototypes back to sdPhotonics so that sdPhotonics could perform its own proprietary testing needed to develop a quantum mechanical current-voltage model that could be used for optimization of sdPhotonics' future Cryo-VCSEL designs.

3203. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the Cryo-VCSEL prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds in excess of 80 GHz at 4 K.

3204. Feng then refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

3205. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototyes.

3206. Once the Plaintiff had been threatened by Vetter, followed by stalking, assaults, and batteries in Carbondale, IL, the Plaintiff called Defendant Feng from

Carbondale, IL, explained he was being stalked and assaulted by the military, and requested Feng's assistance.

3207. However, Defendant Feng informed the Plaintiff that he had been instructed not to assist the Plaintiff or his company in any way, and refused multiple requests from the Plaintiff for help, informing the Plaintiff that he could not and was not allowed to.

3208. The Plaintiff was then by the military when Deborah Van Vechten used a trick to confine the Plaintiff in the psychiatric ward of the Pavilion, on the same University of Illinois where Feng held the Plaintiff's company's Cryo-VCSEL prototypes, where the Plaintiff was harassed, threatened, extorted for trade secrets, and poisoned.

3209. Once the Plaintiff was released, with the Plaintiff never having mentioned the illegal confinement by the military and Deborah Van Vechten, Defendant Feng began sending the Plaintiff emails of well-wishes and get well soon messages.

3210. In or about March, 2021, the Plaintiff received a draft of an article from Michael Gerhold and was informed by Gerhold that Gerhold and Feng had written an article about Gerhold's VCSEL projects. The Plaintiff found buried in the article claims by Gerhold and Feng claimed that Feng had developed the Cryo-VCSEL invention in his University of Illinois laboratory.

3211. Gerhold agreed to correct the article, and Feng informed the Plaintiff that Gerhold had made the errors in the article.

3212. By the end of the IARPA Supercables project in or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois.

3213. Defendant Feng engaged in abuse of process, to use the illegal Florida Whistleblower proceedings in Q4 2020 to extort, stalk, assault, and batter the Plaintiff in Carbondale, IL, with the ulterior motives to take over the Cryo-VCSEL prototypes from sdPhotonics, and take over the company's business operations for the military.

3214. The Plaintiff was damaged by Defendant Feng's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 12: Defendant Mark Beranek.**

3215. Plaintiff realleges and incorporates paragraphs 301-302, 393, 427-431, 437-464, 630-641, 3003 of this Complaint as though fully set forth herein.

3216. Defendant Mark Beranek worked closely with the Plaintiff in developing a proposal to and SBIR solicitation from his employment agency, NAVAIR.

3217. The NAVAIR project included sdPhotonics as a performer and Charles Kuznia's company to perform as a subcontractor to sdPhotonics in a Phase II.

3218. The NAVAIR project with Defendant Beranek began in or about March, 2020, during the Florida Whistleblower proceedings, and included Kuznia's company as a proposed subcontractor on a Phase II.

3219. sdPhotonics began making progress presentations in monthly phone meetings with Beranek and Beranek's colleagues who also monitored project, in which Defendant Beranek repeatedly stated or claimed to the Plaintiff that the oxide-free VCSELs being developed on his project had been invented and developed at the University of Illinois in Milton Feng's group.

3220. The Plaintiff repeatedly corrected Defendant Beranek in multiple phone meetings that Milton Feng was not involved in the invention or development of the oxide-free VCSEL.

3221. In early November, 2020, the Plaintiff was threatened and extorted by John Vetter to sign an agreement that included the military as part of the Florida Whistleblower lawsuit. The basis of the agreement had already been determined fraudulent by Lateka Eifert's office, and was refused by the Plaintiff.

3222. The Plaintiff was then stalked, assaulted, and battered that began in Carbondale, IL, only a few days after the threats from Vetter involving the agreement. During that episode of stalking, assaults, and batteries in Carbondale, IL, the Plaintiff received multiple phone calls from attorneys, military program monitors, and defense contractors to the military.

3223. Defendant Beranek was one of the military program monitors who contacted the Plaintiff by phone during the stalking, and informed the Plaintiff that

he wanted to take control of the oxide-free VCSEL inventions from sdPhotonics for his other projects.

3224. Defendant Beranek then offered the Plaintiff the prospect of other defense contracts he would issue to sdPhotonics, if the Plaintiff relinquished the rights to the oxide-free VCSEL inventions.

3225. The Plaintiff made no agreements and did not respond to the offers by Defendant Beranek.

3226. Defendant Beranek engaged in abuse of process, to use the Florida Whistleblower proceeding to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries in Carbondale, IL, with the ulterior motive to acquire or maintain improper ownership in the technologies of the Plaintiff's company.

3227. The Plaintiff was damaged by Defendant Beranek's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 13: Defendant Kim.**

3228. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 3003 of this Complaint as though fully set forth herein.

3229. Defendant Kim is a former University of Illinois graduate student and owner of the company QuanTera that does military contracting in semiconductors.

3230. Defendant Kim specialty is semiconductor electronic devices, and Kim also consulted for the Plaintiff's company on different occasions, and often contacted the Plaintiff with questions concerning lasers.

3231. Defendant Kim repeatedly contacted the Plaintiff while he was being extorted, stalked, assaulted, and battered in Carbondale, IL in Q4 2020 involving the evidence of perjury in the USPTO and the Florida Whistleblower proceedings.

3232. Kim called the Plaintiff repeatedly and repeatedly asked the Plaintiff in the calls whether the Plaintiff had ever had sex with a sixteen (16) year old girl.

3233. The Plaintiff informed Defendant Kim that he was being stalked by the military, and asked why was Kim was calling to ask the Plaintiff with such questions.

3234. Defendant Kim could provide no legitimate reason for his phone calls or why he was asking the Plaintiff whether he had ever had sex with a sixteen (16) year old girl.

3235. Defendant Kim conspired and engaged with military and the military's state actors at the University of Illinois, Feng, and UCF, Cook, Sovinski, and Weiss, to cyber-stalk, harass, and extort the Plaintiff in Q4 2020 as part of the illegal Florida Whistleblower proceeding, trying to take over the Plaintiff's company for the military.

3236. Defendant Kim engaged in abuse of process, to use the Florida Whistleblower proceeding to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries in Carbondale, IL,

harassing the Plaintiff as part of the stalking with phone calls asking whether the Plaintiff had ever had sex with a sixteen-year-old girl, with the ulterior motive to acquire or maintain improper ownership in the technologies of the Plaintiff's company.

3237. The Plaintiff was damaged by Defendant Kim's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 14: Defendant Pan.**

3238. Plaintiff realleges and incorporates paragraphs 393-462, 485-486, 630-641, 3003 as though fully set forth herein.

3239. Defendant Pan is a former University of Illinois graduate student and owner of the company Microlink, Inc., that does military contracting in semiconductors.

3240. Defendant Pan and the Plaintiff's company, sdPhotonics, had performed some work before in anticipation of submitting joint research proposals for projects.

3241. The Plaintiff contacted Pan in November, 2020, while he was being stalked, assaulted, and battered in Carbondale, IL, and informed Pan about what was happening and requested his help.

3242. Defendant Pan responded by text message and informed the Plaintiff that Pan had set up a meeting in a vacant house in Chicago, and wanted the Plaintiff to meet him in the vacant house.

3243. Defendant Pan could provide no legitimate reason for why he was asking the Plaintiff to meet him in a vacant house during the stalking that took place in Carbondale, IL, in Q4 2020 during the Florida Whistleblower proceeding.

3244. The Plaintiff and Pan later discussed the military attempted take-over in January, 2021 by phone.

3245. Defendant Pan admitted in that phone call in January, 2021, that he knew the Plaintiff's company had been targeted by the military, universities, and defense contractors in intellectual property theft.

3246. Defendant Pan then asked the Plaintiff to come to Chicago, IL to discuss a project he knew was upcoming that became the "Chips + Science" government funding from the Biden administration.

3247. Defendant Pan admitted that he had agreed to harass and extort the Plaintiff during the illegal Florida Whistleblower proceeding, and Pan conspired and engaged in that harassment and extortion with the military's state actors including Feng, Cook, Sovinski, and Weiss, to use the illegal Florida proceeding to take over the sdPhotonics' oxide-free VCSELs.

3248. Defendant Pan engaged in abuse of process, to use the Florida Whistleblower proceeding to try to take over sdPhotonics' oxide-free VCSEL technology during the Q4 2020 extortion, stalking, assaults, and batteries in

Carbondale, IL, harassing the Plaintiff by asking the Plaintiff to meet Pan in a vacant house in Chicago, with the ulterior motive to acquire or maintain improper ownership in the technologies of the Plaintiff's company.

3249. The Plaintiff was damaged by Defendant Pan's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 15: Defendant Kish.**

3250. Plaintiff realleges and incorporates paragraphs 393-462, 575-580, 630-641, 3003 of this Complaint as though fully set forth herein.

3251. Defendant Kish a professor at NC State who is one of the former graduate students of Nick Holonyak. Defendant Kish contacted the Plaintiff while he was being stalked in Carbondale, IL, in November, 2020 during the Florida Whistleblower proceedings.

3252. The Plaintiff and Defendant Kish exchanged emails in which the Plaintiff informed Kish he was being stalked as part of a military take-over of his company, and that the stalking was occurring as part of the Florida Whistleblower lawsuit.

3253. Defendant Kish then informed the Plaintiff that Kish was very good friends with one of the DARPA program monitors linked to the organized crime from the military, Gordon Keeler. Defendant Kish acknowledged that he knew the

effort was to take over the Plaintiff's company and use the laser inventions to obtain further government funding.

3254. Kish advised the Plaintiff that he should file suit over the actions by the military and UCF during the stalking, assaults, and batteries in Carbondale, IL in Q4 2020 as part of the Florida Whistleblower proceeding.

3255. Defendant Kish insisted in November, 2020 while the Plaintiff was being stalked and cyber-stalked, that his own university, North Carolina State University, would not receive any of the funding related to the military efforts to use the Plaintiff's oxide-free VCSEL inventions.

3256. However, Defendant Kish later changed his position, and in or about November, 2021 falsely claimed with Milton Feng, John Dallesassee, and Susan Martini's UIUC office that Nick Holonyak had somehow made the Plaintiff's VCSEL inventions as a reason for UIUC to retain the Cryo-VCSEL invention.

3257. In or about the fall of 2018 at a meeting at UIUC, Defendant Kish had tried to enter a discussion with the Plaintiff and John Dallesassee about VCSELs, and it immediately became clear that Kish had little if any scientific knowledge of the physics needed to actually understand lasers, and Deppe and Dallesassee had to be repeatedly correct Kish and explain his confusion to him about how the devices work.

3258. Defendant Kish engaged in abuse of process, to use the Florida Whistleblower proceeding in Q4 2020 to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries in

Carbondale, IL, telling the Plaintiff that Kish was good friends with the DARPA program monitor Gordon Keeler, and that his university, North Carolina State would not receive any funding related to what the military intended for the sdPhotonics' technology, with the ulterior motive to acquire improper ownership or control in the technologies of the Plaintiff's company.

3259. The Plaintiff was damaged by Defendant Kish's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 16: Defendant Van Vechten.**

3260. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 630-641, 3003 of this Complaint as though fully set forth herein.

3261. Defendant Van Vechten participated in the IARPA Supercables project monthly reporting meetings and site visits, and from that project met the Plaintiff and learned about the Plaintiff's Cryo-VCSEL technologies.

3262. Van Vechten worked closely with the Pinsukanjana, Feng, Harrod, and the Plaintiff involving the oxide-free VCSEL and Cryo-VCSEL technologies that were invented by the Plaintiff and being developed by the Plaintiff's company sdPhotonics.

3263. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was

being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

3264. Van Vechten then used a trick after the Plaintiff had been heavily stalked and assaulted, and had contacted Milton Feng for help who had refused. Van Vechten then called and informed the Plaintiff that she had learned Trump was behind the stalking, assaults, and batteries in Carbondale, IL.

3265. Van Vechten then explained that she knew a place behind locked doors away from the stalkers for a few days close to the Univ. of Illinois campus, in the blue part of the state, and that she had connections there but that it would take her several hours to arrange the stay and would call back.

3266. Instead, Defendant Van Vechten used the trick to confine the Plaintiff in the psychiatric ward of Martin Repetto, where the Plaintif was harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. During this time Repetto demanded to know details of the oxide-free VCSEL inventions Van Vechten was after.

3267. After the Plaintiff had been released, Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to avoid the stalkers in Illinois, and that the Plaintiff didn't understand how the military did its business with the universities.

3268. Defendant Van Vechten engaged in abuse of process, to use the Florida Whistleblower proceeding in Q4 2020 to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries in Carbondale, IL, using a trick to confine the Plaintiff in the psychiatric ward of the Pavilion on the University of Illinois campus, with the ulterior motive to acquire improper ownership or control in the technologies of the Plaintiff's company.

3269. The Plaintiff was damaged by Defendant Van Vechten's illegal actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 17: Defendant Nicholas Stork.**

3270. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 3003 of this Complaint as though fully set forth herein.

3271. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

3272. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

3273. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

3274. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking was due to then president Trump, and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

3275. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

3276. Several hours later during the drive Van Vechten gave the Plaintiff the information and directions to the Pavilion, while the Plaintiff was riding with Nick Stork and his wife, and explained that she had set up a room with a medical facility on the University of Illinois campus and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

3277. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

3278. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed,

threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

3279. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

3280. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3281. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

3282. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3283. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

3284. Defendant N. Stork engaged in abuse of process, to use the Florida Whistleblower proceeding in Q4 2020 to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries in Carbondale, IL, using a trick to confine the Plaintiff in the psychiatric ward of the Pavilion on the University of Illinois campus, with the ulterior motive to acquire improper ownership or control in the technologies of the Plaintiff's company.

3285. The Plaintiff was damaged by Defendant N. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 18: Defendant Martin Repetto.**

3286. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 3003 of this Complaint as though fully set forth herein.

3287. Defendant Repetto was the supervising doctor who oversaw the confinement of the Plaintiff in the psychiatric ward of the Pavilion.

3288. The Plaintiff was confined against his will and without cause in the psychiatric ward under Repetto for approximately six (6) days.

3289. During that time the Plaintiff was placed in a communal sleeping center. Numerous different supposed "patients" were checked into the room, all refusing to wear masks despite covid.

3290. The Plaintiff was forced to attend supposed "group" sessions in order to be released. The sessions were clearly staged meetings of approximately a dozen people pretending to be patients with supposed mental ailments.

3291. Defendant Repetto met with the Plaintiff at least three times during the Plaintiff's confinement.

3292. Each time Repetto demanded information about the VCSEL inventions, claiming the Plaintiff was not giving him enough information. The Plaintiff had never mentioned lasers to Defendant Repetto or anyone else in the Pavilion.

3293. The supposed "mental patients" were moved continuously into and out of the communal sleeping area, none of whom wore masks despite the peak of covid in November, 2020.

3294. On the fourth day of the Plaintiff's confinement one of the staff brought the Plaintiff a supposed diagnosis from Repetto the Plaintiff was asked to sign stating the Plaintiff had bipolar mental disease.

3295. The Plaintiff refused to sign.

3296. On the fourth morning one of the supposed "mental patients" admitted to the Plaintiff in a private conversation that he had been out of work and was approached by someone who agreed to pay him to part in the intimidation scheme in the psychiatric ward of the Pavilion with the military against the Plaintiff.

3297. Later that day the Plaintiff was moved to a private room to sleep on the same floor in the same area. On that night the Plaintiff received food poisoning and vomited throughout the night, and did not sleep.

3298. The next morning several of the supposed "patients" met in the hallway, after which one of the staff members brought each of the supposed "patients" ballpoint pens. The supposed "patients" then followed the Plaintiff around the hallway with their ballpoint pens pointed towards the patient in what was obviously staged for intimidation.

3299. When that failed the supposed "patients" began checking themselves out of the Pavilion by going to the reception desk on the floor and informing the staff they were leaving. The staff signed paperwork for more than half of the dozen or so supposed "patients."

3300. On the final morning Defendant Repetto came to the Plaintiff's room and informed the Plaintiff that he wanted to keep the Plaintiff longer in the facility, and the Plaintiff demanded to be let out.

3301. Defendant Repetto conspired and engaged with Van Vechten, Nick Stork, and the military's state actors Feng at the University of Illinois and Sovinski,

Shtrom, and with Weiss of UCF, and admitted to the Plaintiff directly that Repetto's reasons for the confinement involved extortion of information from the Plaintiff about the oxide-free VCSEL inventions. Repetto improperly confined the Plaintiff and harassed, threatened, extorted, intimidated, and oversaw assaults and batteries in the Pavilion, so that UCF and the military could take over the Plaintiff's company and its technologies.

3302. Defendant Repetto engaged in abuse of process, to use the Florida Whistleblower proceeding in Q4 2020 to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries, using a trick with Deborah Van Vechten to confine the Plaintiff in the psychiatric ward of the Pavilion on the University of Illinois campus, with the ulterior motive to acquire improper ownership or control in the technologies of the Plaintiff's company.

3303. The Plaintiff was damaged by Defendant Repetto's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 19: Defendant Brenda Stork.**

3304. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3003 of this Complaint as though fully set forth herein.

3305. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

3306. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

3307. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

3308. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

3309. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

3310. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

3311. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

3312. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

3313. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

3314. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3315. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork

and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3316. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

3317. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

3318. Defendant Brenda Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

3319. Defendant B. Stork engaged in abuse of process, to use the Florida Whistleblower proceeding in Q4 2020 to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries in Carbondale, IL, using a trick to confine the Plaintiff in the psychiatric ward of the

Pavilion on the University of Illinois campus, with the ulterior motive to acquire improper ownership or control in the technologies of the Plaintiff's company.

3320. The Plaintiff was damaged by Defendant B. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 20: Defendant Larry Stork.**

3321. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3003 of this Complaint as though fully set forth herein

3322. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

3323. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

3324. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

3325. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

3326. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

3327. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

3328. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

3329. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

3330. Because of the disorganization of the scheme and dissention from even the participants and staff, the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

3331. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3332. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3333. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

3334. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

3335. Defendant Larry Stork admitted in October, 2021 that she had conspired and engaged with Van Vechten and the military's state actors including Feng at the University of Illinois and Sovinski, Shtrom, and Weiss with UCF, to use a trick as part of the Florida Whistleblower proceedings with Van Vechten to confine the Plaintiff and harass, threaten, extort, intimidate, assault, and batter, so that UCF and the military could take over the Plaintiff's company and its technologies.

3336. Defendant L. Stork engaged in abuse of process, to use the Florida Whistleblower proceeding in Q4 2020 to try to take over sdPhotonics' oxide-free VCSEL technology during the extortion, stalking, assaults, and batteries in Carbondale, IL, using a trick to confine the Plaintiff in the psychiatric ward of the Pavilion on the University of Illinois campus, with the ulterior motive to acquire improper ownership or control in the technologies of the Plaintiff's company.

3337. The Plaintiff was damaged by Defendant L. Stork's actions, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings, and the Plaintiff is entitled to punitive damage.

**Count 21: Defendant Joe Southron.**

3338. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 3003, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

3339. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings.

3340. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

3341. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

3342. However, Defendant Southron prepared an improper complaint, that brought the Florida Whistleblower Act, Fl. St. §112.3187 against a large number of individuals.

3343. Prior Florida court rulings had already disallowed what Southron was attempting, which was to bring violations of the Fl. St. §112.3187 against individuals.

3344. When the Plaintiff informed Defendant Southron that the Plaintiff would not allow the improper amended complaint that Southron had prepared to be filed, Southron informed the Plaintiff that he was withdrawing from representation and refused to properly dismiss the Florida Whistleblower lawsuit.

3345. When the Plaintiff objected to Defendant Southron about his refusal to dismiss the complaint, Defendant Southron filed improper dismissal orders that other attorneys, Robin Foret and Kevin Keeling, caught, and explained to the Plaintiff why these could be damaging to the Plaintiff.

3346. Defendant Southron engaged in abuse of process, to use tricks during the Florida Whistleblower proceedings, trying file an improper federal complaint trying to prevent the evidence of perjury in the USPTO from coming into proceeding, and tried to withdraw from the case to damage it further when he was discovered and the Plaintiff refused to allow him to file the improper complaint, with the ulterior motive to acquire or maintain improper ownership in the Plaintiff's company.

3347. The Plaintiff was damaged by Defendant Southron' actions and refusal to allow due process in the proceeding, and because of the injuries and damages caused to him and his company had to cease his business operations, and incurred additional damages as a result of what occurred in the Florida Whistleblower proceedings. Defendant Southron's actions were unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 22: Defendant Cook.**

3348. Plaintiff realleges and incorporates paragraphs 187-189, 192, 236-276, 278-280, 289-292, 305-313, 383-384, 630-641, 3003 and Exhibit 3-10, 16 of this Complaint of this Complaint as though fully set forth herein.

3349. Defendant Cook was contacted by the Plaintiff in or about October, 2019, and provided information that Sandra Sovinski had filed false declarations into the USPTO on the Plaintiff's oxide-free VCSEL inventions, and had violated the 2014 IP Agreement and UCF-2.029.

3350. Defendant Cook and Sandra Sovinski refused to correct the declaration in the USPTO.

3351. From early January, 2020 into May, 2020 during the Florida Whistleblower proceedings, Defendant Cook worked with Sandra Sovinski and Alen Hsu who sent the Plaintiff numerous drafts of an agreement that claimed UCF needed military approval to correct the false declarations Sovinski had filed into the USPTO.

3352. The drafts of the agreement included markups identified in the drafts as made by Defendant Cook, Sovinski, or Hsu.

3353. However the military had already secured government rights in the invention, and UCF had no involvement in the sdPhotonics' government contract that involved development of the oxide-free VCSEL invention under Lateka Eifert.

3354. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

3355. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings could be proven false by prior USPTO filings that were part of the applications.

3356. The declarations filed by Sovinski into the USPTO constituted perjury, in violation of both Florida statutes and federal criminal codes against perjury.

3357. After Sovinski filed the altered declarations into the USPTO in April, 2020, and again violated UCF-2.029, the Plaintiff was again presented the agreement prepared by Cook, Sovinski, and Hsu, that the Plaintiff had rejected.

3358. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that Svetlana Shtrom had contacted a separate Army office than the office that issued the government contracts to sdPhotonics monitored by Lateka Eifert, claiming that UCF had been owed a subcontract on one of the sdPhotonics' Army contracts because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics.

3359. In or about late May, 2020, Alen Hsu sent the Plaintiff the agreement that had been prepared by Cook, Sovinski, and Hsu, that falsely claimed UCF required approval from the Army office that was unrelated to the Lateka Eifert or the contracts or her military office who had issued and monitored the contracts to the Plaintiff's company.

3360. In or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her the emails by UCF to the separate Army office that claimed Eifert

should have issued UCF a subcontract because O'Neal had been employed part time with UCF when the contract was issued.

3361. Eifert then informed the Plaintiff that she would need to discuss the matter with her supervisors. Eifert contacted the Plaintiff about a week later an informed him that UCF had engaged in fraud in other military contracts from her office, that Eifert's military supervisors were tired of UCF engaging in fraud on their contracts. Eifert then gave the Plaintiff instructions on reporting the fraud by the UCF employees to the SBA IG, Hannibal Ware.

3362. In or about October, 2021, the Plaintiff again contacted Defendant Cook by email about the false declarations in the USPTO filed by Sovinski and others working with UCF, after military auditors confirmed that sdPhotonics was paying patent costs on the patents at issue, and that Sovinski had breached the 2014 IP Agreement.

3363. The Plaintiff included the military auditors on the email to Cook who had verified the patent payments from sdPhotonics to UCF.

3364. Defendant Cook did not respond to the Plaintiff's contact and information in October, 2021 showing Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement.

3365. By the end of December, 2022, the Plaintiff was being electronically and physically stalked, assaulted, and battered so heavily by the DOJ and military, he was forced to leave the U.S. for his physical safety.

3366. Defendant Cook engaged in abuse of process, to use the Florida Whistleblower proceeding to try to take over sdPhotonics' oxide-free VCSEL, preparing fraudulent settlement agreements in or about May, 2020 and again in or about October, 2020, that were then followed by extortion trying to cover up the perjury in the USPTO by UCF's Sovinski, with the ulterior motive to acquire improper ownership or control in the technologies of the Plaintiff's company.

3367. The Plaintiff damaged in his person and property by Defendant Cook's actions, and was forced to cease business operations of his company and suffered additional damages. The Plaintiff is entitled to punitive damages because of Cook's intentional and malicious acts to damage the Plaintiff and his company.

## NINTH CAUSE OF ACTION
## Intentional Infliction of Emotional Distress. Defendants: Vetter, Taboada, Van Vechten, N. Stork, Repetto, B. Stork, L. Stork, Miguel, Taft, Maier, Coco.

3368. The elements needed to prove a claim of intentional infliction of emotional distress are: 1) Defendant's conduct was intentional or reckless; 2.) Defendant's conduct was outrageous; 3.) Defendant's conduct caused emotional distress; and 4.) Plaintiff suffered severe emotional distress.

3369. The32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**Count 1: Defendant Vetter.**

3370. Plaintiff realleges and incorporates paragraphs 342-347, 386-464, 630-641, 3368 and Exhibits 3-16, 18 of this Complaint of this Complaint as though fully set forth herein.

3371. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit.

3372. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits.

3373. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

3374. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

3375. Vetter informed the Plaintiff that the false declarations filed by Sovinski were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

3376. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

3377. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused. In the call Vetter became angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

3378. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

3379. What followed Vetter's threats that the Plaintiff would find out what happens to a Florida whistleblower included the Plaintiff was subsequently stalked, assaulted, battered in Carbondale, IL by the military working with attoneys, the FBI, and professors, followed by Van Vechtent using a trick to confine the Plaintiff in a psychiatric ward under Martin Repetto in the Pavilion, where the Plaintiff was held for six days and harassed, stalked, assaulted, threatened, intimidated, repeatedly exposed to deadly covid risk, and poisoned.

3380. The Plaintiff was then stalked across the country after being left out and all the way back to Oviedo, FL, where he found his house had been broken into and all locks on the house broken.

3381. Defendant Vetter engaged in intentional infliction of emotional distress, threatening the Plaintiff knowing the stalking, assaults, batteries, and confinement would be carried out by the military working with the FBI and universities.

3382. Vetter's actions were intentional, reckless, outrageous, and caused the Plaintiff extreme emotional distress. Defendant Vetter is liable to the Plaintiff for his unlawful actions.

**Count 2. Defendant Taboada.**

3383. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 630-641, 3368, and Exhibits 3-18 of this Complaint as though fully set forth herein.

3384. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

3385. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

3386. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to additional corrective assignments.

3387. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

3388. After the Plaintiff filed the Florida Whistleblower complaint, and Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed he was amazed that Sovinski would again engage in fraud.

3389. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO.

3390. In November, 2020, while the Plaintiff was allegedly being stalked, assaulted, and battered as part of the extortion attempt using a settlement

agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics patents in October, 2021.

3391. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew that these were false.

3392. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski

3393. Defendant Taboada engaged in intentional infliction of emotional distress, engaged in intentional, reckless, and outrageous behavior informing the Plaintiff he would be framed by the FBI for the perjury in the USPTO that Sovinski had committed, when the FBI was part of the stalking, assaults, and batteries with the military in Carbondale, IL. Taboada made his threats just before Van Vechten and others uses the trick by the military to get the Plaintiff confined in the psychiatric ward of the Pavilion under Martin Repetto, where the Plaintiff was further stalked, harassed, assaulted, battered, poisoned, threatened, and intimidated.

3394. The Plaintiff suffered severe emotional distress due to Taboada's threats in Carbondale, IL, and the confinement in the Pavilion on the University of Illinois campus by Martin Repettos in the military scheme using the DOJ with the

attorneys, and Defendant Taboada is liable to the Plaintiff for the damages and injuries he caused.

**Count 3: Defendant Van Vechten.**

3395. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 630-641, 3368-3369 of this Complaint as though fully set forth herein.

3396. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

3397. After being stalked, assaulted, harassed, constantly awoken in the hotel, and repeatedly exposed to covid, the Plaintiff had been surrounded by unknown and threatening individuals in a parking lot, where he became extremely concerned for his safety.

3398. Exhausted, the Plaintiff walked into a grocery store where the workers behind the counter allowed the Plaintiff to use a store phone. The Plaintiff then called Milton Feng and explained he was being stalked and threatened, and asking for Feng's help.

3399. When Feng repeatedly refused and claimed he had been instructed not to help, and the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

3400. Van Vechten then called almost immediately after the Plaintiff had contacted his nephew, Nick Stork and informed the Plaintiff that she knew the Plaintiff was being stalked, had information about the stalkers, and that it was coming from part of the military that was working with Donald Trump, that the government and UCF were defending themselves because of the Plaintiff's accusations in the Florida whistleblower lawsuit, and that Trump hated whistleblowers.

3401. Van Vechten then used a trick, informing the Plaintiff that Trump had lots of supporters in So. Illinois and he should stay out of the hotels, and that he needed to get to a blue part of the state. Van Vechten then explained that she knew a place behind locked doors away from the stalkers for a few days close to the Univ. of Illinois campus, in the blue part of the state, and that the military had connections there but would take her several hours to arrange the stay and would call back.

3402. Once the Plaintiff's nephew arrived with his wife, Mindy Stork, the Plaintiff explained to them that he was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

3403. Several hours later during the drive Van Vechten called back and explained that she had set up a room that she had arranged with a medical facility

and its doctor with a receptionist that would control intruders, and the Plaintiff could stay for a few days.

3404. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

3405. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

3406. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and his sister Brenda Stork and brother-in-law Larry Stork.

3407. Each claimed that they had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility.

3408. Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to

avoid the stalkers in Southern Illinois, and that the Plaintiff didn't understand how the military did business.

3409. Defendant Van Vechten engaged in infliction of intentional emotion distress against the Plaintiff, using a trick while he was being stalked, assaulted, and battered in Carbondale, IL, to intentionally confine the Plaintiff against his will in a psychiatric ward under Martin Repetto, and was harassed, threatened, intimidated, extorted, assaulted, battered with covid exposures, and poisoned.

3410. Defendant Van Vechten's actions were intentional and outrageous, and caused the Plaintiff severe emotional distress, and Defendant Van Vechten is liable for damages to the Plaintiff.

**Count 4: Defendant Nicholas Stork.**

3411. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 3368 of this Complaint as though fully set forth herein.

3412. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

3413. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

3414. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff

was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

3415. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

3416. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

3417. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

3418. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

3419. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were

blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

3420. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

3421. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3422. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

3423. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3424. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they

had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

3425. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to force the Plaintiff to sign over property to them that the Plaintiff held in Southern Illinois, claiming they would take more action with the military.

3426. Defendant Nicholas Stork engaged in acts to cause intentional emotional distress to the Plaintiff. Defendant Nick Stork used a trick to intentionally confine the Plaintiff against his will in a psychiatric ward under Martin Repetto, knowing the Plaintiff would be harassed, threatened, intimidated, extorted, assaulted, battered with covid exposures, and poisoned, and possibly not let back out.

3427. Defendant Stork's actions were intentional, reckless, and outrageous, and designed to inflict extreme emotional distress to the Plaintiff. The Plaintiff did suffer extreme emotional distress due to the trick by Defendant Stork, and Defendant Stork is liable to the Plaintiff for damages.

**Count 5: Defendant Martin Repetto.**

3428. Plaintiff realleges and incorporates paragraphs 393-463, 630-641, 3368 of this Complaint as though fully set forth herein.

3429. Defendant Repetto was the supervising doctor who oversaw the confinement of the Plaintiff in the psychiatric ward of the Pavilion.

3430. The Plaintiff was confined against his will and without cause in the psychiatric ward for approximately six (6) days.

3431. During that time the Plaintiff was placed in a communal sleeping center. Numerous different supposed "dangerous patients" were checked into the room, all refusing to wear masks despite covid.

3432. The Plaintiff was told by certain staff that he would be forced to attend supposed "group" sessions for their patience in order to be released at the end of the six days.

3433. The sessions were clearly staged meetings of approximately a dozen people pretending to be patients with supposed mental ailments.

3434. Defendant Repetto met with the Plaintiff at least three times during the Plaintiff's confinement in the psychiatric ward.

3435. Each time Repetto requested to meet with the Plaintiff, Defendant Repetto demanded information about the lasers, claiming the Plaintiff was not giving him enough information, and Repetto wanted more information on the lasers.

3436. The Plaintiff had never mentioned lasers to Defendant Repetto or anyone else in the Pavilion.

3437. The supposed "psychiatric patients" were moved continuously into and out of the communal sleeping area without masks, and claiming they had never been tested for covid.

3438. On the fourth day of the Plaintiff's confinement one of the staff brought the Plaintiff a supposed diagnosis from Repetto the Plaintiff was asked to sign stating the Plaintiff had bipolar mental disease.

3439. The Plaintiff refused to sign.

3440. On the fourth morning one of the supposed "psychiatric patients" admitted he was out of work and had been approached by someone who was paying him to part in the elaborate intimidation scheme.

3441. Later that day the Plaintiff was moved to a private room to sleep on the same floor in the same area.

3442. On that night the Plaintiff received food poisoning and vomited throughout the night, and did not sleep.

3443. The next morning several of the supposed "patients" met in the hallway, after which one of the staff members brought each of the supposed "patients" ballpoint pens. The supposed "patients" then followed the Plaintiff around the hallway with their ballpoint pens pointed towards the patient in what was obviously staged for intimidation.

3444. When that failed the supposed "patients" began checking themselves out of the Pavilion by going to the reception desk on the floor and informing the staff they were leaving. The staff signed paperwork for more than half of the dozen or so supposed "patients."

3445. On the final morning Defendant Repetto came to the Plaintiff's room and informed the Plaintiff that he wanted to keep the Plaintiff longer in the facility, and the Plaintiff demanded to be let out.

3446. Defendant Repetto engaged in acts to cause intentional emotional distress to the Plaintiff. Defendant Repetto used a trick with Deborah Van Vechten to intentionally confine the Plaintiff against his will in Repetto's psychiatric ward at the Pavilion, where Repetto and his staff repeatedly harassed, threatened, intimidated, extorted, assaulted, battered with covid exposures, and poisoned the Plaintiff, trying to prevent the Plaintiff being let back out.

3447. Defendant Repetto's actions were intentional, reckless, and outrageous, and designed to inflict extreme emotional distress to the Plaintiff. The Plaintiff did suffer extreme emotional distress due to the trick by Defendant Repetto with the military, and Defendant Repettor is liable to the Plaintiff for damages.

**<u>Count 6: Defendant Brenda Stork.</u>**

3448. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3368 of this Complaint as though fully set forth herein.

3449. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

3450. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

3451. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

3452. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

3453. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

3454. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

3455. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

3456. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

3457. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

3458. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3459. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

3460. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork

and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3461. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

3462. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

3463. Defendant Brenda Stork engaged in internal infliction of emotional distress against the Plaintiff, and participated in a trick to intentionally confine the Plaintiff against his will in a psychiatric ward under Martin Repetto in the Pavilion, knowing the Plaintiff would be harassed, threatened, intimidated, extorted, assaulted, battered with covid exposures, and poisoned, and possibly not let back out. After realizing the Plaintiff had evidence of what Brenda Stork had done, in or about October, 2021 Defendant B. Stork admitted she had been working with the military to confine the Plaintiff, and threatened additional action she would take with the military against the Plaintiff.

3464. Defendant B. Stork's actions were intentional, reckless, and outrageous, and designed to inflict extreme emotional distress to the Plaintiff. The

Plaintiff did suffer extreme emotional distress due to the trick by Defendant Stork, and Defendant Stork is liable to the Plaintiff for damages.

**Count 7: Defendant Larry Stork.**

3465. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3368 of this Complaint as though fully set forth herein.

3466. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL.

3467. After trying to obtain assistance the Plaintiff called his nephew, Nick Stork, and informed him the Plaintiff had car problems, and could assist him in Carbondale. Nick Stork agreed and said he would arrive in about 45 minutes.

3468. Once Defendant Nick Stork had arrived with his wife, Mindy Stork, in Carbondale, IL during the stalking, the Plaintiff explained to Nick that the Plaintiff was being stalked by the military with the FBI in a military take-over of his company, and that it was linked to the Trump administration.

3469. The Plaintiff also explained to Nick that one of the military program monitors, Deborah Van Vechten, had explained the stalking and was looking for a place that the Plaintiff would be safe close to Champaign-Urbana.

3470. The Plaintiff was exhausted from two days of stalking and lack of sleep, stress from having his financial accounts hacked, and Nick Stork agreed to drive the Plaintiff to Champaign-Urbana with his wife Mindy.

3471. Several hours later during the drive Van Vechten called back and the Plaintiff discussed the information Van Vechten gave the Plaintiff with Nick Stork and his wife, and explained that she had set up a room that she had arranged with a medical facility and its doctor with a receptionist that would control intruders, and where the Plaintiff could stay for a few days.

3472. During the drive and stops the Plaintiff's glasses went missing and it was after midnight when they arrived at the facility. With the Plaintiff exhausted and without glasses, Nick Stork filled out the paperwork and the Plaintiff was led to a large room in the facility where he slept the remainder of the night.

3473. When the Plaintiff awoke the next morning, he learned he had been placed in the psychiatric ward of Martin Repetto, and was then harassed, threatened, intimidated, stalked, assaulted, repeatedly exposed to covid risks from maskless so-called new "patients," and poisoned over the course of the next several days. The Plaintiff repeatedly tried to call out of the facility and his calls were blocked or failed to go through. During this time Repetto demanded to know details of the oxide-free VCSEL inventions.

3474. Because of the disorganization of the scheme and dissention from even the participants and staff the Plaintiff was let out after nearly a week of being confined against his will in the Pavilion's psychiatric ward. When the Plaintiff was finally let out and left the facility, he was met by Nick Stork, Mindy Stork, and the Plaintiff's sister Brenda Stork and brother-in-law Larry Stork.

3475. Each claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3476. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

3477. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that contains of phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3478. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records in or about August, 2021 that showed phone calls between Nicholas Stork and the Pavilion, Brenda Stork, Larry Stork, and Deborah Baird admitted they had worked with the military and UCF in the scheme to get the Plaintiff confined in the Pavilion psychiatric ward.

3479. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some unspecified actions with UCF and the military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

3480. Defendant Larry Stork violated Fl. St. §914.22(1)(a) when she used a trick against the Plaintiff during the Florida Whistleblower proceeding.

3481. Defendant Larry Stork violated Fl. St. 914.23(1), when she knowingly engaged in conduct intended to cause bodily harm to the Plaintiff using confinement as part of the military scheme to prevent the Plaintiff from attending or continuing the Florida Whistleblower lawsuit.

3482. Defendant Larry Stork engaged in internal infliction of emotional distress against the Plaintiff, and participated in a trick to intentionally confine the Plaintiff against his will in a psychiatric ward under Martin Repetto in the Pavilion, knowing the Plaintiff would be harassed, threatened, intimidated, extorted, assaulted, battered with covid exposures, and poisoned, and possibly not let back out.

3483. After realizing the Plaintiff had evidence of what Larry Stork had done, in or about October, 2021 Defendant L. Stork admitted she had been working with the military to confine the Plaintiff, and threatened additional action she would take with the military against the Plaintiff.

3484. Defendant L. Stork's actions were intentional, reckless, and outrageous, and designed to inflict extreme emotional distress to the Plaintiff. The Plaintiff did suffer extreme emotional distress due to the trick by Defendant L. Stork in the Plaintiff's confinement, and Defendant L. Stork is liable to the Plaintiff for damages.

**Count 8: Defendant Coco.**

3485. Plaintiff realleges and incorporates paragraphs 114-137, 586-596, 630-641, 3368 of this Complaint as though fully set forth herein.

3486. Defendant Coco was a law professor living in Orlando, FL and began dating the Plaintiff in or about 2015.

3487. Defendant Coco sought to become involved in the Plaintiff's company expressing an interest in learning how start-ups and military contracting worked.

3488. Defendant Coco consulted for the Plaintiff and his company, assisting in hiring and setting up financial accounts.

3489. In or about 2016, Defendant Coco began making threats against the Plaintiff and his company for reasons she was unable to explain. Coco made threats that she would report the Plaintiff's company to the IRS, but did not say why.

3490. Later in or about 2016, Defendant Coco made false reports to UCF administrator Christina Serra about a W-2 and the IRS involving the Plaintiff and his company, which Serra tried to use against the Plaintiff and his company.

3491. Defendant Coco then made threats that she would stalk and cyber-stalk the Plaintiff "for the rest of his life."

3492. Serra met with the Plaintiff, and added her own false information in the meeting claiming she had been visited by one of the former employees who had not received his W-2. In fac, he had received his W-2 and Serra had to admit she had lied to the Plaintiff about the visit from the former employee.

3493. Serra then advised the Plaintiff that Coco was making false reports about him and his company, and he should avoid Coco.

3494. By Q4 2020, the Plaintiff was being stalked, assaulted, battered and was confined as part of the military intellectual property theft scheme to damage and take over the Plaintiff's company with UCF.

3495. By Q4 2022 the Plaintiff was stalked so heavily, assaulted and battered with military style RF directed energy transmitters, that he was forced to leave the U.S. for his physical safety.

3496. Defendant Coco engaged in intentional infliction of emotional distress against the Plaintiff, and upon information and belief knew the military and UCF planned to use stalking against the Plaintiff as part of the effort to sabotage his company. Coco's threats were intentional and reckless, and Coco made outrageous threats that she would stalk the Plaintiff for the rest of his life to cover up what she had done in the sdPhotonics' retirement accounts, and knowing that the military and UCF planned to take over the Plaintiff's company.

3497. Plaintiff suffered emotional distress, being physically stalked repeatedly while Coco remained in Florida, in Q4 2020 and Q4 2022, forced from the company, as Coco threatened after secretly damaging the sdPhotonics' financial accounts, and the Plaintiff is entitled to damages for Defendant Coco's actions.

**Count 9: Defendant Miguel.**

3498. Plaintiff realleges and incorporates paragraphs 236-276, 603-628, 3368, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

3499. Defendant Miguel in or about October, 2022, that employees working with UCF had engaged in perjury in the USPTO, and that the Plaintiff was being stalked, assaulted, and battered by the military working with UCF.

3500. Despite that Defendant Miguel violated the Florida Whistleblower Act in Fl. St. §112.3187(4)(b), Miguel sent the Plaintiff a letter not long after that she was sending the information he had provided to her to Robert Taft at UCF, cc'd Robert Taft at UCF, who was involved in the stalking, assaults, and batteries by the military and UCF.

3501. After Miguel sent the letter to the Plaintiff and the information the Plaintiff had provided to her to Robert Taft's UCF office, the became stalked, assaulted, and battered so heavily that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

3502. Defendant Miguel's actions were intentional, reckless, and designed to intentionally inflict emotional distress in the Plaintiff through the stalking Miguel knew was occurring. The Plaintiff did suffer severe emotional distress, and was eventually stalked from the U.S. by stalkers using the military style RF transmitters.

3503. Defendant Miguel is liable to the Plaintiff for her outrageous actions intended to continue the stalking, assaults, and batteries on the Plaintiff.

**Count 10: Defendant Tina Maier.**

3504. Plaintiff realleges and incorporates paragraphs 236-276, 603-628, 3368, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

3505. By or about November, 2022, Defendant Maier knew from Melinda Miguel that the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

3506. As the Plaintiff was being stalked from the U.S. by stalkers using the military style RF transmitters, Defendant Maier violated Fl. St. §914.22(1)(a), when she used a trick that claimed the Florida Whistleblower Act did not consider perjury in the USPTO by a UCF employee malfeasance, or the stalking assaults and batteries malfeasance or misfeasance, and used the Florida Whistleblower Act, Fl. St. §112.3187, in attempts to cover up the evidence of perjury in the USPTO by Sandra Sovinski.

3507. Defendant Maier actions were intentional, reckless, and designed to intentionally inflict emotional distress in the Plaintiff through the stalking Miguel knew was occurring. The Plaintiff did suffer severe emotional distress, and was eventually stalked from the U.S. by stalkers using the military style RF transmitters. The Plaintiff suffered injuries and damages because of Defendant Maier's participation in whistleblower retaliation.

3508. Defendant Miguel is liable to the Plaintiff for her outrageous actions intended to continue the stalking, assaults, and batteries on the Plaintiff.

**Count 11: Defendant Taft.**

3509. Plaintiff realleges and incorporates paragraphs 236-276, 603-628, 3368, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

3510. Defendant Taft knew by or about November, 2022 from Melinda Miguel that the Plaintiff was being stalked, assaulted, and battered by the military and attorneys working with UCF trying to cover up evidence of perjury they had committed in the USPSTO.

3511. As the Plaintiff was being stalked from the U.S. by stalkers using the military style RF transmitters, Defendant Taft violated Fl. St. §112.3187(4)(b), and had his investigator Tina Maier claim the Florida Whistleblower Act did not consider perjury in the USPTO by a UCF employee malfeasance, or the stalking assaults and batteries malfeasance or misfeasance, and used the Florida Whistleblower Act, Fl. St. §112.3187, in attempts to cover up the evidence of perjury in the USPTO by Sandra Sovinski.

3512. Defendant Maier actions were intentional, reckless, and designed to intentionally inflict emotional distress in the Plaintiff through the stalking Taft knew was occurring as whistleblower retaliation. The Plaintiff did suffer severe emotional distress, and was eventually stalked from the U.S. by stalkers using the military style RF transmitters. The Plaintiff suffered injuries and damages because of Defendant Maier's participation in whistleblower retaliation.

3513. Defendant Taft is liable to the Plaintiff for his outrageous actions intended to continue the stalking, assaults, and batteries on the Plaintiff.

## TENTH CAUSE OF ACTION

**Defendants tortiously interfered with Deppe's employment relationship with sdPhotonics, Defendants: Weiss, Sweetapple, Hsu, Kline, Bustamante, Vetter, Taboada, Pinsukanjana, Kuznia, Baranek, Van Vechten, N. Stork, Repetto, B. Stork, L. Stork, Southron, Keeling, Solomon, Shainline, Feng, Cook, Miguel, Taft, Maier, O'Neal, Coco, Harrod.**

3514. To prove tortious interference with the employment relationship the Plaintiff must show: (1) the existence of the employment relationship; (2) the Defendants had knowledge of the employment relationship; (3) the Defendants intentionally and without legal justification interfered with that employment relationship; and (4) the Plaintiff suffered damages as a result of the Defendants' interference. *Howard v. Murray*, 184 So.3d 1155 (Fla. 1st DCA 2015). (see also, *Ethan Allen, Inc. v. Georgetown Manor*, 647 So.2d 812 Fla. (1994).

3515. T. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**Count 1: Defendant Weiss.**

3516. Plaintiff realleges and incorporates paragraphs 187-194, 236-276, 284-287, 290-291, 305-315, 319-329, 355-357, 362, 365-372, 391, 630-641, 3514, and Exhibits 8-14of this Complaint as though fully set forth herein.

3517. The Florida Whistleblower lawsuit against UCF was filed on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida, that contained the records of Deppe's employment relationship with sdPhotonics.

3518. At issue in the Florida Whistleblower lawsuit were that Sandra Sovinski and Svetlana Shtrom had breached the 2014 IP Agreement and UCF-2.029 and filed retroactive ownership declarations into the USPSTO that claimed the Plaintiff's company had no ownership in the patents.

3519. Sandra Sovinski had committed perjury through contradictory statements as well as false statements she made in her USPTO declarations.

3520. Defendant Weiss then made use of the Florida Whistleblower proceedings, pretending to be an officer of the court, when court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3521. While Defendant Weiss pretended to be an officer of an illegal state court proceeding, he took actions to prevent evidence from coming into the proceedings, so that the military and UCF could take over the Plaintiff's company by maintaining the false declarations in the USPTO on the patents at issue.

3522. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

3523. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower

proceedings, which in fact was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

3524. At the end of June, 2020, Defendant Weiss announced he had stayed the proceedings and refused a discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

3525. In or about August, 2020, Defendant Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, that in fact Defendant Weiss had refused, and again tried to keep evidence of Sovinski's perjury in the USPTO from coming into the proceeding.

3526. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

3527. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

3528. Defendant Weiss knew the Plaintiff had an employment relationship with sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings that damaged and disrupted the Plaintiff's

company's operations, to prevent the Plaintiff from continuing his employment relationship with sdPhotonics.

3529. The Plaintiff was damaged by Defendant Weiss' tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and to terminate his employment. Defendant Weiss actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 2: Defendant Sweetapple.**

3530. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 3514, and Exhibits 3-14 of this Complaint as though fully set forth herein

3531. The Florida Whistleblower lawsuit against UCF was filed on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida, and contained records of Deppe's employment relationship with sdPhotonics.

3532. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3533. During the time the proceeding operated without a judge, Defendant Weiss pretended that it was a proper and lawful state court proceeding, and filed documents for his client, UCF, into the Florida Whistleblower proceedings, pretending to be a legitimate officer of the state court proceeding while he operated the proceeding without a judge.

3534. At issue in the Florida Whistleblower lawsuit were that Sandra Sovinski and Svetlana Shtrom had breached the 2014 IP Agreement and UCF-2.029 and filed retroactive ownership declarations into the USPSTO, and Sandra Sovinski had committed perjury through contradictory statements as well as false statements she made in her declarations.

3535. While Defendant Sweetapple pretended to be an officer of a legitimate state court proceeding, and representing the Plaintiff, he took actions to prevent evidence from coming into the proceedings, so that the military and UCF could take over the Plaintiff's company.

3536. In or about May, 2020, Defendant Sweetapple tried to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

3537. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which in fact was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

3538. In or about the end of June, 2020, Defendant Sweetapple announced to the Plaintiff that Weiss had stayed the proceedings, and that because of the stay Defendant Sweetapple would not serve Weiss the discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

3539. In or about August, 2020, Jeffrey Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, when in fact Sweetapple had falsely claimed that Weiss had stayed the proceedings.

3540. When the Plaintiff instructed repeated that Defendant Sweetapple serve Weiss the discovery response, Defendant Sweetapple refused.

3541. When the Plaintiff fired Defendant Sweetapple, Defendant Sweetapple refused to cease work on the matter, despite that the contract between the Plaintiff and Sweetapple required Sweetapple to cease work upon being filed.

3542. Defendant Sweetapple knew the Plaintiff had an employment relationship with sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings to damage the Plaintiff's company's operations, to prevent the Plaintiff continuing his employment with sdPhotonics.

3543. The Plaintiff was damaged by Defendant Sweetapple's tortious interference with the Plaintiff's business operations, so that the Plaintiff could no longer be employed by sdPhotonics. Defendant Sweetaple's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 3. Defendant Hsu.**

3544. Plaintiff realleges and incorporates paragraphs 282-293, 315-329, 362-365, 630-641, 3514, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

3545. The Plaintiff filed the Florida Whistleblower lawsuit December 13, 2019. At issue were the false ownership declarations filed into the USPTO by Defendant, and Hsu knew of the Plaintiff's relationshiup with sdPhotonics.

3546. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

3547. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

3548. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

3549. Instead, Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that required military approval after the Plaintiff signed the agreement, and the military had already secured its rights in the patents.

3550. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

3551. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

3552. Lateka Eifert and her military supervisors eventually determined in early June, 2020 during the Florida Whistleblower proceeding that what Hsu had used in the agreement with the different Army office was fraudulent, and asked the Plaintiff to file the complaint with the SBA IG, Hannibal Ware.

3553. Defendant Hsu learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents to prove certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

3554. Sandra Sovinski then filed the changed declarations into the USPTO in April, 2020, in which place strikethroughs in some of the statements that were proven false by prior patent filings.

3555. Upon information and belief, Defendant Hsu knew the Florida Whistleblower proceeding was being operated without a judge, and with only Jeffrey Weiss and Robert Sweetapple as officers of the court in the proceeding.

3556. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into the meeting with Weiss and Sweetapple involving the agreements that Hsu and prepared with Cook and Sovinski.

3557. The meeting was over the agreement the Plaintiff had refused and instructed Hsu to cease further work, because for one of the reasons, the agreement did not correct the false declarations Sovinski had filed into the USPTO.

3558. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused

to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

3559. Defendant Hsu warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

3560. Defendant Hsu engaged in constructive fraud on the agreement he drafted with Cook and Sovinksi, claiming the military needed approval, when Lateka Eifert's office had already obtained government rights in the inventions, and Hsu took his actions to prevent the Plaintiff's company from being able to use its intellectual property and for the Plaintiff's company to be able to continue to do business.

3561. Defendant Hsu knew the Plaintiff had an employment relationship with sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings that damaged and disrupted the Plaintiff's company's operations, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3562. The Plaintiff was damaged by Defendant Hsu's tortious interference with the Plaintiff's employment relationship, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Hsu's actions were in fact both unlawful and criminal, and intentional, and he is

severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 4. Defendant Kline.**

3563. The Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 3514, and Exhibits 3-14, 16 of this Complaint of this Complaint as though fully set forth.

3564. The Plaintiff hired Defendant Karen Kline in or about 2016 to provide legal advice on patents filed by the Plaintiff and his company, sdPhotonics, and knew of the Plaintiff's employment relationship with sdPhotonics.

3565. In or about November, 2018, the Plaintiff informed Defendant Kline he planned to resign his employment from UCF and move sdPhotonics from the UCF incubator, and asked Defendant Kline to review the patents that had been filed jointly with UCF and two additional patents.

3566. In December, 2018, Defendant Kline contacted Sandra Sovinski at Sovinski's UCF office with the patent list.

3567. In or about the beginning of January, 2019, after sending her letter, Defendant Kline informed the Plaintiff she had been contacted by Sandra Sovinski and had a new conflict of interest due to UCF, but that she wished to consult to find other attorneys to represent the Plaintiff and his company, sdPhotonics.

3568. Defendant Kline subsequently informed the Plaintiff that she had found Alen Hsu from a different firm to represent the Plaintiff.

3569. Defendant Kline continued to refuse to take action when, in August, 2019, Sandra Sovinski filed false declarations into the USPSTO, violating the same 2014 IP Agreement and UCF-2.029 patent regulations Kline had contacted Sovinski about in December, 2018.

3570. Instead, the Plaintiff was informed that he should file the Florida Whistleblower complaint.

3571. Defendant Kline then referred Robert Sweetapple and Alen Hsu to be hired by the Plaintiff to pursue the Florida Whistleblower lawsuit, which the records show was operated without a judge for more than six months.

3572. Defendant Kline took part in phone conferences with Jeffrey Weiss, Robert Sweetapple, Youndy Cook, Sandra Sovinski, and Alen Hsu in May, 2020 concerning the additional declarations filed by Sandra Sovinski in April, 2020 during the Florida Whistleblower lawsuit, and billed the Plaintiff for her time.

3573. However, Defendant Kline refused and/or failed to inform the Plaintiff as to specific information discussed in those phone conferences, and never provided any work product for the "consulting" she did with Weiss, Cook, Sovinski, Hsu, and Sweetapple.

3574. Defendant Kline knew the Plaintiff owned sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet ceased representation and coordinated with Sweetapple, Hsu, Weiss, Cook, and Sovinski, to damage and disrupte the Plaintiff's

company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3575. The Plaintiff was damaged by Defendant Kline's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Kline's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 5: Defendant John Bustamante**

3576. Plaintiff realleges and incorporates paragraphs 236-274, 316-317, 322-329, 350-354, 375-385, 630-641, 3514, and Exhibits 8-10 of this Complaint as though fully set forth herein.

3577. Defendant Bustamante was hired by the Plaintiff to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom, and knew of the Plaintiff's employment relationship with sdPhotonics.

3578. Instead, Bustamante filed an improper federal complaint against UCF that the Plaintiff was forced to dismiss.

3579. Prior to filing the complaint, Bustamante called the Plaintiff and admitted and harassed the Plaintiff that he had obtained information a Trump judge would be assigned to the case, and that her name was Wendy Berger prior to filing the improper federal complaint.

3580. Defendant Bustamante could not or would not explain how he had obtained the name of the federal judge prior to filing the complaint.

3581. After the Plaintiff dismissed the federal complaint, Bustamante contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

3582. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered the defendant an equity position, he would have worked for sdPhotonics.

3583. Bustamante prepared then agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski, and again Bustamante had written the military approval after the Plaintiff had signed, when Lateka Eifert had already obtained government rights in the inventions, and her own office had determined UCF was engaged in fraud on their contracts.

3584. When the Plaintiff reviewed the agreement by Bustamante, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

3585. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

3586. Bustamante responded at that time that there was nothing he was able to do about it.

3587. Defendant Bustamante knew the Plaintiff had an employment relationship with sdPhotonics, filed the improper federal complaint based on this business relationship, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions preparing a settlement agreement that even Lateka Eifert's military office considered based on fraud, that damaged and disrupted the Plaintiff's company's operations, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3588. The Plaintiff was damaged by Defendant Bustamante's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Bustamante's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 6: Defendant John Vetter.**

3589. Plaintiff realleges and incorporates paragraphs 342-347, 386-471, 630-641, 3514, and Exhibits 8-10, 16 this Complaint as though fully set forth herein.

3590. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit, and knew of the Plaintiff's employment relationship with sdPhotonics.

3591. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits, and knew that the Plaintiff owned and operated sdPhotonics.

3592. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

3593. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

3594. Vetter informed the Plaintiff that the false declarations filed by Sovinski were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

3595. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

3596. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused. In the call Vetter became angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

3597. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

3598. The Plaintiff was subsequently stalked, assaulted, battered and confined over the agreement Vetter had threatened to the Plaintiff to sign.

3599. Defendant Vetter made clear his intentions to take over the inventions of the Plaintiff's company, threatening the Plaintiff to sign the agreement that even Lateka Eifert's military office was based on fraud.

3600. Defendant Vetter knew the Plaintiff had an employment relationship with sdPhotonics, had worked with the Plaintiff when the Plaintiff had consulted on patent lawsuits, and had reviewed the patent records and knew that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, to that damage and disrupt the Plaintiff's company's operations, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3601. The Plaintiff was damaged by Defendant Vetter's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and

intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 7: Defendant Paul Pinsukanjana.**

3602. Plaintiff realleges and incorporates paragraphs 224-231, 303-304, 395-474, 630-641, 3514 of this Complaint as though fully set forth herein.

3603. Defendant Pinsukanjana is a physicist employed by Intelligent Epitaxial Technologies, Inc. (IET).

3604. IET is an epitaxial growth foundry who provides custom semiconductor materials for optoelectronic and III-V semiconductor devices, including VCSELs.

3605. The Plaintiff and sdPhotonics' engineers worked with Defendant Pinsukanjana and IET through contracts and purchase orders that were used in developing specialized materials for sdPhotonics oxide-free VCSELs and other photonic devices, including the Cryo-VCSEL and specialized detectors.

3606. Defendant Pinsukanjana also obtained contracts from the military to develop new materials for military applications.

3607. Defendant Pinsukanjana worked directly with the Plaintiff to learn the special techniques needed to grow the epitaxy for the Plaintiff's Cryo-VCSEL intention that could operate at 4 K and below, and knew the Plaintiff had an employment relationship with sdPhotonics.

3608. Defendant Pinskukanjana worked closely with Deborah Van Vechten and Milton Feng, and the Plaintiff, Pinsukanjan, Feng, and Van Vechten had

meetings at the IET growth facility near Dallas, TX, in meetings and discussions concerning the sdPhotonics Cryo-VCSEL.

3609. On multiple occasions, Defendant Pinsukanjana and the Plaintiff discussed the declarations that Sandra Sovinski had filed into the USPTO, and the Florida Whistleblower lawsuit that had been filed December 12, 2019 involving the evidence of perjury created by Sovinski's USPTO filings.

3610. Pinsukanjana had learned in other discussions that the Plaintiff would be driving to the University of Illinois to visit Feng's laboratory and obtain measured results on the sdPhotonics Cryo-VCSEL prototypes Feng was testing.

3611. Pinsukanjana then made repeated phone calls to learn that the Plaintiff would stay, which was Carbondale, IL, where the Plaintiff was stalked, assaulted, battered and confined over multiple days.

3612. During the stalking Defendant Pinsukanjana contacted the Plaintiff and informed him that Pinsukanjana intended to fulfil a purchase order that his company had received involving Yunpeng Song from the Chinese company with the oxide-free VCSEL materials of the Plaintiff's company, sdPhotonics.

3613. When the Plaintiff objected to the sale and informed Pinsukanjana that sdPhotnoics and IET had trade secret agreements that prohibited the sale, Pinsukanjana responded that he had no choice but to fulfill the purchase order.

3614. When the Plaintiff objected that such a sale to a Chinese company would violate ITAR agreements, Defendant Pinsukanjana ignored the ITAR, and

informed the Plaintiff that Pinsukanjana's company would go forward with the sale.

3615. Defendant Pinsukanjana knew the Plaintiff had an employment relationship with sdPhotonics, had worked with the Plaintiff performing custom epitaxial growths, and yet he took illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, and tried to take over the growth recipes of the sdPhotonics's oxide-free VCSELs, to damage and disrupt the Plaintiff's company's operations, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3616. The Plaintiff was damaged by Defendant Pinsukanjana's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Pinsukanjana's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 8: Defendant John Taboada.**

3617. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 630-641, 3514, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

3618. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics, and knew the Plaintiff had an employment relationship with sdPhotonics.

3619. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

3620. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to take the action for which he was hired, which was to file the additional corrective assignments, while knowing that his refusal to take action would damage sdPhotonics.

3621. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

3622. After the Plaintiff filed the Florida Whistleblower complaint, and Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed Sovinski engaged in fraud.

3623. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO, all the while again knowing that his refusal to take action would damage sdPhotonics.

3624. In November, 2020, while the Plaintiff was allegedly being stalked, assaulted, and battered as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics' patents in October, 2021.

3625. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew that these were false, knowing his refusal to take action would damage sdPhotonics.

3626. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski, and again refused to take the action for which he was hired.

3627. Defendant Taboada knew the Plaintiff had an employment relationship with sdPhotonics, and was hired to protect the sdPhotonics patents. Yet Taboada refused to perform the work for which he was hired, and took illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, threatening the Plaintiff that the FBI would frame him for the perjury by Sovinski in the USPTO, to damage and disrupt the Plaintiff's company's operations, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3628. The Plaintiff was damaged by Defendant Taboada's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Taboada's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 9: Defendant Charles Kuznia.**

3629. Plaintiff realleges and incorporates paragraphs 297-304, 393-463, 630-641, 3514, of this Complaint as though fully set forth herein.

3630. Kuznia was CEO of Ultra Communications, Inc., a defense contracting company worked closely with the military program monitors Mark Beranek and Michael Gerhold on SBIR contracts to develop his company's VCSEL transceivers.

3631. Kuznia repeatedly the Plaintiff had an employment relationship with sdPhotonics, contacted the Plaintiff to discuss work with Beranek on the NAVAIR contract to develop the oxide-free VCSELs for use in Kuznia's transceivers involving a specific contract, and that Kuznia's company would work with sdPhotonics through subcontracting.

3632. The Plaintiff did contact Baranek, and sdPhotonics was issued the SBIR Phase I contract monitored by Beranek. Kuznia's company was to receive a subcontract for their work in a Phase II.

3633. Defendant Kuznia travelled with the Plaintiff was then asked by Kuznia to join him and Richard Weiss in attending meetings in Washington, D.C. in March, 2020, that Kuznia's company and Michael Gerhold had set up with lobbyists and U.S. congressional offices as part of an effort by the military to obtain government contracts to accelerate the commercialization of the oxide-free VCSEL inventions for use in military transceivers, including by Kuznia's company.

3634. At the beginning of November, 2020, the Plaintiff was repeatedly threatened by John Vetter to sign an agreement as part of the Florida

Whistleblower proceeding that failed to correct the false declarations, and included the military for no apparent purpose and without military contracts.

3635. When the Plaintiff refused claiming he only needed the corrected assignments to file with the USPTO, Vetter threatened the Plaintiff that if he refused to sign, he would "find out what happens to a whistleblower in Florida."

3636. The Plaintiff was contacted by a barrage of attorneys involved in the Florida Whistleblower proceedings, military program monitors, and engineers from various defense contractors, while the Plaintiff was being stalked in Carbondale, IL as Vetter had threatened.

3637. Defendant Kuznia was one of those engineers, and called the Plaintiff while the Plaintiff was being stalked in Carbondale, IL.

3638. Kuznia informed the Plaintiff that he knew the military program monitors were taking over the Plaintiff's company and Kuznia wanted to take over the $2M IARPA Supercables project that was based on the Plaintiff's Cryo VCSEL invention.

3639. Kuznia could provide no legitimate reason to the Plaintiff for why Kuzni's company should obtain the sdPhotonics' IARPA Supercables project and claimed it was because he knew sdPhotonics had been targeted in the military take-over.

3640. Defendant Kuznia knew the Plaintiff had an employment relationship with sdPhotonics, and that sdPhotonics needed the IARPA Supercables project as planned to pay the company's employees and develop its inventions. Yet Kuznia

used the illegal actions by the attorneys and military program monitors in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, to try and take over the contract of the Plaintiff's company, and damage and disrupt the Plaintiff's company's operations, so that the Plaintiff could no longer be employed by sdPhotonics.

3641. The Plaintiff was damaged by Defendant Kuznia's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Kuznia's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 10: Defendant Milton Feng.**

3642. Plaintiff realleges and incorporates paragraphs 334-340, 393-463, 555-556, 561-572, 575-580, 630-641, 3514, and Exhibits 2, 20 of this Complaint as though fully set forth herein.

3643. Defendant Feng worked as a consultant to the Plaintiff and the Plaintiff's company, sdPhotonics, and knew the Plaintiff had an employment relationship with sdPhotonics.

3644. Defendant Feng's laboratory at the University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project to fabricate and test prototypes of its new laser invention, the Cryo-VCSEL, using sdPhotonics' proprietary epitaxial material.

3645. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds.

3646. When Defendant Feng tested the prototypes of the sdPhotonics' Cryo-VCSEL invention, he found they had record speed and refused to return the Cryo-VCSEL prototypes to sdPhotonics.

3647. The Plaintiff and his company could not perform its own testing to develop the current-voltage model, and Feng's actions disrupted sdPhotonics research on the laser devices.

3648. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototyes.

3649. Once the Plaintiff had been threatened by Vetter, followed by stalking, assaults, and batteries in Carbondale, IL, the Plaintiff called Defendant Feng from Carbondale, IL, and requested Feng's assistance. However, Defendant Feng informed the Plaintiff that he had been instructed not to assist the Plaintiff or his company in any way, and refused multiple informing the Plaintiff that he could not and was not allowed to.

3650. In or about about March, 2021, the Plaintiff received a draft of an article from Michael Gerhold and was informed by Gerhold that Gerhold and Feng had written an article about Gerhold's VCSEL projects. The Plaintiff found buried

in the article claims by Gerhold and Feng claimed that Feng had developed the Cryo-VCSEL invention in his University of Illinois laboratory.

3651. By the end of the IARPA Supercables project in or about August, 2021, Defendant Feng claimed that the Cryo-VCSEL had been invented at the University of Illinois.

3652. Defendant Feng and his supervisors, Bashir and Martinis, subsequently used the sdPhotonics' Cryo-VCSEL prototypes to obtain additional contracts for the University of Illinois.

3653. Defendant Feng violated Fl. St. §812.081(2)(a) (b) when he refused to return the Cryo-VCSEL prototypes to sdPhotonics, which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

3654. Defendant Feng knew the Plaintiff had an employment relationship with sdPhotonics, and yet Feng used the illegal actions by the attorneys and military program monitors in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, to misappropriate sdPhotonics' record-setting prototypes, use them for himself, and damage and disrupt the Plaintiff's company's operations, so that the Plaintiff could no longer be employed by sdPhotonics.

3655. The Plaintiff was damaged by Defendant Vetter's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 11: Defendant Van Vechten.**

3656. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 630-641, 3514 of this Complaint as though fully set forth herein.

3657. Defendant Van Vechten participated in the IARPA Supercables project monthly reporting meetings and site visits, and from that project met the Plaintiff and learned about the Plaintiff's Cryo-VCSEL technologies, and knew the Plaintiff had an employment relationship with sdPhotonics.

3658. Van Vechten worked closely with the Pinsukanjana, Feng, Harrod, and the Plaintiff involving the oxide-free VCSEL and Cryo-VCSEL technologies being developed by the Plaintiff's company, and sought to fund sdPhotonics.

3659. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

3660. Van Vechten took part in the stalking, assaults, harassment and confinement in Carbondale, IL and Champaign, IL, using a trick to confine the Plaintiff in a psychiatric ward for six days.

3661. After the Plaintiff was released, Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to avoid the stalkers in Southern Illinois, and that the Plaintiff didn't understand how the military did business.

3662. Defendant Van Vechten knew the Plaintiff had an employment relationship with sdPhotonics, and yet harassed the Plaintiff during the Florida Whistleblower proceedings and took part in extortion, stalking, assaults, batteries, and confinement, to misappropriate sdPhotonics' record-setting prototypes, and admitted she planned to use them to benefit her own projects and her retirement, and damage and disrupt the Plaintiff's company's operations, so that the Plaintiff could no longer be employed by sdPhotonics.

3663. The Plaintiff was damaged by Defendant Vetter's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 12: Defendant Nicholas Stork.**

3664. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 3514 of this Complaint as though fully set forth herein.

3665. Defendant Nick Stork and the Plaintiff routinely discussed the sdPhotonics, and Nick Stork knew the Plaintiff had an employment relationship with sdPhotonics.

3666. Defendant N. Stork coordinated in the trick used by Deborah Van Vechten to confine the Plaintiff in the psychiatric ward in the Pavilion, and communicated with staff while the Plaintiff was confined.

3667. N. Stork denied contacts with the Pavilion staff, and claimed they had refused his phone calls, but records obtained seventh months later from the Pavilion show that N. Stork was in repeated contact with the Pavilion staff, well after the Plaintiff had been released.

3668. Once the Plaintiff obtained the medical records in or about early August, 2021, showing N. Stork had been in repeated contacts with the Pavilion, his parents Brenda Stork and Larry Stork admitted they had been working together with the military to take over the Plaintiff's company, sdPhotonics.

3669. Defendant N. Stork knew the Plaintiff had an employment relationship sdPhotonics, and yet coordinated with the attorneys and military program monitors in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confining the Plaintiff in the psychiatric ward of the Pavilion, to damage and disrupt the Plaintiff's company's operations for the military, so that the Plaintiff could no longer be employed by sdPhotonics.

3670. The Plaintiff was damaged by Defendant N. Stork's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant N. Stork's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 13: Defendant Brenda Stork.**

3671. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3514 of this Complaint as though fully set forth herein.

3672. Defendant Brenda Stork knew that the Plaintiff had a business relationship with sdPhotonics, and owned the company, and knew the Plaintiff had an employment relationship with sdPhotonics.

3673. Defendant B. Stork initially claimed that she had no knowledge of what had occurred with the military and Deborah Van Vechten in the Plaintiff's confinement during the Florida Whistleblower proceeding in Q4 2020.

3674. Defendant B. Stork claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3675. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to

help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

3676. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that included phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3677. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme with Deborah Van Vechten to get the Plaintiff confined in the Pavilion.

3678. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some further unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

3679. Defendant Brenda Stork knew the Plaintiff had an employment relationship with sdPhotonics, and yet she coordinated with the military program monitors, specifically Deborah Van Vechten, during the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confining the Plaintiff in the Pavilion, to damage and disrupt the Plaintiff's company's operations for the military, so that the Plaintiff could no longer be employed by sdPhotonics.

3680. The Plaintiff was damaged by Defendant Vetter's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 14: Defendant Larry Stork.**

3681. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3514 of this Complaint of this Complaint as though fully set forth herein.

3682. Defendant Larry Stork knew that the Plaintiff had a business relationship with sdPhotonics, and owned the company, and had an employment relationship with sdPhotonics.

3683. Defendant L. Stork initially claimed that she had no knowledge of what had occurred with the military and Deborah Van Vechten in the Plaintiff's confinement during the Florida Whistleblower proceeding in Q4 2020.

3684. Defendant L. Stork claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

3685. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to

help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

3686. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that included phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

3687. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme with Deborah Van Vechten to get the Plaintiff confined in the Pavilion.

3688. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some further unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

3689. Defendant Larry Stork knew the Plaintiff had an employment relationship with sdPhotonics, and yet she coordinated with the military program monitors, specifically Deborah Van Vechten, during the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confining the Plaintiff in the Pavilion, to damage and disrupt the Plaintiff's company's operations for the military, so that the Plaintiff could no longer be employed by sdPhotonics.

3690. The Plaintiff was damaged by Defendant Vetter's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 15: Defendant Joe Southron.**

3691. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 3514, and Exhibits 8-10, 14, 16 as though fully set forth herein of this Complaint astthough fully set forth herein.

3692. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings, and knew the Plaintiff had an employment relationship with sdPhotonics.

3693. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

3694. Defendant Southron asked for and received the information on the Plaintiff's company, its ownership in the patents at issue, the 2014 IP Agreement, UCF-2.029, and discovery materials.

3695. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

3696. Defendant Southron then tried to withdraw from representation because the Plaintiff instead of properly dismissing the complaint, to damage the Plaintiff's position further in the Florida Whistleblower lawsuit.

3697. Defendant Southron knew the Plaintiff had an employment relationship with sdPhotonics, had worked with the Plaintiff when the Plaintiff had consulted on patent lawsuits, and had reviewed the patent records and knew that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and knew of the illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults, involving prior attorneys, and yet Defendant Southron took repeated steps to damage the Plaintiff's ability to correct the false declarations that had been filed on the patents of the Plaintiff's company, to prevent the Plaintiff from continuing to be employed by sdPhotonics.

3698. The Plaintiff was damaged by Defendant Southron's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 16: Defendant Kevin Keeling.**

3699. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 3514 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

3700. The Plaintiff hired Defendant Keeling along with Mark Solomon, in or about January, 2021, at the recommendation of Robin Foret, and after Keeling and Solomon confirmed that their review of the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement. Defendant Keeling knew the Plaintiff had an employment relationship with sdPhotonics.

3701. Defendant Keeling assisted the Plaintiff to dismiss the Florida Whistleblower proceeding, by reviewing the dismissal orders that were prepared by Joe Southron and providing legal explanations as to why what Southron had prepared could be damaging to the Plaintiff.

3702. However, following the dismissal of the Florida Whistleblower lawsuit, Kevin Keeling refused to take the actions he had promised, and refused to take any action to correct past USPTO declarations.

3703. Instead, Defendant Keeling refused to take action and allowed attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company from about April, 2021 into or about February, 2021, totaling an estimated six patent applications or more, while refusing to take action to protect the applications.

3704. Defendant Keeling knew the Plaintiff had an employment relationship with sdPhotonics, and yet took steps to damage the business operations of the Plaintiff's company by allowing other attorneys to file false declarations of ownership on sdPhotonics' patent applications, to prevent the Plaintiff from continuing the employment by sdPhotonics.

3705. The Plaintiff was damaged by Defendant Keeling's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Keeling's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 17: Defendant Solomon.**

3706. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 3514 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

3707. Plaintiff hired Defendant Solomon and his associate or partner, Kevin Keeling, in or about January, 2021, at the recommendation of Robin Foret. Defendant Solomon knew the Plaintiff had an employment relationship with sdPhotonics.

3708. Defendant Solomon confirmed in his review of records from the Florida Whistleblower lawsuit, that the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

3709. Defendant Solomon informed the Plaintiff that Solomon could assist the Plaintiff with legal works to correct the false declarations at issue that had been filed by Sandra Sovinski into the USPTO.

3710. However, after obtaining a power of attorney from the Plaintiff, Solomon refused to take actions to correct the false declarations that Solomon had already determined constituted fraud and perjury in the USPTO.

3711. Defendant Solomon claimed instead that since Solomon had a doctorate, he knew what he was doing, and the Plaintiff should not question Defendant Solomon about not making corrections to the false declarations at issue, as Solomon had promised before obtaining the power of attorney.

3712. Instead of correcting the false declarations that had been filed by Sovinski into the USPTO, Defendant Solomon used his power of attorney to allow other attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company.

3713. Defendant Sololom knew the Plaintiff had an employment relationship with sdPhotonics, and used a power of attorney improperly to damage the business operations of the Plaintiff's company by allowing other attorneys to file false declarations of ownership on sdPhotonics' patent applications, to prevent the Plaintiff from continuing to be employed by sdPhotonics.

3714. The Plaintiff was damaged by Defendant Solomon's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed

by sdPhotonics. Defendant Solomon's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 18: Defendant Jeffrey Shainline.**

3715. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 3514 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

3716. Defendant Shainline repeatedly contacted the Plaintiff and informed him that his organization, NIST, wished to work with sdPhotonics on the large government project NIST was targeted to oversee which at that point was known as "Build Back Better" under the Biden Administration, and later became "Chips + Science." Defendant Shainline knew the Plaintiff had an employment relationship with sdPhotonics.

3717. Shainline had numerous phone calls in or about April, 2021, to learn details of how sdPhotonics oxide-free VCSEL invention could be integrated onto silicon platforms and why certain approaches that had been tried such as by Bowers at UCSB had been failures.

3718. After numerous phone calls in which the Plaintiff explained the technical issues to Shainline and what needed to be implemented for successful integration, the Plaintiff asked Shainline for more details on the proposal so that sdPhotonics could begin making plans to provide the proposal to Shainline.

3719. Instead, Shainline sent the Plaintiff the email informing the Plaintiff that Shainline and NIST intended to use the Cryo-VCSEL prototypes that Feng had refused to return to sdPhotonics as part of IARPA Supercables.

3720. Defendant Shainline had no involvement in the IARPA Supercables project.

3721. Defendant Shainline taunted and harassed the Plaintiff, informing the Plaintiff that Shainline did not believe money was important to the Plaintiff or his company, and repeating flawed studies that Feng had claimed he would do at the University of Illinois.

3722. Defendant Shainline did not contact the Plaintiff again after confirming to the Plaintiff that Shainline had obtained control of the sdPhotonics' Cryo-VCSEL prototypes that were being tested by Feng at the University of Illinois, and intended to use the Cryo-VCSEL prototypes in his own projects to obtain additional funding and develop new products.

3723. Defendant Shainline knew the Plaintiff had an employment relationship with sdPhotonics, obtained information under the guise that he wanted to submit a proposal with the Plaintiff's company, and then admitted he had only used the trick to obtain more information to use with sdPhotonics' Cryo-VCSELs, all to take sdPhotonic's technologies, to prevent the Plaintiff from benefiting from continuing his employment with sdPhotonics.

3724. The Plaintiff was damaged by Defendant Shainline's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was

forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Shainline's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 19: Defendant Sabine O'Neal.**

3725. Plaintiff realleges and incorporates paragraphs 94-116, 161-167, 172-174, 588-594, 630-641, 3514 of this Complaint as though fully set forth herein.

3726. Defendant O'Neal was employed by sdPhotonics as its president from about 2008 until or about December, 2015. Defendant O'Neal knew the Plaintiff had an employment relationship with sdPhotonics.

3727. Defendant O'Neal's employment responsibilities with sdPhotonics were to serve as principal investigator and she oversaw the company's financial records and tax filings.

3728. Defendant O'Neal's employment responsibilities with sdPhotonics had included writing and filing proposals to obtain research contracts, serving as principal investigator on those contracts, and overseeing the company's financial records and tax filings with a tax accountant.

3729. In or about 2012, sdPhotonics needed to close out an SBIR Phase II contract with the military, and the military sent an auditor to visit the company and audit the accounting records for direct costs expenditures made on the contract and indirect costs expended on the contract, comprising overhead.

3730. O'Neal worked with the military auditor for about five (5) hours alone in O'Neal's office.

3731. Following the meeting with the auditor, O'Neal claimed the military audit of the company's direct and indirect cost expenditures were nearly perfect, and had only one small accounting error of a few dollars.

3732. Defendant O'Neal then generated accounting records that falsely represented the contract had been properly closed out.

3733. Sometime after the audit, in or about 2013, sdPhotonics lost a contract that had been awarded because the awarding agency could not verify the company's overhead numbers from prior audits.

3734. Because of this, the Plaintiff then requested the overhead information and accounting records from Defendant O'Neal.

3735. When the Plaintiff asked Defendant O'Neal for the accounting records of the direct and indirect company costs, O'Neal claimed she had no understanding of the overhead accounting or indirect costs, and could not provide the records.

3736. The Plaintiff had no experience in maintaining financial records at that time, and in or about 2014 the Plaintiff hired a separate accountant to oversee the sdPhotonics financial accounts.

3737. Defendant O'Neal insisted on working with that accountant.

3738. After sdPhotonics had the false ownership declarations filed onto its oxide-free VCSEL patents, and the Plaintiff targeted in extortion, stalking, assaults, and batteries, and its prototypes misappropriated by the military and

university employees, the Plaintiff was forced to cease business operations for the company.

3739. In or about September, 2021, the Plaintiff began work with military auditors to audit the company's financial records and close out the company's remaining contracts.

3740. By or about April, 2022, the military auditors admitted that the military had engaged in fraud with O'Neal when it was discovered that O'Neal had set the company up on the incorrect accounting system not allowed for government contracts.

3741. By or about June, 2021, the auditors that O'Neal had not provided overhead or indirect costs in the audit in or about 2012, and yet the auditor at that time claimed to have reviewed and approved the overhead expenditures.

3742. This also explained why O'Neal had refused to provide any accounting information to the Plaintiff in 2013 and 2014, and instead resigned from the company at the end of December, 2014.

3743. Furthermore, the military auditors led by ?? also admitted to knowing prior to issuing the contracts that O'Neal had set up the accounting system with an improper accounting method not allowed by the military in tax filing.

3744. As the Plaintiff discovered in or about June, 2022, and the auditors confirmed, O'Neal had set up the company's accounting with an incorrect accounting system that could be used to damage the company's contracts and tax

filings, and sabotage the company's business operations at some time in the future because of the incorrect filings.

3745. Defendant O'Neal then engaged in accounting fraud with the military auditor in or about 2012, to cover up the earlier fraud and improper tax filings, this fraud was discovered in or about June, 2022 by the Plaintiff with the military auditors.

3746. Defendant O'Neal violated Fl. St. §817.15 when she falsified the sdPhotonics business records in or about 2012, representing that the sdPhotonics contract had been properly closed out.

3747. Fl. St. §817.15 which states in relevant part "Any officer, agent, clerk or servant of a business entity who makes a false entry in the books thereof, with intent to defraud..."

3748. Defendant O'Neal furthermore engaged in constructive fraud, when she set up sdPhotonics accounting using the incorrect accounting system for tax filing and cost accrual basis required for government contracts.

3749. Defendant O'Neal knew the Plaintiff had an employment relationship with sdPhotonics, and engaged in financial fraud in audits and constructive fraud in placing sdPhotonics on an improper accounting basis, to prevent the Plaintiff from benefiting from continuing his employment with sdPhotonics.

3750. The Plaintiff was damaged by Defendant O'Neal's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed

by sdPhotonics. Defendant O'Neal's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 20: Defendant Linda Coco.**

3751. Plaintiff realleges and incorporates paragraphs 114-137, 586-596, 630-641, 3514 of this Complaint as though fully set forth herein.

3752. Defendant Coco was a law professor living in Orlando, FL and began dating the Plaintiff in or about 2015.

3753. Defendant Coco sought to become involved in the Plaintiff's company expressing an interest in learning how start-ups and military contracting worked, and knew the Plaintiff had an employment relationship with sdPhotonics.

3754. Defendant Coco consulted for the Plaintiff and his company, assisting in hiring and setting up financial accounts.

3755. In or about 2016, Defendant Coco then began making threats against the Plaintiff and his company for reasons she was unable to explain. Coco made threats that she would report the Plaintiff's company to the IRS, but did not say why.

3756. Defendant Coco then made false complaints to UCF administrators, claiming that the Plaintiff's company had withheld W-2's from employees, which even the UCF administrators admitted had been a false claim by Coco.

3757. In or about Spring, 2022, during reviews of financial records with military auditors, Defendant Coco was found to have placed errors in the

sdPhotonics' retirement accounts of its employees and former employees, and that affected the company's IRS tax filings, and that the company was forced to correct.

3758. The errors sent retirement checks into incorrect accounts, and some checks to no accounts at all, consistent with Defendant Coco's threats that she had taken actions to damage the Plaintiff's company through errors she placed in the company's financial records and tax filings with the IRS.

3759. Defendant Coco knew the Plaintiff had an employment relationship with sdPhotonics, and used her consulting position with the company to damage its financial records, and the company's tax filings, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3760. The Plaintiff was damaged by Defendant Coco's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Coco's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 21: Defendant Youndy Cook.**

3761. Plaintiff realleges and incorporates paragraphs 188-189, 236-275, 278-280, 289, 292, 305-329, 383-385, 600-601, 630-641, 3514 and Exhibits 3-10, 16, of this Complaint as though fully set forth herein.

3762. Defendant Cook was contacted by the Plaintiff in or about October, 2019, and knew the Plaintiff had an employment relationship with sdPhotonics.

Cook was provided information that Sandra Sovinski had filed false declarations into the USPTO on the Plaintiff's oxide-free VCSEL inventions, and had violated the 2014 IP Agreement and UCF-2.029.

3763. Defendant Cook and Sandra Sovinski refused to correct the declaration in the USPTO.

3764. The Plaintiff was then advised by Alen Hsu, John Taboada, and Karen Kline that he should file the Florida Whistleblower lawsuit to obtain the corrections.

3765. Robert Sweetapple filed the Florida Whistleblower complaint on December 12, 2019, and the complaint was served to UCF's legal counsel including Youndy Cook.

3766. From early January, 2020 into May, 2020 during the Florida Whistleblower proceedings, Defendant Cook worked with Sandra Sovinski and Alen Hsu who sent the Plaintiff numerous drafts of an agreement that claimed UCF needed military approval to correct the false declarations Sovinski had filed into the USPTO.

3767. The drafts of the agreement included markups identified in the drafts as made by Defendant Cook, Sovinski, or Hsu.

3768. However the military had already secured government rights in the invention, and UCF had no involvement in the sdPhotonics' government contract that involved development of the oxide-free VCSEL invention under Lateka Eifert.

3769. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

3770. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings could be proven false by prior USPTO filings that were part of the applications.

3771. After Sovinski filed the altered declarations into the USPTO in April, 2020, and again violated UCF-2.029, the Plaintiff was again presented the agreement prepared by Cook, Sovinski, and Hsu, that the Plaintiff had rejected.

3772. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that Svetlana Shtrom had contacted a separate Army office than the office that issued the government contracts to sdPhotonics monitored by Lateka Eifert, claiming that UCF had been owed a subcontract on one of the sdPhotonics' Army contracts because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics.

3773. In or about late May, 2020, Alen Hsu sent the Plaintiff the agreement that had been prepared by Cook, Sovinski, and Hsu, that falsely claimed UCF required approval from the Army office that was unrelated to the Lateka Eifert or the contracts or her military office who had issued and monitored the contracts to the Plaintiff's company.

3774. In or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her the emails by UCF to the separate Army office that claimed Eifert should have issued UCF a subcontract because O'Neal had been employed part time with UCF when the contract was issued.

3775. Eifert then informed the Plaintiff that she would need to discuss the matter with her supervisors.

3776. Eifert contacted the Plaintiff about a week later an informed him that UCF had engaged in fraud in other military contracts from her office, that Eifert's military supervisors were tired of UCF engaging in fraud on their contracts.

3777. Eifert then gave the Plaintiff instructions on reporting the fraud by the UCF employees to the SBA IG, Hannibal Ware.

3778. In or about October, 2021, the Plaintiff again contacted Defendant Cook by email again in October, 2021, after military auditors confirmed that sdPhotonics was paying patent costs on the patents at issue, and that Sovinski had breached the 2014 IP Agreement.

3779. The Plaintiff included the military auditors on the email to Cook who had verified the patent payments from sdPhotonics to UCF.

3780. Defendant Cook did not respond to the Plaintiff's contact and information in October, 2021 showing Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement.

3781. By the end of December, 2022, the Plaintiff was being electronically and physically stalked, assaulted, and battered so heavily by the DOJ and military, he was forced to leave the U.S. for his physical safety.

3782. Defendant Cook knew the Plaintiff had an employment relationship with sdPhotonic, and prepared a settlement agreement with Alen Hsu and Sandra Sovinski, and a second settlement agreement with Bustamante and Sovinski, that even the military office that contracted with sdPhotonics determined was based on fraud, to try to take-over the Plaintiff's company, to prevent the Plaintiff from benefiting from continuing his employment with sdPhotonics.

3783. The Plaintiff was damaged by Defendant Cook's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Cook's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**<u>Count 22: Defendant Bahaa Saleh.</u>**

3784. Plaintiff realleges and incorporates paragraphs 106-109, 151-161, 166-183, 630-641, 3514 of this Complaint of this Complaint as though fully set forth herein.

3785. Defendant Saleh oversaw the UCF Photonics Incubator that was part of the larger UCF High Technology Incubator system that has multiple site

locations. Defendant Saleh knew the Plaintiff had an employment relationship with sdPhotonics.

3786. Defendant Saleh also supervised Sabine O'Neal after she had become a full-time employee of UCF, and met with her monthly to learn about her consulting work with sdPhotonics.

3787. In or about April, 2018, Sabine O'Neal learned from the Plaintiff that he intended to move his company sdPhotonics from the UCF Photonics Incubator, and that it would take approximately 24 months to arrange and complete the move.

3788. In or about September, 2018, after Sabine O'Neal learned the Plaintiff planned to move the Defendant Saleh took action against the Plaintiff's company, demanding the company be moved immediately.

3789. sdPhotonics had just signed a new one-year lease with the head of the UCF Technology Incubator in August, 2018, that had gone through the necessary levels of approval.

3790. Defendant Saleh knew the move would damage the sdPhotonics' business operations by preventing it from work on the company's research and development contracts.

3791. Because sdPhotonics had already signed a one-year lease, Defendant Saleh instead refused to sign the necessary paperwork to allow the Plaintiff to continue to be employed by both UCF and sdPhotonics to force the immediate move of the Plaintiff's company.

3792. Defendant Saleh knew the Plaintiff had an employment relationship with sdPhotonics, and tried to force the Plaintiff's company to make an immediate move from its newly leased spaced, in order to damage the company's business operations, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3793. The Plaintiff was damaged by Defendant Saleh's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 23: Defendant Elizabeth Klonoff.**

3794. Plaintiff realleges and incorporates paragraphs 110-111, 162-166, 188-189, 192, 236-276, 630-641, 3514 of this Complaint of this Complaint as though fully set forth herein.

3795. Defendant Klonoff repeatedly sought to obtain direct access to intellectual property being developed by the Plaintiff's company through Sabine O'Neal, and knew the Plaintiff had an employment relationship with sdPhotonics.

3796. Defendant Klonoff used Sabine O'Neal who consulted for sdPhotonics to request proposals from the Plaintiff's company on how they would solve certain technology problems using sdPhotonics inventions, with claims the contracts would be in the range of $250,000 ~ $350,000 to perform the initial work.

3797. Despite multiple such requests, Klonoff always worked through O'Neal as opposed to the Plaintiff directly.

3798. The email records from Karen Kline's contact to Sandra Sovinski show that Defendant Klonoff then participated in the plan with Sovinski to file false ownership declarations in violation of UCF Regulations UCF-2.029(4)(d) into the USPTO.

3799. In or about the end of December, 2018, Sandra Sovinski made the plan with Defendant Klonoff, Youndy Cook, Svetlana Shtrom, and John Miner that became the false declarations and breaches of the 2014 IP Agreement and UCF-2.029 that Klonoff oversees, that Sandra Sovinski filed into the USPTO creating the dispositive evidence of perjury.

3800. The declarations filed by Sovinski into the USPTO attaches a 2014 IP Agreement that is pursuant to UCF-2.029, and that Klonoff is required to follow.

3801. The declarations filed by Sovinski make statements about the patent filings and inventor rights to inventions that contradict the 2014 IP Agreement.

3802. Sovinski claimed that the Plaintiff exchanged his employment rights to give UCF unrestricted rights to his inventions, while the 2014 IP Agreement states the terms of those rights are pursuant to UCF Regulations UCF-2.029.

3803. Klonoff knew at the time Sovinski filed the declarations into the USPTO, that the plan she participated in with Sovinski that UCF was required to follow UCF-2.029, and that Deppe's employment rights were in fact contained in

UCF-2.029 that Sovinski and Shtrom were violating with their retroactive USPTO declarations.

3804. Defendant Klonoff knew the Plaintiff had an employment relationship with sdPhotonics, and yet entered into a plan with Sandra Sovinski, Youndy Cook, and Svetlana Shtrom, to damage the Plaintiff's company by filing false declarations into the USPTO patent records on the patents just after or as they were about to issue, to prevent the Plaintiff from continuing to be employed by sdPhotonics.

3805. The Plaintiff was damaged by Defendant Konoff's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Klonoff's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 24: Defendant Melinda Miguel.**

3806. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 3514, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

3807. The Plaintiff contacted Defendant Miguel in or about November, 2022, and provided information and records that employees working with UCF had engaged in perjury in the USPTO against his company, sdPhotonis, and that stalking, assaults, and batteries were being used against the Plaintiff in retaliation

for his prior reporting through the Florida Whistleblower Act, and that the retaliation from coming from the UCF office of Robert Taft and Tina Maier.

3808. Despite that Defendant Miguel is prohibited by the Florida Whistleblower Act in Fl. St. §112.3187(4)(b) from taking any adverse action against the Plaintiff, Miguel sent the Plaintiff a letter not long after that she was sending the information he had provided to her to Robert Taft at UCF, cc'd Robert Taft at UCF.

3809. Miguel claimed she was sending Robert Taft at UCF the information and records the Plaintiff provided her pursuant to the Florida Whistleblower's Act.

3810. The information and records that contained evidence the UCF employee Sandra Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement, and that the office of Taft and Maier had engaged in retaliation in violation of the Florida Whistleblower's Act.

3811. Defendant Miguel sent the information to Robert Taft and Tina Maier at UCF, despite they had been implicated in retaliation in violation of the Florida Whistlblower's Act by the BCLP investigative report she had received from the prior Florida governor's office.

3812. After Miguel sent the letter to the Plaintiff, he became stalked, assaulted, and battered so heavily that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

3813. Defendant Miguel knew the Plaintiff had an employment relationship with sdPhotonics, that he was being stalked, assaulted, and battered over the

evidence of perjury UCF employs had committed in the USPTO, and yet violated the Florida Whistleblower's Act, sending information to those engaged in the cover-up of the perjury and stalking, Taft and Maier, to injure the Plaintiff and damage the business operations of the Plaintiff's company, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3814. The Plaintiff was damaged by Defendant Miguel's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Miguel's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 25: Defendant Tina Maier.**

3815. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 3514, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint of this Complaint as though fully set forth herein.

3816. Defendant Maier knew the Plaintiff had an employment relationship with sdPhotonics, and Melinda Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that involved the UCF employees Taft and Maier, back to Taft and Maier who were implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

3817. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

3818. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, and/or the military, did not constitute malfeasance or misfeasance.

3819. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

3820. Defendant Maier admitted in her letter she knew that UCF employees were engaged in crimes of perjury in the USPTO, extortion, stalking, assaults, and batteries, tax fraud, identity theft, and more, and yet placed false information in her letter claiming none of these rose to the level of malfeasance or misfeasance.

3821. Defendant Maier knew the Plaintiff had an employment relationship with sdPhotonics, that he was being stalked, assaulted, and battered over the evidence of perjury UCF employs had committed in the USPTO, and yet violated the Florida Whistleblower's Act, falsely claiming that perjury in the USPTO was not malfeasance of misfeasance, and that stalking, assaults, and batteries also were not malfeasance or misfeasance, to injure the Plaintiff and damage the business

operations of the Plaintiff's company, to prevent the Plaintiff from continuing the employment with sdPhotonics.

3822. The Plaintiff was damaged by Defendant Maier's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Maier's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 26: Defendant Taft.**

3823. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 3514, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

3824. Defendant Taft knew the Plaintiff had an employment relationship with sdPhotonics, and Melinda Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that involved the UCF employees Taft and Maier, back to Taft who had been implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

3825. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that cc'd Defendant Taft and falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

3826. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, did not constitute malfeasance or misfeasance.

3827. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

3828. Defendant Maier violated Fl. St. §914.22(1)(a), when she used a trick that claimed the Florida Whistleblower Act did not consider perjury in the USPTO by a UCF employee malfeasance, or the stalking assaults and batteries malfeasance or misfeasance, and used the Florida Whistleblower Act, Fl. St. §112.3187 as a cover for the letter and to send to the Plaintiff and cc to Defendant Taft, in attempts by Miguel, Taft, and Maier to cover up the evidence of perjury in the USPTO by the UCF employee Sandra Sovinski.

3829. Defendant Taft received the letters from his investigator Tina Maier in which she admitted in her letter she knew that UCF employees were engaged in crimes of perjury in the USPTO, extortion, stalking, assaults, and batteries, tax fraud, identity theft, and more, and yet placed false information in her letter claiming none of these rose to the level of malfeasance or misfeasance.

3830. Defendant Taft's knew the Plaintiff had an employment relationship with sdPhotonics, that he was being stalked, assaulted, and battered over the evidence of perjury UCF employs had committed in the USPTO, and yet violated the Florida Whistleblower's Act, having his investigator Tina Maier write a false letter of finding that violated the Fl. St. §(4)(b), to injure the Plaintiff and damage the business operations of the Plaintiff's company, to prevent the Plaintiff from continuing his employment with sdPhotonics.

3831. The Plaintiff was damaged by Defendant Taft's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Taft's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 27: Defendant William Harrod.**

3832. Plaintiff realleges and incorporates paragraphs 335-336, 566-575, 579-580, 3514, and Exhibits 1, 2 of this Complaint as though fully set forth herein.

3833. Defendant Harrod was the IARPA program monitor who oversaw the IARPA Supercables project issued to sdPhotonics that began in or about June, 2019, and knew the Plaintiff had an employment relationship with sdPhotonics.

3834. Defendant Feng's laboratory at the University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project to

fabricate and test prototypes of its new laser invention, the Cryo-VCSEL, using sdPhotonics' proprietary epitaxial material.

3835. Feng's laboratory received the proprietary epitaxial material from sdPhotonics for the sdPhotonics' prototypes, based on the 4 K design that had been developed by the Plaintiff.

3836. Feng used his standard fabrication process for high speed VCSELs to fabricate prototypes of the sdPhotonics epitaxial structure that could be tested at high speed, and then return the sdPhotonics' prototypes to sdPhotonics so it could perform its own electrical testing on the same prototype devices, and development of a quantum mechanical current-voltage model that could be used for optimization of future sdPhotonics designs.

3837. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds.

3838. Feng refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

3839. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototypes.

3840. By the beginning of or about August, 2020, Defendant Harrod began demanding in phone meetings that the Plaintiff allow IARPA to use the sdPhotonics' Cryo-VCSELs in other projects. However, Harrod could provide no legitimate reason.

3841. Instead, Harrod demanded control of the prototypes, claiming his IARPA Director, Catherine Marsh, had told him to obtain the prototypes for other projects, and that Harrod himself knew nothing about the issue, and he was only doing what Catherine Marsh was instructing him to do.

3842. The Plaintiff refused to provide Harrod any permission and demanded the return of the sdPhotonics' Cryo-VCSEL prototypes.

3843. By the end of the IARPA Supercables project near the end or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois, and Harrod was agreeing with Feng.

3844. Harrod then issued Feng additional contracts after the IARPA Supercables ended, based on the sdPhotonics' Cryo-VCSEL prototypes, with Feng publishing articles on the Cryo-VCSELs with claims the lasers were developed at the University of Illinois in his laboratory.

3845. Defendant Harrod made an agreement with the military's state actor Milton Feng, at the University of Illinois, to take the Cryo-VCSEL prototype and its trade-secrets and withhold control of those trade secrets from sdPhotonics, while demanding control of the prototype for his project in the overt action of blaming the IARPA Director, Catherine Marsh for his demands, and then worked with

Milton Feng after the IARPA Supercables project, to damage the Plaintiff and his company.

3846. Defendant Harrod knew the Plaintiff had an employment relationship with sdPhotonics, and tortiously interfered to damage that employment relationship by sabotaging the company's business operation, and misappropriated the Cryo-VCSEL to take over the prototype and its trade secrets, for his own use and benefit, and IARPA's use and benefit, depriving the Plaintiff and Plaintiff's company of benefit of the prototypes and trade secrets, and preventing the Plaintiff from continuing his employment with sdPhotonics.

3847. The Plaintiff was damaged by Defendant Vetter's tortious interference with the Plaintiff's employment relationship with sdPhotonics, was forced to cease his company's business operations, and can no longer be employed by sdPhotonics. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

## ELEVENTH CAUSE OF ACTION

**Defendants tortiously interfered with Deppe's business relationship and his expectation of an economic advantage in sdPhotonics. Defendants: Weiss, Sweetapple, Hsu, Kline, Bustamante, Vetter, Taboada, Pinsukanjana, Feng, Kuznia, Baranek, Van Vechten, N. Stork, B. Stork, L. Stork, Southron, Keeling, Solomon, Shainline, Klonoff, Saleh, Cook, Miguel, Taft, Maier, O'Neal, Coco, Harrod.**

3848. The elements needed to prove a claim of tortious interference with a business relationship are: (1) The Plaintiff had a business relationship with another

party; (2) the Defendants knew about the Plaintiff's business relationship with the other party; (3) the Defendants purposely and without lawful justification disrupted or interfered with the business relationship; and (4) as a direct result of the disruption, damages occurred. *Howard v. Murray*, 184 So.3d 1155 (Fla. 1st DCA 2015). (see also, *Ethan Allen, Inc. v. Georgetown Manor*, 647 So.2d 812 Fla. (1994).)

3849. 32 C.F.R. § 750.23 (b) Intentional Torts, states that any federal employee who commits an intentional tort is "normally considered to be acting outside the scope of employment."

**Count 1: Defendant Weiss.**

3850. Plaintiff realleges and incorporates paragraphs 187-194, 236-276, 284-287, 290-291, 305-315, 319-329, 355-357, 362, 365-372, 391, 630-641, 3848, and Exhibits 8-14 of this Complaint as though fully set forth herein.

3851. The Florida Whistleblower lawsuit against UCF was filed on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

3852. At issue in the Florida Whistleblower lawsuit were that Sandra Sovinski and Svetlana Shtrom had breached the 2014 IP Agreement and UCF-2.029 and filed retroactive ownership declarations into the USPSTO that claimed the Plaintiff's company had no ownership in the patents.

3853. Sandra Sovinski had committed perjury through contradictory statements as well as false statements she made in her USPTO declarations.

3854. Defendant Weiss then made use of the Florida Whistleblower proceedings, pretending to be an officer of the court, when court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3855. While Defendant Weiss pretended to be an officer of an illegal state court proceeding, he took actions to prevent evidence from coming into the proceedings, so that the military and UCF could take over the Plaintiff's company by maintaining the false declarations in the USPTO on the patents at issue.

3856. In or about May, 2020, Defendant Weiss attempted to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

3857. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which in fact was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

3858. At the end of June, 2020, Defendant Weiss announced he had stayed the proceedings and refused a discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

3859. In or about August, 2020, Defendant Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to

discovery requests, that in fact Defendant Weiss had refused, and again tried to keep evidence of Sovinski's perjury in the USPTO from coming into the proceeding.

3860. In or about October, 2020, the Plaintiff was sent a second agreement involving UCF and the military, that had been prepared by John Bustamante, Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski.

3861. The Plaintiff refused the agreement that had been prepared by Weiss and others, and was subsequently threatened, harassed, stalked, assaulted, battered, and physically confined, by the military and DOJ as part of organized crime involving the Florida court system, for refusing to sign the agreement.

3862. Defendant Weiss knew the Plaintiff owned sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings that damaged and disrupted the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3863. The Plaintiff was damaged by Defendant Weiss' tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Weiss actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 2: Defendant Sweetapple.**

3864. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 3848, and Exhibits 3-14 of this Complaint as though fully set forth herein

3865. The Florida Whistleblower lawsuit against UCF was filed on or about December 12, 2019, in the 9th Judicial Circuit Court of Florida.

3866. Court records show that the Florida Whistleblower proceedings were set up by the 9th Judicial Circuit to operate without a judge.

3867. During the time the proceeding operated without a judge, Defendant Weiss pretended that it was a proper and lawful state court proceeding, and filed documents for his client, UCF, into the Florida Whistleblower proceedings, pretending to be a legitimate officer of the state court proceeding while he operated the proceeding without a judge.

3868. At issue in the Florida Whistleblower lawsuit were that Sandra Sovinski and Svetlana Shtrom had breached the 2014 IP Agreement and UCF-2.029 and filed retroactive ownership declarations into the USPSTO, and Sandra Sovinski had committed perjury through contradictory statements as well as false statements she made in her declarations.

3869. While Defendant Sweetapple pretended to be an officer of a legitimate state court proceeding, and representing the Plaintiff, he took actions to prevent evidence from coming into the proceedings, so that the military and UCF could take over the Plaintiff's company.

3870. In or about May, 2020, Defendant Sweetapple tried to force the Plaintiff into a settlement meeting based on claims UCF required Army approval for UCF to assign.

3871. In or about early June, 2020, Lateka Eifert confirmed that UCF had engaged in fraud with the separate Army office during the Florida Whistleblower proceedings, which in fact was the basis of Defendant Weiss's false claims, and that Army had already obtained its government rights in the inventions.

3872. In or about the end of June, 2020, Defendant Sweetapple announced to the Plaintiff that Weiss had stayed the proceedings, and that because of the stay Defendant Sweetapple would not serve Weiss the discovery response the Plaintiff had prepared that included emails, records of evidence of perjury in the USPTO by Sandra Sovinski, and contract breaches of the 2014 IP Agreement.

3873. In or about August, 2020, Jeffrey Weiss filed a false motion to compel into the proceedings, claiming the Plaintiff had refused to respond to discovery requests, when in fact Sweetapple had falsely claimed that Weiss had stayed the proceedings.

3874. When the Plaintiff instructed repeated that Defendant Sweetapple serve Weiss the discovery response, Defendant Sweetapple refused.

3875. When the Plaintiff fired Defendant Sweetapple, Defendant Sweetapple refused to cease work on the matter, despite that the contract between the Plaintiff and Sweetapple required Sweetapple to cease work upon being filed.

3876. Defendant Sweetapple knew the Plaintiff owned sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings to damage the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3877. The Plaintiff was damaged by Defendant Sweetapple's tortious interference with the Plaintiff's business operations, and has lost all value in his company. Defendant Sweetaple's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 3. Defendant Hsu.**

3878. Plaintiff realleges and incorporates paragraphs 282-293, 315-329, 362-365, 630-641, 3848, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

3879. The Plaintiff filed the Florida Whistleblower lawsuit December 13, 2019. At issue were the false ownership declarations filed into the USPTO by Defendant.

3880. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

3881. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

3882. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

3883. Instead, Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that required military approval after the Plaintiff signed the agreement, and the military had already secured its rights in the patents.

3884. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

3885. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

3886. Lateka Eifert and her military supervisors eventually determined in early June, 2020 during the Florida Whistleblower proceeding that what Hsu had used in the agreement with the different Army office was fraudulent, and asked the Plaintiff to file the complaint with the SBA IG, Hannibal Ware.

3887. Defendant Hsu learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents to prove certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

3888. Sandra Sovinski then filed the changed declarations into the USPTO in April, 2020, in which place strikethroughs in some of the statements that were proven false by prior patent filings.

3889. Upon information and belief, Defendant Hsu knew the Florida Whistleblower proceeding was being operated without a judge, and with only Jeffrey Weiss and Robert Sweetapple as officers of the court in the proceeding.

3890. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into the meeting with Weiss and Sweetapple involving the agreements that Hsu and prepared with Cook and Sovinski.

3891. The meeting was over the agreement the Plaintiff had refused and instructed Hsu to cease further work, because for one of the reasons, the agreement did not correct the false declarations Sovinski had filed into the USPTO.

3892. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

3893. Defendant Hsu warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

3894. Defendant Hsu engaged in constructive fraud on the agreement he drafted with Cook and Sovinksi, claiming the military needed approval, when Lateka Eifert's office had already obtained government rights in the inventions, and Hsu took his actions to prevent the Plaintiff's company from being able to use

its intellectual property and for the Plaintiff's company to be able to continue to do business.

3895. Defendant Hsu knew the Plaintiff owned sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings that damaged and disrupted the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3896. The Plaintiff was damaged by Defendant Hsu's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Hsu's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 4. Defendant Kline.**

3897. The Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 3848, and Exhibits 3-14, 16 of this Complaint as though fully set forth.

3898. The Plaintiff hired Defendant Karen Kline in or about 2016 to provide legal advice on patents filed by the Plaintiff and his company, sdPhotonics.

3899. In or about November, 2018, the Plaintiff informed Defendant Kline he planned to resign his employment from UCF and move sdPhotonics from the UCF incubator, and asked Defendant Kline to review the patents that had been filed jointly with UCF and two additional patents.

3900. In December, 2018, Defendant Kline contacted Sandra Sovinski at Sovinski's UCF office with the patent list.

3901. In or about the beginning of January, 2019, after sending her letter, Defendant Kline informed the Plaintiff she had been contacted by Sandra Sovinski and had a new conflict of interest due to UCF, but that she wished to consult to find other attorneys to represent the Plaintiff and his company, sdPhotonics.

3902. Defendant Kline subsequently informed the Plaintiff that she had found Alen Hsu from a different firm to represent the Plaintiff.

3903. Defendant Kline continued to refuse to take action when, in August, 2019, Sandra Sovinski filed false declarations into the USPSTO, violating the same 2014 IP Agreement and UCF-2.029 patent regulations Kline had contacted Sovinski about in December, 2018.

3904. Instead, the Plaintiff was informed that he should file the Florida Whistleblower complaint.

3905. Defendant Kline then referred Robert Sweetapple and Alen Hsu to be hired by the Plaintiff to pursue the Florida Whistleblower lawsuit, which the records show was operated without a judge for more than six months.

3906. Defendant Kline took part in phone conferences with Jeffrey Weiss, Robert Sweetapple, Youndy Cook, Sandra Sovinski, and Alen Hsu in May, 2020 concerning the additional declarations filed by Sandra Sovinski in April, 2020 during the Florida Whistleblower lawsuit, and billed the Plaintiff for her time.

3907. However, Defendant Kline refused and/or failed to inform the Plaintiff as to specific information discussed in those phone conferences, and never provided any work product for the "consulting" she did with Weiss, Cook, Sovinski, Hsu, and Sweetapple.

3908. Defendant Kline knew the Plaintiff owned sdPhotonics, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet ceased representation and coordinated with Sweetapple, Hsu, Weiss, Cook, and Sovinski, to damage and disrupte the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3909. The Plaintiff was damaged by Defendant Kline's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Kline's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**<u>Count 5: Defendant John Bustamante</u>**

3910. Plaintiff realleges and incorporates paragraphs 236-274, 316-317, 322-329, 350-354, 375-385, 630-641, 3848, and Exhibits 8-10 of this Complaint as though fully set forth herein.

3911. Defendant Bustamante was hired by the Plaintiff to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations

that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom.

3912. Instead, Bustamante filed an improper federal complaint against UCF that the Plaintiff was forced to dismiss.

3913. Prior to filing the complaint, Bustamante called the Plaintiff and admitted and harassed the Plaintiff that he had obtained information a Trump judge would be assigned to the case, and that her name was Wendy Berger prior to filing the improper federal complaint.

3914. Defendant Bustamante could not or would not explain how he had obtained the name of the federal judge prior to filing the complaint.

3915. After the Plaintiff dismissed the federal complaint, Bustamante contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

3916. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered the defendant an equity position, he would have worked for sdPhotonics.

3917. Bustamante prepared then agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski, and again Bustamante had written the military approval after the Plaintiff had signed, when

Lateka Eifert had already obtained government rights in the inventions, and her own office had determined UCF was engaged in fraud on their contracts.

3918. When the Plaintiff reviewed the agreement by Bustamante, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

3919. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

3920. Bustamante responded at that time that there was nothing he was able to do about it.

3921. Defendant Bustamante knew the Plaintiff owned sdPhotonics, filed the improper federal complaint based on this business relationship, and that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions preparing a settlement agreement that even Lateka Eifert's military office considered based on fraud, that damaged and disrupted the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3922. The Plaintiff was damaged by Defendant Bustamante's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Bustamante's actions were in fact both unlawful and criminal, and intentional, and

he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 6: Defendant John Vetter.**

3923. Plaintiff realleges and incorporates paragraphs 342-347, 386-471, 630-641, 3848, and Exhibits 8-10, 16 of this Complaint as though fully set forth herein.

3924. The Plaintiff contacted Defendant John Vetter in or about July, 2020, to discuss what attorneys were doing on the Florida Whistleblower lawsuit.

3925. The Plaintiff knew Defendant Vetter from prior consulting work the Plaintiff had performed on patent lawsuits, and knew that the Plaintiff owned and operated sdPhotonics.

3926. The Plaintiff sent Vetter the declarations that Sovinski had filed into the USPTO in August, 2019, and again in April, 2020 during the Florida Whistleblower proceedings.

3927. Defendant Vetter is an expert on patent infringement and litigation of intellectual property and extensive trial experience.

3928. Vetter informed the Plaintiff that the false declarations filed by Sovinski were perjury, and referred the Plaintiff to Ary Chang, who both Vetter and the Plaintiff had worked in patent litigation.

3929. Ary Chang worked with John Bustamante, Weiss, Cook, and Sovinski in drafting the settlement agreement Bustamante sent the Plaintiff in or about October, 2020.

3930. In early November, 2020 the Plaintiff and Vetter discussed the agreement by phone, which the Plaintiff had refused. In the call Vetter became angry and repeatedly threatened the Plaintiff that the Plaintiff needed to sign the agreement.

3931. When the Plaintiff informed Vetter he did not intend to sign the agreement because it did not make the needed corrections to the false declarations Sovinski filed into the USPTO, Vetter made the explicit threat that if the Plaintiff did not sign the agreement, he would "find out what happens to a whistleblower in Florida."

3932. The Plaintiff was subsequently stalked, assaulted, battered and confined over the agreement Vetter had threatened to the Plaintiff to sign.

3933. Defendant Vetter made clear his intentions to take over the inventions of the Plaintiff's company, threatening the Plaintiff to sign the agreement that even Lateka Eifert's military office was based on fraud.

3934. Defendant Vetter knew the Plaintiff owned sdPhotonics, had worked with the Plaintiff when the Plaintiff had consulted on patent lawsuits, and had reviewed the patent records and knew that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and yet he took illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, to that damage and disrupt the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3935. The Plaintiff was damaged by Defendant Vetter's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Vetter's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 7: Defendant Paul Pinsukanjana.**

3936. Plaintiff realleges and incorporates paragraphs 224-231, 303-304, 395-474, 630-641, 3848 of this Complaint as though fully set forth herein.

3937. Defendant Pinsukanjana is a physicist employed by Intelligent Epitaxial Technologies, Inc. (IET).

3938. IET is an epitaxial growth foundry who provides custom semiconductor materials for optoelectronic and III-V semiconductor devices, including VCSELs.

3939. The Plaintiff and sdPhotonics' engineers worked with Defendant Pinsukanjana and IET through contracts and purchase orders that were used in developing specialized materials for sdPhotonics oxide-free VCSELs and other photonic devices, including the Cryo-VCSEL and specialized detectors.

3940. Defendant Pinsukanjana also obtained contracts from the military to develop new materials for military applications.

3941. Defendant Pinsukanjana worked directly with the Plaintiff to learn the special techniques needed to grow the epitaxy for the Plaintiff's Cryo-VCSEL intention that could operate at 4 K and below.

3942. Defendant Pinskukanjana worked closely with Deborah Van Vechten and Milton Feng, and the Plaintiff, Pinsukanjan, Feng, and Van Vechten had meetings at the IET growth facility near Dallas, TX, in meetings and discussions concerning the sdPhotonics Cryo-VCSEL.

3943. On multiple occasions, Defendant Pinsukanjana and the Plaintiff discussed the declarations that Sandra Sovinski had filed into the USPTO, and the Florida Whistleblower lawsuit that had been filed December 12, 2019 involving the evidence of perjury created by Sovinski's USPTO filings.

3944. Pinsukanjana had learned in other discussions that the Plaintiff would be driving to the University of Illinois to visit Feng's laboratory and obtain measured results on the sdPhotonics Cryo-VCSEL prototypes Feng was testing.

3945. Pinsukanjana then made repeated phone calls to learn that the Plaintiff would stay, which was Carbondale, IL, where the Plaintiff was stalked, assaulted, battered and confined over multiple days.

3946. During the stalking Defendant Pinsukanjana contacted the Plaintiff and informed him that Pinsukanjana intended to fulfil a purchase order that his company had received involving Yunpeng Song from the Chinese company with the oxide-free VCSEL materials of the Plaintiff's company, sdPhotonics.

3947. When the Plaintiff objected to the sale and informed Pinsukanjana that sdPhotnoics and IET had trade secret agreements that prohibited the sale, Pinsukanjana responded that he had no choice but to fulfill the purchase order.

3948. When the Plaintiff objected that such a sale to a Chinese company would violate ITAR agreements, Defendant Pinsukanjana ignored the ITAR, and informed the Plaintiff that Pinsukanjana's company would go forward with the sale.

3949. Defendant Pinsukanjana knew the Plaintiff owned sdPhotonics, had worked with the Plaintiff performing custom epitaxial growths, and yet he took illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, and tried to take over the growth recipes of the sdPhotonics's oxide-free VCSELs, to damage and disrupt the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3950. The Plaintiff was damaged by Defendant Pinsukanjana's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Pinsukanjana's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**<u>Count 8: Defendant John Taboada.</u>**

3951. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 630-641, 3848, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

3952. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

3953. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

3954. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to take the action for which he was hired, which was to file the additional corrective assignments, while knowing that his refusal to take action would damage sdPhotonics.

3955. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

3956. After the Plaintiff filed the Florida Whistleblower complaint, and Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed Sovinski engaged in fraud.

3957. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO, all the while again knowing that his refusal to take action would damage sdPhotonics.

3958. In November, 2020, while the Plaintiff was allegedly being stalked, assaulted, and battered as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that

additional false declarations were filed into the USPTO on the sdPhotonics' patents in October, 2021.

3959. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew that these were false, knowing his refusal to take action would damage sdPhotonics.

3960. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski, and again refused to take the action for which he was hired.

3961. Defendant Taboada knew the Plaintiff owned sdPhotonics, and was hired to protect the sdPhotonics patents. Yet Taboada refused to perform the work for which he was hired, and took illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, threatening the Plaintiff that the FBI would frame him for the perjury by Sovinski in the USPTO, to damage and disrupt the Plaintiff's company's operations, to prevent the Plaintiff from benefiting from the business relationship.

3962. The Plaintiff was damaged by Defendant Taboada's tortious interference with the Plaintiff's business operations, and was forced to cease his company's business operations, and has lost all value in his company. Defendant Taboada's actions were in fact both unlawful and criminal, and intentional, and he

is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 9: Defendant Charles Kuznia.**

3963. Plaintiff realleges and incorporates paragraphs 297-304, 393-463, 630-641, 3848, of this Complaint as though fully set forth herein.

3964. Kuznia was CEO of Ultra Communications, Inc., a defense contracting company worked closely with the military program monitors Mark Beranek and Michael Gerhold on SBIR contracts to develop his company's VCSEL transceivers.

3965. Kuznia repeatedly contacted the Plaintiff to discuss work with Beranek on the NAVAIR contract to develop the oxide-free VCSELs for use in Kuznia's transceivers involving a specific contract, and that Kuznia's company would work with sdPhotonics through subcontracting.

3966. The Plaintiff did contact Baranek, and sdPhotonics was issued the SBIR Phase I contract monitored by Beranek. Kuznia's company was to receive a subcontract for their work in a Phase II.

3967. Defendant Kuznia travelled with the Plaintiff was then asked by Kuznia to join him and Richard Weiss in attending meetings in Washington, D.C. in March, 2020, that Kuznia's company and Michael Gerhold had set up with lobbyists and U.S. congressional offices as part of an effort by the military to obtain government contracts to accelerate the commercialization of the oxide-free VCSEL inventions for use in military transceivers, including by Kuznia's company.

3968. At the beginning of November, 2020, the Plaintiff was repeatedly threatened by John Vetter to sign an agreement as part of the Florida Whistleblower proceeding that failed to correct the false declarations, and included the military for no apparent purpose and without military contracts.

3969. When the Plaintiff refused claiming he only needed the corrected assignments to file with the USPTO, Vetter threatened the Plaintiff that if he refused to sign, he would "find out what happens to a whistleblower in Florida."

3970. The Plaintiff was contacted by a barrage of attorneys involved in the Florida Whistleblower proceedings, military program monitors, and engineers from various defense contractors, while the Plaintiff was being stalked in Carbondale, IL as Vetter had threatened.

3971. Defendant Kuznia was one of those engineers, and called the Plaintiff while the Plaintiff was being stalked in Carbondale, IL.

3972. Kuznia informed the Plaintiff that he knew the military program monitors were taking over the Plaintiff's company and Kuznia wanted to take over the $2M IARPA Supercables project that was based on the Plaintiff's Cryo VCSEL invention.

3973. Kuznia could provide no legitimate reason to the Plaintiff for why Kuzni's company should obtain the sdPhotonics' IARPA Supercables project and claimed it was because he knew sdPhotonics had been targeted in the military take-over.

3974. Defendant Kuznia knew the Plaintiff owned sdPhotonics, and that sdPhotonics needed the IARPA Supercables project as planned to pay the company's employees and develop its inventions. Yet Kuznia used the illegal actions by the attorneys and military program monitors in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confinement, to try and take over the contract of the Plaintiff's company, and damage and disrupt the Plaintiff's company's operations.

3975. The Plaintiff was damaged by Defendant Kuznia's tortious interference with the Plaintiff's business operations, and was forced to cease his company's business operations, and has lost all value in his company. Defendant Kuznia's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 10: Defendant Milton Feng.**

3976. Plaintiff realleges and incorporates paragraphs 334-340, 393-463, 555-556, 561-572, 575-580, 630-641, 3848, and Exhibits 2, 20 of this Complaint as though fully set forth herein.

3977. Defendant Feng worked as a consultant to the Plaintiff and the Plaintiff's company, sdPhotonics.

3978. Defendant Feng's laboratory at the University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project to

fabricate and test prototypes of its new laser invention, the Cryo-VCSEL, using sdPhotonics' proprietary epitaxial material.

3979. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the prototypes in or about February, 2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds.

3980. When Defendant Feng tested the prototypes of the sdPhotonics' Cryo-VCSEL invention, he found they had record speed and refused to return the Cryo-VCSEL prototypes to sdPhotonics.

3981. The Plaintiff and his company could not perform its own testing to develop the current-voltage model, and Feng's actions disrupted sdPhotonics research on the laser devices.

3982. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototyes.

3983. Once the Plaintiff had been threatened by Vetter, followed by stalking, assaults, and batteries in Carbondale, IL, the Plaintiff called Defendant Feng from Carbondale, IL, and requested Feng's assistance. However, Defendant Feng informed the Plaintiff that he had been instructed not to assist the Plaintiff or his company in any way, and refused multiple informing the Plaintiff that he could not and was not allowed to.

3984. In or about about March, 2021, the Plaintiff received a draft of an article from Michael Gerhold and was informed by Gerhold that Gerhold and Feng had written an article about Gerhold's VCSEL projects. The Plaintiff found buried in the article claims by Gerhold and Feng claimed that Feng had developed the Cryo-VCSEL invention in his University of Illinois laboratory.

3985. By the end of the IARPA Supercables project in or about August, 2021, Defendant Feng claimed that the Cryo-VCSEL had been invented at the University of Illinois.

3986. Defendant Feng and his supervisors, Bashir and Martinis, subsequently used the sdPhotonics' Cryo-VCSEL prototypes to obtain additional contracts for the University of Illinois.

3987. Defendant Feng violated Fl. St. §812.081(2)(a) (b) when he refused to return the Cryo-VCSEL prototypes to sdPhotonics, which states in relevant part that it is "unlawful for a person to willfully and without authorization, obtain or use, or endeavor to obtain or use, a trade secret with the intent to either temporarily or permanently deprive or withhold from the owner thereof the control or benefit of a trade secret; or (b) appropriate a trade secret to his or her own use or to the use of another person not entitled to the trade secret."

3988. Defendant Feng knew the Plaintiff owned sdPhotonics, and yet Feng used the illegal actions by the attorneys and military program monitors in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and

confinement, to misappropriate sdPhotonics' record-setting prototypes, use them for himself, and damage and disrupt the Plaintiff's company's operations.

3989. The Plaintiff was damaged by Defendant Feng's tortious interference with the Plaintiff's business operations, and was forced to cease his company's business operations, and has lost all value in his company. Defendant Feng's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 11: Defendant Van Vechten.**

3990. Plaintiff realleges and incorporates paragraphs 393-462, 466-469, 630-641, 3848-3449 of this Complaint as though fully set forth herein.

3991. Defendant Van Vechten participated in the IARPA Supercables project monthly reporting meetings and site visits, and from that project met the Plaintiff and learned about the Plaintiff's Cryo-VCSEL technologies.

3992. Van Vechten worked closely with the Pinsukanjana, Feng, Harrod, and the Plaintiff involving the oxide-free VCSEL and Cryo-VCSEL technologies being developed by the Plaintiff's company, and sought to fund sdPhotonics.

3993. After the Plaintiff was threatened by Vetter at the start of November, 2020 as part of the Florida Whistleblower proceeding, and while the Plaintiff was being stalked, assaulted, and battered in Carbondale, IL, Van Vechten began contacting the Plaintiff and informing him of how she planned to use his VCSEL technologies with her other companies.

3994. Van Vechten took part in the stalking, assaults, harassment and confinement in Carbondale, IL and Champaign, IL, using a trick to confine the Plaintiff in a psychiatric ward for six days.

3995. After the Plaintiff was released, Defendant Van Vechten then began systematic harassment contacting the Plaintiff to tell him she had remote places in Michigan that he could stay to avoid the stalkers in Southern Illinois, and that the Plaintiff didn't understand how the military did business.

3996. Defendant Van Vechten knew the Plaintiff owned sdPhotonics, and yet harassed the Plaintiff during the Florida Whistleblower proceedings and took part in extortion, stalking, assaults, batteries, and confinement, to misappropriate sdPhotonics' record-setting prototypes, and admitted she planned to use them to benefit her own projects and her retirement, and damage and disrupt the Plaintiff's company's operations.

3997. The Plaintiff was damaged by Defendant Van Vechten's tortious interference with the Plaintiff's business operations, and was forced to cease his company's business operations, and has lost all value in his company. Defendant Feng's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 12: Defendant Nicholas Stork.**

3998. Plaintiff realleges and incorporates paragraphs 393-468, 630-641, 3848 of this Complaint as though fully set forth herein.

3999. Defendant Nick Stork and the Plaintiff routinely discussed the sdPhotonics.

4000. Defendant N. Stork coordinated in the trick used by Deborah Van Vechten to confine the Plaintiff in the psychiatric ward in the Pavilion, and communicated with staff while the Plaintiff was confined.

4001. N. Stork denied contacts with the Pavilion staff, and claimed they had refused his phone calls, but records obtained seventh months later from the Pavilion show that N. Stork was in repeated contact with the Pavilion staff, well after the Plaintiff had been released.

4002. Once the Plaintiff obtained the medical records in or about early August, 2021, showing N. Stork had been in repeated contacts with the Pavilion, his parents Brenda Stork and Larry Stork admitted they had been working together with the military to take over the Plaintiff's company, sdPhotonics.

4003. Defendant N. Stork knew the Plaintiff owned sdPhotonics, and yet coordinated with the attorneys and military program monitors in the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confining the Plaintiff in the psychiatric ward of the Pavilion, to damage and disrupt the Plaintiff's company's operations for the military.

4004. The Plaintiff was damaged by Defendant N. Stork's tortious interference with the Plaintiff's business operations, and was forced to cease his company's business operations, and has lost all value in his company. Defendant N. Stork's actions were in fact both unlawful and criminal, and intentional, and he

is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 13: Defendant Brenda Stork.**

4005. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3848 of this Complaint as though fully set forth herein.

4006. Defendant Brenda Stork knew that the Plaintiff had a business relationship with sdPhotonics, and owned the company.

4007. Defendant B. Stork initially claimed that she had no knowledge of what had occurred with the military and Deborah Van Vechten in the Plaintiff's confinement during the Florida Whistleblower proceeding in Q4 2020.

4008. Defendant B. Stork claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

4009. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

4010. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that included phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

4011. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they had worked with the military and UCF in the scheme with Deborah Van Vechten to get the Plaintiff confined in the Pavilion.

4012. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some further unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

4013. Defendant Brenda Stork knew the Plaintiff owned sdPhotonics, and yet she coordinated with the military program monitors, specifically Deborah Van Vechten, during the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confining the Plaintiff in the Pavilion, to damage and disrupt the Plaintiff's company's operations for the military.

4014. The Plaintiff was damaged by Defendant B. Stork's tortious interference with the Plaintiff's business operations, and was forced to cease his company's business operations, and has lost all value in his company. Defendant B. Stork's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 14: Defendant Larry Stork.**

4015. Plaintiff realleges and incorporates paragraphs 393-470, 630-641, 3848 of this Complaint as though fully set forth herein.

4016. Defendant Larry Stork knew that the Plaintiff had a business relationship with sdPhotonics, and owned the company.

4017. Defendant L. Stork initially claimed that she had no knowledge of what had occurred with the military and Deborah Van Vechten in the Plaintiff's confinement during the Florida Whistleblower proceeding in Q4 2020.

4018. Defendant L. Stork claimed to the Plaintiff that Defendant Nick Stork had been refused access and contact to the Plaintiff while he had been held against his will in the psychiatric ward of the Pavilion facility, and that the clinic would not allow phone calls to the Plaintiff.

4019. The Plaintiff grew suspicious when Brenda and Larry Stork after they arrived in Southern Illinois and Brenda and Larry Stork explained they wanted to help hide the Plaintiff from UCF, when the stalking was clearly being set up by the military and DOJ.

4020. In or about August, 2021, the Plaintiff was able to obtain some medical records from the Pavilion that included phone records between Nicholas Stork and the Pavilion that had lasted for more than two weeks after the Plaintiff had been released.

4021. Once Brenda and Larry Stork, and Deborah Baird, learned the Plaintiff had obtained the medical records showing phone calls between Nicholas Stork and the Pavilion, Brenda and Larry Stork, and Deborah Baird, admitted they

had worked with the military and UCF in the scheme with Deborah Van Vechten to get the Plaintiff confined in the Pavilion.

4022. By October, 2021, Brenda and Larry Stork, and Deborah Baird used threats and intimidation that they would take some further unspecified actions with UCF and military in attempts to extort property from the Plaintiff that he held in Southern Illinois.

4023. Defendant Larry Stork knew the Plaintiff owned sdPhotonics, and yet he coordinated with the military program monitors, specifically Deborah Van Vechten, during the Florida Whistleblower proceedings in extortion, stalking, assaults, batteries, and confining the Plaintiff in the Pavilion, to damage and disrupt the Plaintiff's company's operations for the military.

4024. The Plaintiff was damaged by Defendant L. Stork's tortious interference with the Plaintiff's business operations, and was forced to cease his company's business operations, and has lost all value in his company. Defendant L. Stork's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 15: Defendant Joe Southron.**

4025. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 3848, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

4026. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings.

4027. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

4028. Defendant Southron asked for and received the information on the Plaintiff's company, its ownership in the patents at issue, the 2014 IP Agreement, UCF-2.029, and discovery materials.

4029. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

4030. Defendant Southron then tried to withdraw from representation because the Plaintiff instead of properly dismissing the complaint, to damage the Plaintiff's position further in the Florida Whistleblower lawsuit.

4031. Defendant Southron knew the Plaintiff owned sdPhotonics, had worked with the Plaintiff when the Plaintiff had consulted on patent lawsuits, and had reviewed the patent records and knew that the Plaintiff's company had ownership in the patents at issue in the Florida Whistleblower lawsuit, and knew of the illegal actions in the Florida Whistleblower proceedings in extortion,

stalking, assaults, involving prior attorneys, and yet Defendant Southron took repeated steps to damage the Plaintiff's ability to correct the false declarations that had been filed on the patents of the Plaintiff's company, to prevent the Plaintiff from benefiting from the business relationship.

4032. The Plaintiff was damaged by Defendant Southron's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Southron's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 16: Defendant Kevin Keeling.**

4033. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 3848 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

4034. The Plaintiff hired Defendant Keeling along with Mark Solomon, in or about January, 2021, at the recommendation of Robin Foret, and after Keeling and Solomon confirmed that their review of the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

4035. Defendant Keeling assisted the Plaintiff to dismiss the Florida Whistleblower proceeding, by reviewing the dismissal orders that were prepared by Joe Southron and providing legal explanations as to why what Southron had prepared could be damaging to the Plaintiff.

4036. However, following the dismissal of the Florida Whistleblower lawsuit, Kevin Keeling refused to take the actions he had promised, and refused to take any action to correct past USPTO declarations.

4037. Instead, Defendant Keeling refused to take action and allowed attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company from about April, 2021 into or about February, 2021, totaling an estimated six patent applications or more, while refusing to take action to protect the applications.

4038. Defendant Keeling knew the Plaintiff owned and had a business relationship with sdPhotonics, and yet took steps to damage the business operations of the Plaintiff's company by allowing other attorneys to file false declarations of ownership on sdPhotonics' patent applications, to prevent the Plaintiff from benefiting from the business relationship.

4039. The Plaintiff was damaged by Defendant Keeling's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Keeling's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 17: Defendant Solomon.**

4040. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 3848 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

4041. Plaintiff hired Defendant Solomon and his associate or partner, Kevin Keeling, in or about January, 2021, at the recommendation of Robin Foret.

4042. Defendant Solomon confirmed in his review of records from the Florida Whistleblower lawsuit, that the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

4043. Defendant Solomon informed the Plaintiff that Solomon could assist the Plaintiff with legal works to correct the false declarations at issue that had been filed by Sandra Sovinski into the USPTO.

4044. However, after obtaining a power of attorney from the Plaintiff, Solomon refused to take actions to correct the false declarations that Solomon had already determined constituted fraud and perjury in the USPTO.

4045. Defendant Solomon claimed instead that since Solomon had a doctorate, he knew what he was doing, and the Plaintiff should not question Defendant Solomon about not making corrections to the false declarations at issue, as Solomon had promised before obtaining the power of attorney.

4046. Instead of correcting the false declarations that had been filed by Sovinski into the USPTO, Defendant Solomon used his power of attorney to allow other attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company.

4047. Defendant Solomon knew the Plaintiff owned and had a business relationship with sdPhotonics, and used a power of attorney improperly to damage the business operations of the Plaintiff's company by allowing other attorneys to

file false declarations of ownership on sdPhotonics' patent applications, to prevent the Plaintiff from benefiting from the business relationship.

4048. The Plaintiff was damaged by Defendant Solomon's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Solomon's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 18: Defendant Jeffrey Shainline.**

4049. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 3848-3849 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

4050. Defendant Shainline repeatedly contacted the Plaintiff and informed him that his organization, NIST, wished to work with sdPhotonics on the large government project NIST was targeted to oversee which at that point was known as "Build Back Better" under the Biden Administration, and later became "Chips + Science."

4051. Shainline had numerous phone calls in or about April, 2021, to learn details of how sdPhotonics oxide-free VCSEL invention could be integrated onto silicon platforms and why certain approaches that had been tried such as by Bowers at UCSB had been failures.

4052. After numerous phone calls in which the Plaintiff explained the technical issues to Shainline and what needed to be implemented for successful

integration, the Plaintiff asked Shainline for more details on the proposal so that sdPhotonics could begin making plans to provide the proposal to Shainline.

4053. Instead, Shainline sent the Plaintiff the email informing the Plaintiff that Shainline and NIST intended to use the Cryo-VCSEL prototypes that Feng had refused to return to sdPhotonics as part of IARPA Supercables.

4054. Defendant Shainline had no involvement in the IARPA Supercables project.

4055. Defendant Shainline taunted and harassed the Plaintiff, informing the Plaintiff that Shainline did not believe money was important to the Plaintiff or his company, and repeating flawed studies that Feng had claimed he would do at the University of Illinois.

4056. Defendant Shainline did not contact the Plaintiff again after confirming to the Plaintiff that Shainline had obtained control of the sdPhotonics' Cryo-VCSEL prototypes that were being tested by Feng at the University of Illinois, and intended to use the Cryo-VCSEL prototypes in his own projects to obtain additional funding and develop new products.

4057. Defendant Shainline knew the Plaintiff owned and had a business relationship with sdPhotonics, obtained information under the guise that he wanted to submit a proposal with the Plaintiff's company, and then admitted he had only used the trick to obtain more information to use with sdPhotonics' Cryo-VCSELs, all to take sdPhotonic's technologies, to prevent the Plaintiff from benefiting from the business relationship.

4058. The Plaintiff was damaged by Defendant Shainline's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Shainline's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**<u>Count 19: Defendant Sabine O'Neal.</u>**

4059. Plaintiff realleges and incorporates paragraphs 94-116, 161-167, 172-174, 588-594, 630-641, 3848 of this Complaint as though fully set forth herein.

4060. Defendant O'Neal was employed by sdPhotonics as its president from about 2008 until or about December, 2015.

4061. Defendant O'Neal's employment responsibilities with sdPhotonics were to serve as principal investigator and she oversaw the company's financial records and tax filings.

4062. Defendant O'Neal's employment responsibilities with sdPhotonics had included writing and filing proposals to obtain research contracts, serving as principal investigator on those contracts, and overseeing the company's financial records and tax filings with a tax accountant.

4063. In or about 2012, sdPhotonics needed to close out an SBIR Phase II contract with the military, and the military sent an auditor to visit the company and audit the accounting records for direct costs expenditures made on the contract and indirect costs expended on the contract, comprising overhead.

4064. O'Neal worked with the military auditor for about five (5) hours alone in O'Neal's office.

4065. Following the meeting with the auditor, O'Neal claimed the military audit of the company's direct and indirect cost expenditures were nearly perfect, and had only one small accounting error of a few dollars.

4066. Defendant O'Neal then generated accounting records that falsely represented the contract had been properly closed out.

4067. Sometime after the audit, in or about 2013, sdPhotonics lost a contract that had been awarded because the awarding agency could not verify the company's overhead numbers from prior audits.

4068. Because of this, the Plaintiff then requested the overhead information and accounting records from Defendant O'Neal.

4069. When the Plaintiff asked Defendant O'Neal for the accounting records of the direct and indirect company costs, O'Neal claimed she had no understanding of the overhead accounting or indirect costs, and could not provide the records.

4070. The Plaintiff had no experience in maintaining financial records at that time, and in or about 2014 the Plaintiff hired a separate accountant to oversee the sdPhotonics financial accounts.

4071. Defendant O'Neal insisted on working with that accountant.

4072. After sdPhotonics had the false ownership declarations filed onto its oxide-free VCSEL patents, and the Plaintiff targeted in extortion, stalking, assaults, and batteries, and its prototypes misappropriated by the military and

university employees, the Plaintiff was forced to cease business operations for the company.

4073. In or about September, 2021, the Plaintiff began work with military auditors to audit the company's financial records and close out the company's remaining contracts.

4074. By or about April, 2022, the military auditors admitted that the military had engaged in fraud with O'Neal when it was discovered that O'Neal had set the company up on the incorrect accounting system not allowed for government contracts.

4075. By or about June, 2021, the auditors that O'Neal had not provided overhead or indirect costs in the audit in or about 2012, and yet the auditor at that time claimed to have reviewed and approved the overhead expenditures.

4076. This also explained why O'Neal had refused to provide any accounting information to the Plaintiff in 2013 and 2014, and instead resigned from the company at the end of December, 2014.

4077. Furthermore, the military auditors led by ?? also admitted to knowing prior to issuing the contracts that O'Neal had set up the accounting system with an improper accounting method not allowed by the military in tax filing.

4078. As the Plaintiff discovered in or about June, 2022, and the auditors confirmed, O'Neal had set up the company's accounting with an incorrect accounting system that could be used to damage the company's contracts and tax

filings, and sabotage the company's business operations at some time in the future because of the incorrect filings.

4079. Defendant O'Neal then engaged in accounting fraud with the military auditor in or about 2012, to cover up the earlier fraud and improper tax filings, this fraud was discovered in or about June, 2022 by the Plaintiff with the military auditors.

4080. Defendant O'Neal violated Fl. St. §817.15 when she falsified the sdPhotonics business records in or about 2012, representing that the sdPhotonics contract had been properly closed out.

4081. Fl. St. §817.15 which states in relevant part "Any officer, agent, clerk or servant of a business entity who makes a false entry in the books thereof, with intent to defraud..."

4082. Defendant O'Neal furthermore engaged in constructive fraud, when she set up sdPhotonics accounting using the incorrect accounting system for tax filing and cost accrual basis required for government contracts.

4083. Defendant O'Neal knew the Plaintiff owned and had a business relationship with sdPhotonics, and engaged in financial fraud in audits and constructive fraud in placing sdPhotonics on an improper accounting basis, to prevent the Plaintiff from benefiting from the business relationship.

4084. The Plaintiff was damaged by Defendant O'Neal's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant

O'Neal's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 20: Defendant Linda Coco.**

4085. Plaintiff realleges and incorporates paragraphs 114-137, 586-596, 630-641, 3848 of this Complaint as though fully set forth herein.

4086. Defendant Coco was a law professor living in Orlando, FL and began dating the Plaintiff in or about 2015.

4087. Defendant Coco sought to become involved in the Plaintiff's company expressing an interest in learning how start-ups and military contracting worked.

4088. Defendant Coco consulted for the Plaintiff and his company, assisting in hiring and setting up financial accounts.

4089. In or about 2016, Defendant Coco then began making threats against the Plaintiff and his company for reasons she was unable to explain. Coco made threats that she would report the Plaintiff's company to the IRS, but did not say why.

4090. Defendant Coco then made false complaints to UCF administrators, claiming that the Plaintiff's company had withheld W-2's from employees, which even the UCF administrators admitted had been a false claim by Coco.

4091. In or about Spring, 2022, during reviews of financial records with military auditors, Defendant Coco was found to have placed errors in the sdPhotonics' retirement accounts of its employees and former employees, and that affected the company's IRS tax filings, and that the company was forced to correct.

4092. The errors sent retirement checks into incorrect accounts, and some checks to no accounts at all, consistent with Defendant Coco's threats that she had taken actions to damage the Plaintiff's company through errors she placed in the company's financial records and tax filings with the IRS.

4093. Defendant Coco knew the Plaintiff owned and had a business relationship with sdPhotonics, and used her consulting position with the company to damage its financial records, and the company's tax filings, to prevent the Plaintiff from benefiting from the business relationship.

4094. The Plaintiff was damaged by Defendant Coco's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Coco's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 21: Defendant Youndy Cook.**

4095. Plaintiff realleges and incorporates paragraphs 188-189, 236-275, 278-280, 289, 292, 305-329, 383-385, 600-601, 630-641, 3848 and Exhibits 3-10, 16, of this Complaint as though fully set forth herein.

4096. Defendant Cook was contacted by the Plaintiff in or about October, 2019, and provided information that Sandra Sovinski had filed false declarations into the USPTO on the Plaintiff's oxide-free VCSEL inventions, and had violated the 2014 IP Agreement and UCF-2.029.

4097. Defendant Cook and Sandra Sovinski refused to correct the declaration in the USPTO.

4098. The Plaintiff was then advised by Alen Hsu, John Taboada, and Karen Kline that he should file the Florida Whistleblower lawsuit to obtain the corrections.

4099. Robert Sweetapple filed the Florida Whistleblower complaint on December 12, 2019, and the complaint was served to UCF's legal counsel including Youndy Cook.

4100. From early January, 2020 into May, 2020 during the Florida Whistleblower proceedings, Defendant Cook worked with Sandra Sovinski and Alen Hsu who sent the Plaintiff numerous drafts of an agreement that claimed UCF needed military approval to correct the false declarations Sovinski had filed into the USPTO.

4101. The drafts of the agreement included markups identified in the drafts as made by Defendant Cook, Sovinski, or Hsu.

4102. However the military had already secured government rights in the invention, and UCF had no involvement in the sdPhotonics' government contract that involved development of the oxide-free VCSEL invention under Lateka Eifert.

4103. In April, 2020, during the Florida Whistleblower proceedings, Sovinski filed altered declarations into the USPTO that contained strikethroughs placed in certain statements she had made in the prior declarations Sovinski had filed in or about August, 2019.

4104. Sovinski placed strikethroughs in statements of her prior USPTO declarations that Cook had learned during the Florida Whistleblower proceedings could be proven false by prior USPTO filings that were part of the applications.

4105. After Sovinski filed the altered declarations into the USPTO in April, 2020, and again violated UCF-2.029, the Plaintiff was again presented the agreement prepared by Cook, Sovinski, and Hsu, that the Plaintiff had rejected.

4106. In or about May, 2020, the Plaintiff used public records requests to obtain emails from UCF showing that Svetlana Shtrom had contacted a separate Army office than the office that issued the government contracts to sdPhotonics monitored by Lateka Eifert, claiming that UCF had been owed a subcontract on one of the sdPhotonics' Army contracts because Sabine O'Neal had worked part time for UCF while she also worked with sdPhotonics.

4107. In or about late May, 2020, Alen Hsu sent the Plaintiff the agreement that had been prepared by Cook, Sovinski, and Hsu, that falsely claimed UCF required approval from the Army office that was unrelated to the Lateka Eifert or the contracts or her military office who had issued and monitored the contracts to the Plaintiff's company.

4108. In or about early June, 2020, the Plaintiff met with Lateka Eifert and showed her the emails by UCF to the separate Army office that claimed Eifert should have issued UCF a subcontract because O'Neal had been employed part time with UCF when the contract was issued.

4109. Eifert then informed the Plaintiff that she would need to discuss the matter with her supervisors.

4110. Eifert contacted the Plaintiff about a week later an informed him that UCF had engaged in fraud in other military contracts from her office, that Eifert's military supervisors were tired of UCF engaging in fraud on their contracts.

4111. Eifert then gave the Plaintiff instructions on reporting the fraud by the UCF employees to the SBA IG, Hannibal Ware.

4112. In or about October, 2021, the Plaintiff again contacted Defendant Cook by email again in October, 2021, after military auditors confirmed that sdPhotonics was paying patent costs on the patents at issue, and that Sovinski had breached the 2014 IP Agreement.

4113. The Plaintiff included the military auditors on the email to Cook who had verified the patent payments from sdPhotonics to UCF.

4114. Defendant Cook did not respond to the Plaintiff's contact and information in October, 2021 showing Sovinski had engaged in perjury in the USPTO and breached the 2014 IP Agreement.

4115. By the end of December, 2022, the Plaintiff was being electronically and physically stalked, assaulted, and battered so heavily by the DOJ and military, he was forced to leave the U.S. for his physical safety.

4116. Defendant Cook knew the Plaintiff owned and had a business relationship with sdPhotonic, and prepared a settlement agreement with Alen Hsu and Sandra Sovinski, and a second settlement agreement with Bustamante and

Sovinski, that even the military office that contracted with sdPhotonics determined was based on fraud, to try to take-over the Plaintiff's company, to prevent the Plaintiff from benefiting from the business relationship.

4117. The Plaintiff was damaged by Defendant Cook's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Cook's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 22: Defendant Bahaa Saleh.**

4118. Plaintiff realleges and incorporates paragraphs 106-109, 151-161, 166-183, 3848 of this Complaint as though fully set forth herein.

4119. Defendant Saleh oversaw the UCF Photonics Incubator that was part of the larger UCF High Technology Incubator system that has multiple site locations.

4120. Defendant Saleh also supervised Sabine O'Neal after she had become a full-time employee of UCF, and met with her monthly to learn about her consulting work with sdPhotonics.

4121. In or about April, 2018, Sabine O'Neal learned from the Plaintiff that he intended to move his company sdPhotonics from the UCF Photonics Incubator, and that it would take approximately 24 months to arrange and complete the move.

4122. In or about September, 2018, after Sabine O'Neal learned the Plaintiff planned to move the Defendant Saleh took action against the Plaintiff's company, demanding the company be moved immediately.

4123. sdPhotonics had just signed a new one-year lease with the head of the UCF Technology Incubator in August, 2018, that had gone through the necessary levels of approval.

4124. Defendant Saleh knew the move would damage the sdPhotonics' business operations by preventing it from work on the company's research and development contracts.

4125. Because sdPhotonics had already signed a one-year lease, Defendant Saleh instead refused to sign the necessary paperwork to allow the Plaintiff to continue to be employed by both UCF and sdPhotonics to force the immediate move of the Plaintiff's company.

4126. Defendant Saleh knew the Plaintiff owned and had a business relationship with sdPhotonics, and tried to force the Plaintiff's company to make an immediate move from its newly leased spaced, in order to damage the company's business operations, to prevent the Plaintiff from benefiting from the business relationship.

4127. The Plaintiff was damaged by Defendant Saleh's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Solomon's actions

were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 23: Defendant Elizabeth Klonoff.**

4128. Plaintiff realleges and incorporates paragraphs 110-111, 162-166, 188-189, 192, 236-276, 3848 of this Complaint as though fully set forth herein.

4129. Defendant Klonoff repeatedly sought to obtain direct access to intellectual property being developed by the Plaintiff's company through Sabine O'Neal.

4130. Defendant Klonoff used Sabine O'Neal who consulted for sdPhotonics to request proposals from the Plaintiff's company on how they would solve certain technology problems using sdPhotonics inventions, with claims the contracts would be in the range of $250,000 ~ $350,000 to perform the initial work.

4131. Despite multiple such requests, Klonoff always worked through O'Neal as opposed to the Plaintiff directly.

4132. The email records from Karen Kline's contact to Sandra Sovinski show that Defendant Klonoff then participated in the plan with Sovinski to file false ownership declarations in violation of UCF Regulations UCF-2.029(4)(d) into the USPTO.

4133. In or about the end of December, 2018, Sandra Sovinski made the plan with Defendant Klonoff, Youndy Cook, Svetlana Shtrom, and John Miner that became the false declarations and breaches of the 2014 IP Agreement and UCF-

2.029 that Klonoff oversees, that Sandra Sovinski filed into the USPTO creating the dispositive evidence of perjury.

4134. The declarations filed by Sovinski into the USPTO attaches a 2014 IP Agreement that is pursuant to UCF-2.029, and that Klonoff is required to follow.

4135. The declarations filed by Sovinski make statements about the patent filings and inventor rights to inventions that contradict the 2014 IP Agreement.

4136. Sovinski claimed that the Plaintiff exchanged his employment rights to give UCF unrestricted rights to his inventions, while the 2014 IP Agreement states the terms of those rights are pursuant to UCF Regulations UCF-2.029.

4137. Klonoff knew at the time Sovinski filed the declarations into the USPTO, that the plan she participated in with Sovinski that UCF was required to follow UCF-2.029, and that Deppe's employment rights were in fact contained in UCF-2.029 that Sovinski and Shtrom were violating with their retroactive USPTO declarations.

4138. Defendant Klonoff knew the Plaintiff owned and had a business relationship with sdPhotonics, and yet entered into a plan with Sandra Sovinski, Youndy Cook, and Svetlana Shtrom, to damage the Plaintiff's company by filing false declarations into the USPTO patent records on the patents just after or as they were about to issue, to prevent the Plaintiff from benefiting from the business relationship.

4139. The Plaintiff was damaged by Defendant Klonoff's tortious interference with the Plaintiff's business operations, was forced to cease his

company's business operations, and has lost all value in his company. Defendant Klonoff's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 24: Defendant Melinda Miguel.**

4140. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 3848, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

4141. The Plaintiff contacted Defendant Miguel in or about November, 2022, and provided information and records that employees working with UCF had engaged in perjury in the USPTO against his company, sdPhotonis, and that stalking, assaults, and batteries were being used against the Plaintiff in retaliation for his prior reporting through the Florida Whistleblower Act, and that the retaliation from coming from the UCF office of Robert Taft and Tina Maier.

4142. Despite that Defendant Miguel is prohibited by the Florida Whistleblower Act in Fl. St. §112.3187(4)(b) from taking any adverse action against the Plaintiff, Miguel sent the Plaintiff a letter not long after that she was sending the information he had provided to her to Robert Taft at UCF, cc'd Robert Taft at UCF.

4143. Miguel claimed she was sending Robert Taft at UCF the information and records the Plaintiff provided her pursuant to the Florida Whistleblower's Act.

4144. The information and records that contained evidence the UCF employee Sandra Sovinski had engaged in perjury in the USPTO and breached the

2014 IP Agreement, and that the office of Taft and Maier had engaged in retaliation in violation of the Florida Whistleblower's Act.

4145. Defendant Miguel sent the information to Robert Taft and Tina Maier at UCF, despite they had been implicated in retaliation in violation of the Florida Whistlblower's Act by the BCLP investigative report she had received from the prior Florida governor's office.

4146. After Miguel sent the letter to the Plaintiff, he became stalked, assaulted, and battered so heavily that by the end of December, 2022, he was forced to leave the U.S. for his physical safety.

4147. Defendant Miguel knew the Plaintiff owned and had a business relationship with sdPhotonics, that he was being stalked, assaulted, and battered over the evidence of perjury UCF employs had committed in the USPTO, and yet violated the Florida Whistleblower's Act, sending information to those engaged in the cover-up of the perjury and stalking, Taft and Maier, to injure the Plaintiff and damage the business operations of the Plaintiff's company, to prevent the Plaintiff from benefiting from the business relationship.

4148. The Plaintiff was damaged by Defendant Miguel's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Miguel's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 25: Defendant Tina Maier.**

4149. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 3848, and Exhibits 1, 8-10, 16, 24, 25 of this Complaint as though fully set forth herein.

4150. Defendant Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that involved the UCF employees Taft and Maier, back to Taft and Maier who were implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

4151. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

4152. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, and/or the military, did not constitute malfeasance or misfeasance.

4153. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

4154. Defendant Maier admitted in her letter she knew that UCF employees were engaged in crimes of perjury in the USPTO, extortion, stalking, assaults, and batteries, tax fraud, identity theft, and more, and yet placed false information in her letter claiming none of these rose to the level of malfeasance or misfeasance.

4155. Defendant Maier knew the Plaintiff owned and had a business relationship with sdPhotonics, that he was being stalked, assaulted, and battered over the evidence of perjury UCF employs had committed in the USPTO, and yet violated the Florida Whistleblower's Act, falsely claiming that perjury in the USPTO was not malfeasance of misfeasance, and that stalking, assaults, and batteries also were not malfeasance or misfeasance, to injure the Plaintiff and damage the business operations of the Plaintiff's company, to prevent the Plaintiff from benefiting from the business relationship.

4156. The Plaintiff was damaged by Defendant Maier's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company.

4157. Defendant Maier took her actions maliciously and intentionally, and the Plaintiff was forced to cease the business operations of his company and loss of its value, and the Plaintiff is entitled to punitive damages.

**Count 26: Defendant Taft.**

4158. Plaintiff realleges and incorporates paragraphs 200, 204-208, 211-219, 236-276, 603-628, 3848, and Exhibits 1, 8-10, 16, 24, 25of this Complaint as though fully set forth herein.

4159. Defendant Miguel informed the Plaintiff in or about November, 2022 that she was sending information about evidence of crimes involving perjury in the USPTO, and stalking, assaults, and batteries trying to cover up those crimes that involved the UCF employees Taft and Maier, back to Taft who had been implicated in the cover-ups, and whistleblower retaliation in violation of Fl. St. §112.3187.

4160. In or about January, 2023, Defendant Maier sent the Plaintiff a letter that cc'd Defendant Taft and falsified the Florida statutes to claim that perjury by Sandra Sovinski in the USPTO did not rise to the level of malfeasance.

4161. In the same letter Defendant Maier falsified other Florida statutes to claim that stalking, assaults, and batteries linked to the office of Taft and Maier, and the perjury by Sovinski in the USPTO, did not constitute malfeasance or misfeasance.

4162. In the time period Robert Taft had received the letter from Melinda Miguel, and Defendant Maier sent the Plaintiff her letter that falsely claimed that the stalking, assaults, and batteries linked to her office did not constitute malfeasance or misfeasance, the Plaintiff had become stalked, assaulted, and battered so heavily that he was forced to leave the U.S. for his physical safety.

4163. Defendant Maier violated Fl. St. §914.22(1)(a), when she used a trick that claimed the Florida Whistleblower Act did not consider perjury in the USPTO by a UCF employee malfeasance, or the stalking assaults and batteries malfeasance or misfeasance, and used the Florida Whistleblower Act, Fl. St. §112.3187 as a cover for the letter and to send to the Plaintiff and cc to Defendant Taft, in attempts by

Miguel, Taft, and Maier to cover up the evidence of perjury in the USPTO by the UCF employee Sandra Sovinski.

4164. Defendant Taft received the letters from his investigator Tina Maier in which she admitted in her letter she knew that UCF employees were engaged in crimes of perjury in the USPTO, extortion, stalking, assaults, and batteries, tax fraud, identity theft, and more, and yet placed false information in her letter claiming none of these rose to the level of malfeasance or misfeasance.

4165. Defendant Taft's knew the Plaintiff owned and had a business relationship with sdPhotonics, that he was being stalked, assaulted, and battered over the evidence of perjury UCF employs had committed in the USPTO, and yet violated the Florida Whistleblower's Act, having his investigator Tina Maier write a false letter of finding that violated the Fl. St. §(4)(b), to injure the Plaintiff and damage the business operations of the Plaintiff's company, to prevent the Plaintiff from benefiting from the business relationship.

4166. The Plaintiff was damaged by Defendant Taft's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company. Defendant Taft's actions were unlawful and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 27: Defendant William Harrod.**

4167. Plaintiff realleges and incorporates paragraphs 335-336, 566-575, 579-580, 3848-3849, and Exhibits 1, 2 of this Complaint as though fully set forth herein.

4168. Defendant Harrod was the IARPA program monitor who oversaw the IARPA Supercables project issued to sdPhotonics that began in or about June, 2019, and in which sdPhotonics issued a subcontract to the University of Illinois under Miltron.

4169. Defendant Feng's laboratory at the University of Illinois subcontracted with sdPhotonics as part of the IARPA Supercables project to fabricate and test prototypes of its new laser invention, the Cryo-VCSEL, using sdPhotonics' proprietary epitaxial material.

4170. Feng's laboratory received the proprietary epitaxial material from sdPhotonics for the sdPhotonics' prototypes, based on the 4 K design that had been developed by the Plaintiff.

4171. Feng used his standard fabrication process for high speed VCSELs to fabricate prototypes of the sdPhotonics epitaxial structure that could be tested at high speed, and then return the sdPhotonics' prototypes to sdPhotonics so it could perform its own electrical testing on the same prototype devices, and development of a quantum mechanical current-voltage model that could be used for optimization of future sdPhotonics designs.

4172. Defendant Feng received the new sdPhotonics' epitaxial design in or about September, 2019, and began testing of the prototypes in or about February,

2020. By about June, 2020, Defendant Feng had verified the theoretical modeling by the Plaintiff that the Cryo-VCSEL invention performed at record speeds.

4173. Feng refused to return the Cryo-VCSEL prototypes to sdPhotonics so that the Plaintiff and his company could perform its own testing to develop the current-voltage model, and disrupted sdPhotonics research on the laser devices.

4174. By November, 2020 the Plaintiff had made plans to visit Feng at his University of Illinois laboratory in Champaign-Urbana, IL, and obtain the measured results and the Cryo-VCSEL prototypes.

4175. By the beginning of or about August, 2020, Defendant Harrod began demanding in phone meetings that the Plaintiff allow IARPA to use the sdPhotonics' Cryo-VCSELs in other projects. However, Harrod could provide no legitimate reason.

4176. Instead, Harrod demanded control of the prototypes, claiming his IARPA Director, Catherine Marsh, had told him to obtain the prototypes for other projects, and that Harrod himself knew nothing about the issue, and he was only doing what Catherine Marsh was instructing him to do.

4177. The Plaintiff refused to provide Harrod any permission and demanded the return of the sdPhotonics' Cryo-VCSEL prototypes.

4178. By the end of the IARPA Supercables project near the end or about August, 2021, Defendant Feng was outwardly claiming that the Cryo-VCSEL had been invented at the University of Illinois, and Harrod was agreeing with Feng.

4179. Harrod then issued Feng additional contracts after the IARPA Supercables ended, based on the sdPhotonics' Cryo-VCSEL prototypes, with Feng publishing articles on the Cryo-VCSELs with claims the lasers were developed at the University of Illinois in his laboratory.

4180. Defendant Harrod made an agreement with the military's state actor Milton Feng, at the University of Illinois, to take the Cryo-VCSEL prototype and its trade-secrets and withhold control of those trade secrets from sdPhotonics, while demanding control of the prototype for his project in the overt action of blaming the IARPA Director, Catherine Marsh for his demands, and then worked with Milton Feng after the IARPA Supercables project, to damage the Plaintiff and his company.

4181. Defendant Harrod knew the Plaintiff owned and had a business relationship with sdPhotonics from the IARPA Supercables proejct, and tortiously interfered to damage that business relationship by sabotaging the company's business operation, and misappropriated the Cryo-VCSEL to take over the prototype and its trade secrets, for his own use and benefit, and IARPA's use and benefit, depriving the Plaintiff and Plaintiff's company of benefit of the prototypes and trade secrets.

4182. Defendant Harrod's unlawful actions damaged the Plaintiff, and the Plaintiff was forced to cease his business operations and lost the value in his comany. Defendant Harrod's actions were intentional and malicious, and the Plaintiff is entitled to punitive damages.

## TWELFTH CAUSE OF ACTION

**Breach of Fiduciary Duty. Defendants: Sweetapple, Hsu, Kline, Taboada, Bustamante, Southron, Keeling, Solomon.**

4183. To prove breach of fiduciary duty in Florida, a plaintiff must establish that 1.) There was a legal obligation for one party (the fiduciary) to act in the best interest of another party (the beneficiary); 2.) The fiduciary failed to fulfill their obligations or acted in a way that was not in the beneficiary's best interest; and 3.) the plaintiff suffered harm due to the fiduciary's breach.

**Count 1: Defendant Sweetapple.**

4184. Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, 4183, and Exhibits 3-14 of this Complaint as though fully set forth herein.

4185. The Plaintiff hired Defendant Sweetapple to represent the Plaintiff in the Florida Whistleblower lawsuit for the benefit of the Plaintiff.

4186. In April, 2020, the UCF attorney Sandra Sovinski filed altered declarations into the USPTO that placed strike-throughs in statements that Defendant Sweetapple had learned could be proven false with other USPTO records the Plaintiff possessed.

4187. The new filings by Sovinski during the Florida Whistleblower proceeding in April, 2020 provided dispositive proof that Sovinski had committed perjury in the USPTO in trying to cover up her prior perjury in the USPTO in or about August, 2019.

4188. Defendant Sweetapple took no action in response to the changed declarations Sovinski filed into the USPTO in April, 2020 during the Florida Whistleblower proceedings.

4189. After Sovinski filed the changed USPTO declarations, in or about May, 2020, Defendant Sweetapple attempted to force the Plaintiff into a settlement meeting with opposing counsel Jeffrey Weiss, involving a settlement agreement the Plaintiff had already refused.

4190. The Plaintiff subsequently learned that Defendant Sweetapple and opposing counsel had operated the Florida Whistleblower proceeding from the time the complaint was filed December 13, 2019, into or about August, 2020.

4191. In or about the end of May, 2020, Robert Sweetapple informed the Plaintiff that the opposing counsel, Jeffrey Weiss, had stayed the Florida Whistleblower proceedings.

4192. Sweetapple claimed at that time in or about May, 2020, that he would not serve the opposing counsel the discovery responses the Plaintiff had prepared, because Weiss had stayed the proceedings.

4193. In or about August, 2020, Weiss filed a motion to compel that falsely claimed Weiss or his law-firm had spoken to the Plaintiff, and Plaintiff had refused the UCF discovery requests.

4194. After discovering the false motion to compel on the court's docket that Weiss had filed, the Plaintiff instructed Sweetapple to serve Weiss the discovery requests the Plaintiff had prepared, but Sweetapple refused to do so.

4195. The Plaintiff then informed Sweetapple the agreement was terminated, and instructed Sweetapple to cease work on the case.

4196. Sweetapple refused, and informed the Plaintiff that Sweetapple and his law firm would not cease work on the matter, unless he was told to do so by a judge.

4197. Sweetapple then continued to work with Weiss attempting to set a hearing for the false motion to compel that Weiss had filed.

4198. The Plaintiff was harmed by Sweetapple's actions, which prevented the Plaintiff from properly asserting his UCF rights to his inventions and caused damage to his company, sdPhotonics.

4199. Defendant Sweetapple had a fiduciary duty to the Plaintiff to act lawfully when performing the services for which he was hired, and to protect the Plaintiff's interests in the Florida Whistleblower proceeding. Instead, Defendant Sweetapple took actions to intentionally damage the Plaintiff and his ability to litigate the Florida Whistleblower lawsuit. The Plaintiff eventually had to cease business operations of his company, and was later stalked, assaulted, battered, and confined in the same proceeding in Q4 2020.

4200. Defendant Sweetapple breached his fiduciary duty to the Plaintiff, and is liable for damages caused by his breach, and the Plaintiff is entitled to punitive damages for his intentional and malicious actions.

**Count 2. Defendant Hsu.**

4201. Plaintiff realleges and incorporates paragraphs 282-293, 315-329, 362-365, 630-641, 4183, and Exhibits 8-10, 16 of this Complaint of this Complaint as though fully set forth herein.

4202. The Plaintiff filed the Florida Whistleblower lawsuit December 13, 2019. At issue were the false ownership declarations filed into the USPTO by Defendant.

4203. Defendant Alen Hsu was hired by the Plaintiff as part of the lawsuit to assist the Plaintiff in drafting documents to be used in the proceedings.

4204. Upon information and belief, Defendant Hsu knew and understood the Florida Whistleblower proceeding was being operated without a judge.

4205. Not long after the complaint was filed in December, 2019, Defendant Hsu informed the Plaintiff that Hsu had learned from Youndy Cook and Sandra Sovinski that they wished to "settle the issue and walk away from the patents."

4206. Instead, Defendant Hsu sent the Plaintiff numerous drafts of the agreement Hsu had prepared with Cook and Sovinski that required military approval after the Plaintiff signed the agreement, and the military had already secured its rights in the patents.

4207. The agreement required approval from an Army office that had no involvement in the contract involving Lateka Eifert, of which Hsu was informed.

4208. The Plaintiff instructed Hsu to cease work on any agreements with Cook and Sovinski but Hsu refused to cease the work.

4209. Lateka Eifert and her military supervisors eventually determined in early June, 2020 during the Florida Whistleblower proceeding that what Hsu had used in the agreement with the different Army office was fraudulent, and asked the Plaintiff to file the complaint with the SBA IG, Hannibal Ware.

4210. Defendant Hsu learned from the Plaintiff that the Plaintiff intended to use prior USPTO patent filings on the patents to prove certain statements in the USPSTO declarations Sandra Sovinski had filed were false.

4211. Sandra Sovinski then filed the changed declarations into the USPTO in April, 2020, in which place strikethroughs in some of the statements that were proven false by prior patent filings.

4212. Upon information and belief, Defendant Hsu knew the Florida Whistleblower proceeding was being operated without a judge, and with only Jeffrey Weiss and Robert Sweetapple as officers of the court in the proceeding.

4213. In or about May, 2020, Defendant Hsu tried to force the Plaintiff into the meeting with Weiss and Sweetapple involving the agreements that Hsu and prepared with Cook and Sovinski.

4214. The meeting was over the agreement the Plaintiff had refused and instructed Hsu to cease further work, because for one of the reasons, the agreement did not correct the false declarations Sovinski had filed into the USPTO.

4215. In or about August, 2020, Defendant Hsu contacted the Plaintiff after Jeffrey Weiss filed a motion to compel that falsely claimed the Plaintiff had refused

to respond to discovery requests, and Sweetapple refused to serve Weiss the discovery responses the Plaintiff had prepared.

4216. Defendant Hsu warned the Plaintiff that the Plaintiff should not to try to do anything to stop Sweetapple and Weiss from using the false motion to compel to keep the discovery responses from entering the Florida Whistleblower proceeding.

4217. Defendant Hsu engaged in constructive fraud on the agreement he drafted with Cook and Sovinksi, claiming the military needed approval, when Lateka Eifert's office had already obtained government rights in the inventions, and Hsu took his actions to prevent the Plaintiff's company from being able to use its intellectual property and for the Plaintiff's company to be able to continue to do business.

4218. Defendant Hsu breached his fiduciary duty to the Plaintiff, and prepared a fraudulent settlement agreement, tried to force the Plaintiff into an unwanted meeting involving the fraudulent settlement agreement, and tried to prevent the Plaintiff from stopping Weiss and Sweetapple from pursuing a false motion to compel to damage the Florida Whistleblower's lawsuit. The Plaintiff was damaged, and had to cease his business operations, and lost the value in his company, and lost legal fees he paid as Hsu breached his fiduciary duty.

4219. The breached his fiduciary duty to the Plaintiff, and is liable for damages caused by his breach, and the Plaintiff is entitled to punitive damages for his intentional and malicious actions.

**Count 3. Defendant Kline.**

4220. The Plaintiff realleges and incorporates paragraphs 184-187, 199-204, 236-275, 282-294, 305-315, 630-641, 4183, and Exhibits 3-14, 16 of this Complaint as though fully set forth.

4221. The Plaintiff hired Defendant Karen Kline in or about 2016 to provide legal advice on patents filed by the Plaintiff and his company, sdPhotonics.

4222. In or about November, 2018, the Plaintiff informed Defendant Kline he planned to resign his employment from UCF and move sdPhotonics from the UCF incubator, and asked Defendant Kline to review the patents that had been filed jointly with UCF and two additional patents.

4223. In December, 2018, Defendant Kline contacted Sandra Sovinski at Sovinski's UCF office with the patent list.

4224. In or about the beginning of January, 2019, after sending her letter, Defendant Kline informed the Plaintiff she had been contacted by Sandra Sovinski and had a new conflict of interest due to UCF, but that she wished to consult to find other attorneys to represent the Plaintiff and his company, sdPhotonics.

4225. Defendant Kline subsequently informed the Plaintiff that she had found Alen Hsu from a different firm to represent the Plaintiff.

4226. Defendant Kline continued to refuse to take action when, in August, 2019, Sandra Sovinski filed false declarations into the USPSTO, violating the same 2014 IP Agreement and UCF-2.029 patent regulations Kline had contacted Sovinski about in December, 2018.

4227. Instead, the Plaintiff was informed that he should file the Florida Whistleblower complaint.

4228. Defendant Kline then referred Robert Sweetapple and Alen Hsu to be hired by the Plaintiff to pursue the Florida Whistleblower lawsuit, which the records show was operated without a judge for more than six months.

4229. Defendant Kline took part in phone conferences with Jeffrey Weiss, Robert Sweetapple, Youndy Cook, Sandra Sovinski, and Alen Hsu in May, 2020 concerning the additional declarations filed by Sandra Sovinski in April, 2020 during the Florida Whistleblower lawsuit, and billed the Plaintiff for her time.

4230. However, Defendant Kline refused and/or failed to inform the Plaintiff as to specific information discussed in those phone conferences, and never provided any work product for the "consulting" she did with Weiss, Cook, Sovinski, Hsu, and Sweetapple.

4231. Defendant Kline brached her fiduciary duty to the Plaintiff, and yet ceased representation to instead coordinate with Sweetapple, Hsu, Weiss, Cook, and Sovinski, to damage the Plaintiff and his company, by refusing to provide work product and instead working to damage the Plaintiff's position in the legal matters. The Plaintiff was damaged, and had to cease his business operations of his company, and lost the value in the company.

4232. Defendant Kline's breach of fiduciary duty caused damages to the Plaintiff, and the Plaintiff was forced to cease his company's business operations, and has lost all value in his company.

4233. Defendant Kline breach of fiduciary duty caused damages, and the Plaintiff is entitled to punitive damages for Kline's intentional and malicious acts.

**Count 4: Defendant Taboada.**

4234. Plaintiff realleges and incorporates paragraphs 223, 236-277, 393-437, 630-641, 4183, and Exhibits 3-10, 16 of this Complaint as though fully set forth herein.

4235. realleges and incorporates paragraphs 303-312, 416-481, 652-653, 659-676 and Exhibits 3-16, 18 of this Complaint of this Complaint as though fully set forth herein.

4236. In or about March, 2019, the Plaintiff hired Defendant Taboada to oversee the patents for the Plaintiff and sdPhotonics.

4237. When Sandra Sovinski filed her first round of false declarations into the USPTO, Taboada agreed to file corrective assignments to correct the false declarations, but informed the Plaintiff he would need to prepare the documents himself.

4238. After the Plaintiff prepared one corrective assignment that Taboada filed into the USPTO, Taboada refused to take the action for which he was hired, which was to file the additional corrective assignments, while knowing that his refusal to take action would damage sdPhotonics.

4239. Defendant Taboada instead informed the Plaintiff that the Plaintiff's only recourse was to file the Florida Whistleblower complaint to have the additional declarations corrected that Sovinski had filed in or about August, 2019.

4240. After the Plaintiff filed the Florida Whistleblower complaint, and Sovinski changed her original declarations and filed these into the USPTO in April, 2020, Taboada claimed Sovinski engaged in fraud.

4241. However, Taboada again refused to take action in response to the April, 2020 filings by Sovinski into the USPTO, all the while again knowing that his refusal to take action would damage sdPhotonics.

4242. In November, 2020, while the Plaintiff was allegedly being stalked, assaulted, and battered as part of the extortion attempt using a settlement agreement, Defendant Taboada called the Plaintiff and informed him that additional false declarations were filed into the USPTO on the sdPhotonics' patents in October, 2021.

4243. Defendant Taboada then informed the Plaintiff that Taboada would take no action in response to the additional USPTO declarations, despite that he knew that these were false, knowing his refusal to take action would damage sdPhotonics.

4244. Defendant Taboada informed the Plaintiff instead that he knew the FBI was planning to frame the Plaintiff for the false USPTO declarations that had been filed by Sandra Sovinski, and again refused to take the action for which he was hired.

4245. Defendant Taboada had a fiduciary duty to the Plaintiff, and yet Taboada refused to perform the work for which he was hired, and took illegal actions in the Florida Whistleblower proceedings in extortion, stalking, assaults,

batteries, and confinement, threatening the Plaintiff that the FBI would frame him for the perjury by Sovinski in the USPTO, to damage and disrupt the Plaintiff's company's operations.

4246. Defendant Taboada's breach of fiduciary duty to the Plaintiff caused damages, and was forced to cease his company's business operations, and has lost all value in his company.

4247. Defendant Taboada's actions were in fact both unlawful and criminal, and intentional, and he is severally and jointly liable for the damages, and the Plaintiff is entitled to punitive damages.

**Count 5: Defendant Bustamante.**

4248. Plaintiff realleges and realleges and incorporates paragraphs 236-274, 316-317, 322-329, 350-354, 375-385, 630-641, 4183, and Exhibits 8-10 of this Complaint as though fully set forth herein.

4249. Defendant Bustamante was hired by the Plaintiff to assist in the litigation of the Florida Whistleblower lawsuit and to address the false declarations that were filed into the USPTO by Sandra Sovinski, and those filed by Svetlana Shtrom.

4250. Instead, Bustamante filed an improper federal complaint against UCF that the Plaintiff was forced to dismiss, and harassed and intimidated the Plaintiff when he filed the improper federal complaint.

4251. Prior to filing the complaint, Bustamante called the Plaintiff and admitted and harassed the Plaintiff that he had obtained information a Trump

judge would be assigned to the case, and that her name was Wendy Berger prior to filing the improper federal complaint.

4252. Defendant Bustamante could not or would not explain how he had obtained the name of the federal judge prior to filing the complaint.

4253. After the Plaintiff dismissed the federal complaint, Bustamante contacted the Plaintiff repeatedly, asking for information involving UCF facilities for a settlement agreement. However, the Plaintiff had never discussed UCF facilities with Bustamante, and Bustamante could not explain why he might need the information.

4254. When pressed, Defendant Bustamante informed the Plaintiff that if sdPhotonics had offered the defendant an equity position, he would have worked for sdPhotonics.

4255. Bustamante prepared then agreement for the Florida Whistleblower case with Ary Chang, Jeffrey Weiss, Youndy Cook, and Sandra Sovinski, and again Bustamante had written the military approval after the Plaintiff had signed, when Lateka Eifert had already obtained government rights in the inventions, and her own office had determined UCF was engaged in fraud on their contracts.

4256. When the Plaintiff reviewed the agreement by Bustamante, it made no corrections to the declarations that Sandra Sovinski had filed into the USPTO, and did not address the breaches of the 2014 IP Agreement, or UCF-2.029.

4257. After the Plaintiff had been stalked, assaulted, and battered in November, 2020, he contacted Bustamante in or about December, 2019, and

informed him that he was being stalked and cyber-stalked by the military and UCF involving the agreement Bustamante had prepared.

4258. Bustamante responded at that time that there was nothing he was able to do about it.

4259. Defendant Bustamante had a fiduciary duty to the Plaintiff, and yet breach filed the improper federal complaint to intentionally damage the Plaintiff's position in the federal lawsuit. Bustamante then prepared a settlement agreement based on conditions requiring military approval after the Plaintiff signed, that was fraudulent, since the military approval was improper and not needed, and not from the office that issued the contracts to sdPhotonics.

4260. Defendant Bustamante's breached his fiduciary to the Plaintiff, and the Plaintiff was eventually forced to cease his company's business operations, and has lost all value in his company.

4261. Defendant Bustamante is liable for the damages, and the Plaintiff is entitled to punitive damages for his intentional and malicious acts.

**Count 6: Defendant Joe Southron.**

4262. Plaintiff realleges and incorporates paragraphs 488-495, 520-526, 4183, and Exhibits 8-10, 16 as though fully set forth herein.

4263. Defendant Southron was hired by the Plaintiff in or about December, 2020, to dismiss the Florida Whistleblower lawsuit because of the extortion, stalking, assaults, and batteries that had occurred involving the state court proceedings.

4264. The Plaintiff discussed the extortion, stalking, assaults, and batteries with Defendant Southron, and Defendant Southron advised against hiring attorneys from south Florida.

4265. Defendant Southron asked for and received the information on the Plaintiff's company, its ownership in the patents at issue, the 2014 IP Agreement, UCF-2.029, and discovery materials.

4266. Defendant Southron then advised the Plaintiff that he should not dismiss the Florida Whistleblower lawsuit, and insisted that the Plaintiff allow Southron to amend the complaint to bring separate charges against individuals involving the alleged perjury in the USPTO.

4267. Defendant Southron then tried to withdraw from representation because the Plaintiff instead of properly dismissing the complaint, to damage the Plaintiff's position further in the Florida Whistleblower lawsuit.

4268. Defendant Southron had a fiduciary duty to the Plaintiff to properly litigate the Florida Whistleblower lawsuit. Instead, Defendant Southron took deliberate actions to damage the Plaintiff's position in the lawsuit, preparing an improper complaint, and threatening to withdraw without properly dismissing the case when the Plaintiff refused to let Southron file the improper complaint.

4269. The Plaintiff was damaged by Defendant Southron's breach of fiduciary duty, and was forced to cease his company's business operations, and has lost all value in his company. Defendant Southron is liable for the damages, and

the Plaintiff is entitled to punitive damages for his intentional and malicious actions.

**Count 7: Defendant Kevin Keeling.**

4270. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 4183 and Exhibit 8-10, 16, 19 of this Complaint as though fully set forth herein.

4271. The Plaintiff hired Defendant Keeling along with Mark Solomon, in or about January, 2021, at the recommendation of Robin Foret, and after Keeling and Solomon confirmed that their review of the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

4272. Defendant Keeling assisted the Plaintiff to dismiss the Florida Whistleblower proceeding, by reviewing the dismissal orders that were prepared by Joe Southron and providing legal explanations as to why what Southron had prepared could be damaging to the Plaintiff.

4273. However, following the dismissal of the Florida Whistleblower lawsuit, Kevin Keeling refused to take the actions he had promised, and refused to take any action to correct past USPTO declarations.

4274. Instead, Defendant Keeling refused to take action and allowed attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company from about April, 2021 into or about February, 2021, totaling an estimated six patent applications or more, while refusing to take action to protect the applications.

4275. Defendant Keeling knew the Plaintiff owned and had a business relationship with sdPhotonics, and yet took steps to damage the business operations of the Plaintiff's company by allowing other attorneys to file false declarations of ownership on sdPhotonics' patent applications, to prevent the Plaintiff from benefiting from the business relationship.

4276. The Plaintiff was damaged by Defendant Keeling's tortious interference with the Plaintiff's business operations, was forced to cease his company's business operations, and has lost all value in his company.

4277. The Plaintiff was damaged by Defendant Keeling's breach of fiduciary duty, and the Plaintiff is entitled to punitive damages for his intentional and malicious actions.

**Count 8: Defendant Solomon.**

4278. Plaintiff realleges and incorporates paragraphs 517-519, 528-544, 598-599, 4183 and Exhibit 8-10, 16, 19 of this Complaint of this Complaint as though fully set forth herein.

4279. Plaintiff hired Defendant Solomon and his associate or partner, Kevin Keeling, in or about January, 2021, at the recommendation of Robin Foret.

4280. Defendant Solomon confirmed in his review of records from the Florida Whistleblower lawsuit, that the USPTO declarations filed by Sandra Sovinski constituted perjury and breach of the 2014 IP Agreement.

4281. Defendant Solomon informed the Plaintiff that Solomon could assist the Plaintiff with legal works to correct the false declarations at issue that had been filed by Sandra Sovinski into the USPTO.

4282. However, after obtaining a power of attorney from the Plaintiff, Solomon refused to take actions to correct the false declarations that Solomon had already determined constituted fraud and perjury in the USPTO.

4283. Defendant Solomon claimed instead that since Solomon had a doctorate, he knew what he was doing, and the Plaintiff should not question Defendant Solomon about not making corrections to the false declarations at issue, as Solomon had promised before obtaining the power of attorney.

4284. Instead of correcting the false declarations that had been filed by Sovinski into the USPTO, Defendant Solomon used his power of attorney to allow other attorneys working with UCF to file additional declarations on the new USPTO patent applications filed by the Plaintiff or his company.

4285. Defendant Sololom had a fiduciary duty to the Plaintiff and his company to protect the patents for which Solomon was issued the power of attorney. Instead, Solomon intentionally damaged the Plaintiff's patents by letting other attorneys file on those patterns, and caused damage to the Plaintiff's company.

4286. Defendant Solomon breached his fiduciary duty to the Plaintiff, and the Plaintiff was forced to cease his company's business operations, and has lost all value in his company. Defendant Solomon is liable to the Plaintiff for the damages

caused by his breach of fiduciary duty, and the Plaintiff is entitled to punitive damages for his intentional and malicious actions.

## THIRTEENTH CAUSE OF ACTION
**Breach of Contract. Defendant: Sweetapple.**

4287. The Plaintiff realleges and incorporates paragraphs 284-293, 319-321, 330-333, 355-372, 630-641, and Exhibits 3-14 of this Complaint as though fully set forth herein.

4288. The elements of breach of contract in Florida are: 1) Plaintiff and Defendant entered into a contract; 2) Plaintiff did all, or substantially all, of the essential things which the contract required him to do; 3) Defendant failed to execute essential functions with the contract required, or the Defendant performed an action that was prohibited by the contract, and that prohibition was essential to the contract; and 4) The Plaintiff was harmed by that failure or performance of an action prohibited by the contract.

4289. The Plaintiff entered into a contract with Sweetapple to file the complaint and litigate the Florida Whistleblower Case No. 2019-CA-015042-O. The case was filed on December 12, 2019.

4290. As part of the contract, the Plaintiff agreed to pay Sweetapple an hourly rate for legal services Sweetapple provided in performing the litigation and invoiced to the Plaintiff.

4291. The Plaintiff prepared discovery responses to requests that Plaintiff provided to Sweetapple.

4292. The Plaintiff paid all invoices from the Sweetapple law firm.

4293. Plaintiff performed all, or substantially all, essential things the Plaintiff's contract with Sweetapple required the Plaintiff to do.

4294. In or about the end of May, 2020, Robert Sweetapple informed the Plaintiff that the opposing counsel, Jeffrey Weiss, had stayed the Florida Whistleblower proceedings.

4295. Sweetapple claimed at that time in or about May, 2020, that he would not serve the opposing counsel the discovery responses the Plaintiff had prepared, because Weiss had stayed the proceedings.

4296. In or about August, 2020, Weiss filed a motion to compel that falsely claimed Weiss or his law-firm had spoken to the Plaintiff, and Plaintiff had refused the UCF discovery requests.

4297. After discovering the false motion to compel on the court's docket that Weiss had filed, the Plaintiff instructed Sweetapple to serve Weiss the discovery requests the Plaintiff had prepared, but Sweetapple refused to do so.

4298. The Plaintiff then notified Sweetapple that his services and the agreement were terminated, and instructed Sweetapple to cease work on the case.

4299. Sweetapple responded to the Plaintiff that he refused the termination, and informed the Plaintiff that he and the Sweetapple law-firm would not cease work on the matter.

4300. Sweetapple then continued to work with Weiss attempting to set a hearing for the false motion to compel that Weiss had filed.

4301. The contract term 8 provided the Plaintiff the right to terminate the agreement at any point in the Florida Whistleblower proceedings and for Sweetapple and his law-firm to cease work on the matter upon notice of the termination. Term 8 from the contract is shown below:

**8.** CLIENT has the right to terminate this agreement at any point in these proceedings of this matter. Upon notice of termination of agreement attorneys will cease work on the matter and provide billing for work performed only up to termination.

4302. Defendant Sweetapple refused to cease work on the matter when given the Plaintiff gave him notice of termination.

4303. Defendant Sweetapple breached the contract he had with the Plaintiff, and the Plaintiff was harmed by Sweetapple's actions, which prevented the Plaintiff from properly asserting his rights to his inventions and damage to his company, sdPhotonics.

4304. Sweetapple intentionally breached the contract to damage the Plaintiff's position in the Florida Whistleblower proceedings by his actions with Weiss involving the false motion to compel. The Plaintiff was forced to cease operations of his company because Sweetapple refused to properly litigate the case, and breached his contract trying to damage the Plaintiff's position in the lawsuit. Plaintiff is entitled to compensatory damages and consequential damages to him and his property, sdPhotonics.

4305. Defendant Sweetapple acted maliciously, taking actions to intentionally prevent the evidence of the perjury in the USPTO from entering the

proceedings of the Florida Whistleblower lawsuit. Plaintiff is entitled to punitive damages for Defendant Sweetapple's malicious actions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Dennis Deppe respectfully requests a jury trial and that this Court as a result enters judgement against the Defendants, that grants the Plaintiff following relief and compensation for damages:

4306. Monetary damages according to Defendants' legal liabilities to Plaintiff for damages that follow:

a. Plaintiff's reduced or lost economic benefit from the value in his ownership of sdPhotonics. sdPhotonics had an annual revenue of ~$1,000,000/yr. at the time Defendants took their actions in filing retroactive false ownership documents with the USPTO. In this time period Plaintiff was in discussions with potential investors and partners that placed a valuation on the Plaintiff's company of approximately $25,000,000. The Plaintiff's damages due to loss of value of his company is approximately $25,000,000.

b. Plaintiff's reduced or loss of economic benefit of salary due to employment with sdPhotonics. The past or imminent damages include $250,000 annual income totaling $225,000 in year 2022, $262,500 for 2023, and future damages of loss of salary including anticipated raises of at least 3% in 2024 and onward for next ten years until 2034. The total anticipated income loss is $3,587,046.

c. Plaintiff's reduced or loss of economic benefit from royalty earnings expected from sdPhotonics' licensing revenue of the oxide-free VCSEL inventions estimated to amount to $50,000 beginning in 2023, $300,000 in 2024, $500,000 in years 2025 through 2037 after that in which sdPhotonics remains unable to return to business operations. Plaintiff's lost royalties from sdPhotonics is estimated to total $6,850,000.

d. Plaintiff's reduced or loss of economic benefit from royalty earnings from UCF licensing revenue earned from the intellectual property of the oxide-free VCSEL inventions. The UCF royalty sharing in 2017 was 50% of royalties earned by the university from $1 to $100K, 40% of royalties earned by the university from $101K to $200K, 30% of royalties earned by the university greater than $200K. The Plaintiffs' lost royalties are estimated to amount to $50,000 for year 2022, $60,000 beginning in 2023, $75,000 in 2024, and $100,000 in 2025, $150,000 in 2025, $200,000 in 2026 and beyond until 2037. Plaintiff's estimated lost royalties from the university total $2,700,000.

4307. Intentional infliction of emotional distress due to the Defendants' outrageous filing the alleged false documents with repeated engagement in civil conspiracy and perjury with the UPSTO in a near continuous fashion on Plaintiff's company for approximately four years until at least May, 2024.

4308. Punitive damages for Defendants' intentional tortious actions of damaging Plaintiff's company, damaging Plaintiff's professional standing, intentional infliction of emotional distress, and additional punitive damages as determined by the Jury and the Court to be fair and equitable under the law.

4309. Plaintiff's reasonable attorneys' fees, costs and other costs and disbursements in this action.

4310. Granting such other and further and additional relief including monetary damages to the Plaintiff as the Jury and Court deems just and proper.

Respectfully submitted this 1st day of December, 2025.

/s/ Dennis G. Deppe
DENNIS G. DEPPE, PRO SE
5749 Aloma Woods Blvd.
Oviedo, FL 32765
Telephone: (407) 929-1062
E-Mail: dennisdeppe01@gmail.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 1st day of December, 2025, I filed the foregoing through courthouse at the U.S. District Court Middle District of Florida Electronic that will provide electronic service to defendants counsels through the CM/ECF electronic system, and separately by email to rforet@texaslaborlaw.com.

/s/ Dennis G. Deppe
DENNIS G. DEPPE, PRO SE
5749 Aloma Woods Blvd.
Oviedo, FL 32765
Telephone: (407) 929-1062
E-Mail: dennisdeppe01@gmail.com